## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | |
|---|---|
| STATE OF TEXAS,<br><br>　　　　*Plaintiff*,<br><br>v.<br><br>THE UNITED STATES OF AMERICA; MIGUEL CARDONA, in his official capacity as Secretary of Education; UNITED STATES DEPARTMENT OF EDUCATION; CATHERINE LHAMON, in her official capacity as Assistant Secretary for Civil Rights, Department of Education; RANDOLPH WILLS, in his official capacity as Deputy Assistant Secretary for Enforcement, Department of Education,<br><br>　　　　*Defendants*. | No. _____ |

---

### State of Texas's Original Complaint

---

1. Through an exercise in notice-and-comment rulemaking ordered by President Biden, the U.S. Department of Education has attempted to effect radical social change in our Nation's schools by purporting to "interpret" Title IX of the Education Amendments Act of 1972 to prohibit discrimination based on sexual orientation and gender identity. Stymied in its attempts to implement this agenda through informal agency guidance, and unable to amend Title IX through the legislative process, the Department has now formally amended the Code of Federal Regulations. This Final Rule tells States and other regulated parties that they must ignore biological sex or face enforcement actions and the loss of federal education funding.

2.      Contrary to the Department's assertions, the Supreme Court's decision in *Bostock v. Clayton County*, 590 U.S. 644 (2020), does not require—or even allow—these interpretations. *Bostock* held only that terminating an employee "simply for being homosexual or transgender" constitutes discrimination "because of … sex" under Title VII. *Id.* at 649–51, 655 (quoting 42 U.S.C. § 2000e-2(a)(1)). The Court "assum[ed]" that the term "sex" means "biological distinctions between male and female," *id.* at 655, and it made clear that its decision did not "sweep beyond Title VII to other federal or state laws that prohibit sex discrimination" or address other issues not before the Court such as "sex-segregated bathrooms, locker rooms, and dress codes." *Id.* at 681.

3.      In addition, the new regulations promise to repeat the disaster that was the Department's ill-advised 2011 Dear Colleague Letter, which had a detrimental impact on publicly funded education across the country, including in Texas. The Final Rule walks back many of the constitutional safeguards issued by the Trump Administration to ensure that students accused of harassment have access to a fair hearing. At the same time, the Final Rule redefines harassment to include constitutionally protected activity. Not only does this put Texas schools in a no-win situation—where adherence to the Constitution risks the loss of federal funds—but students and faculty risk having their futures upended merely for refusing to go along with the Biden Administration's radical agenda.

4.      The Final Rule violates the Administrative Procedure Act (APA). 5 U.S.C. § 706. It is substantively unlawful because its purported "interpretations" of Title IX squarely conflict with the text of that statute. Title IX, by its plain text, defines "sex" as "one sex" that is male or female. *See* 20 U.S.C. § 1681(a)(5) (describing those institutions which have a policy of admitting "only students of one sex"). The Department of Education, furthermore, engaged in arbitrary-and-capricious decisionmaking when promulgating these regulations because it failed to define the amorphous concepts of "gender identity" and "sexual orientation," failed to adequately consider all relevant factors, and failed to adequately explain its reversal of past policies.

2

5.      Title IX does not apply to discrimination based on sexual orientation or gender identity. But even if those concepts were protected against discrimination by Title IX, the Final Rule's provisions do not faithfully implement such protections because they mark as unlawful school policies that do not discriminate based on those concepts—instead, the Final Rule *requires* schools to discriminate based on sexual orientation and gender identity by allowing single-sex programs and facilities but requiring opposite-sex access to them for only those individuals with a transgender gender identity.

6.      The Court should postpone the effective date of the Final Rule under 5 U.S.C. § 705 and preliminarily enjoin the Defendants from implementing the Final Rule or interpreting Title IX to cover discrimination based on sexual orientation or gender identity. And the Court should ultimately declare and hold unlawful the Final Rule, set it aside under 5 U.S.C. § 706(2)(A) (*i.e.*, vacate it), and permanently enjoin the Defendants from implementing or enforcing it and from interpreting Title IX in this way.

## I.      Parties

7.      Plaintiff Texas is a sovereign State of the United States.

8.      Defendant the United States of America is the federal sovereign and is sued under 5 U.S.C §§ 702–03 and 28 U.S.C. § 1346.

9.      Defendant Miguel Cardona is the Secretary of the Department of Education. He is sued in his official capacity.

10.      Defendant the Department of Education is a cabinet-level executive branch department of the United States. It is responsible for administering most federal assistance to education; it administers and enforces Title IX.

11.      Defendant Catherine Lhamon is the Assistant Secretary for Civil Rights at the Department of Education. She is sued in her official capacity.

12.      Defendant Randolph Wills is the Deputy Assistant Secretary for Enforcement at the Department of Education. He is sued in his official capacity.

## II.      Jurisdiction and Venue

13.      The Court has federal-question jurisdiction under 28 U.S.C. § 1331 because this suit concerns the scope of the Department's authority under Title IX, and it also arises under the APA, 5 U.S.C. §§ 702–703.

14.      Venue lies in this district under 28 U.S.C. § 1391(e)(1) because the Defendants are agencies of the United States and officers of the United States in their official capacities; Texas resides in this district; and a substantial part of the events or omissions giving rise to Texas's claims arose in this district.

## III.      Background

### A.  Prior Regulatory Context

15.      During the Obama Administration, the Department issued its misguided 2011 Dear Colleague Letter and 2014 Questions and Answers on Title IX Sexual Violence. *See* Russlynn Ali, OCR, U.S. Dept. of Educ., Dear Colleague Letter: Sexual Violence (Apr. 4, 2011), https://bit.ly/4bgTX1Y; U.S. Dept. of Educ., *Questions and Answers on Title IX and Sexual Violence* (Apr. 29, 2014), https://bit.ly/44ixq2u. Although neither underwent notice and comment rulemaking, the two guidance documents put recipients in a no-win situation where either conforming or failing to conform to the guidance documents would expose them to significant risk of litigation.

