## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

STATE OF TEXAS;
DANIEL A. BONEVAC;
JOHN HATFIELD,

     *Plaintiffs*,

v.

THE UNITED STATES OF AMERICA;
MIGUEL CARDONA, in his official
capacity as Secretary of Education;
UNITED STATES DEPARTMENT OF
EDUCATION; CATHERINE LHAMON, in
her official capacity as Assistant Secretary
for Civil Rights, Department of Education;
RANDOLPH WILLS, in his official capacity
as Deputy Assistant Secretary for
Enforcement, Department of Education,

     *Defendants*.

No. 2:24-cv-86-Z

---

## State of Texas's Amended Complaint

---

1.    Through an exercise in notice-and-comment rulemaking ordered by President Biden, the U.S. Department of Education (the "Department") has attempted to effect radical social change in our Nation's schools by purporting to "interpret" Title IX of the Education Amendments Act of 1972 to prohibit discrimination based on sexual orientation and gender identity. Stymied in its attempts to implement this agenda through informal agency guidance, and unable to amend Title IX through the legislative process, the Department has now formally amended the Code of Federal Regulations. *Nondiscrimination on the Basis of Sex in Educ. Programs or Activities Receiving Fed. Fin.*

*Assistance*, 89 Fed. Reg. 33,474 (Apr. 29, 2024) (to be codified at 34 C.F.R. pt 106) (the "Final Rule"). The Final Rule tells States and other regulated parties to ignore biological sex or face enforcement actions and the loss of federal education funding.

2. Contrary to the Department's assertions, the Supreme Court's decision in *Bostock v. Clayton County*, 590 U.S. 644 (2020), does not require—or even allow—the reinterpretation of "on the basis of sex" to include to sexual orientation and gender identity. *Bostock* held only that terminating an employee "simply for being homosexual or transgender" constitutes discrimination "because of … sex" under Title VII. *Id.* at 649–51, 655 (quoting 42 U.S.C. § 2000e-2(a)(1)). The Court "assum[ed]" that the term "sex" means "biological distinctions between male and female," *id.* at 655, and it made clear that its decision did not "sweep beyond Title VII to other federal or state laws that prohibit sex discrimination" or address other issues not before the Court such as "sex-segregated bathrooms, locker rooms, and dress codes." *Id.* at 681. *See also id.* at 669 ("We agree that homosexuality and transgender status are distinct concepts from sex.").

3. In addition, the Final Rule promises to repeat the disaster that was the Department's ill-advised 2011 Dear Colleague Letter, which had a detrimental impact on publicly funded education across the country, including in Texas. The Final Rule walks back many of the constitutional safeguards issued by the Trump Administration to ensure that students accused of harassment have access to a fair hearing. At the same time, the Final Rule redefines harassment to include constitutionally protected activity. Not only does this put Texas schools in a no-win situation—where adherence to the Constitution risks the loss of federal funds—but students and faculty risk having their futures upended merely for refusing to go along with the Biden Administration's radical social agenda.

4. The Final Rule violates the Administrative Procedure Act (APA). 5 U.S.C. § 706. It is substantively unlawful because its purported "interpretations" of Title IX squarely conflict with the text of that statute. Title IX, by its plain text, defines "sex" as "one sex" that is male or female. *See* 20 U.S.C. § 1681(a)(5) (describing those institutions

2

which have a policy of admitting "only students of one sex"). The Department, furthermore, engaged in arbitrary-and-capricious decision-making when promulgating these regulations because it failed to define the amorphous concepts of "gender identity" and "sexual orientation," failed to adequately consider all relevant factors, and failed to adequately explain its reversal of past policies.

5.   Title IX does not apply to discrimination based on sexual orientation or gender identity. But even if those concepts were protected against discrimination by Title IX, the Final Rule's provisions do not faithfully implement such protections because they mark as unlawful school policies that do not discriminate based on those concepts—instead, the Final Rule *requires* schools to discriminate based on sexual orientation and gender identity by allowing single-sex programs and facilities but requiring opposite-sex access to them for only those individuals purporting to have a transgender identity.

6.   The Court should postpone the effective date of the Final Rule under 5 U.S.C. § 705 (*i.e.*, stay it) and preliminarily enjoin the Defendants from implementing the Final Rule or interpreting Title IX to cover discrimination based on sexual orientation or gender identity. And the Court should ultimately declare and hold unlawful the Final Rule, set it aside under 5 U.S.C. § 706(2)(A) (*i.e.*, vacate it), and permanently enjoin the Defendants from implementing or enforcing this unlawful reinterpretation of Title IX.

## I.   Parties

7.   Plaintiff Texas is a sovereign State of the United States.

8.   Plaintiff Daniel A. Bonevac is a professor at the University of Texas at Austin, who is subject to the requirements of Title IX in his capacity as an educator and scholar.

9.   Plaintiff John Hatfield is a professor at the University of Texas at Austin, who is subject to the requirements of Title IX in his capacity as an educator and a scholar.

10. Defendant the United States of America is the federal sovereign and is sued under 5 U.S.C §§ 702–03 and 28 U.S.C. § 1346.

11. Defendant Miguel Cardona is the Secretary of the Department of Education and is responsible for its administration, including the effectuation of Title IX via rulemaking. He is sued in his official capacity.

12. Defendant the Department of Education is a cabinet-level executive branch department of the United States. It issued the Final Rule challenged in this suit and is responsible for administering most federal assistance to education; it administers and enforces Title IX.

13. Defendant Catherine Lhamon is the Assistant Secretary for Civil Rights at the Department of Education and is responsible for carrying out the duties of the Office of Civil Rights, which initiates enforcement proceeding pursuant to Title IX. She is sued in her official capacity.

14. Defendant Randolph Wills is the Deputy Assistant Secretary for Enforcement at the Department of Education. He oversees the enforcement activities of the Office of Civil Rights' 12 regional offices. He is sued in his official capacity.

## II.    Jurisdiction and Venue

15. The Court has federal-question jurisdiction under 28 U.S.C. § 1331 because this suit concerns the scope of the Department's authority under Title IX, and it also arises under the Administrative Procedure Act., 5 U.S.C. §§ 702–703. Additionally, this court has jurisdiction under 28 U.S.C. § 1346 because this suit involves a claim against an agency and employee of the federal government.

16. Venue lies in this district under 28 U.S.C. § 1391(e)(1) because the Defendants are agencies of the United States and officers of the United States in their official capacities; Texas resides in this district; and a substantial part of the events or omissions giving rise to Texas's claims arose in this district.

### III.    Background

17. President Nixon signed Title IX into law on June 23, 1972. *See* Act of June 23, 1972, Pub. L. No. 92-318, 86 Stat. 235, 373–75 (codified at 20 U.S.C. §§ 1681, et seq.). Title IX provides that:

> "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]"

20 U.S.C. § 1681(a).

### A. Early Interpretations of Title IX adopted a biology-based approach.

18. The Department's predecessor agency[1] first issued regulations implementing Title IX in 1975. *See* 34 C.F.R. pt. 106. These regulations treated sex as a binary, referring multiple times to "one sex," especially versus "the other sex," using the phrase "both sexes," and referencing "boys and girls" and "male and female teams." *See, e.g.*, 34 C.F.R. 106.33, 106.34(a)(3), 106.36(c), 106.37(a)(3), 106.41(c), 106.51(a)(4), 106.58(a), 106.60(b), 106.61; *see also* 34 C.F.R. pt. 86 (1975).

19. This makes sense, as Title IX's test and structure presuppose sexual dimorphism—requiring equal treatment for each sex. *See, e.g., Neese v. Becerra*, No. 2:21-cv-163-Z, 2022 WL 1265925, at *12 (N.D. Tex. Apr. 26, 2022) ("Title IX presumes sexual dimorphism in section after section, requiring equal treatment for each 'sex.'")

20. Indeed, at the time of its enactment, the term "sex" in Title IX referred to a person's immutable biological sex—male or female. *See* Webster's Third New International Dictionary (1966) ("One of the two divisions of organic, especially human beings, respectively designated male or female."); American Heritage Dictionary (1969) ("a. The property or quality by which organisms are classified according to their

---

[1] *See Nondiscrimination on the Basis of Sex Under Federally Assisted Education Programs and Activities*, 40 Fed. Reg. 24, 128 (Jun. 4, 1975) (codified at 45 C.F.R. pt. 86).

reproduction functions. b. Either of two divisions, designated male and female, of this classification."); Webster's New World Dictionary (1972) ("[E]ither of the two divisions, male or female, into which persons, animals, or plants are divided, with reference to their reproductive functions.").

21. The structure of Title IX underscores that "sex" means biological sex—not gender identity or any other distinct concept. The statute explicitly permits educational institutions to maintain separate living facilities for the different sexes. 20 U.S.C. § 1686. This provision only makes sense if "sex" refers to the male-female binary and the associated physiological differences. Indeed, Senator Bayh emphasized that Title IX permitted "differential treatment by sex" when necessary, such as "in sport facilities or other instances where personal privacy must be preserved." 118 Cong. Rec. 5807 (Feb. 28, 1972) (Statement of Sen. Birch Bayh).[2]

22. While Title IX generally prohibits discrimination based on biological sex, it recognizes situations where differentiation is appropriate. For instance, it exempts single-sex organizations like fraternities, sororities, the Boy Scouts of America, and Boy or Girl conferences to maintain their exclusivity. 20 U.S.C.A. § 1681(a)(6)-(7). Traditional single-

---

[2] Title IX is full of examples of "sex" being referred to as binary:

- The statute exempts a public undergraduate institution with a historic "policy of admitting only students of *one sex.*" 20 U.S.C. § 1681(a)(5) (emphasis added).
- Certain organizations whose memberships have "traditionally been limited to *persons of one sex.*" 20 U.S.C. § 1681(a)(6) (emphasis added).
- *"Father-son or mother-daughter activities,"* so long as similar opportunities provided for *"one sex"* are offered to *"the other sex."* (20 U.S.C. § 1681(a)(8) (emphasis added).
- Scholarships associated with participation in a beauty pageant "limited to individuals of *one sex only.*" (20 U.S.C. § 1681(a)(9) (emphasis added).

Title IX's explicit exclusions for sex-specific organizations further underscore this understanding. *See, e.g.,* 20 U.S.C. § 1681(a)(6) (authorizing certain groups to remain limited to one sex, including fraternities and sororities).

sex schools and certain religious schools are also exempt and may limit membership to one sex. 20 U.S.C. § 1681(a)(3), (5)).

23. The early implementing regulations in 1975 recognized that differential treatment was sometimes necessary to ensure equal opportunities based on biological differences. These regulations, which remain in effect today through the current regulations,[3] acknowledged that Title IX did not prohibit all differential treatment based on sex but aimed to provide equal opportunities for both sexes despite biological differences. Title IX and its regulations reflect Congress's policy decision to promote equal educational opportunities for both sexes while not disregarding biological differences or mandating identical treatment of males and females in all circumstances—a decision that has proven highly successful. For instance, female college attendance and participation in athletics have soared since Title IX's enactment. *See Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 818–19 (11th Cir. 2022) (Lagoa, J., concurring)).

24. For decades, the Department operated under the basic premise that "sex" means the biological male-female binary.  In its 1997 guidance clarifying that Title IX covers same-sex sexual harassment, the Department affirmed that "both male and female students are protected from sexual harassment … even if the harasser and the person being harassed are members of the same sex." Office for Civil Rights, *Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties*, 62 Fed. Reg. 12,034, 12,039 (Mar. 13, 1997). The same guidance stated that "Title IX does not prohibit discrimination on the basis of sexual orientation," *id*. at 12,036, because—as the Department correctly recognized— "sex" refers to the status of being male or female, not to one's heterosexual or homosexual orientation, or "gender identity."

---

[3] *See, e.g.*, 34 C.F.R. § 106.41(b)-(c) (allowing single-sex teams and requiring recipients to provide "equal athletic opportunity for members of both sexes").

**B. The Obama Administration tries to redefine "sex" to include gender identity.**

25. Following the presidential transition in January 2009, activists launched an aggressive campaign lobbying Congress and the White House to recognize gender identity as a protected class under federal civil-rights laws.

26. Those early lobbying efforts focused on democratically enacted laws. In October 2009, for example, Congress passed hate-crime legislation that included "gender identity" and "sexual orientation" as independently protected characteristics alongside other protected traits like race, religion, and national origin. 18 U.S.C. § 249(a)(2).

27. After the Republican Party won a majority of the House in 2010, however, the pressure campaign shifted to unilateral executive action. *See, e.g.*, *NCTE 2010 Annual Report* 8, Nat'l Ctr. for Transgender Equality, https://transequality.org/sites/default/files/docs/resources/NCTE_Annual_Report_2010.pdf ("While we do not anticipate significant federal legislative victories for 2011, we … are planning for key wins in several federal administrative policy areas. In particular, we wil[l] [a]dvocate with the federal government to interpret existing civil rights laws such as … Title IX … to cover transgender people.").

28. In 2013, Congress considered a bill to extend Title IX's sex-based provisions to gender identity. According to the "findings" section of that proposed law, congressional action was necessary because "federal statutory protections expressly address discrimination on the basis of race, color, sex, religion, disability, and national origin" but "do not expressly include 'sexual orientation' or 'gender identity.'" To end discrimination based on actual or perceived sexual orientation or gender identity in public schools, and for other purposes, H.R. 1652, 113th Cong. (2013). The bill failed.

29. Tellingly, the same year that it rejected the bill to expand Title IX, Congress reauthorized the Violence Against Women Act, and, in the process, amended the law to prohibit recipients of federal grants from discriminating "on the basis of" "sex" *or* "gender identity" *or* "sexual orientation." *See* 34 U.S.C. § 12291(b)(13)(A). Right after

8

listing "sex," "gender identity," and "sexual orientation" as distinct concepts, the law emphasizes that "nothing in this paragraph shall prevent any … program or activity from consideration of an individual's sex" if "*sex segregation* or *sex-specific programming* is necessary to the essential operation of [the] program." *Id.* § 12291(b)(13)(B) (emphasis added). And today, section 12291 also prohibits "female genital mutilation or cutting," which it defines in explicitly biological terms. *See id.* § 12291(a)(15) (incorporation definition of female genital mutilation in 18 U.S.C. § 116).