16.      The Dear Colleague Letter and 2014 Questions and Answers had a detrimental impact on publicly funded education nationwide, including in Texas. Not only did the two guidance documents introduce significant confusion over academic institutions' obligations under Title IX, but they also created incentives for academic institutions to violate students' constitutional rights in order to avoid incurring liability. To offer some context, before 2011, the number of lawsuits filed against universities for failing to provide due process in Title IX cases averaged one per year—by 2019, over 100 such lawsuits were filed in that year alone. *See* Taylor Mooney, *How Betsy DeVos plans to change*

4

*the rules for handling sexual misconduct on campus*, CBS NEWS (Nov. 24, 2019), https://cbsn.ws/4dib1GD.

17.    In response to growing criticism, under the Trump Administration, the Department rescinded both the Dear Colleague Letter and the 2014 Questions and Answers in 2017. It soon became apparent, however, that the withdrawal could not repair the damage caused by the two guidance documents on its own. *See* Candice Jackson, OCR, U.S. Dept. of Educ., Dear Colleague Letter (Sept. 9, 2017). As the Department later explained, neither action "require[ed] or result[ed] in wholesale changes to the set of expectations guiding recipients' responses to sexual harassment." 85 Fed. Reg. at 30,029. Hence, many, if not most, recipients "chose not to change their Title IX policies and procedures" as a precaution against stigma and liability. *Id.*

18.    The Department, therefore, initiated a round of notice-and-comment rulemaking, after which it published a comprehensive set of regulations governing recipients' obligations to prevent sex discrimination in their programs and activities. *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30,026 (May 19, 2020) (the "2020 Regulations"). The 2020 Regulations took effect on August 14, 2020.

19.    The 2020 Regulations addressed at least three significant ambiguities in the earlier guidance:

      a.  *First*, the 2020 Regulations clearly demarcated, for the first time, the outer boundaries of recipients' obligations and liability under Title IX with respect to sexual harassment.

      b.  *Second*, the 2020 Regulations clarified the standard under which conduct or speech could constitute sex-based harassment—namely, that it be "so severe, pervasive, and objectively offensive that it effectively denies a person equal access." 85 Fed. Reg. at 30,574.

c. *Third*, the 2020 Regulations reaffirmed the primacy of the U.S. Constitution and adopted multiple safeguards to ensure that Title IX enforcement protected the rights and interests of all parties to a disciplinary proceeding.

20.    The 2020 Regulations also addressed the question of whether discrimination "on the basis of sex" encompassed sexual orientation and gender identity. Although the Department declined to define "sex" in the 2020 Regulations because it was not necessary to effectuate the rules and would have consequences that extended outside of the proposed rulemaking, the Department noted that "Title IX and its implementing regulations include provisions that presuppose sex as a binary classification." It further observed that "provisions in the Department's current regulations, which the Department did not propose to revise in this rulemaking, reflect this presupposition." 85 Fed. Reg. at 30,178.

**B. The Final Rule**

21.    From the start, President Biden opposed the 2020 Regulations, stating on the campaign trail that he would order the Department to put a "quick end" to the 2020 Regulations if elected. *See* Joe Biden, *Statement on the Trump Administration Rule to Undermine Title IX and Campus Safety* (May 6, 2020), http://bit.ly/3UDREj9.

22.    Not seven months after the 2020 Regulations became effective, President Biden followed through on that campaign promise. He issued an executive order charging the Secretary of Education to review "all existing regulations, orders, guidance documents, policies, and any other similar agency actions" for consistency with his administration's Title IX policy. Executive Order 14021, 86 Fed. Reg. 13,803 (Mar. 11, 2021), http://bit.ly/4aWLPUI.

23.    In that executive order, President Biden presupposed that "on the basis of sex" included sexual orientation or gender identity. *Id.* The Department conducted its review and subsequent rulemaking bound by President Biden's instruction that Title IX

should be interpreted as encompassing sexual orientation and gender identity notwithstanding decades of precedent to the contrary.

24.    On July 12, 2022, the Department published in the Federal Register a notice of proposed rulemaking to amend the 2020 Regulations. *See* Notice of Proposed Rulemaking, Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 87 Fed. Reg. 41,390 (July 12, 2022). Texas, through its Attorney General and Governor, submitted multiple comments before the 60-day comment period for the Proposed Rule closed on September 12, 2022.

25.    In its comments, Texas highlighted the burden the proposed regulations would impose on the State, as well as the risk the regulations posed to constitutional rights. The comments explained that the combination of expanding recipients' obligation to respond to sex discrimination, while simultaneously lowering the threshold of what fell within that description, meant, in practice, that recipients would hyper-police interactions among students, parents, and faculty for fear of being found noncompliant if individuals affiliated with the recipient failed to recognize each person's highly individualized, potentially fluid, and unverifiable gender identity.

26.    The comments further noted that much of proposed rule represented a significant departure from the Departments' past policies, yet the changes were neither adequately explained nor grounded in the text, structure, or purpose of Title IX. As an example, the Department hinged its redefinition of sex to include sexual orientation and gender identity almost entirely on the U.S. Supreme Court's opinion in *Bostock*. However, as Texas pointed out in its comments, *Bostock* involved an unrelated statute that was enacted nearly a decade earlier, pursuant to a different constitutional power, and did not address questions involving "sex segregated bathrooms, locker rooms, and dress codes" — all of which were not before the Court but appeared in the proposed rule.

27.    Despite these deficiencies, the Department pushed forward and published the Final Rule in the Federal Register on April 29, 2024. *See* Nondiscrimination on the

Basis of Sex in Education Programs or Activities Receiving Financial Assistance, 89 Fed. Reg. 33,474 (Apr. 29, 2024). The Final Rule purports to preempt all "State or local laws or other requirements" that conflict with its terms, 89 Fed. Reg. at 33,885, and it applies to any school "program or activity" regardless of whether the activity occurs within the school— or even within the United States. 89 Fed. Reg. at 33,886 (to be codified at 34 C.F.R. § 106.11).