30. During the Obama Administration, the Department issued its misguided 2011 Dear Colleague Letter and 2014 Questions and Answers on Title IX Sexual Violence. *See* Russlynn Ali, U.S. Dept. of Educ., *Dear Colleague Letter: Sexual Violence* (Apr. 4, 2011), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf; Catherine E. Lhamon, U.S. Dept. of Educ., *Questions & Answers on Title IX & Sexual Violence* (Apr. 29, 2014), https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf.

31. These guidance documents asserted—for the first time—that "Title IX's sex discrimination prohibition extends to claims of discrimination" based solely on "gender identity." *Questions & Answers on Title IX & Sexual Violence,* at 5 (2014).

32. The Dear Colleague Letter and 2014 Questions and Answers had a detrimental impact on publicly funded education nationwide, including in Texas. Not only did the two guidance documents introduce significant confusion over academic institutions' obligations under Title IX, but they also created incentives for academic institutions to violate students' constitutional rights in order to avoid incurring liability. To offer some context, before 2011, the number of lawsuits filed against universities for failing to provide due process in Title IX cases averaged one per year—by 2019, over 100 such lawsuits were filed in that year alone. *See* Taylor Mooney, *How Betsy DeVos plans to change the rules for handling sexual misconduct on campus*, CBS NEWS (Nov. 24, 2019), https://www.cbsnews.com/news/title-ix-sexual-misconduct-on-campus-trump-administration-changing-obama-rules-cbsn-documentary/.

33.  Although neither underwent notice and comment rulemaking, the two guidance documents put recipients in a no-win situation where either conforming or failing to conform to the guidance documents could expose them to significant risk of litigation.

34.  In 2015, Congress considered a new bill that proposed to do what the Department claimed to have already accomplished through its 2014 letter: extend Title IX's protections to differential treatment based on gender identity. *See* S.439, 114th Cong. (2015). The bill was nearly identical to the one that Congress rejected in 2013. Once again, Congress did not pass the legislation.

35.  Twice in the past decade, Congress has considered legislation to amend Title IX to apply to gender identity. *See, e.g.*, H.R. 1652, 113th Cong. (2013); S. 439, 114th Cong. (2015). Yet "Congress has not amended the law to state as much"; so "it is questionable," to put it mildly, "whether the Secretary can alter the term 'sex' by administrative fiat." *Neese*, 2022 WL 1265925, at *13.

36.  As the failed attempts to amend Title IX piled up, so did the pressure from outside groups demanding that the government change Title IX through unilateral executive action.

37.  In May 2016, the Department of Education issued another *Dear Colleague Letter*, this time expanding Title IX obligations to transgender students (the "2016 Guidance"). The 2016 Guidance informed federally funded educational institutions that the Department would "treat a student's gender identity as the student's sex for purposes of Title IX and its implementing regulations." Catherine E. Lhamon and Vanita Gupta, U.S. Dep'ts of Educ. & Justice, *2016 Dear Colleague Letter on Title IX and Transgender Students,* at 2 (May 13, 2016), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201605-title-ix-transgender.pdf?utm_name=.

38.  The 2016 Guidance further informed schools that any attempt to restrict shower, bathroom, or locker-room use according to biological sex would be unlawful. Schools were also warned that failing to "use pronouns and names consistent with a

student's gender identity" would constitute unlawful harassment under Title IX. *Id.* at 2–3.

39.  The 2016 Guidance suggested that schools needed to compel faculty and staff to "use pronouns and names consistent with a transgender student's gender identity" and permit access to previously sex-separated facilities, including restrooms, locker rooms, and shower facilities, based solely on a student's proclaimed gender identity. *Id.* at 3–4.

40.  Thirteen states led by Texas sued the federal government, alleging that the 2016 Guidance was unlawful under the APA. The Northern District of Texas agreed and issued a preliminary injunction, concluding that the Department's purported interpretive guidance "failed to comply with" the APA by "contradicting the existing legislative and regulatory texts" and "was likely contrary to law." *Texas v. United States*, 201 F. Supp. 3d 810, 815, 816 n.4, 836 (N.D. Tex. 2016).

**C.  The Trump Administration rescinds the Obama Administration guidance.**

41.  In a decisive shift from previous policies, the Trump Administration rescinded the Obama-era gender identity guidance in February 2017, and the lawsuit was voluntarily dismissed. Pls.' Notice of Voluntary Dismissal, *Texas*, 2016 WL 7852331, No. 7:16-cv-00054-O (N.D. Tex. Mar. 3, 2017), ECF No. 128. This action marked a return to the pre-2014 interpretation of Title IX, where the prohibition on sex-based discrimination was understood to mean biological sex, not gender identity. This return to the longstanding interpretation was formalized through a Dear Colleague Letter issued by the U.S. Department of Justice and U.S. Department of Education, Office for Civil Rights in February 2017, explicitly withdrawing the previous administration's expansive views on gender identity under Title IX. Sandra Battle & T.E. Wheeler, II, U.S. Dep'ts of Educ. & Justice, *Dear Colleague Letter on Gender Identity Guidance* (Feb. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201702-title-ix.pdf.

42. It soon became apparent, however, that the withdrawal could not repair the damage caused by the two guidance documents on its own. *See* Candice Jackson, U.S. Dept. of Educ., *Dear Colleague Letter* (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf. As the Department later explained, neither action "require[ed] or result[ed] in wholesale changes to the set of expectations guiding recipients' responses to sexual harassment." *Nondiscrimination on the Basis of Sex in Educ. Programs or Activities Receiving Fed. Fin. Assistance*, 85 Fed. Reg. 30,026, 30,029 (May 19, 2020) (to be codified at 34 C.F.R. pt 106) (the "2020 Rule"). Hence, many, if not most, recipients "chose not to change their Title IX policies and procedures" as a precaution against stigma and liability. *Id.*

43. The Department, therefore, initiated a round of notice-and-comment rulemaking, after which it published a comprehensive set of regulations governing recipients' obligations to prevent sex discrimination in their programs and activities. *See* 85 Fed. Reg. 30,026. The 2020 Rule took effect on August 14, 2020.

44. The 2020 Rule addressed at least three significant ambiguities in the earlier guidance:

    a. *First*, the 2020 Rule clearly demarcated, for the first time, the outer boundaries of recipients' obligations and liability under Title IX with respect to sexual harassment.

    b. *Second*, the 2020 Rule clarified the standard under which conduct or speech could constitute sex-based harassment—namely, that it be "so severe, pervasive, and objectively offensive that it effectively denies a person equal access." 85 Fed. Reg. at 30,574.

    c. *Third*, the 2020 Rule reaffirmed the primacy of the U.S. Constitution and adopted multiple safeguards to ensure that Title IX enforcement protected the rights and interests of all parties to a disciplinary proceeding.

45. For example, the 2020 Rule also addressed the question of whether discrimination "on the basis of sex" encompassed sexual orientation and gender identity. Although the Department declined to define "sex" in the 2020 Rule because it was not necessary to effectuate the rules and would have consequences that extended outside of the proposed rulemaking, the Department noted that "Title IX and its implementing regulations include provisions that presuppose sex as a binary classification," and further observed that "provisions in the Department's current regulations, which the Department did not propose to revise in this rulemaking, reflect this presupposition." 85 Fed. Reg. at 30,178.

46. And the Department further amended its regulations to clarify the definition of "sexual harassment" for purposes of Title IX enforcement. *See* 85 Fed. Reg. 30,026. The Department adopted the Supreme Court's definition of harassment in *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999), that is, "conduct that is so severe, pervasive, and objectively offensive that it effectively denies a person equal access to education." 85 Fed. Reg. at 30,036.

47. Finally, the 2020 Rule strengthened the rights of students accused of sexual harassment under Title IX. It required schools to, among other things, provide the accused with written notice of the charges against him, 85 Fed. Reg. at 30,571, let a representative accompany him to disciplinary hearings, *id.* at 30,577, and let that counsel cross-examine witnesses. *Id.* It specified that schools could choose between a preponderance or clear-and-convincing standard to adjudicate accusations of Title IX misconduct, but only if they used the same standard for "all formal complaints of sexual harassment," including "formal complaints against employees." *Id.* at 30,575.

**D. The Supreme Court decides *Bostock*.**

48. In June 2020, shortly after the Department issued the 2020 Rule, the Supreme Court decided *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644 (2020). The Court held that

Title VII's prohibition on sex discrimination prevents an employer from firing an employee "for being homosexual or transgender." *Id.* at 651–52. The Court interpreted Title VII's prohibition against discrimination "because of" sex using a "but-for" causation standard, concluding that "sex plays an unmistakable and impermissible role in [a] discharge decision" based on an employee's homosexuality or transgender status. *Id.* at 660.

49. But *Bostock* explicitly assumed that "homosexuality and transgender status are distinct concepts from sex," *id.* at 669, and it assumed throughout its opinion that "sex" in Title VII referred "*only to biological distinctions between male and female*," *id.* at 655 (emphasis added). The Court refrained from extending its decision to other statutes like Title IX and declined to "prejudge" whether it would "sweep beyond Title VII" or impact "sex-segregated bathrooms, locker rooms, and dress codes." *Id.* at 681.

50. In January 2021, the Department's Office of the General Counsel issued a memo clarifying that *Bostock* did not affect the 2020 Rule. It reiterated that Title IX's "longstanding construction of the term 'sex' to mean biological sex, male or female" aligns with the ordinary public meaning of "sex" at the time of the statute's enactment. Reed D. Rubinstein, *Memorandum for Kimberly M. Richey, Acting Assistant Sec'y of the Office for Civil Rights*, *re:* Bostock v. Clayton Cty., 140 S. Ct. 1731 (2020) (Jan. 8, 2021) at 1, 10, https://www2.ed.gov/about/offices/list/ocr/correspondence/other/ogc-memorandum-01082021.pdf. The memo also emphasized that "schools must consider students' biological sex when determining whether male and female student-athletes have equal opportunities to participate." *Id.* at 7.

**E. The Biden Administration initiates efforts to redefine "sex" under Title IX.**

51. Despite the well-reasoned analysis of the Department itself that *Bostock* changed nothing in the Title IX context and that "sex" means "biological sex," the Biden Administration, like the Obama Administration before it, once again moved to redefine "sex" as including gender identity.

14

52. From the start, President Biden opposed the 2020 Rule, stating on the campaign trail that he would order the Department to put a "quick end" to it if elected. *See* Joe Biden, *Statement on the Trump Administration Rule to Undermine Title IX & Campus Safety* (May 6, 2020), https://medium.com/@JoeBiden/statement-by-vice-president-joe-biden-on-the-trump-administration-rule-to-undermine-title-ix-and-e5dbc545daa.

53. Shortly after taking office, President Biden issued an executive order declaring that *Bostock* applied across all federal law, maintaining that under *Bostock*'s reasoning, laws prohibiting sex discrimination—including Title IX of the Education Amendments of 1972—should also prohibit discrimination based on gender identity or sexual orientation, "so long as the laws do not contain sufficient indications to the contrary." Exec. Order No. 13,988, 86 Fed. Reg. 7,023 (Jan. 20, 2021). Federal agencies were directed to review their regulations and develop plans to align them with the executive order.

54. Following this directive, on June 22, 2021, the Department issued guidance interpreting Title IX's prohibition on discrimination "on the basis of sex" to encompass discrimination based on sexual orientation and gender identity. *Enf't of Title IX of the Educ. Amend. of 1972 with Respect to Discrimination Based on Sexual Orientation & Gender Identity in Light of* Bostock v. Clayton County, 86 Fed. Reg. 32,637 (June 22, 2021) ("2021 Guidance"). The Department claimed that this interpretation aligned with Title IX's purpose of "ensuring equal opportunity and protecting individuals from the harms of sex discrimination" *Id.* at 32,639. This was followed by additional guidance from the Department stating its intent to "fully enforce Title IX to prohibit discrimination based on sexual orientation and gender identity in education programs and activities that receive federal financial assistance." Suzanne B. Goldberg, *Dear Educator letter on Confronting Anti-LGBTQI+ Harassment in Schools*, at 2 (June 23, 2021), https://www2.ed.gov/about/offices/list/ocr/correspondence/stakeholders/educator-202106-tix.pdf.

15

55.  Like the 2016 Guidance, the enforcement of the 2021 Guidance was swiftly enjoined. In *Tennessee v. United States Dep't of Educ.*, 615 F. Supp. 3d 807 (E.D. Tenn. 2022), the Eastern District of Tennessee enjoined the Department from enforcing the 2021 guidance, ruling that it likely acted unlawfully by creating "new rights and obligations" without following the APA's notice-and-comment requirements. *Id.* at 842.

56.  The court identified two main issues with the 2021 Guidance: (1) It was inconsistent with existing regulations. Title IX allows for sex-separation in some cases, but the Department's guidance "appear[ed] to suggest such conduct will be investigated as unlawful discrimination," *id.* at 839; and (2) it "create[d] rights for students and obligations for regulated entities not to discriminate based on sexual orientation or gender identity *that appear nowhere in Bostock, Title IX, or its implementing regulations.*" *Id.* (emphasis added).

## F.  The Biden Administration publishes the Proposed Rule to replace the 2020 Rule and overhaul Title IX.

57.  Undeterred, in July 2022, the Department issued a notice of proposed rulemaking, reiterating its position from the 2021 guidance and introducing other significant revisions to Title IX. *Nondiscrimination on the Basis of Sex in Educ. Programs or Activities Receiving Fed. Fin. Assistance*, 87 Fed. Reg. 41,390 (July 12, 2022) (the Proposed Rule).