### Redefining "On the Basis of Sex"

28.     Title IX states, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

29.     For the entire half century since its enactment, both the Department and recipients have understood Title IX's prohibition on sex discrimination to refer to a person's *biological sex*. Notwithstanding this history, the Final Rule redefines Title IX's prohibition on sex discrimination to include "discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity." 89 Fed. Reg. 33,886 (to be codified at 34 C.F.R. § 106.10).

30.     In accordance with the Department's reinvention of Title IX, the Final Rule threatens to withhold federal funding from schools that do not allow students access to "restrooms and locker rooms" and comply with any "appearance codes (including dress and grooming codes)" based on gender identity. *See, e.g.*, 89 Fed. Reg. at 33,816. The Final Rule dictates that a school violates Title IX's nondiscrimination prohibition if a transgender student is denied access to a bathroom or locker room of the opposite biological sex. *See, e.g.*, 89 Fed. Reg. at 33,818.

31.     "The Department cannot enforce Title IX in a manner that requires recipients to restrict any rights protected under the First Amendment."85. Fed. Reg. 30,071. But under the Final Rule, recipients have an obligation under the Final Rule to

8

"take specific actions … to promptly and effectively prevent sex discrimination," including what the Final Rule defines as sex-based harassment. 89 Fed. Reg. at 33,887. It follows that recipients would have an obligation under the Final Rule to confront students and employees who refuse to affirm someone's gender identity, up to and including disciplinary proceedings, or risk being found in noncompliance with Title IX.

32.     The Final Rule also institutes a new, lower standard for sexual harassment. The Final Rule stipulates that "[s]ex-based harassment, including harassment predicated on sex stereotyping or gender identity, is covered by Title IX if it is sex-based, unwelcome, subjectively and objectively offensive, and sufficiently severe *or* pervasive to limit or deny a student's ability to participate in or benefit from a recipient's education program or activity." 89 Fed. Reg. at 33,516 (emphasis added).

33.     In adopting this standard, the Final Rule expands Title IX's prohibition on sex-based harassment, contrary to Supreme Court precedent. *Compare, e.g.*, 89 Fed. Reg. 33,498*, with Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 649–50 (1999).

34.     Under *Davis*, the Supreme Court held that Title IX's proscriptions included sexual harassment "that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." 526 U.S. at 650. The Final Rule ignores this precedent and institutes a sweeping new standard that would subject students, faculty, and staff to onerous investigations if they fail to use a transgender student's preferred pronouns.

35.     The 2020 Regulations purposefully adopted the *Davis* standard, "to ensure that speech and expression are prohibited only when their seriousness and impact avoid First Amendment concerns." 85. Fed. Reg. 30142. The Final Rule departs from this policy but fails to adequately justify the Department's about-face; nor does it explain how the looser standard conforms to the Constitution. The reason given by the Department is simply that the Defendants "believe[] a broader standard is appropriate." 89 Fed. Reg. at 33,498.

9

36.     The Final Rule also lacks objective standards, making every complaint subjective, not limited to those who visibly identify as transgender but broadly encompasses anyone who may even only temporarily or intermittently so identify, *see* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 451 (5th ed. 2013) (defining "transgender" to include "individuals who transiently" identify one way), or those with nefarious intentions who are merely seeking access to a schoolgirls' bathroom or locker room for predatory purposes.

37.     The Final Rule is therefore ambiguous, overbroad, and vague, and fails to adequately notify schools of adequate compliance to avoid onerous investigations.

### Misguided Reliance on *Bostock*

38.     The Department lacks the legal justification to initiate and support such radical departures in the interpretation of Title IX. The Department rests its redefinition of sex discrimination almost entirely on the U.S. Supreme Court's opinion in *Bostock*. But that case's "reasoning applies only to Title VII, as *Bostock* itself and [] subsequent cases make clear." *L.W. ex rel. Williams v. Skrmetti*, 73 F.4th 408, 420 (6th Cir. 2023) (Sutton, C.J.).

39.     To start with, Title VII prohibits employment discrimination "because of such individual's … sex[]," 42 U.S.C. § 2000e-2(a), but Title IX prohibits education discrimination "on the basis of sex," 20 U.S.C. § 1681(a). The statutes thus contain different language with different results for different contexts. *Neese v. Becerra*, 640 F. Supp. 3d 668, 675–84 (N.D. Tex. 2022) (Kacsmaryk, J.) (*Bostock* and its reasoning do not apply to Title IX). And "*Bostock* … was limited only to Title VII itself" and "d[id] not stretch to [other statutes]." *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021); *see also Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 808 (11th Cir. 2022) (en banc) (holding that *Bostock*'s reasoning applies only to Title VII, and describing the argument that it applies to Title IX as "faulty").

40.     Defendants conflate Title IX's prohibition of discrimination "on the basis of sex," 20 U.S.C. § 1681(a), with Title VII's prohibition on discrimination "because of … sex," 42 U.S.C. § 2000e-2(a)(1). But the *Bostock* court ruled that the phrase "because of" in Title VII mandated a sweeping but-for causation requirement. *Bostock*, 590 U.S. at 656. The U.S. Supreme Court has tendered no such ruling regarding the phrase "on the basis of sex" as used in Title IX. 20 U.S.C. § 1681(a). To the contrary. "On the basis of sex" references to one's "biological sex." It does not mean does not mean "on the basis of gender identity" or "on the basis of sexual orientation."

41.     Indeed, even though Title IX provides that recipients of federal funding for education programs or activities shall not discriminate "on the basis of sex," 20 U.S.C. § 1681(a), Title IX explicitly authorizes separation based on sex in certain situations, including "maintaining separate living facilities for the different sexes," 20 U.S.C. § 1686, and specified single-sex educational institutions, organizations, activities, and scholarship awards, 20 U.S.C. § 1681(a). These exceptions presume—and only make sense in the context of—biological sex.

42.     In any event, the Final Rule misinterprets the holding of *Bostock*, 590 U.S. 644, and the definition of "sex" discrimination adopted by the *Bostock* majority. *Bostock* does not hold that discrimination on account of "sexual orientation" or "gender identity" is discrimination on account of "sex." *Bostock* holds only that Title VII's prohibition on "sex" discrimination prohibits employers from firing or refusing to hire individuals "for being homosexual or transgender."