58.  The Proposed Rule sought to formally rescind the 2020 Rule's biology-based definition of sex—based almost entirely on the supposed applicability of *Bostock*. 87 Fed. Reg. at 41,410, 41,531. It also dropped the 2020 Rule's adoption of the *Davis* standard for actionable sexual harassment, *id.* at 41,568–69, and removed procedural protections for students accused of misconduct, *id.* at 41,485, 41,488, 41,497, 41,577–78.

59. The Department received over 240,000 comments on the Proposed Rule— overwhelmingly negative. 89 Fed. Reg. at 33,477. Texas, through its Attorney

General and Governor, submitted multiple comments before the 60-day comment period for the Proposed Rule closed on September 12, 2022.

60. In its comments, Texas highlighted the burden the Proposed Rule would impose on the State, as well as the risk the regulations posed to constitutional rights. The comments explained that the combination of expanding recipients' obligation to respond to sex discrimination, while also lowering the threshold of what fell within that description, meant, in practice, that recipients would hyper-police interactions among students, parents, and faculty for fear of being found noncompliant if individuals affiliated with the recipient failed to recognize each person's highly individualized, potentially fluid, and unverifiable gender identity.

61. The Proposed Rule also weakened procedural protections for students accused of sexual harassment, such as the right to present witnesses, inspect all evidence, and have a live hearing. *Id.* at 41,485, 41,497, 41,577. It also abandoned the *Davis* standard for actionable sexual harassment, instead adopting a broader, less stringent definition. *Id.* at 41,568–69.

62. The comments added that much of Proposed Rule departed from the Department's past policies, yet the changes were neither adequately explained nor grounded in the text, structure, or purpose of Title IX. As an example, the Department hinged its redefinition of sex to include sexual orientation and gender identity almost entirely on the U.S. Supreme Court's opinion in *Bostock*. Yet as Texas pointed out in its comments, *Bostock* involved an unrelated statute that was enacted nearly a decade earlier, pursuant to a different constitutional power, and did not address questions involving "sex segregated bathrooms, locker rooms, and dress codes"—all of which appeared in the Proposed Rule.

### G. The Final Rule is published in substantially the same form as the Proposed Rule.

63.   Despite these deficiencies, the Biden Administration pressed on. On April 29, 2024, the Department published its Final Rule, dramatically reshaping Title IX by redefining what constitutes sex discrimination and broadening the definition of prohibited "harassment." *Nondiscrimination on the Basis of Sex in Educ. Programs or Activities Receiving Fed. Fin. Assistance*, 89 Fed. Reg. 33,474 (Apr. 29, 2024) (to be codified at 34 C.F.R. pt 106).

64. Despite strong opposition and over 240,000 public comments—mostly negative—the Department published the Final Rule largely unchanged from the Proposed Rule. Set to take effect on August 1, 2024, it expands schools' liability risks and Title IX obligations by expanding the definition of sex discrimination and harassment beyond what Title IX's text and purpose originally intended.

65.   The Final Rule redefines Title IX's prohibition on sex discrimination to include "discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity." 89 Fed. Reg. at 33,476. It asserts that it preempts all state and local laws conflicting with its terms and applies to any school "program or activity," regardless of whether the activity occurs within the school or even within the United States. *Id*. at 33,885–86.

66.   While the Final Rule allows schools to maintain sex-segregated programs, activities, and facilities, it prohibits schools from enforcing these distinctions in a way that causes "more than de minimis harm"—but the Final Rule simultaneously contends that prohibiting a person from participating in education programs or activities consistent with their gender identity *inherently* inflicts more than de minimis harm. *Id*. at 33,816, 33,819– 20. Thus, the Final Rule threatens to withhold federal funding from schools that deny students access to bathrooms and locker rooms based on their claimed gender identity or maintain dress codes based on biological sex.

67. The Final Rule claims that it does not affect athletics programs in schools because there is currently a regulation that allows sex-separated sports teams. 89 Fed. Reg. at 33,817–18, 33,839. Yet that was also true for bathrooms and locker rooms, but the Final Rule declares that invalid when exceptions are not made for those who identify as transgender. *See id.* at 33,819–21. The Final Rule claims sex-separate athletics does not suffer the same fate because of the Javits Amendment, 88 Stat. 484, 612 (1974), and because Congress reviewed the regulation that explicitly allows them before it went into effect. *See* 89 Fed. Reg. at 33,816–17. But the Javits Amendment only applies to "intercollegiate athletic activities," 88 Stat. at 612, and the bathroom regulation was part of the same set of regulations as the one relating to sports and also not disapproved by Congress. *See* 40 Fed. Reg. 24,128, 24,141 (June 4, 1975); 34 C.F.R. § 106.33. And the Department fails to address its own position taken in litigation that Title IX forbids categorically limiting sports teams to one biological sex. *See B.P.J. v. W. Virginia*, ECF 42, No. 2:21-cv-316 (S.D. W. Va. Jun. 17, 2021); United States Amicus Br. 24–27, *B.P.J. v. W.V. State Bd. of Educ.*, Nos. 23-1078, 23-1130 (4th Cir. Apr. 3, 2023).

68. The Final Rule also prohibits schools from even seeking confirmation of a student's gender identity, deeming such inquiries as causing "more than de minimis harm." *Id*. at 33,819. So schools cannot require documentary evidence confirming a student's gender dysphoria diagnoses prior to permitting their participation in sex-segregated activities or facilities of the opposite sex.

69. The Final Rule also broadens the definition of harassment by lowering the standard set by the 2020 Rule, and instead defining sex-based harassment as "subjectively and objectively offensive" and "sufficiently severe or pervasive to limit or deny a student's ability to participate in or benefit from a recipient's education program or activity." *Id*. at 33,516. This new standard does not require harassment to be both severe and pervasive, meaning a single serious incident or a pattern of non-severe incidents might qualify.

19

70.   The Final Rule also expands the definition of harassment to cover conduct that is "subjectively and objectively" offensive from the complainant's position. For instance, referring to a transgender-identifying male using male pronouns instead of female pronouns could be considered harassment based on the individual's subjective viewpoint.

## IV.   The Legal Flaws of the Final Rule

71.   The Final Rule is flawed from top to bottom—no aspect of it can be salvaged.

### A.   Redefining "On the Basis of Sex"

72.  Title IX states, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

73.  For the entire half century since its enactment, both the Department and recipients have understood Title IX's prohibition on sex discrimination to refer to a person's *biological sex*. Notwithstanding this history, the Final Rule redefines Title IX's prohibition on sex discrimination to include "discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity." 89 Fed. Reg. at 33,886.

74.  The Final Rule threatens to withhold federal funding from schools that do not allow students access to "restrooms and locker rooms" and comply with any "appearance codes (including dress and grooming codes)" based on gender identity. *See, e.g.*, 89 Fed. Reg. at 33,816. The Final Rule dictates that a school violates Title IX's nondiscrimination mandate if a transgender student is denied access to a bathroom or locker room of the opposite biological sex. *See, e.g.*, 89 Fed. Reg. at 33,818.

75.  "The Department cannot enforce Title IX in a manner that requires recipients to restrict any rights protected under the First Amendment." 2020 Rule, 85 Fed. Reg. at 30,071. But under the Final Rule, recipients have an obligation under the Final Rule to

"take specific actions … to promptly and effectively prevent sex discrimination," including what the Final Rule defines as sex-based harassment. 89 Fed. Reg. at 33,887. It follows that recipients would have an obligation under the Final Rule to confront students and employees who refuse to affirm someone's gender identity, up to and including disciplinary proceedings, or risk being found in noncompliance with Title IX.

76. The Final Rule also institutes a new, lower standard for sexual harassment. The Final Rule stipulates that "[s]ex-based harassment, including harassment predicated on sex stereotyping or gender identity, is covered by Title IX if it is sex-based, unwelcome, subjectively and objectively offensive, and sufficiently severe *or* pervasive to limit or deny a student's ability to participate in or benefit from a recipient's education program or activity." 89 Fed. Reg. at 33,516 (emphasis added).

77. In adopting this standard, the Final Rule expands Title IX's prohibition on sex-based harassment beyond that which would create liability under Supreme Court precedent.. *Compare, e.g.*, 89 Fed. Reg. at 33,498, *with Davis*, 526 U.S. at 649–50.

78. Under *Davis*, the Supreme Court held that Title IX imposes liability on schools when sexual harassment is "so severe, pervasive, and objectively offensive that it *effectively bars* the victim's access to an educational opportunity or benefit." 526 U.S. at 633 (emphasis added). The Final Rule ignores this precedent and institutes a sweeping new standard that drastically lowers the "effectively bars" access to an educational opportunity or benefits to now include *any* conduct that "limits" access—in any way and to any degree—to educational opportunities or benefits. 89 Fed. Reg. at 33,497–98. Such a standard subjects students, faculty, and staff to onerous investigations that would have would not rise to the level of actionable conduct under the *Davis* standard, such as failing to use a student's preferred pronouns.

79. The 2020 Rule purposefully adopted the *Davis* standard "to ensure that speech and expression are prohibited only when their seriousness and impact avoid First Amendment concerns." 85. Fed. Reg. at 30,142. The Final Rule departs from this policy

but fails to adequately justify the Department's about-face; nor does it explain how the looser standard conforms to the Constitution—the reason given by the Department is simply that the Defendants "believe[] a broader standard is appropriate." 89 Fed. Reg. at 33,498.

80. The Final Rule also lacks objective standards, making every complaint subjective, not limited to those who visibly identify as transgender but broadly encompassing anyone who may even only temporarily or intermittently so identify, *see* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 451 (5th ed. 2013) (defining "transgender" to include "individuals who transiently" identify one way), or those with nefarious intentions who are merely seeking access to a schoolgirls' bathroom or locker room for predatory purposes. *See* Jessica Marie Baumgartner, *Transwoman Facing Charges for Flashing Women at California Spa Is a Registered Sex Offender*, Evie Mag. (Sep. 3, 2021), https://www.eviemagazine.com/post/transwoman-flashing-women-california-spa-registered-sex-offender.

81. The Final Rule is therefore ambiguous, overbroad, and vague, and fails to adequately notify schools of adequate compliance to avoid onerous investigations.

**B. The Final Rule wrongly relies on *Bostock*.**

82. The Department lacks the legal justification to initiate and support such radical departures in the interpretation of Title IX. The Department rests its redefinition of sex discrimination almost entirely on the U.S. Supreme Court's opinion in *Bostock*. But that case's "reasoning applies only to Title VII, as *Bostock* itself and [] subsequent cases make clear." *L.W. ex rel. Williams v. Skrmetti*, 73 F.4th 408, 420 (6th Cir. 2023) (Sutton, C.J.).

83. How does Title IX differ from Title VII? To start, Title VII prohibits employment discrimination "because of such individual's … sex[]," 42 U.S.C. § 2000e- 2(a), but Title IX prohibits education discrimination "on the basis of sex," 20 U.S.C. § 1681(a). The statutes thus contain different language with different results for

different contexts. *Neese v. Becerra*, 640 F. Supp. 3d 668, 675–84 (N.D. Tex. 2022) (Kacsmaryk, J.) (*Bostock* and its reasoning do not apply to Title IX). And "*Bostock* … was limited only to Title VII itself" and "d[id] not stretch to [other statutes]." *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021); *see also Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 808 (11th Cir. 2022) (en banc) (holding that *Bostock*'s reasoning applies only to Title VII, and describing the argument that it applies to Title IX as "faulty").

84. Defendants conflate Title IX's prohibition of discrimination "on the basis of sex," 20 U.S.C. § 1681(a), with Title VII's prohibition on discrimination "because of … sex," 42 U.S.C. § 2000e-2(a)(1). But the *Bostock* court ruled that the phrase "because of" in Title VII mandated a sweeping but-for causation requirement. *Bostock*, 590 U.S. at 656. The U.S. Supreme Court has tendered no such ruling regarding the phrase "on the basis of sex" as used in Title IX. 20 U.S.C. § 1681(a). To the contrary. "On the basis of sex" references to one's "biological sex—it does not mean does not mean "on the basis of gender identity" or "on the basis of sexual orientation."

85. Indeed, even though Title IX provides that recipients of federal funding for education programs or activities shall not discriminate "on the basis of sex," 20 U.S.C. § 1681(a), Title IX explicitly authorizes separation based on sex in certain situations, including "maintaining separate living facilities for the different sexes," 20 U.S.C. § 1686, and specified single-sex educational institutions, organizations, activities, and scholarship awards, 20 U.S.C. § 1681(a). These exceptions presume—and only make sense in the context of—biological sex is the relevant category.

86. In any event, the Final Rule misinterprets the holding of *Bostock* and the definition of "sex" discrimination adopted by the *Bostock* majority. *Bostock* does not hold that discrimination on account of "sexual orientation" or "gender identity" is discrimination on account of "sex"; rather, it holds only that Title VII's prohibition on "sex" discrimination prohibits employers from firing or refusing to hire individuals "for being homosexual or transgender."

23

87. *Bostock* explains that an employer who fires an employee for conduct or personal attributes that it would tolerate in a person of the opposite biological sex has made the employee's sex the "but-for cause" of his discharge, and that (in the Court's view) automatically violates the statutory command of Title VII. The Court explained:

> If the employer fires the male employee for no reason other than the fact he is attracted to men, the employer discriminates against him for traits or actions it tolerates in his female colleague. Put differently, the employer intentionally singles out an employee to fire based in part on the employee's sex, and the affected employee's sex is a but-for cause of his discharge. Or take an employer who fires a transgender person who was identified as a male at birth but who now identifies as a female. If the employer retains an otherwise identical employee who was identified as female at birth, the employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth. Again, the individual employee's sex plays an unmistakable and impermissible role in the discharge decision.

*Bostock*, 590 U.S. at 660.

88. *Bostock* also makes clear that an employer does *not* violate Title VII or engage in "sex" discrimination if it fires an employee for conduct or personal attributes that it would not tolerate in an employee of the opposite biological sex:

> Take an employer who fires a female employee for tardiness or incompetence or simply supporting the wrong sports team. Assuming the employer would not have tolerated the same trait in a man, Title VII stands silent.