43.     *Bostock* explains that an employer who fires an employee for conduct or personal attributes that it would tolerate in a person of the opposite biological sex has made the employee's sex the "but-for cause" of his discharge, and that (in the Court's view) automatically violates the statutory command of Title VII. The Court explained:

> If the employer fires the male employee for no reason other than the fact he
> is attracted to men, the employer discriminates against him for traits or

actions it tolerates in his female colleague. Put differently, the employer intentionally singles out an employee to fire based in part on the employee's sex, and the affected employee's sex is a but-for cause of his discharge. Or take an employer who fires a transgender person who was identified as a male at birth but who now identifies as a female. If the employer retains an otherwise identical employee who was identified as female at birth, the employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth. Again, the individual employee's sex plays an unmistakable and impermissible role in the discharge decision.

*Bostock*, 590 U.S. at 660.

44. *Bostock* also makes clear that an employer does *not* violate Title VII or engage in "sex" discrimination if it fires an employee for conduct or personal attributes that it would not tolerate in an employee of the opposite biological sex:

Take an employer who fires a female employee for tardiness or incompetence or simply supporting the wrong sports team. Assuming the employer would not have tolerated the same trait in a man, Title VII stands silent.

*Bostock*, 590 U.S. at 660

45. *Bostock* does not prohibit employers (or anyone else) from discriminating on account of sexual orientation or gender identity, so long as they do not engage in "sex" discrimination when doing so. For example, *Bostock* does not prohibit Title IX recipients from discriminating against bisexual students or individuals, so long as the covered entity regards bisexual behavior or orientation as equally unacceptable in a man or a woman. *See, e.g.*, *Bostock*, 590 U.S. at 660; *see also id.* at 658 ("[F]iring [a] person for actions or attributes it would tolerate in an individual of another sex … discriminates against that person in violation of Title VII.").

46. Discrimination against bisexuals is certainly discrimination on account of "sexual orientation," but it is not discrimination on account of "sex."

47.     *Bostock* allows discrimination against homosexual or transgender individuals, so long as it is done pursuant to rules or policies that apply equally to both sexes and would lead to the same result if the individual's biological different were different.

48.     A teacher or professor, for example, may refuse to accommodate a transgender or non-binary student's demands to be referred to by the singular pronoun "they"—so long as the teacher or professor refuses demands for such pronoun usage on equal terms from a biological male or a biological woman, and would equally refuse to honor the transgender or non-binary student's request if that student's biological sex were different.

49.     Even if the Department considers policies or practices of that sort to be regarded as discrimination against transgender or non-binary individuals, they do not constitute "sex" discrimination as defined in *Bostock* because the rules apply equally to both biological sexes. *See Bostock*, 590 U.S. at 669 ("We agree that homosexuality and transgender status are distinct concepts from sex.").

50.     The Final Rule wrongly equates discrimination on account of sexual orientation and gender identity with "sex" discrimination. Yet there are many ways in which entities covered by Title IX can discriminate against homosexual, bisexual, transgender, or non-binary individuals without engaging in "sex" discrimination as defined in *Bostock*.

51.     The Final Rule further conflicts with the reasoning of *Bostock* because that case did not find that all sex-based distinctions were prohibited. *Bostock* repeatedly cited the Court's earlier decision in *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998), as authority. *Oncale* explained that Title VII "does not reach genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex," and "requires neither asexuality nor androgyny in the workplace." *Id.* at 81.

13

52.     The *Oncale* Court noted the central concern of Title VII was not every aspect of interaction in the workplace but "whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Id.* at 80 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 25 (1993) (Ginsburg, J., concurring)).

53.     The Second Circuit—in one of the cases consolidated with and affirmed in *Bostock*—also favorably cites *Oncale* as "arguably" supporting the view that "sex-specific bathroom and grooming policies [do not] impose disadvantageous terms or conditions" because not all distinctions of "'sexual content or connotations' rise to the level of discrimination." *Zarda v. Altitude Express, Inc.,* 883 F.3d 100, 119 & n.16 (2d Cir. 2018) (en banc) (quoting *Oncale*, 523 U.S. at 79–80)); *see also West v. Radtke*, 48 F.4th 836, 849 (7th Cir. 2022) (finding Title VII would not be violated by preventing transgender prison guard from performing strip searches of opposite-sex inmates).

54.     Relatedly, *Bostock* also cautioned that "Title VII does not concern itself with everything that happens 'because of' sex," 590 U.S. at 657—only discrimination that is "inextricably" related to sex is forbidden; distinctions "related to sex in some vague sense" or having only "some disparate impact on one sex or the other" are not reached by the statute. *Id.* at 660–61.

55.     *Bostock* did not overturn any Supreme Court precedents, instead resting on those dating to the 1970s. It also did not disturb lower-court precedent that has long applied those same precedents. "[T]the Court relied in *Bostock* on the same well established Title VII principles that animated the outcome in those prior decisions [of lower courts that applied the same key precedents, so those courts] effectively anticipated *Bostock*'s rationale." *Maner v. Dignity Health*, 9 F.4th 1114, 1124 (9th Cir. 2021) (Bea, J.) (explaining *Bostock* did not overturn decades of lower-court precedents rejecting "paramour preference" theory of liability).

56.     This is consistent with *Willingham v. Macon Tel. Publ'g Co.*, 507 F.2d 1084 (5th Cir. 1975) (en banc), which upheld sex-specific grooming codes under Title VII. *Willingham* applied *Phillips v. Martin Marietta Corp.*, 400 U.S. 542 (1971), one of the key cases the Supreme Court relied on in *Bostock*. The Second Circuit in *Zarda*— which relied on the same key precedents that the Supreme Court would later adopt in *Bostock* (*Martin Marietta* and *L.A. Dep't of Water & Power v. Manhart*, 435 U.S. 702 (1978))—favorably cited *Willingham* as consistent with its analysis, 883 F.3d at 118–19.