*Id.*

89. *Bostock* does not prohibit employers (or anyone else) from discriminating on account of sexual orientation or gender identity, so long as they do not engage in "sex" discrimination when doing so. For example, *Bostock* does not prohibit discrimination against bisexual students or individuals, so long as the employer regards bisexual behavior or orientation as equally unacceptable in a man or a woman. *See, e.g.*, *Bostock*, 590 U.S. at 660; *see also id.* at 658 ("[F]iring [a] person for actions or attributes it would tolerate in an individual of another sex … discriminates against that person in violation of Title VII.").

24

90. Discrimination against bisexuals is certainly discrimination on account of "sexual orientation," but it is not discrimination on account of "sex."

91. *Bostock* allows discrimination against homosexual or transgender individuals, so long as it is done pursuant to rules or policies that apply equally to both sexes and would lead to the same result if the individual's biological different were different.

92. A teacher or professor, for example, may refuse to accommodate a transgender or nonbinary student's demands to be referred to by the singular pronoun "they"—so long as the teacher or professor refuses demands for such pronoun usage on equal terms from a biological male or a biological woman, and would equally refuse to honor the transgender or nonbinary student's request if that student's biological sex were different.

93. Even if the Department considers policies or practices of that sort to be regarded as discrimination against transgender or non-binary individuals, they do not constitute "sex" discrimination as defined in *Bostock* because the policies apply equally to both biological sexes. *See Bostock*, 590 U.S. at 669 ("We agree that homosexuality and transgender status are distinct concepts from sex.").

94. The Final Rule wrongly equates discrimination on account of sexual orientation and gender identity with "sex" discrimination. Yet there are many ways in which entities covered by Title IX could discriminate against homosexual, bisexual, transgender, or non-binary individuals without engaging in the kind of "sex"–based discrimination described in *Bostock*.

95. The Final Rule further conflicts with the reasoning of *Bostock* because that case did not find that all sex-based distinctions were prohibited. *Bostock* repeatedly cited the Court's earlier decision in *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998), as authority. *Oncale* explained that Title VII "does not reach genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex," and "requires neither asexuality nor androgyny in the workplace." *Id.* at 75, 81.

96. The *Oncale* Court noted the central concern of Title VII was not every aspect of interaction in the workplace but "whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Id.* at 80 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 25 (1993) (Ginsburg, J., concurring)).

97. The Second Circuit—in one of the cases consolidated with and affirmed in *Bostock*—also favorably cites *Oncale* as "arguably" supporting the view that "sex-specific bathroom and grooming policies [do not] impose disadvantageous terms or conditions" because not all distinctions of "'sexual content or connotations' rise to the level of discrimination." *Zarda v. Altitude Express, Inc.,* 883 F.3d 100, 119 & n.16 (2d Cir. 2018) (en banc) (quoting *Oncale*, 523 U.S. at 79–80)); *see also West v. Radtke*, 48 F.4th 836, 849 (7th Cir. 2022) (finding Title VII would not be violated by preventing transgender prison guard from performing strip searches of opposite-sex inmates).

98. Relatedly*, Bostock* also cautioned that "Title VII does not concern itself with everything that happens 'because of' sex," *Bostock*, 590 U.S. at 657—only discrimination that is "inextricably" related to sex is forbidden; distinctions "related to sex in some vague sense" or having only "some disparate impact on one sex or the other" are not reached by the statute. *Id.* at 660–61.

99. *Bostock* did not overturn any Supreme Court precedents, instead resting on those dating to the 1970s. It also did not disturb lower-court precedent that has long applied those same precedents. "[T]the Court relied in *Bostock* on the same well established Title VII principles that animated the outcome in those prior decisions [of lower courts that applied the same key precedents, so those courts] effectively anticipated *Bostock*'s rationale." *Maner v. Dignity Health*, 9 F.4th 1114, 1124 (9th Cir. 2021) (Bea, J.) (explaining *Bostock* did not overturn decades of lower-court precedents rejecting "paramour preference" theory of liability).

100.     This is consistent with *Willingham v. Macon Tel. Publ'g Co.*, 507 F.2d 1084 (5th Cir. 1975) (en banc), which upheld sex-specific grooming codes under Title VII. *Willingham* applied *Phillips v. Martin Marietta Corp.*, 400 U.S. 542 (1971) one of the key cases the Supreme Court relied on in *Bostock*. The Second Circuit in *Zarda*— which relied on the same key precedents that the Supreme Court would later adopt in *Bostock* (*Martin Marietta* and *L.A. Dep't of Water & Power v. Manhart*, 435 U.S. 702 (1978))—favorably cited *Willingham* as consistent with its analysis. *Zarda*, 883 F.3d at 118–19.

101.     In short, *Bostock* did not nullify the Supreme Court's longstanding acceptance of differences between the sexes. It did not question any longstanding precedent beyond the narrow question before it: whether "[a]n employer who fires an individual *merely for being* gay or transgender defies the law." *Bostock*, 590 U.S. at 683 (emphasis added).

## C. The Final Rule's expansion of Title IX's scope into sexual orientation and gender identity violates the Clear Statement Rule and the Major Questions Doctrine.

102.     Even if there were ambiguity on whether Title IX adopts the Final Rule's definition of discrimination "on the basis of sex," that ambiguity must be resolved in favor of the State because conditions on federal funding must be stated clearly. *Adams*, 57 F.4th at 815.

103.     Congress enacted Title IX pursuant to its powers under the Spending Clause. *Davis*, 526 U.S. at 640 ("[W]e have repeatedly treated Title IX as legislation enacted pursuant to Congress' authority under the Spending Clause[.]"). If Congress intends to impose a condition on the grant of federal funding under Title IX, it must do so with "a clear voice," "unambiguously." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).

104.     This clear statement rule is required when imposing a condition on federal funding because "legislation enacted pursuant to the spending power is much in the nature

of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *Adams*, 57 F.4th at 815 (citing *Pennhurst*, 451 U.S. at 17). "Recipients cannot knowingly accept the deal with the Federal Government unless they would clearly understand the obligations that would come along with doing so." *Cummings v. Premier Rehab Keller, PLLC*, 596 U.S. 212, 219 (2022) (internal quotations omitted).

105.    The use of the word "sex" in Title IX did not put educational institutions and programs on notice that by accepting funding from the federal government for educational services and activities, they are prohibited from providing bathrooms or other facilities for the two sexes. *See Adams,* 57 F.4th at 816. That is clear not only from historical practice but from Defendants' longstanding interpretation of Title IX and its implementing regulations, which "include provisions that presuppose sex as a binary classification." 85 Fed. Reg. at 30,178.

106.    Similarly, courts will not assume that Congress has assigned questions of "deep economic and political significance" to an agency unless Congress has done so expressly. *See King v. Burwell*, 576 U.S. 473, 486 (2015); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000).

107.    "We expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance." *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021) (quoting *Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014)).

108.    "Congress typically [does not] use oblique or elliptical language to empower an agency to make a radical or fundamental change to a statutory scheme …We presume that Congress intends to make major policy decisions itself, not leave those decisions to agencies." *Id.* (cleaned up); *see also Brown & Williamson Tobacco Corp.*, 529 U.S. at 160.

109.    The Final Rule will affect all elementary schools, secondary schools, postsecondary institutions, and other recipients of federal financial funds with far-reaching social and economic impact. Yet Title IX's language cannot be plausibly read to smuggle in

a power for federal agencies to overturn the "unremarkable—and nearly universal—practice[s]" such as separating bathrooms by biological sex, common in States' governance of schools. *Adams*, 57 F.4th at 796.

### D.  In the alternative, if *Bostock* applies to Title IX, the Final Rule violates it.

110.    In addition, even if Title IX covered discrimination on the bases of sexual orientation and gender identity, the Final Rule interprets Title IX's anti-discrimination provision as requiring accommodations for gender identity even though Title IX—unlike Title VII's prohibition on religious discrimination and the disability discrimination provisions of the Rehabilitation Act and the Americans with Disabilities Act—has no accommodation requirement.

111. The Final Rule requires exceptions from admittedly lawful sex-segregated policies and facilities for those whose gender identity is transgender—and only for them, as schools would still be allowed to prevent biological males who do not identify as women from entering female-only spaces and programs. *See* 89 Fed. Reg. at 33,818 (under Final Rule, "sex separation in certain circumstances, including in the context of bathrooms or locker rooms, is not presumptively unlawful sex discrimination" but when a school "denies a transgender student access to a sex-separate facility or activity consistent with that student's gender identity, this would violate Title IX's general nondiscrimination mandate"); *id.* at 33,887 (to be codified at 34 C.F.R. § 106.31: where Title IX permits "different treatment or separation in a manner that discriminates on the basis of sex," the Final Rule requires "sex" to be determined by gender identity); *id.* at 33,820 (reasoning that non-transgender students are not harmed by being denied access to sex-separated facilities such as restrooms and locker rooms, so only transgender students are protected by the new 34 C.F.R. § 106.31(a)(2) that prohibits "more than de minimis harm").

112.    The types of school policies targeted by the Final Rule do not discriminate based on gender identity. While *Bostock* held that "discrimination based on homosexuality

or transgender status necessarily entails discrimination based on sex," 590 U.S. at 669, the Final Rule instead addresses "the converse question: whether discrimination on the basis of sex necessarily entails discrimination based on transgender status." *Adams v. Sch. Bd. of St. Johns Cty.*, 3 F.4th 1299, 1332 (11th Cir. 2021) (Pryor, C.J., dissenting), *rev'd by Adams.*, 57 F.4th 791.

113.    The Final Rule never addressed the question of whether the policies "impose[d] disadvantageous terms or conditions" based on sex. The Second Circuit ruling affirmed in *Bostock* left this question open but indicated the serious possibility that such policies were not covered by Title VII even if discrimination based on sexual orientation and gender identity were forbidden. *Zarda*, 883 F.3d at 118–19 (favorably citing on this ground *Oncale,* 523 U.S. 75, and *Willingham*, 507 F.2d 1084). This distinction is alluded to in *Bostock* itself. *See Bostock*, 590 U.S. at 681 (after noting that its reasoning does not settle the issue of "bathrooms, locker rooms, or anything else of the kind," referring to Title VII's limitation to "distinctions or differences in treatment that injure protected individuals"; while "firing employees surely counts other policies and practices might or might not qualify as unlawful discrimination") (cleaned up). But if such policies *are* covered by Title IX, then the Final Rule violated the prohibition on treating employees and students differently based on gender identity.

114.    Consider standard bathroom norms. All biological males, regardless of their gender identity, may use the men's bathroom; all biological females, regardless of their gender identity, may use the women's bathroom. "Separating bathrooms based on sex dates back as far as written history will take us," long before the concept of gender identity even existed. *Adams*, 3 F.4th at 1328 (Pryor, C.J., dissenting) (cleaned up), *rev'd*, 57 F.4th 791. These policies do not even consider "gender identity," and therefore cannot be described as discriminating based on that category. *Cf. Raytheon Co. v. Hernandez*, 540 U.S. 44, 54 n.7 (2003) ("[I]f no part of the hiring decision turned on [the applicant's] status as disabled, he cannot, *ipso facto,* have been subject to disparate treatment"). "Separating

30

bathrooms by sex treats people differently on the basis of sex ... [but] the mere act of determining an individual's sex, using the same rubric for both sexes, does not treat anyone differently on the basis of sex." *Adams*, 3 F.4th at 1325–26 (Pryor, C.J., dissenting), *rev'd*, 57 F.4th 791.

115.    The Final Rule purports to allow sex-specific bathrooms, locker rooms, and showers (explicitly) and sex-specific dress codes and pronoun usage policies (implicitly) as a general matter. But it then "tr[ied] to work around [those concessions] with a linguistic device." *Doe 2 v. Shanahan*, 917 F.3d 694, 723 (D.C. Cir. 2019) (Williams, J., concurring in the result) (criticizing plaintiffs' concession that military may have sex-specific standards while arguing that "sex" should be determined by subjective gender identity). It is no consolation to tell schools they can still have sex-specific bathrooms (or dress codes or pronoun usage) so long as they allow exceptions for individuals who subjectively identify as the opposite sex.

116.    If schools may have separate facilities or policies for men and women, as the Final Rule concedes, then they may also require compliance with those policies. *Cf.* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 30, at 192–93 (2012) ("[W]henever a power is given by a statute, everything necessary to making it effectual or requisite to attaining the end is implied.") (citation omitted). The same is true for sex-specific dress codes or allowing the use of gendered pronouns as part of standard English in schools; such policies do not classify based on the gender identity of anyone but disregard that concept altogether, exactly as *Bostock* requires. Indeed, to allow schools to have sex-specific policies, but then require them to have exemptions only for transgender employees or students, violates *Bostock* because such a rule discriminates based on gender identity.

## V.    The Final Rule's Irreparable Harm to Texas

Texas is harmed by the Final Rule in several ways.

**A. Texas is the object of the Final Rule and faces compliance costs.**

117.    Texas administers numerous education programs and operates thousands of educational institutions through its constituent agencies and political subdivisions, including programs and institutions that receive federal funding and are subject to Title IX and its effectuating regulations.

118.    The Texas Constitution charges the Texas Legislature "to establish and make suitable provision for the support and maintenance of an efficient system of public free schools." Tex. Const. art. VII, § 1.

119.    Pursuant to this charge, Texas funds, regulates, and oversees the Nation's second-largest K–12 public education system, serving over 5.4 million students across 1,200 school districts. Tex. Educ. Agency, *Enrollment in Texas Public Schools 2021-22* at ix (June 2022), https://tea.texas.gov/reports-and-data/school-performance/accountability-research/enroll-2021-22.pdf.