57.     In short, *Bostock* did not nullify the Supreme Court's longstanding acceptance of differences between the sexes. It did not question any longstanding precedent beyond the narrow question before it: whether "[a]n employer who fires an individual *merely for being* gay or transgender defies the law." *Bostock*, 590 U.S. at 683 (emphasis added).

### The Clear Statement Rule and the Major Questions Doctrine

58.     Even if there were ambiguity on whether Title IX adopts the Final Rule's definition of discrimination "on the basis of sex," that ambiguity must be resolved in favor of the State because conditions on federal funding must be stated clearly. *Adams*, 57 F.4th at 815.

59.     Congress enacted Title IX pursuant to its powers under the Spending Clause. *Davis*, 526 U.S. at 640 ("[W]e have repeatedly treated Title IX as legislation enacted pursuant to Congress' authority under the Spending Clause[.]"). If Congress intends to impose a condition on the grant of federal funding under Title IX, it must do so with "a clear voice," "unambiguously." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).

60.     This clear statement rule is required when imposing a condition on federal funding because "legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed

conditions." *Adams*, 57 F.4th at 815 (citing *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 17 (1981). "Recipients cannot knowingly accept the deal with the Federal Government unless they would clearly understand the obligations that would come along with doing so." *Cummings v. Premier Rehab Keller, PLLC*, 596 U.S. 212, 219 (2022) (internal quotations omitted).

61.     The use of the word "sex" in Title IX did not put educational institutions and programs on notice that by accepting funding from the federal government for educational services and activities, they are prohibited from providing bathrooms or other facilities for the two sexes. *See Adams,* 57 F.4th at 816. That is clear not only from historical practice but from Defendants' longstanding interpretation of Title IX and its implementing regulations, which "include provisions that presuppose sex as a binary classification." 85 Fed. Reg. at 30,178.

62.     Similarly, courts will not assume that Congress has assigned questions of "deep economic and political significance" to an agency unless Congress has done so expressly. *See King v. Burwell*, 576 U.S. 473, 486 (2015); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000).

63.     "We expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance." *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021) (quoting *Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014)).

64.     "Congress typically [does not] use oblique or elliptical language to empower an agency to make a radical or fundamental change to a statutory scheme …We presume that Congress intends to make major policy decisions itself, not leave those decisions to agencies." *Id.* (cleaned up); *see also Brown & Williamson Tobacco Corp.*, 529 U.S. at 160.

65.     The Final Rule will affect all elementary schools, secondary schools, postsecondary institutions, and other recipients of federal financial funds with far-reaching social and economic impact. Yet Title IX's language cannot be plausibly read to smuggle in

a power for federal agencies to overturn the "unremarkable—and nearly universal—practice[s]" common in States' governance of schools. *Adams*, 57 F.4th at 796.

## If *Bostock* Applies to Title IX, the Final Rule Violates It

66.     In addition, even if Title IX covered discrimination on the bases of sexual orientation and gender identity, the Final Rule interprets Title IX's anti-discrimination provision as requiring accommodations for gender identity even though Title IX—unlike Title VII's prohibition on religious discrimination and the disability discrimination provisions of the Rehabilitation Act and the Americans with Disabilities Act—has no accommodation requirement.

67.     The Final Rule requires exceptions from admittedly lawful sex-segregated policies and facilities for those whose gender identity is transgender—and only for them, as schools would still be allowed to prevent biological males who do not identify as women from entering female-only spaces and programs. *See* Fed. Reg. at 33,818 (under Final Rule, "sex separation in certain circumstances, including in the context of bathrooms or locker rooms, is not presumptively unlawful sex discrimination" but when a school "denies a transgender student access to a sex-separate facility or activity consistent with that student's gender identity, this would violate Title IX's general nondiscrimination mandate"); *id.* at 33,887 (to be codified at 34 C.F.R. § 106.31: where Title IX permits "different treatment or separation in a manner that discriminates on the basis of sex," the Final Rule requires "sex" to be determined by gender identity); *id.* at 33,820 (reasoning that non-transgender students are not harmed by being denied access to sex-separated facilities such as restrooms and locker rooms, so only transgender students are protected by the new 34 C.F.R. § 106.31(a)(2) that prohibits "more than de minimis harm").

68.     Consider standard bathroom norms. All biological males, regardless of their gender identity, may use the men's bathroom; all biological females, regardless of their gender identity, may use the women's bathroom. "Separating bathrooms based on sex

dates back as far as written history will take us," long before the concept of gender identity even existed. *Adams*, 3 F.4th at 1328 (Pryor, C.J., dissenting) (cleaned up), *rev'd*, 57 F.4th 791. These policies do not even consider "gender identity," and therefore cannot be described as discriminating based on that category. *Cf. Raytheon Co. v. Hernandez*, 540 U.S. 44, 54 n.7 (2003) ("[I]f no part of the hiring decision turned on [the applicant's] status as disabled, he cannot, *ipso facto,* have been subject to disparate treatment"). "Separating bathrooms by sex treats people differently on the basis of sex … [but] the mere act of determining an individual's sex, using the same rubric for both sexes, does not treat anyone differently on the basis of sex." *Adams*, 3 F.4th at 1325–26 (Pryor, C.J., dissenting).

69.     The Final Rule purports to allow sex-specific bathrooms, locker rooms, and showers (explicitly) and sex-specific dress codes and pronoun usage policies (implicitly) as a general matter. But it then "tr[ied] to work around [those concessions] with a linguistic device." *Doe 2 v. Shanahan*, 917 F.3d 694, 723 (D.C. Cir. 2019) (Williams, J., concurring in the result) (criticizing plaintiffs' concession that military may have sex-specific standards while arguing that "sex" should be determined by subjective gender identity). It is no consolation to tell schools they can still have sex-specific bathrooms (or dress codes or pronoun usage) so long as they allow exceptions for individuals who subjectively identify as the opposite sex.