120.    The Texas Education Agency ("TEA") is a state agency charged by State law to oversee the State's public school system's compliance with Title IX. *See* Tex. Educ. Code § 7.021. As part of its mandate, TEA allocates the majority of federal funding for Texas K-12 education. *See* Ex. A, Decl. Michael Meyer ¶ 6.

121.    In the 2021–2022 biennium, Texas received approximately $6.6 billion dollars in federal funds for its K-12 education. Tex. Educ. Agency, 2022 *Comprehensive Biennial Report on Texas Public Schools* at 239 (Dec. 2020), https://tea.texas.gov/reports-and-data/school-performance/accountability-research/comp-annual-biennial-2022.pdf.

122.    In fiscal year 2023, Texas public schools received approximately $9.4 billion in federal funding distributed by TEA and an additional $4.8 billion in federal disbursements that were allocated by the federal government directly or another intermediary. *See* Ex. A ¶¶ 4–5.

123.    State statute requires TEA to operate a number of educational programs directly. These include "regional day programs" for deaf students and a school network for students with "visual impairments." Tex. Educ. Code 7.021(b)(10), (11).

124.    The Texas School for the Deaf is a state agency that provides educational services, on a day and residential basis, to students who are deaf or hard of hearing. Tex. Educ. Code § 30.051; Ex. B, Decl. of Peter L. Bailey ¶ 3.  The school's dormitories, athletic teams, and locker rooms are separated by biological sex. *Id*. at ¶¶ 3–4.

125.    The Texas School for the Deaf relies on federal funding for the services it provides to students and their families. *Id*. at ¶ 5. The school received $1,261,735.00 in federal funds for fiscal year 2024. *Id*.

126.    Texas also funds, supports, and administers a robust higher education network. Texas is home to 119 public postsecondary institutions, including 37 universities and 82 two-year colleges and technical schools. *See* Tex. Higher Educ. Coordinating Bd., *2020 Texas Public Higher Education Almanac* at 28, 47 (Sept. 28, 2020), https://reportcenter.highered.texas.gov/agency-publication/almanac/2020-texas-public-higher-education-almanac/.

127.    While most States have just one or two public university systems, Texas has six. The largest of these systems—the University of Texas—has 14 separate locations that educate approximately 256,000 students each year. *See About The University of Texas System*, The University of Texas System, https://www.utsystem.edu/about. All told, the State's entire higher education network includes 148 public institutions and currently enrolls approximately 1.4 million students. *See* Ex. C, Decl. of Sarah Keyton ¶ 3.

128.    Public postsecondary education institutions in Texas received approximately $2.5 billion in federal funding during fiscal year 2022.

129.    As a condition of receiving federal funding, Title IX protections against sex-based discrimination apply to state educational institutions. *See* 20 U.S.C. § 1681. Hence, should Texas, or any of Texas's affiliated academic institutions, deviate from the Department's guidance effectuating Title IX, that departure would invite enforcement actions at the risk of significant monetary penalties, up to and including the loss of federal money.

130.    Public education in Texas depends on federal funds. Institutions that lose their federal funding will need to eliminate certain educational services if they cannot find alternative funding sources. *See* Exs. A ¶ 8, B ¶¶ 6–7, C ¶ 7.

131.    Texas educational institutions rely on federal funding and will be irreparably harmed if they lose their funding because of their reliance on 50 years of Title IX practice and legal precedent interpreting "on the basis of sex" to mean biological sex, *not* "sexual orientation" and "gender identity." *Id.*

132.    It is a "fundamental canon of statutory construction" that, "unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning" at the time of enactment. *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)); Scalia & Garner, *supra*, at 16 (same).

133.    No dictionary at the time Title IX was enacted defined "sex" to include "gender identity" or "sexual orientation." *Adams*, 57 F.4th at 812–13.

134.    Texas, relying on the contemporary (and etymological) meaning of "sex" when Title IX was enacted, adopted laws, policies, and procedures, and significantly invested in an entire infrastructure to implement its education systems. The Final Rule upends these important reliance interests and usurps Texas's sovereignty by adding "gender identity" and "sexual orientation."

135.    The Final Rule refuses to define "gender identity" and "sexual orientation," nor whether both fixed and fluid identities and orientations are protected.

136.    The Final Rule's protections for an ever-fluctuating number of gender identities and sexual orientations, which individuals can allegedly change at any time, anywhere, and for any (or no) reason, undermines Title IX's original sex-based protections. *See United States v. Varner*, 948 F.3d 250, 256–58 (5th Cir. 2020) (examining bewildering assortment of purported gender identities and bespoke pronouns).

137.    Texas independent school districts and Texas public universities are instrumentalities of the State. *See, e.g., Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 660 (Tex. 2008).

138.    Federal funding allocated to Texas's post-secondary public universities, technical educational institutions, health-related educational institutions, and community colleges is managed by the Texas Higher Education Coordinating Board ("THECB"). Ex. C ¶ 3.

139.    In fiscal year 2022, Texas public universities received more than $3.8 billion in federal funding; Texas community colleges received more than $2.1 billion in federal funds; Texas technical educational institutions received more than $100 million in federal funds; and Texas health-related educational institutions received more than $1.5 billion in federal funds. *See* Tex. Higher Educ. Coordinating Bd., Sources and Uses Report, at https://www.highered.texas.gov/our-work/supporting-our-institutions/institutional-funding-resources/sources-and-uses/.

140.    The Final Rule threatens to withdraw federal funding from Texas educational institutions. The Department may pursue enforcement actions against educational facilities that are out of compliance with its aberrant interpretation of Title IX and penalize any institution deemed non-compliant by withholding funds. *See* U.S.C. §§ 1681, 1682; Exs. A ¶¶ 7–8, B ¶¶ 6–8, C ¶¶ 6–7.

141.    Complying with Title IX costs Texas money. Texas educational institutions undertake internal efforts to ensure compliance with Title IX, including federal regulations promulgated pursuant to Title IX. These efforts involve but are not exhausted by hiring

staff to perform compliance reviews, facilitate the Title IX grievance process, and respond to lawsuits that stem from allegations of liability under Title IX protections. *See* Ex. D, Decl. of Rick Olshak ¶¶ 4–5.

142.    These and other compliance efforts incur considerable expense to state educational facilities. The costs of complying with Title IX will likely increase when the Department of Education adopts new regulations that create additional requirements or make existing requirements more demanding. *See id.* These include the administrative costs due to the increased caseload caused by the Final Rule's lower standard for harassment, the extension of coverage to off-campus behavior, regulating covered third-party entities, increased referrals to the Title IX Coordinators, updating training and educational materials for employees, and maintaining two different complaint processes. *Id.*

143.    Even the Department's low regulatory cost estimates reveal a substantial monetary burden on state educational facilities. Overall, the Department estimates more than $98 million in short-term compliance costs, some of which will fall on Texas schools. *See* 89 Fed. Reg. at 33,861.

144.    Further aspects of the Department's regulatory burden analysis reflect an arbitrary and capricious consideration of relevant information. The Department failed to adequately consider how expanding Title IX to apply to gender identity would impose new regulatory burdens on recipients. With no reasonable explanation, the Department asserts that extending Title IX protections to an entirely new class will not add new compliance costs or create additional liability. *See id.* at 33,876.

145.    Contrary to the Department, responsible deliberation during the rulemaking phase would have concluded that expanding Title IX's anti-discrimination mandate to cover gender identity will likely increase costs for recipients, including Texas educational institutions.

146.    Nor could the Department have reasonably concluded that the new rule would not interfere with local and State governments "in the exercise of their governmental functions." *Id*. at 33,859.

**B.  The Final Rule expands liability to Texas and other recipients of federal education funds.**

147.    Educational institutions are subject to liability for alleged violations of Title IX. *See generally, Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979); *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, (2009). The Final Rule forces a waiver of Texas's sovereign immunity as to certain regulatory requirements without its consent.

148.    The Final Rule rolls back constitutional safeguards for students while expanding recipients' liability far beyond what title IX allows. These changes are unconstitutional.

149.    Indeed, the Final Rule goes so far as to reinterpret the word "sex" to include "sexual orientation" and "gender identity."

150.    Not only does it reinvent the definition of "sex discrimination" to include "sexual orientation" and "gender identity" impermissibly, but the Final Rule also expands when, where, and how recipients must respond to claims of sexual harassment—extending to conduct that occurs online, off campus, outside the United States, or even before the relevant individuals attended the school. 89 Fed. Reg. at 33,386, 33,527.

151.    Additionally, the Final Rule amends the definition of "sexual harassment" in 34 C.F.R. § 106.2 to include unwelcome sex-based conduct (1) "that is sufficiently severe *or* pervasive," and (2) "that based on the totality of the circumstances and evaluated *subjectively and objectively*, denies or *limits* a person's ability to participate in" the recipient's education program or activity. 89 Fed. Reg. at 33,517 (emphasis added).

152.    On its own, the redefinition of "sex discrimination" to include sexual orientation and gender identity increases the odds of academic institutions intruding on

protected rights when seeking to enforce Title IX. But when combined with the other listed changes, the danger becomes especially acute.

153.     For example, the Final Rule directly curtails First Amendment and Due Process protections for Texas students. It does this by lowering he standard for sex-based harassment to a "preponderance-of-the-evidence" standard; barring accused students from access to evidence, offering them instead a mere "description" of "relevant" evidence; and permitting recipients to adopt the investigator model, in which a single "decisionmaker" adjudicates the proceedings as prosecutor, judge, and jury. *See* 89 Fed. Reg. at 33,891–95.

154.     These weakened standards are introduced at the same time the recipient's liability expands. The Department thus gives recipients cause to initiate more zealous Title IX enforcement proceedings, reducing students' access to a fair hearing when accused of harassment.

155.     Additionally, compared to the 2020 Rule, the standards advanced by the Final Rule would create far more opportunities for recipients to inadvertently fall out of compliance. The previous version of § 106.44(a) required recipients to "respond promptly in a manner that is not deliberately indifferent"—something they could achieve if their response was not "clearly unreasonable in light of the known circumstances." 2020 Rule, 85 Fed. Reg. at 30,574. Recipients therefore had more flexibility in how to craft a response that was appropriate to the facts and parties involved. Recipients were also judged based on the information they had on hand without the benefit of hindsight, which the Final Rule could allow.

156.     But the language in the Final Rule unlawfully shifts from the deliberate indifference standard which requires institutions to take actions reasonably calculated to address allegations to a standard that requires their actions to be "effective."[4]

157.     Yet institutions do not have an obligation under Title IX to eliminate discrimination; they are merely obligated to respond in a manner that is not clearly unreasonable.[5]

158.     The Final Rule greatly expands the scope of Title IX protections, thereby expanding the range of conduct that could give rise to a lawsuit against Texas educational institutions. *See, e.g.*, 89 Fed. Reg. at 33,563 ("the recipient need not have incontrovertible proof that conduct violates Title IX for it to have an obligation to respond," but rather "if the conduct reasonably *may* be sex discrimination, the recipient must respond in accordance with § 106.44" (emphasis added)).

159.     Because the Final Rule contradicts existing case law, including the departure from *Davis,* grants institutions the permission to ditch live hearings, permits a single-investigator model, and revokes the right to cross-examination—the likelihood that Texas institutions will get sued and lose lawsuits is significant.  Texas schools are placed in a no-win situation—where adherence to the Constitution risks the loss of federal funds.

**C. The Final Rule infringes on Texas's sovereignty.**

160.     The Final Rule injures Texas by obstructing its sovereign authority to enforce and administer its laws and by imposing substantial pressure on Texas to change

---

[4] "§ 106.44(a) (1) a recipient with knowledge of conduct that reasonably may constitute sex discrimination in its education program or activity must respond promptly and *effectively*; and (2) a recipient must also comply with this section to address sex discrimination in its education program or activity." 89 Fed. Reg. at 33563 (emphasis added).

[5] *See Davis*, 526 U.S. at 648–49 ("[C]ourts should refrain from second guessing the disciplinary decisions made by school administrators," who "must merely respond to known peer harassment in a manner that is not clearly unreasonable.") (citations omitted).

its laws and policies. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982) (impeding a state's sovereign interest in creating and enforcing a legal code was an injury-in-fact sufficient to find standing); *see also Texas v. United States*, 809 F.3d 134, 153 (5th Cir. 2015) ("[S]tates may have standing based on (1) federal assertions of authority to regulate matters they believe they control, (2) federal preemption of state law, and (3) federal interference with the enforcement of state law[.]").

161. The Final Rule conflicts with Texas law governing school athletics programs.

162. Texas has enacted laws to protect sex separation in K-12 and higher education athletics programs.

163. Texas law provides that "an interscholastic athletic competition team sponsored or authorized by a school district or open-enrollment charter school may not allow [] a student to compete in an interscholastic athletic competition sponsored or authorized by the district or school that is designated for the biological sex opposite to the student's biological sex." Tex. Educ. Code § 33.0834; *see also* University Interscholastic League Non-Discrimination Policy, Const. sub. J (accessed May 12, 2024) (policy segregating certain school sports based on sex), https://www.uiltexas.org/policy/constit ution/general/nondiscrimination.

164. The Final Rule prohibits separation based on biological sex in K-12 athletics teams, which indicates that the Department will investigate K-12 schools for following Texas law and provides that the Department may sanction the schools by withholding federal funding for complying with Texas law. *See* 89 Fed. Reg. at 33,886.

165. Texas law also provides that "an intercollegiate athletic team sponsored or authorized by an institution of higher education may not allow a student to compete on the team in an intercollegiate athletic competition sponsored or authorized by the institution that is designated for the biological sex opposite to the student's biological sex." Tex. Educ. Code. § 51.980.

166.    The Final Rule's prohibition on the separation of education athletics teams based on biological sex will subject institutions of higher education to investigation (and possibly sanctions) by the Department merely for complying with Texas law. *See* 89 Fed. Reg. at 33,886.