70.     If schools may have separate facilities or policies for men and women, as the Final Rule concedes, then they may also require compliance with those policies. *Cf.* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 30, at 192–93 (2012) ("[W]henever a power is given by a statute, everything necessary to making it effectual or requisite to attaining the end is implied.") (citation omitted). The same is true for sex-specific dress codes or allowing the use of gendered pronouns as part of standard English in schools; such policies do not classify based on the gender identity of anyone but disregard that concept altogether, exactly as *Bostock* requires. Indeed, to allow schools to

have sex-specific policies, but then require them to have exemptions only for transgender employees, violates *Bostock* because such a rule discriminates based on gender identity.

### C. The Final Rule's Irreparable Harm to Texas

Texas is harmed by the Final Rule in several ways.

#### OBJECT OF THE REGULATION

71.     Texas administers numerous education programs and operates thousands of educational institutions through its constituent agencies and political subdivisions, including programs and institutions that receive federal funding and are subject to Title IX and its effectuating regulations.

72.     The Texas Constitution charges the Texas Legislature "to establish and make suitable provision for the support and maintenance of an efficient system of public free schools." Tex. Const. art. VII, § 1.

73.     Pursuant to this charge, Texas funds, regulates, and oversees the Nation's second-largest K–12 public education system, serving over 5.4 million students across 1,200 school districts. Tex. Educ. Agency, *Enrollment in Texas Public Schools 2021-22* at ix (June 2022), http://bit.ly/3WcXeeC.

74.     In the 2021-2022 biennium, Texas received approximately $6.6 billion dollars in federal funds for its K-12 education. Tex. Educ. Agency, 2022 *Comprehensive Biennial Report on Texas Public Schools* at 239 (Dec. 2020), https://bit.ly/4a2Y9Bw.

75.     Texas also funds, supports, and administers a robust higher education network. Texas is home to 119 public postsecondary institutions, including 37 universities and 82 two-year colleges and technical schools. *See* Tex. Higher Educ. Coordinating Bd., *2020 Texas Public Higher Education Almanac* at 28, 47 (Sept. 28, 2020), https://bit.ly/3wguAP9.

76.     While most States have just one or two public university systems, Texas has six. The largest of these systems—the University of Texas—has 14 separate locations that

19

educate approximately 256,000 students each year. *See About The University of Texas System*, THE UNIVERSITY OF TEXAS SYSTEM, https://www.utsystem .edu/about. All told, the State's entire higher education network enrolled almost 1.7 million students in 2019. *See 2020 Texas Public Higher Education Almanac*, *supra*, at 13.

77.     Public postsecondary education institutions in Texas received approximately $2.5 billion in federal funding during fiscal year 2022.

78.     As a condition of receiving federal funding, Title IX protections against sex-based discrimination apply to state educational institutions. *See* 20 U.S.C. § 1681. Hence, should Texas, or any of Texas's affiliated academic institutions, deviate from the Department's guidance effectuating Title IX, that departure would invite enforcement actions at the risk of significant monetary penalties, up to and including the loss of federal money.

79.     Texas educational institutions rely on federal funding and will be irreparably harmed if they lose their funding because of their reliance on 50 years of Title IX practice and legal precedent interpreting "on the basis of sex" to mean biological sex, *not* "sexual orientation" and "gender identity."

80.     It is a "fundamental canon of statutory construction" that, "unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning" at the time of enactment. *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)); Scalia & Garner, *supra*, at 16 (same).

81.     No dictionary at the time Title IX was enacted defined "sex" to include "gender identity" or "sexual orientation." *Adams*, 57 F.4th at 812–13.

82.     Texas, relying on the contemporary (and etymological) meaning of "sex" when Title IX was enacted, adopted laws, policies, and procedures, and significantly invested in an entire infrastructure to implement its education systems. The Final Rule

upends these important reliance interests and usurps Texas's sovereignty by adding "gender identity" and "sexual orientation."

83.     The Final Rule refuses to define "gender identity" and "sexual orientation," nor whether both fixed and fluid identities and orientations are protected.

84.     The Final Rule's protections for an ever-fluctuating number of gender identities and sexual orientations, which individuals can allegedly change at any time, anywhere, and for any reason, undermines Title IX's original sex-based protections. *See United States v. Varner*, 948 F.3d 250, 256–58 (5th Cir. 2020) (examining bewildering assortment of purported gender identities and bespoke pronouns).

85.     Texas independent school districts and Texas public universities are instrumentalities of the State. *See, e.g., Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 660 (Tex. 2008).

86.     Federal funding allocated to Texas's post-secondary public universities, technical educational institutions, health-related educational institutions, and community colleges is managed by the Texas Higher Education Coordinating Board (THECB).

87.     In fiscal year 2022, Texas public universities received more than $3.8 billion in federal funding; Texas community colleges received more than $2.1 billion in federal funds; Texas technical educational institutions received more than $100 million in federal funds; and Texas health-related educational institutions received more than $1.5 billion in federal funds. *See* Texas Higher Education Coordinating Board, Sources and Uses Report, Accessed April 27, 2024, at https://bit.ly/3QmFLww.

88.     The Final Rule threatens to withdraw federal funding from Texas educational institutions. The Department may pursue enforcement actions against educational facilities that are out of compliance with its aberrant interpretation of Title IX and penalize any institution deemed non-compliant by withholding funds. *See* U.S.C. §§ 1681, 1682.

89.     Complying with Title IX costs Texas money. Texas educational institutions undertake internal efforts to ensure compliance with Title IX, including federal regulations promulgated pursuant to Title IX. These efforts involve but are not exhausted by hiring staff to perform compliance reviews, facilitate the Title IX grievance process, and respond to lawsuits that stem from allegations of liability under Title IX protections.

90.     These and other compliance efforts incur considerable expense to State educational facilities. The costs of complying with Title IX will likely increase when the Department of Education adopts new regulations that create additional requirements or make existing requirements more demanding.

91.     Even the Department's low regulatory cost estimates reveal a substantial monetary burden on state educational facilities. Overall, the Department estimates more than $98 million in short-term compliance costs, some of which will fall on Texas schools. *See* 89 Fed. Reg. at 33,861.