167.    The Final Rule also conflicts with the policies adopted by some of Texas's political subdivisions—pursuant to authority granted by state law—regarding separating school bathrooms and locker rooms by biological sex.  For example, the Carroll, Frisco, and Grapevine–Colleyville Independent School Districts require schools owned or operated by the districts to separate bathrooms, locker rooms, shower rooms, and other similar facilities based on biological sex determined at birth and correctly identified on a person's birth certificate.

168.    Under Texas statute, independent school districts are expressly authorized to exercise State power by implementing local policies; the trustees of ISDs "have the exclusive power and duty to govern and oversee the management of the public schools of the district." Tex. Educ. Code § 11.151(b).The Final Rule conflicts with each of these policies by treating them as unlawful sex discrimination and by requiring school districts to change their policies to separate bathrooms, locker rooms, showers, and changing facilities based on gender identity instead of biological sex to remain in compliance with the Rule. *See* 89 Fed. Reg. at 33,886.

169.    The Final Rule requires using pronouns that are consistent with a person's gender identity rather than biological sex, which conflicts with policies adopted by some of Texas's political subdivisions and is not required by Texas state law. For example, the Carroll and Grapevine–Colleyville Independent School Districts have adopted policies that prohibit district employees from requiring the use of pronouns that are inconsistent with a person's biological sex as correctly identified on a person's birth certificate or other government-issued record.

41

170.    The Final Rule conflicts with these policies by treating them as unlawful sex discrimination and by requiring school districts to change their policies to use pronouns based on a person's gender identity instead of biological sex to remain in compliance with the Final Rule. *See* 89 Fed. Reg. at 33,886. Compliance with the Final Rule would expose the school districts to liability for violating district employees' and students' religious freedom and free speech rights, despite district policies protecting those rights.

171.    The Final Rule explicitly preempts contrary state laws and directs recipients of Title IX funding to comply with the Final Rule in the event of a conflict with state law. *See* 89 Fed. Reg. at 33,885. These injuries are sufficient to establish Texas's standing.

172.    The Final Rule also purports to override Texas's abortion prohibitions.

173.    The Final Rule purports to protect women who abort their pregnancies, even when doing so violates Texas law.

174.    The Final Rule purports to ban "discrimination" against anyone who has had an abortion, even if the abortion was illegal.

175.    The Final Rule defines "pregnancy or related conditions" to include "termination of pregnancy." 89 Fed. Reg. at 33,883 (to be codified at 34 C.F.R. § 106.2).

176.    The Final Rule stipulates that every recipient of federal funds, including educational institutions, must treat abortion on the same terms as "any other temporary medical condition." *See* 89 Fed. Reg. at 33,887–888 (to be codified at 34 C.F.R. § 106.40(b)(6)(vi)(4) ("[A] recipient must treat pregnancy or related conditions in the same manner and under the same policies as any other temporary medical conditions.").

177.    Accordingly, the Final Rule requires all healthcare plans offered by every educational institution to cover abortion on the same terms as "any other temporary medical condition." *Id.*

178.    The Final Rule also requires schools to excuse a student's absence for "terminat[ing] [her] pregnancy" even when doing so violates Texas law. *See id.*

42

179.    This provision of the Final Rule is another attempt by the Biden Administration to nullify *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2242 (2022). The Supreme Court has held that "the Constitution does not confer a right to abortion" and "does not prohibit the citizens of each State from regulating or prohibiting abortion." *Id.* at 2279, 2284.

180.    In accordance with *Dobbs*, Texas regulates and prohibits abortions.

181.    Under Texas's Human Life Protection Act, "[a] person may not knowingly perform, induce, or attempt an abortion." Tex. Health & Safety Code § 170A.002. That prohibition does not apply if the woman on whom the abortion is performed "has a life-threatening physical condition" arising from a pregnancy that places her "at risk of death or poses a serious risk of substantial impairment of a major bodily function unless the abortion is performed." Tex. Health & Safety Code § 170A.002(b)(2). Texas law imposes criminal and civil penalties for violation of this law. *See* Tex. Health & Safety Code §§ 170A.004–.005; Tex. Penal Code § 12.32–.33.

182.    In addition to the Human Life Protection Act, Texas statutes predating *Roe v. Wade* also address the subject of abortion. *See* Tex. Rev. Civ. Stat. arts. 4512.1–.4, .6 Under those statutes, any person who causes an abortion is guilty of an offense and shall be confined in a penitentiary. *Id.* at 4512.1. Moreover, an individual may not act as an accomplice to abortion or an attempted abortion. *Id.* at 4512.2–.3. However, it is not an offense if the abortion is performed under "medical advice for the purpose of saving the life of the mother." *Id.* at 45.12.6.

183.    The Texas pre-*Roe* statutes also impose felony criminal liability on any person who engages in conduct in Texas that "procures" an abortion, as well as any person who aids or abets this procuring conduct. *See* Tex. Rev. Civ. Stat. arts. 4512.1.

184.    Plaintiffs Hatfield and Bonevac do not intend to accommodate student absences from class to obtain abortions—including illegal abortions and purely elective abortions that are not medically required. Nor will Plaintiffs Hatfield and Bonevac hire a

teaching assistant who has violated the abortion laws of Texas or the federal-law prohibitions on the shipment or receipt of abortion pills and abortion-related paraphernalia. *See* 18 U.S.C. § 1461–1462.

185.    The Final Rule purports to preempt Texas' laws by requiring its schools to protect actions that would otherwise violate State law. This violates Texas's "sovereign interest in the power to create and enforce a legal code." *Texas v. United States*, 809 F.3d 134, 153 (5th Cir. 2015) (quotation omitted).

186.    Texas's injuries are directly traceable to the Final Rule. They would be redressed by the relief sought in this case, *see Texas v. EEOC*, 933 F.3d 433, 449 (5th Cir. 2019), which includes staying and ultimately vacating the Final Rule under the APA, and preliminarily and permanently enjoining its enforcement, as well as any further attempts to interpret, apply, or enforce Title IX as including sexual orientation or gender identity in its anti-discrimination mandate.

187.    Likewise, an injunction restraining the Department from applying the Final Rule to the State would also restrain the Department from applying the Rule to subdivisions of the State, including Texas ISDs, thereby redressing injuries caused by depriving ISDs of policies based on respecting biological sex differences. *See Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 362-64 (2009); *see also Commonwealth v. Biden*, 57 F.4th 545, 557 (6th Cir. 2023) ("An injunction barring the federal government from enforcing the mandate against the States would also run to the States' subdivisions and thus would not encroach on the States' own vaccination policies for state employees)".

44

## VI.    Claims

### Count I
### The Final Rule Exceeds Statutory Authority
### and is Not in Accordance with Law
### 5 U.S.C. § 706

188.    Plaintiff incorporates by reference all other paragraphs.

189.    The Final Rule is a final agency action within the meaning of 5 U.S.C. 704 because it was published in the Federal Register following notice-and-comment. 89 Fed. Reg. at 33,474. Texas lacks another adequate remedy by which to challenge the Final Rule, and no legal authority requires that Texas appeal to a superior agency prior to seeking judicial review. 5 U.S.C. § 704.

190.    Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory… authority, or limitations, or short of statutory right." 5 U.S.C. 706(2)(A), (C). This is because "[a]dministrative agencies are creatures of statute" and "accordingly possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022).

191.    The Final Rule is not in accordance with law and exceeds the Department's statutory authority because the plain language of Title IX and its implementing regulations allow recipients of federal education funds to distinguish between biological males and biological females in situations the Final Rule condemns. And the correct interpretation of Title IX's prohibition on discrimination "on the basis of sex" does not include protections for the concepts of sexual orientation or gender identity. Nor does Title IX reach issues of pregnancy discrimination or require professors to accommodate students who skip class to obtain abortions. *See Geduldig v. Aiello*, 417 U.S. 484 (1974). Nor does Title IX require professors and universities to accommodate or employ students who have engaged in the shipment or receipt of abortion pills and abortion-related paraphernalia in violation of federal law. *See* 18 U.S.C. § 1461–1462. And Title IX does not require educational institutions that receive federal funds to cover abortions in student health-insurance plans.

*See* 34 C.F.R. § 106.40(b)(6)(vi)(4). Even if *Bostock* applied to Title IX, the Final Rule must still be vacated as "not in accordance with law" because its requirements extend far beyond *Bostock*'s interpretation of "sex" discrimination.

192.    The Final Rule effectively rewrites the statute from one requiring equal opportunity for both sexes (often through the explicit consideration of biologically based sex differences) into one that requires recipients to engage in sex discrimination in order to accommodate someone's internal sense of gender identity. Indeed, the Final Rule flips Title IX on its head by closing off opportunities to women—the very group the statute was designed to protect. *See, e.g., Soule v. Connecticut Ass'n of Sch., Inc.*, No. 3:20-cv-201, 2021 WL 1617206 (D. Conn. Apr. 25, 2021) (dismissing as moot a suit brought by a group of high school female track athletes seeking to stop two biological males from participating in girls' track competitions), *aff'd*, 57 F.4th 43 (2d Cir. 2022) *and vacated and remanded sub nom.* 90 F.4th 34 (2d Cir. 2023).

193.    As a result of the Final Rule, women, among other things, (a) will be deprived of equal athletic opportunities, such as scholarships; (b) will be forced to accept claims about what makes a person a woman that often rely on sex stereotypes and caricatures; (c) will be put in situations that compromise their bodily privacy; and (d) will likely suffer increased sexual violence since the Final Rule fails to provide any safeguards against sexual predators who claim a female gender identity in order to gain access to women-only spaces.

194.    The Final Rule is not in accordance with law and exceeds the Department's statutory authority because it relies upon the interpretation of Title VII described in *Bostock* and applies it to Title IX, despite the textual and structural differences between the two statutes and the express disclaimer in *Bostock* that its holding did not apply to other federal or state laws. *See Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021) (observing that "Title VII differs from Title IX in important respects").

195.    Defendants lack authority to issue, implement, enforce, or rely on regulations that undermine the purpose of Title IX and are contrary to its text and structure. They cannot circumvent these limitations by citing to a narrow Supreme Court holding involving the interpretation of an unrelated statute that was enacted nearly a decade later, pursuant to a different constitutional power.

196.    The Final Rule is not in accordance with law and exceeds the Department's statutory authority because it expands recipients' liability beyond the scope of the statute. The Final Rule expands Title IX to include "discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity." *Id*. These other grounds, however, are not interchangeable with sex.

197.    In addition, Title IX limits recipients' obligations to discrimination that occur "under" their "education programs or activities." 20 U.S.C. § 1681(a); *see also id.* at § 1687 (defining programs and activities). This means that the discrimination or harassment "must take place in a context subject to the school district's control." *Davis*, 526 U.S. at 645.

198.    The Final Rule nevertheless obliges recipients to "promptly and effectively" address "conduct that occurs in a building owned or controlled by a student organization," 89 Fed. Reg. at 33,886 (34 C.F.R. § 106.11), 33,888 (34 C.F.R. § 106.44); misconduct occurring off campus (online or otherwise) or even "outside the United States," *id*.; and activities that occurred before any of the individuals attended the academic, *id*. at 33,527.

199.    The combination of recipients' heightened liability under the Final Rule, the redefinition of "on the basis of sex" to include sexual orientation and gender identity, and the rejection of the *Davis* standard for determining sex-based harassment, will force recipients, including Texas, to intrude on individuals' free speech and due process rights if they are to remain compliant with the regulations. Defendants lack authority under Title IX to induce public institutions to violate the U.S. Constitution.

200.   The Final Rule is also not in accordance with law and exceeds the Department's statutory authority because Title IX demands that recipients provide equal treatment to both sexes, yet the Final Rule instructs recipients to establish grievance procedures that treat respondents "equitably." See, *e.g.*, 89 Fed. Reg. at 33891 (34 C.F.R. 106.45(b)(1)).

201.   The Final Rule does not define "equity" or "equitably," but Defendants have interpreted the terms elsewhere as necessitating the disparate treatment of individuals based their perceived privilege—the determination of which partially turns on an individual's sex. To the extent that the Final Rule permits disparate treatment on the basis of sex, it contradicts the text, structure, and purpose of Title IX.

202.   The Final Rule attempts to impose a legal duty on recipients of federal funds to protect women who abort their pregnancies even when that abortion violates State law. *See* 88 Fed. Reg. 33,887–888.

203.   Defendants did not act in accordance with the law and exceeded their statutory and regulatory authority when promulgating the Final Rule, and they do not act in accordance with the law and exceed their statutory and regulatory authority when enforcing the policies set forth in these regulations. "Vacatur is the normal remedy under the APA, which provides that a reviewing court 'shall ... set aside' unlawful agency action." *Long Island Power Auth. v. FERC*, 27 F.4th 705, 717 (D.C. Cir. 2022) (quoting 5 U.S.C. § 706(2)).

**Count II**
**The Final Rule is Contrary to U.S. Constitution**
**5 U.S.C. § 706**

204.    Plaintiff incorporates by reference all other paragraphs.

205.    The Final Rule is a final agency action within the meaning of 5 U.S.C. 704 because it was published in the Federal Register following notice-and-comment. 89 Fed. Reg. 33,474 (Apr. 29, 2024). Texas lacks another adequate remedy by which to challenge the Final Rule, and no legal authority requires that Texas appeal to a superior agency prior to seeking judicial review. 5 U.S.C. § 704.

206.    Under the APA, a court must "hold unlawful and set aside agency action" that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

### Free Speech Restrictions

207.    The Final Rule violates the First and Fourteenth Amendments because it imposes viewpoint-based and content-based restrictions on students and employees affiliated with recipients and compels public entities, like Texas, to enforce said restrictions at risk of the federal funds. Specifically, the Final Rule deliberately discards the standard for actionable sexual harassment articulated by the Supreme Court in *Davis* and adopted by the Department in its 2020 rulemaking, in favor of a weaker standard that requires schools to police wide swaths of constitutionally protected activity.