92.     Further aspects of the Department's regulatory burden analysis reflect an arbitrary and capricious consideration of relevant information. The Department failed to adequately consider how expanding Title IX to apply to gender identity would impose new regulatory burdens on recipients. With no reasonable explanation, the Department asserts that extending Title IX protections to an entirely new class will not add new compliance costs or create additional liability. *See id.* at 33,876.

93.     Contrary to the Department, responsible deliberation during the rulemaking phase would have concluded that expanding Title IX's anti-discrimination mandate to cover gender identity will likely increase costs for recipients, including Texas educational institutions.

94.     Nor could the Department have reasonably concluded that the new rule would not interfere with local and State governments "in the exercise of their governmental functions." *Id*. at 33,859.

22

## Expansion of Liability under Title IX

95.     Educational institutions are subject to liability for alleged violations of Title IX. *See generally, Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979); *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, (2009). The Final Rule forces a waiver of Texas's sovereign immunity as to certain regulatory requirements without its consent.

96.     The Final Rule greatly expands the scope of Title IX protections, thereby expanding the range of conduct that could give rise to a lawsuit against Texas educational institutions.

97.     The Department's decision to change the definition of "sexual harassment" from one grounded in a solely objective standard to one based on a hybrid objective and subjective standard, *see* 89 Fed. Reg. 33,511, 33,885, opens the door to an upsurge of sexual harassment lawsuits brought against Texas educational facilities.

98.     To comply with the Final Rule, Texas educational facilities must substantially overhaul their existing practices regarding Title IX grievances.

## Infringement on Texas's sovereignty

99.     The Final Rule injures Texas by obstructing its sovereign authority to enforce and administer its laws and by imposing substantial pressure on Texas to change its laws and policies. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982) (impeding a state's sovereign interest in creating and enforcing a legal code was an injury-in-fact sufficient to find standing); *see also Texas v. United States*, 809 F.3d 134, 153 (5th Cir. 2015) ("[S]tates may have standing based on (1) federal assertions of authority to regulate matters they believe they control, (2) federal preemption of state law, and (3) federal interference with the enforcement of state law[.]").

100.    The Final Rule also conflicts with the policies adopted by some of Texas's political subdivisions—pursuant to authority granted by state law—regarding separating school bathrooms and locker rooms by biological sex.  For example, the Carroll, Frisco, and Grapevine–Colleyville Independent School Districts require schools owned or operated by

the districts to separate bathrooms, locker rooms, shower rooms, and other similar facilities based on biological sex determined at birth and correctly identified on a person's birth certificate.

101.    The Final Rule conflicts with each of these policies by treating them as unlawful sex discrimination and by requiring school districts to change their policies to separate bathrooms, locker rooms, showers, and changing facilities based on gender identity instead of biological sex to remain in compliance with the Rule. *See* 89 Fed. Reg. at 33,886 (to be codified at 34 C.F.R. § 106.10).

102.    The Final Rule requires using pronouns that are consistent with a person's gender identity rather than biological sex, which conflicts with policies adopted by some of Texas's political subdivisions and is not required by Texas state law. For example, the Carroll and Grapevine–Colleyville Independent School Districts have adopted policies that prohibit district employees from requiring the use of pronouns that are inconsistent with a person's biological sex as correctly identified on a person's birth certificate or other government-issued record.

103.    The Final Rule conflicts with these policies by treating them as unlawful sex discrimination and by requiring school districts to change their policies to use pronouns based on a person's gender identity instead of biological sex to remain in compliance with the Final Rule. *See* 89 Fed. Reg. at 33,886 (to be codified at 34 C.F.R. § 106.10). Compliance with the Final Rule would expose the school districts to liability for violating district employees' and students' religious freedom and free speech rights, despite district policies protecting those rights.

104.    The Final Rule also conflicts with the policies adopted by some of Texas's political subdivisions regarding school library materials and other instructional resources. For example, Granbury Independent School District has adopted policies regarding the availability of vulgar material in its libraries which arguably conflicts with the Department's intended enforcement of the Rule.

105.     Grapevine-Colleyville Independent School District has adopted a policy prohibiting district personnel and agents from teaching, instructing, training, or otherwise promoting gender fluidity.

106.     Keller Independent School District has adopted a policy prohibiting the inclusion of discussion or depiction of gender fluidity in its instructional resources and library materials.

107.     The Final Rule conflicts with each of the policies by treating them as unlawful sex discrimination and by requiring school districts to change their policies to promote gender fluidity to remain in compliance with the Final Rule. *See* 89 Fed. Reg. at 33,886 (to be codified at 34 C.F.R. § 106.10).

108.     The Final Rule explicitly preempts contrary state laws and directs recipients of Title IX funding to comply with the Final Rule in the event of a conflict with state law. *See* 89 Fed. Reg. at 33,885 (to be codified at 34 C.F.R. § 106.6). These injuries are sufficient to establish Texas's standing.

109.     Texas's injuries are directly traceable to the Final Rule. They would be redressed by the relief sought in this case, which includes preliminarily enjoining Defendants from enforcing the Final Rule and vacating it in its entirety. *See Texas v. EEOC*, 933 F.3d 433, 449 (5th Cir. 2019).

## IV.    Claims

### COUNT I
### The Final Rule Exceeds Statutory Authority
### and is Not in Accordance with Law
### 5 U.S.C. § 706

110.    Plaintiff incorporates by reference all other paragraphs.

111.    Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory … authority, or limitations, or short of statutory right." *See* 5 U.S.C. § 706(2)(A), (C).

112.    The Final Rule is not in accordance with law and exceeds the Department's statutory authority because it relies upon the interpretation of Title VII described in *Bostock* and applies it to Title IX, despite the textual and structural differences between the two statutes and the express disclaimer in *Bostock* that its holding did not apply to other federal or state laws.

113.    The Final Rule is not in accordance with law and exceeds the Department's statutory authority because the plain language of Title IX and its implementing regulations allow recipients of federal education funds to distinguish between biological males and biological females in situations the Final Rule condemns. And the correct interpretation of Title IX's prohibition on discrimination "on the basis of sex" does not include protections for the concepts of sexual orientation or gender identity.