208.    In *Davis*, the Court held that recipients can violate Title IX only if they have "actual knowledge" of sexual harassment and are "deliberately indifferent" to it. 526 U.S. at 650. And the harassment in question must be "so severe, pervasive, *and* objectively offensive that it *denies* its victims the equal access to education." *Id.* at 652 (emphases added). This standard intentionally excludes "a single instance of one-on-one peer harassment," even if "sufficiently severe," and harassment that has only negative effects like "a mere 'decline in grades.'" *Id.* at 652-53.

49

209.    When crafting the *Davis* standard, the Supreme Court made clear that it chose this stringent definition in part to avoid constitutional concerns. *E.g.*, *id.* at 648-49, 652-53. In the dissent, Justice Kennedy had argued that, if schools are liable for student-on-student harassment, then they will adopt "campus speech codes" that "may infringe students' First Amendment rights." *Id.* at 682; *see id.* at 667 (noting that schools' "power to discipline its students" for harassment is "circumscribed by the First Amendment"). In response, the majority explained that its narrow definition accounts for "the practical realities of responding to student behavior." *Id.* at 652-53 (citing the dissent). Those "practical realities," the Court agreed, include the need to comply with the First Amendment. *See id.* at 649 (agreeing with the dissent that schools face "legal constraints on their disciplinary authority" and explaining that its interpretation of Title IX would not require universities to risk "liability" via "constitutional … claims").

210.    Notably, *Davis* refused to adopt the definition of harassment that governs the workplace under Title VII. While actionable harassment under Title VII can be "severe *or* pervasive," students are not employees and Title IX's "severe *and* pervasive" standard reflects the greater First Amendment concerns that arise in the educational context. *See id.* at 651 (emphases added; distinguishing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). In short, "the school is not the workplace." *Adams*, 57 F.4th at 808 (discussing *Davis*).

211.    Hence why the Trump administration "adopt[ed]" the *Davis* standard "verbatim." 85 Fed. Reg. at 30,036; *accord id.* at 30,151-52, 30,164-65 & nn.738-39; 34 C.F.R. §106.30(a). Broader definitions of harassment, the Department found, have "infringed on constitutionally protected speech" and have led "'many potential speakers to conclude that it is better to stay silent.'" 85 Fed. Reg. at 30,164-65 & nn.738-39. According to the Department then, the *Davis* standard "ensures that speech … is not peremptorily chilled or restricted" because it applies only when harassment rises to the

level of "serious *conduct* unprotected by the First Amendment." *Id.* at 30,151-52 (emphasis added); *accord id.* at 30,162-63.

212.    The Department now thinks the Supreme Court's definition isn't good enough; its new definition deviates from *Davis* in several key ways

213.    The Final Rule expands Title IX to cover harassment that's "severe *or* pervasive," 89 Fed. Reg. at 33,884, rather than "severe *and* pervasive," *Davis*, 526 U.S. at 652–53. And the Final Rule applies even if the harassment merely "limits" a person's "ability to participate in or benefit from" a program or activity, 89 Fed. Reg. at 33,884, rather than "denies" a person "access to the educational opportunities or benefits provided by the school," *Davis*, 526 U.S. at 651–53. Broader still, the rule requires recipients to "promptly and effectively end any sex discrimination," regardless whether they were deliberately indifferent to it. *See* 89 Fed. Reg. at 33,889 (Proposed 34 C.F.R. §106.44(f)(1)); *contra Davis*, 526 U.S. at 650–52. As a result, the Final Rule's new hostile-environment definition thus covers a single or isolated incident and all negative effects like a choice to skip class, or a decision not to attend a campus activity. *Davis*, 526 U.S. at 652–53; *accord* 89 Fed. Reg. at 33,511 ("[A] complainant must demonstrate some impact on their ability to participate or benefit from the education program or activity, but the definition does not specify any particular limits or denials."). And the Final Rule's new definition would force students and teachers to, for example, use someone's "preferred pronouns." What's worse, the Final Rule extends to conduct that occurs online, off campus, outside the United States, or even before the relevant individuals attended the school. 89 Fed. Reg. at 33,886, 33,527.

214.    At the same time, the Final Rule expands recipients' obligations far beyond what Title IX allows, such as by reinterpreting the word "sex" to include "sexual orientation" and "gender identity." Hence, not only does the Final Rule fundamentally rewrite Title IX's prohibition on sex-based discrimination, but the failure to affirm a student's gender identity would constitute "sex-based harassment" under the new

51

regulations since it could have negative effects that constitute more than a de minimis harm.

215.    Recipients have an obligation under the Final Rule to "take specific actions … to promptly and effectively prevent sex discrimination," including what the Final Rule defines as sex-based harassment. 89 Fed. Reg. at 33,887. It follows that recipients would have an obligation under the Final Rule to confront students and employees who refuse to affirm someone's sexual orientation or gender identity, up to and including disciplinary proceedings, or risk enforcement proceedings against them for noncompliance.

**OVERBREADTH**

216.    The Final Rule violates the First and Fourteenth Amendments because it is vague and overbroad. The Final Rule promulgates an expansive definition of "sex-based harassment" that covers all "unwelcome" expression—even personal speech made in online forums off campus—that might be deemed (1) "subjectively and objectively offensive" and (2) "so severe or pervasive" that the expressive activity "limits" students' educational participation even slightly. 89 Fed. Reg. at 33,884 (amending 34 C.F.R. § 106.02).

217.    In addition, the Final Rule enlarged the range of subjects in which expressive conduct may cause offense to include sex stereotypes, sex characteristics, pregnancy or related conditions, as well as sexual orientation and gender identity. This broad framework inhibits First Amendment rights by chilling, or risking liability over, students' expression on deeply held views regarding significant moral and political issues that in no way resemble the hostile environment that these regulations allegedly target.

218.    In short, a substantial number of the Final Rule's applications are unconstitutional, when judged in relation to the regulations legitimate sweep. *United States v. Stevens*, 559 U.S. 460, 473 (2010) (internal quotation marks omitted) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008)).

**VOID FOR VAGUENESS**

219.    The Final Rule violates the Fifth and Fourteenth Amendment because it (1) "fails to provide those targeted by the [regulations] a reasonable opportunity to know what conduct is prohibited," *Moore v. Brown*, 868 F.3d 398, 406 (5th Cir. 2017), and (2) "authorizes" and "even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000).

220.    Although "'perfect clarity and precise guidance' are not required," *Doe I v. Landry*, 909 F.3d 99, 117 (5th Cir. 2018) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989)), laws and regulations must provide "sufficient definiteness" that ordinary people can understand what is being prohibited, *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 552 (5th Cir. 2008) (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)).

221.    The Final Rule, however, demarcates permissible and impermissible conduct based on a complainant's subjective and idiosyncratic response, which is unknowable beforehand. *See*, *e.g.*, 89 Fed. Reg. at 33,510 (noting that subjective standard is based on the complainant's perspective). The Department likewise concedes that "gender identity" turns on "an individual's sense of their gender," which the Final Rule neither explains nor defines. 89 Fed. Reg. at 33,809.

222.    Not only do these regulations deny ordinary persons fair notice of what speech and conduct would cause more than a de minimis harm, but their broad sweep allows recipients, coordinators, investigators, and OCR's enforcement division "to pursue their personal predilections" when carrying out the law. *Kolender v. Lawson*, 461 U.S. 352, 358 (1983). The result will be a regime that falls more heavily on unpopular and controversial opinions while giving orthodox positions a pass.

**DUE PROCESS RIGHTS**

223.    The Final Rule violates the Fifth and Fourteenth Amendments by inducing recipients, including public entities like Texas, to deny students and employees due process protections when accused of sex-based harassment. Circuit courts across the country

recognize that students have protected constitutional interests in their pursuit of higher education. *See, e.g.*, *Plummer v. Univ. of Hous.*, 860 F.3d 767, 774 & n.6 (5th Cir. 2017). And the Supreme Court has assumed such rights in deciding due process cases in the higher education context. *See Regents of Univ. of Mich. v. Ewing,* 474 U.S. 214, 222–23 (1985).

224.    The fundamental tenets of due process require public schools to avoid arbitrary decision making and reduce the risk of erroneous deprivations of protected rights by balancing the individual's interests with the cost of additional due process measures that would guard against that risk. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). The 2020 Rule established a procedural due process standard that would pass constitutional muster in most, if not all, cases. But instead of preserving this benchmark, the Final Rule eliminated or made discretionary many of the safeguards that protected students and employees accused of harassment from arbitrary decision-making.

225.    Although the specific requirements of constitutional due process vary on a case-by-case basis, including in the Title IX context, the Final Rule's overhaul of Title IX grievance procedures has serious implications for individual due process rights. The Texas Attorney General explained during the notice-and-comment period that the Department was reducing protections at the same time it was amplifying recipients' liability. The combination will pressure recipients to curtail the rights of the accused below the constitutional minimum, as it did when the Department issued its 2011 Dear Colleague Letter.

## Count III
## Arbitrary and Capricious Agency Action
## 5 U.S.C. § 706

226.    Plaintiff incorporates by reference all other paragraphs.

227.    The Final Rule is a final agency action within the meaning of 5 U.S.C. 704 because it was published in the Federal Register following notice-and-comment. 89 Fed. Reg. at 33,474. Texas lacks another adequate remedy by which to challenge the Final Rule, and no legal authority requires that Texas appeal to a superior agency prior to seeking judicial review. 5 U.S.C. § 704.

228.    Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary," "capricious," or "an abuse of discretion." 5 U.S.C. § 706(2)(A). This means if an agency action is not "reasonable and reasonably explained," it must be vacated. *Wages & White Lion Investments, L.L.C. v. FDA*, 16 F.4th 1130, 1136 (5th Cir. 2021) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)); *see Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 224 (2016) ("[A] lack of reasoned explication for a regulation that is inconsistent with the Department's longstanding earlier position results in a rule that cannot carry the force of law.").

229.    "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

230.    Defendants did not engage in reasoned decision-making, but instead acted arbitrarily and capriciously in issuing the Final Rule.

231.    To summarize a few flaws, the Rule is internally inconsistent, fails to define key terms, disregards evidence submitted, makes decisions that are counter to the evidence before the Department, fails to properly balance all the relevant interests that would be affected by the Department's changed position, and routinely offers "conclusory statements" rather than real responses to valid and serious concerns submitted by commenters. *See Louisiana v. U.S. Dep't of Energy*, 90 F.4th 461, 473 (5th Cir. 2024).

232.    The Final Rule fails arbitrary-and-capricious review because the Department neglected to offer a reasoned explanation for the Final Rule's departure from the historic understanding—including within previous Title IX regulations—of Title IX's prohibition on "sex" discrimination. The Department noted during its 2020 regulations that "Title IX and its implementing regulations include provisions that presuppose sex as a binary classification." It further observed that provisions in the Department's then-existing regulations reflected that premise. 85 Fed. Reg. at 30,178.

233.    Instead of confronting this history, the Department deflected by referencing the Supreme Court's decision in *Bostock*, but that is insufficient given the textual and structural differences between the two statutes and the express disclaimer in *Bostock* that its holding did not apply to other laws. The Department compounds the problems with its analysis by dismissing multiple court opinions, including from this Court, that recognized "*Bostock* … was limited only to Title VII itself" and "does not stretch to [other statutes]." *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021); *Neese*, 640 F. Supp. 3d 668; *compare* 89 Fed. Reg. at 33,806.

234.    In addition, when an agency changes its position, the agency must "recognize[ ] the change, reason[ ] through it without factual or legal error, and balance[ ], all relevant interests affected by the change*." Louisiana*, 90 F.4th at 469. The Department, however, refused to dutifully consider the reliance interest Texas and other recipients had with respect to the Department's historic understanding of Title IX.

235.    Nor did the Department address the States' practical concerns about authenticating gender identity or the risk that the Department's policy would pose to student safety and privacy. The Department had before it significant evidence that permitting individuals who identify as transgender to use bathrooms or locker rooms associated with their gender identity, as opposed to their biological sex, subjected students to distress and embarrassment as well as an increased risk of harassment or assault. Yet, its response simply stated that the Department "does not agree." 89 Fed. Reg.at 33,820.

236. This dismissal of commenters' substantive concerns characterized the entire rulemaking process.

237. The Final Rule also fails arbitrary-and-capricious review because it is contradictory, failing to reasonably explain treating like circumstances differently. It declines to apply its gender-identity mandate to "living facilities" by pointing to the statutory exceptions in 20 U.S.C. § 1681(1)-(9). 89 Fed. Reg. at 33,816, 33,818–19. But it applies its mandate to "toilet, locker room, and shower facilities," permitted to be sex-separated by rule, 34 C.F.R. § 106.33.

238. The Final Rule also fails the test of reasoned decision-making by failing to address how its gender-identity mandate applies to "nonbinary," "bisexual," or "questioning individuals."

239. The Final Rule's cost-benefit analysis is also wholly deficient. The Final Rule assumes the average time to read and understand the final, 423-page regulation will be 4 hours for a Title IX Coordinator and lawyers, which defies belief. *See* 89 Fed. Reg at 33,867. The Rule's other cost-and-benefit assumptions are equally absurd, including its failure to include any construction costs based on Defendants' refusal to acknowledge the Final Rule will require schools to modify bathrooms and locker rooms. *See*, *e.g.*, 89 Fed. Reg. at 33,876.

240. Turning to the Final Rule's other changes, the Final Rule fails arbitrary-and-capricious review because the Department neglected to reasonably consider the constitutional concerns raised by its new definition of sex-based harassment, its new geographic scope, and the reduction of due process protections for those accused of misconduct—let alone taken together. The Department likewise failed to consider how these new provisions affect recipients' liability.

241. Take, for example, the Final Rule's new definition of sex-based harassment. The Department first contends that it "is not required to adopt the *Gebser/Davis* standard" at all because those cases were private lawsuits, not "administrative enforcement." 89 Fed.