114.    The Final Rule is also not in accordance with law and exceeds the Department's statutory authority because it compels recipients to violate the First Amendment to remain compliant with Title IX. Specifically, the Final Rule discards the definition of sexual harassment initially articulated in *Davis* and adopted by the Department in its 2020 rulemaking, in favor of a weaker standard that encompasses constitutionally protected activity.

115.    The Final Rule also expands recipients' liability far beyond what Title IX allows, such as by reinterpreting the word "sex" to include "sexual orientation" and "gender identity." Hence, not only does the Final Rule fundamentally rewrite Title IX's prohibition on sex-based discrimination, but the failure to affirm a student's gender identity would constitute "sex-based harassment." *See, e.g.*, 89 Fed. Reg. at 33,884.

116.    Recipients have an obligation under the Final Rule to "take specific actions ... to promptly and effectively prevent sex discrimination," including what the Final Rule defines as sex-based harassment. 89 Fed. Reg. at 33,887. It follows that recipients would have an obligation under the Final Rule to confront students and employees who refuse to affirm someone's gender identity, up to and including disciplinary proceedings, or risk being found in noncompliance with Title IX.

117.    Defendants did not act in accordance with the law and exceeded their statutory and regulatory authority when promulgating the Final Rule, and they do not act in accordance with the law and exceed their statutory and regulatory authority when enforcing the policies set forth in these regulations.

**COUNT II**
**Arbitrary and Capricious Agency Action**
**5 U.S.C. § 706**

118.    Plaintiff incorporates by reference all other paragraphs.

119.    The Final Rule is final agency action subject to review under the APA. "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

120.   "[A]gency action" is "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). An agency "rule" is defined as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." *Id.* at § 551(4).

121.   An agency action is arbitrary or capricious if it fails to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43. Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary and capricious." 5 U.S.C. § 706(2)(A).

122.   Defendants did not engage in reasoned decisionmaking, but instead acted arbitrarily and capriciously in issuing the Final Rule.

123.   Defendants dismissed case law that recognized that "*Bostock* … was limited only to Title VII itself" and "does not stretch to [other statutes]." *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021); *Neese v. Becerra*, 640 F. Supp. 3d 668 (N.D. Tex. 2022) (Kacsmaryk, J.); *compare* 89 Fed. Reg. at 33,806.

124.   The Final Rule also fails to adequately consider the effects of its terms on the States. *See generally* 89 Fed. Reg. 33,474–33,896.

125.   Defendants expressly "decline[d] to opine on how [the Final Rule] interacts or conflicts with any specific State laws because it would require a fact-specific analysis," and instead "refer[red] the public to § 106.6(b), which affirms that a [school's] obligation to comply with Title IX and the regulations is not obviated or alleviated by any State or local law." 89 Fed. Reg. 33,822. This does not satisfy Defendants' obligation to "adequately assess reliance interests" or "reasonably consider[] the relevant issues and reasonably explain[] the decision." *Texas v. Biden*, 10 F.4th 538, 552, 555 (5th Cir. 2021).

126.    The Final Rule also fails to adequately articulate its departure from established Supreme Court precedent related to sex-based harassment, as well as previous policies adopted by the Department in previous rulemakings.

## V.    Demand for Relief

This Court is authorized to award the requested vacatur and declaratory and injunctive relief under the APA, 5 U.S.C. §§ 702, 705, and 706; 28 U.S.C. § 1361; the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202; Federal Rules of Civil Procedure 57 and 65; and the general and legal equitable powers of the Court. For these reasons, Texas respectfully requests that the Court:

i.      Postpone the effective date of the Final Rule under 5 U.S.C. § 705 and hold unlawful and set aside (*i.e.*, vacate) the Final Rule under 5 U.S.C. § 706(2);

ii.     Declare that the Final Rule is contrary to Title IX and exceeds agency authority;

iii.    Declare that the Final Rule was not a result of in reasoned decisionmaking but is instead arbitrary and capricious;

iv.     Issue preliminary and permanent injunctive relief prohibiting Defendants from interpreting or enforcing Title IX as barring discrimination based on sexual orientation or gender identity—including by denying federal financial assistance or by otherwise pursuing, charging, or assessing any penalties, fines, assessments, investigations, or other enforcement actions—and from enforcing, implementing, or relying on the Final Rule against the State of Texas (including any of its instrumentalities, agencies, and political subdivisions); and

v.      Award such other relief as the Court deems equitable and just.

Dated: April 29, 2024.                    Respectfully submitted.

KEN PAXTON                                */s/Ryan D. Walters*
Attorney General of Texas                 RYAN D. WALTERS
                                          Chief, Special Litigation Division
                                          Texas Bar No. 24105085
BRENT WEBSTER                             Ryan.Walters@oag.texas.gov
First Assistant Attorney General

                                          AMY SNOW HILTON
RALPH MOLINA                              Special Counsel
Deputy Attorney General for Legal Strategy   Texas Bar No. 24097834
                                          Amy.Hilton@oag.texas.gov

GENE P. HAMILTON
America First Legal Foundation            KATHLEEN T. HUNKER
Virginia Bar No. 80434                    Special Counsel
611 Pennsylvania Ave. SE #231             Texas Bar No. 24118415
Washington, DC 20003                      Kathleen.Hunker@oag.texas.gov
(202) 964-3721
Gene.Hamilton@aflegal.org
                                          JOHNATHAN STONE
                                          Special Counsel
JONATHAN F. MITCHELL                      Tex. State Bar No. 24071779
Texas Bar No. 24075463                    Johnathan.Stone@oag.texas.gov
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701                       Office of the Attorney General of Texas
(512) 686-3940 (phone)                    Special Litigation Division
(512) 686-3941 (fax)                      P.O. Box 12548, Capitol Station
Jonathan@mitchell.law                     Austin, Texas 78711-2548
                                          Telephone: 512-463-2100
                                          Fax: 512-457-4410


                                          COUNSEL FOR PLAINTIFF
                                          STATE OF TEXAS