Reg. at 33,560. This reasoning makes no sense. The Supreme Court was interpreting Title IX. Whether a private plaintiff is bringing a lawsuit or the Department is bringing an enforcement action, the language of Title IX is the same. *See Clark v. Martinez*, 543 U.S. 371, 380-81 (2005) (courts cannot construe the same statute one way in one factual context and another way in another factual context). As are the concerns that the Court articulated in *Davis*, including the First Amendment concerns that arise by overly broad definitions of harassment. Title IX is not "a chameleon" whose "meaning [is] subject to change depending on the presence or absence of constitutional concerns in each individual case." *Id.* at 382. *Davis* based its standard on what Title IX "makes clear," yet the Department deviates from *Davis*'s clear instruction without a reasoned justification. *Davis*, 526 U.S. at 650. Here, *Davis*'s "lowest common denominator," which takes account for the constitutional concerns, must control. *Clark*, 543 U.S. at 380.

242.     Unlike the 2020 Rule, the Final Rule contradicts *Davis* when it expands Title IX to cover harassment that's "severe *or* pervasive," 89 Fed. Reg. at 33,884, rather than "severe *and* pervasive," *Davis*, 526 U.S. at 652-53. And the Final Rule applies even if the harassment merely "limits" a person's "ability to participate in or benefit from" a program or activity, 89 Fed. Reg. at 33,884, rather than "denies" a person "access to the educational opportunities or benefits provided by the school," *Davis*, 526 U.S. at 651-53. Broader still, the rule requires recipients to "promptly and effectively end any sex discrimination," regardless of whether they were deliberately indifferent to it. *See* 89 Fed. Reg. at 33,889 (Proposed 34 C.F.R. §106.44(f)(1)); *contra Davis*, 526 U.S. at 650-52. As a result, the Final Rule's new hostile-environment definition thus covers a single or isolated incident and all negative effects like a choice to skip class, or a decision not to attend a campus activity. *Davis*, 526 U.S. at 652-53; *accord* 89 Fed. Reg. at 33,511 ("[A] complainant must demonstrate some impact on their ability to participate or benefit from the education program or activity, but the definition does not specify any particular limits or denials."). And the Final Rule's new definition would force students and teachers to, for example, use

58

someone's "preferred pronouns." What's worse, the Final Rule extends to conduct that occurs online, off campus, outside the United States, or even before the relevant individuals attended the school. 89 Fed. Reg. at 33,886, 33,527. And because the Final Rule thus raises First Amendment and other constitutional concerns, Defendants acted arbitrarily and capriciously when they failed to engage in reasoned decisionmaking in addressing these concerns.

243.    Defendants also acted arbitrarily and capriciously when they failed to reasonably consider the lose-lose situation the Final Rule places on funding recipients through its illegal redefinition of "sex-based harassment." Justice Kennedy warned in his dissent for four Justices that "[o]n college campuses, and even in secondary schools, a student's claim that the school should remedy a sexually hostile environment will conflict with the alleged harasser's claim that his speech, even if offensive, is protected by the First Amendment. In each of these situations, the school faces the risk of suit, and maybe even multiple suits, regardless of its response." *Davis*, 526 U.S. at 682–83 (Kennedy, J., dissenting). The majority avoided this problem by stressing the deliberate-indifference requirement to liability and the stringent definition of actionable harassment. By abandoning the deliberate-indifference requirement, the Department unravels *Davis*'s reasoning.

244.    The Department's hostile-environment definition is also internally inconsistent, rendering the rule arbitrary and capricious. It stresses a "totality of circumstances" test that considers, among other things, "[t]he degree to which the conduct affected the complainant's ability to access the recipient's education program or activity." 89 Fed. Reg. at 33,884 (34 C.F.R. §106.2). But that factor is in tension with the Department's other statement that "sex-based conduct meets the 'severe or pervasive' standard of sex-based harassment if it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity." 89 Fed. Reg. at 33,508. The Department reads out "severe or pervasive" from its definition. It is not clear why the

degree of harm matters if the only requirement is that the harassment "limits" the individuals' ability to participate in education, and the Department provides no reasonable explanation justifying this tension.

245.    Further, the Department's action is arbitrary and capricious because it fails to reasonably address comments on misgendering. The Department noted that a commenter raised the Department's "recent resolution letter finding that a school district violated Title IX when it failed to effectively respond to a misgendering of a student." 89 Fed. Reg. at 33,516. Other commentators also "urged" the Department to state that "misgendering is a form of sex-based harassment that can create a hostile environment." 89 Fed. Reg. at 33,516. Many commentators also raised the notice of proposed rulemakings seeming approval of the 2016 Dear Colleague Letter, stating that misgendering is punishable harassment. Rather than address these comments or the 2016 letter, the Department did not meaningfully engage with either comment or even cite the 2016 letter, but merely stated that the issue "is necessarily fact-specific" and that "a stray remark, such as a misuse of language, would not constitute harassment under this standard." 89 Fed. Reg. at 33,516. The terse statement is hardly "'reasoned decisionmaking.'" *Michigan*, 576 U.S. at 750. Commentators put the Department on notice of the 2016 letter and the resolution, so the Department was obligated to address those "relevant authorit[ies]" and explain any "inconsistencies" or differences in position. *Data Mktg.*, 45 F.4th at 857.

246.    The Texas Attorney General alerted the Department during the notice-and-comment period that the combination of heighten liability and diminished safeguards would pressure recipients into violating the constitutional rights of students and employees, as demonstrated by the aftermath of the 2011 Dear Colleague Letter. The Department's response was simply that "nothing in the regulations requires or authorizes a recipient to violate anyone's [constitutional] rights." 89 Fed. Reg. at 33,516.

247.    "[B]are acknowledgement" of a concern "is no substitute for reasoned consideration." *Louisiana*, 90 F.4th at 473. The Final Rule charges recipients to "promptly

and effectively" respond to "conduct that reasonably may constitute sex discrimination."
89 Fed. Reg. at 33,888. It then defines sex discrimination so broadly that recipients would
be in violation of their obligations if they did not step in to "end" protected activity,
"prevent its recurrence, and remedy its effects." *Id.* at 33,592.

248.     Indeed, the Final Rule's boilerplate denials of authorizing violations of the
First Amendment are contradictory and omit discussion of relevant factors. The Final Rule
incorporates EEOC gender-identity guidance, 89 Fed. Reg. at 33,516, which states that
"intentionally and repeatedly using the wrong name and pronouns to refer to a transgender
employee could contribute to an unlawful work environment." EEOC, *Sexual Orientation
and Gender Identity (SOGI) Discrimination*, https://www.eeoc.gov/sexual-orientation-and-
gender-identity-sogi-discrimination#:~:text=Although%20accidental%20misuse%
20of%20a,an%20unlawful%20hostile%20work%20environment. But requiring employees to
use pronouns based on gender identity rather than biological sex is unconstitutional.

249.     It is not enough for the Department to say that the Final Rule accommodates
recipients' constitutional limits when a fair (and more natural) reading of the regulations
lead to an opposite result. Furthermore, courts have recognized a private right of action.
Even if the Department elects not to initiate enforcement proceedings in such
circumstances, Texas and other public recipients would still be subject to litigation from
private individuals.

250.     Texas should not have to risk liability for respecting the rights of its students
and employees.

251.     The Department also failed to adequately articulate its departure from
established Supreme Court precedent governing Title IX, as well as policies adopted by the
Department in previous rulemakings. For example, the 2020 Rule adopted the Supreme
Court's deliberate-indifference requirement for liability because "the recipient cannot
commit its own misconduct unless the recipient first knows of the sexual harassment that
needs to be addressed." 87 Fed. Reg. at 41,432. The Department now changes course,

asserting that it "is not required to adopt the *Gebser/Davis* standard" because "the standard for administrative enforcement is not derived from the same implied remedy discussed in *Gebser* and *Davis*." 89 Fed. Reg. at 33,560.

252.    This reasoning is arbitrary and capricious. Not only does it fail to explain the reason for the about face, but the agency has no authority to override the Supreme Court's interpretations of Title IX. Whether a private plaintiff is bringing a lawsuit, or the Department is bringing an enforcement action, the language of Title IX is the same. The Supreme Court in *Davis* determined when a school could be liable for sex-based harassment and articulated a definition of actionable harassment standard that balanced the objectives of Title IX with the constitutional interests of respondents, which the Department adopted in the 2020 Rule. The Department has no right to define actionable harassment differently from the Supreme Court. The Final Rule also fails to recognize how its standard regarding gender-identity discrimination undercuts its separate ongoing rulemaking process specific to athletics. *Cf. Portland Cement Ass'n v. EPA*, 665 F.3d 177, 187 (D.C. Cir. 2011) ("an agency must have a similar obligation to acknowledge and account for a changed regulatory posture the agency creates—especially when the change impacts a contemporaneous and closely related rulemaking"); *Office of Commc'n of the United Church of Christ v. FCC,* 707 F.2d 1413, 1441–42 (D.C. Cir. 1983) (finding it "seriously disturbing" and "almost beyond belief" that an agency would take rulemaking action undercutting another "concurrent" rulemaking process).

253.    Finally, the Department repeatedly failed to adequately consider the effects of its terms on the States and their reliance interests of over 50 years of Title IX and its regulations. When commentators raised concerns about preemption, Defendants expressly "decline[d] to opine on how [the Final Rule] interacts or conflicts with any specific State laws because it would require a fact-specific analysis," and instead "refer[red] the public to § 106.6(b), which affirms that a [school's] obligation to comply with Title IX and the regulations is not obviated or alleviated by any State or local law." 89 Fed. Reg. at 33,822.

This does not satisfy Defendants' obligation to "adequately assess reliance interests" or "reasonably consider[] the relevant issues and reasonably explain[] the decision." *Texas v. Biden*, 10 F.4th 538, 552, 555 (5th Cir. 2021).

**Count IV**
**Declaratory Judgment**
**28 U.S.C. § 2201 and 5 U.S.C. § 706**

254.   Plaintiff incorporates by reference all other paragraphs.

255.   "In a case of actual controversy within its jurisdiction … any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).

256.   This case presents an actual controversy because the Final Rule directly regulates the States as recipients of Title IX funds. Enforcement of the Final Rule would force recipients to violate State laws and alter school facilities and policies, or otherwise risk losing billions of dollars of education funds they depend on.

257.   This Amended Complaint is an appropriate pleading, and this Court has jurisdiction over this case.  And the Court can resolve the controversy over the legality of the Final Rule by declaring that Title IX does not authorize the mandates of the Final Rule.

## VII.   Demand for Relief

This Court is authorized to award the requested vacatur and declaratory and injunctive relief under the APA, 5 U.S.C. §§ 702, 705, and 706; 28 U.S.C. § 1361; the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202; Federal Rules of Civil Procedure 57 and 65; and the general and legal equitable powers of the Court. For these reasons, Texas respectfully requests that the Court:

    i.   Postpone the effective date of (*i.e.,* stay) the Final Rule under 5 U.S.C. § 705 and hold unlawful and set aside (*i.e.*, vacate) the Final Rule under 5 U.S.C. § 706(2);

ii.      Enter a judgment declaring that (1) the Final Rule is contrary to law and exceeds the agency's statutory authority; (2) the Final Rule was not a result of reasoned decisionmaking but is instead arbitrary and capricious; (3) the Final Rule is contrary to a constitutional right, power, privilege or immunity; and (4) the State of Texas, including all of Texas's instrumentalities, agencies, and political subdivisions, may continue to receive Title IX funding notwithstanding any failure to adhere to the Final Rule's unlawful requirements;

iii.     Issue preliminary and permanent injunctive relief prohibiting Defendants from interpreting or enforcing Title IX as barring discrimination based on sexual orientation or gender identity—including by denying federal financial assistance or by otherwise pursuing, charging, or assessing any penalties, fines, assessments, investigations, or other enforcement actions—against the State of Texas, including all of Texas's instrumentalities, agencies, and political subdivisions;

iv.      Issue preliminary and permanent injunctive relief prohibiting Defendants from interpreting, enforcing, or relying on any portion of the Final Rule that violates Title IX, the APA, or the federal Constitution—including by denying federal financial assistance or by otherwise pursuing, charging, or assessing any penalties, fines, assessments, investigations, or other enforcement actions—against the State of Texas, including all of Texas's instrumentalities, agencies, and political subdivisions;

v.       Award such other relief as the Court deems equitable and just.

Dated: May 13, 2024.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy Attorney General for Legal Strategy

*/s/Ryan D. Walters*
RYAN D. WALTERS
Chief, Special Litigation Division
Ryan.Walters@oag.texas.gov

AMY SNOW HILTON
Special Counsel
Amy.Hilton@oag.texas.gov

KATHLEEN T. HUNKER
Special Counsel
Kathleen.Hunker@oag.texas.gov

JOHNATHAN STONE
Special Counsel
Johnathan.Stone@oag.texas.gov

GARRETT GREENE
Special Counsel
Garrett.Greene@oag.texas.gov

MUNERA AL-FUHAID
Special Counsel
Munera.Al-fuhaid@oag.texas.gov

ZACHARY BERG
Special Counsel
Zachary.Berg@oag.texas.gov

ETHAN SZUMANSKI
Special Counsel
Ethan.Szumanski@oag.texas.gov

KYLE TEBO
Assistant Attorney General
Kyle.Tebo@oag.texas.gov

Office of the Attorney General of Texas
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: 512-463-2100
Fax: 512-457-4410

COUNSEL FOR STATE OF TEXAS

GENE P. HAMILTON
America First Legal Foundation
611 Pennsylvania Ave. SE #231
Washington, DC 20003
(202) 964-3721
Gene.Hamilton@aflegal.org

COUNSEL FOR STATE OF TEXAS, DANIEL A.
BONEVAC & JOHN HATFIELD

JONATHAN F. MITCHELL
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
Jonathan@mitchell.law

COUNSEL FOR PLAINTIFFS
DANIEL A. BONEVAC AND JOHN HATFIELD

### CERTIFICATE OF SERVICE

I certify that on May 13, 2024, this document was filed through the Court's CM/ECF system, which served it upon all counsel of record.

*/s/ Ryan D. Walters*
RYAN D. WALTERS