# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

STATE OF TEXAS, ET AL.,
    *PLAINTIFFS,*

V.

THE UNITED STATES OF AMERICA, ET AL.,
    *DEFENDANTS.*

NO. 2:24-CV-86-Z

## PLAINTIFFS' MOTION FOR STAY OF AGENCY ACTION AND PRELIMINARY INJUNCTION

TABLE OF CONTENTS

Table of Contents..................................................................................................................ii

Index of Authorities............................................................................................................iv

Introduction .........................................................................................................................1

Background ...........................................................................................................................3

    A.    Early Interpretations of Title IX adopted a biology-based approach.......................3

    B.    The Obama Administration tries to redefine "sex" to include gender identity. .....5

    C.    The Trump Administration rescinds the Obama Administration guidance. ...........7

    D.    The Supreme Court decides *Bostock*...............................................................9

    E.    The Biden Administration initiates efforts to redefine "sex" under Title IX........10

    F.    The Biden Administration publishes the Proposed Rule to replace the 2020 Rule and overhaul Title IX. ...............................................................................................12

    G.    The Final Rule is published in substantially the same form as the Proposed Rule. 13

Standard .............................................................................................................................15

Argument............................................................................................................................16

  I.    Texas is Likely to Prevail on the Merits. ...........................................................16

    A.    The Rule illegally redefines Title IX's prohibition on "sex" discrimination..........17

      1.    The Final Rule illegally redefines "sex."...................................................17

      2.    The Final Rule's transformation of "sex" is arbitrary and capricious..................25

    B.    The Final Rule wrongfully protects abortion. ........................................................28

    C.    The Final Rule illegally redefines "sex-based harassment." ....................................30

      1.    The Final Rule's unlawful redefinition of sex-based harassment is contrary to law. 30

      2.    The Final Rule's unlawful redefinition of sex-based harassment is also arbitrary and capricious. ....................................................................................................31

    D.    The Final Rule illegally changes procedural safeguards in the Title IX grievance process. ...............................................................................................................33

      1.    The Department only considered the changes in isolation. ...................................33

      2.    The Department's reasoning was flawed even when the changes are considered one-by-one. ...........................................................................................................35

    E.    The Final Rule illegally expands scope of recipients' liability beyond the scope of the statute. ...............................................................................................................39

  II.    Texas will suffer irreparable harm if the Final Rule takes effect, as will other recipients. ...............................................................................................................39

    F.    Texas is the object of the Final Rule and faces compliance costs.........................40

    G.    The Final Rule expands liability to Texas and other recipients of federal education funds. ...............................................................................................................44

H.      The Final Rule infringes on Texas's sovereignty. ...................................................46

III.    The public interest and balance of equities favors Plaintiffs........................................49

Conclusion..................................................................................................................................50

## INDEX OF AUTHORITIES

### Cases

*Portland Cement Ass'n v. EPA,*
  665 F.3d 177 (D.C. Cir. 2011) ...................................................................................40

*Adams v. Sch. Bd. of St. Johns Cnty.,*
  57 F.4th 791 (11th Cir. 2022) .....................................................................................6

*Adams v. Sch. Bd. of St. Johns Cnty.,*
  57 F.4th 791 (11th Cir. 2022) (en banc) ........................................................27, 32, 33

*Adams v. Sch. Bd. of St. Johns Cty.,*
  3 F.4th 1299 (11th Cir. 2021) (Pryor, C.J., dissenting),
  *rev'd by Adams,* 57 F.4th 791 ..............................................................................35, 36

*Affinity Healthcare Servs., Inc. v. Sebelius,*
  720 F. Supp. 2d 12 (D.D.C. 2010) ..............................................................................23

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.,*
  141 S. Ct. 2485 (2021)................................................................................................33

*All. for Hippocratic Med. v. U.S. Food & Drug Admin.,*
  78 F.4th 210 (5th Cir. 2023)........................................................................................24

*Averett v. Hardy,*
  2020 WL 1033543 (W.D. Ky. Mar. 3, 2020) ..............................................................53

*B.P.J. v. W. Virginia,*
  ECF 42, No. 2:21-cv-316 (S.D. W. Va. Jun. 17, 2021) .............................................21

*Bostock v. Clayton Cnty., Georgia,* 590 U.S. 644 (2020) .......................................passim

*Career Colleges & Sch. of Texas v. United States Dep't of Educ.,*
  98 F.4th 220 (5th Cir. 2024)................................................................................24, 57

*Cf. Raytheon Co. v. Hernandez,*
  540 U.S. 44 (2003) ......................................................................................................36

*Cummings v. Premier Rehab Keller, PLLC,*
  596 U.S. 212 (2022)....................................................................................................32

*Data Mktg. v. United States Dep't of Labor,*
  45 F.4th 846 (C.A.5 (Tex.), 2022) ..............................................................................47

*Dobbs v. Jackson Women's Health Org.,*
  142 S. Ct. 2228 (2022)................................................................................................42

*Doe 2 v. Shanahan,*
  917 F.3d 694 (D.C. Cir. 2019) ...................................................................................36

*Doe v. Baum,*
  903 F.3d 575 (6th Cir. 2018) ......................................................................................52

*Doe v. Brandeis Univ.,*
  177 F. Supp. 3d 561 (D. Mass. 2016) .........................................................................51

*Doe v. Purdue Univ.,*
  928 F.3d 652 (7th Cir. 2019).......................................................................................53

*Doe v. Trump,*
  3:19-cv-1743, 2020 WL 1853657 (D. Or. Apr. 13, 2020)..........................................22

*Encino Motorcars, LLC v. Navarro,*
  579 U.S. 211 (2016)....................................................................................................37

*FCC v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009)......................................................................................51, 52, 54

*FDA v. Brown & Williamson Tobacco Corp.,*
  529 U.S. 120 (2000) ..............................................................................................33
*FDA v. Brown & Williamson Tobacco Corp.,*
  529 U.S. 120, (2000) .............................................................................................33
*Franciscan All., Inc. v. Burwell,*
  7:16-cv-10, 2016 WL 9281524 (N.D. Tex. Nov. 1, 2016) ...................................22
*Goss v. Lopez,*
  419 U.S. 565 (1975) ..............................................................................................50
*Humana, Inc. v. Avram A. Jacobson,*
  *M.D., P.A.,* 804 F.2d 1390 (5th Cir. 1986) ....................................................56, 57
*Judulang v. Holder,*
  565 U.S. 42 (2011) ................................................................................................55
*King v. Burwell,*
  576 U.S. 473 (2015) ..............................................................................................33
*L.W. ex rel. Williams v. Skrmetti,*
  73 F.4th 408 (6th Cir. 2023) (Sutton, C.J.)..........................................................26
*Louisiana v. U.S. Dep't of Energy,*
  90 F.4th 461 (5th Cir. 2024)............................................................................38, 39
*Maner v. Dignity Health,*
  9 F.4th 1114 (9th Cir. 2021) .................................................................................31
*Mathews v. Eldridge,*
  424 U.S. 319 (1976) ..............................................................................................50
*Mexican Gulf Fishing Co. v. U.S. Dep't of Com.,*
  60 F.4th 956 (5th Cir. 2023) .................................................................................50
*Michigan v. EPA,*
  576 U.S. 743 (2015) ..............................................................................................47
*Mock v. Garland,*
  75 F.4th 563, (5th Cir. 2023) ................................................................................24
*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.,*
  463 U.S. 29 (1983) ..........................................................................................37, 49
*Neese v. Becerra,*
  640 F. Supp. 3d 668 (N.D. Tex. 2022) .............................................................26, 38
*Neese v. Becerra,*
  No. 2:21-cv-163-Z, 2022 WL 1265925 (N.D. Tex. Apr. 26, 2022) ...................3, 9
*Nken v. Holder,*
  556 U.S. 418 (2009) ..............................................................................................23
*Office of Commc'n of the United Church of Christ v. FCC,*
  707 F.2d 1413 (D.C. Cir. 1983) ............................................................................40
*Oncale v. Sundowner Offshore Servs., Inc.,*
  523 U.S. 75 (1998) ..........................................................................................29, 30
*Pelcha v. MW Bancorp, Inc.,*
  988 F.3d 318 (6th Cir. 2021) ...........................................................................27, 38
*Pennhurst State Sch. & Hosp. v. Halderman,*
  451 U.S. 1 (1981) ..................................................................................................32
*Phillips v. Martin Marietta Corp.,*
  400 U.S. 542 (1971) ..............................................................................................31
*Tennessee v. United States Dep't of Educ.,*
  615 F. Supp. 3d 807 (E.D. Tenn. 2022) ................................................................17

v

*Texas v. Biden,*
    10 F.4th 538 (5th Cir. 2021) ........................................................................41
*Texas v. EPA,*
    829 F.3d 405 (5th Cir. 2016) ................................................................. 23, 57
*Texas v. United States,*
    201 F. Supp. 3d 810 (N.D. Tex. 2016) ........................................................10
*Texas v. United States,*
    2016 WL 7852331, No. 7:16-cv-00054-O (N.D. Tex. Mar. 3, 2017) ............10
*Valley v. Rapides Parish School Bd.,*
    118 F.3d 1047 (5th Cir. 1997) .....................................................................22
*Wages & White Lion Invs., L.L.C. v. United States Food & Drug Admin.,*
    16 F.4th 1130 (5th Cir. 2021) .....................................................................24
*Wages & White Lion Invs.L.L.C v. FDA,*
    16 F.4th 1130 (C.A.5, 2021) ................................................................. 37, 57
*West v. Radtke,*
    48 F.4th 836 (7th Cir. 2022) .......................................................................30
*Willingham v. Macon Tel. Publ'g Co.,*
    507 F.2d 1084 (5th Cir. 1975) (en banc) .....................................................31
*Zarda v. Altitude Express, Inc.,*
    883 F.3d 100 (2d Cir. 2018) (en banc) .............................................30, 31, 35

### Statutes

18 U.S.C. § 1461–462 ...................................................................................41
18 U.S.C. § 249(a)(2) .....................................................................................7
20 U.S.C. § 1681(a) .........................................................................26, 27, 56
20 U.S.C. § 1681(a)(3) ....................................................................................5
20 U.S.C. § 1681(a)(5) ....................................................................................5
20 U.S.C. § 1681(a)(6) ....................................................................................5
20 U.S.C. § 1681(a)(6)-(7) ..............................................................................5
20 U.S.C. § 1681(a)(8) ....................................................................................5
20 U.S.C. § 1681(a)(9) ....................................................................................5
20 U.S.C. § 1686 .......................................................................................4, 27
20 U.S.C. § 1687 ...........................................................................................56
34 U.S.C. § 12291(a)(15) ................................................................................7
34 U.S.C. § 12291(b)(13)(A) ...........................................................................7
34 U.S.C. §12291(b)(13)(B) .............................................................................7
42 U.S.C. § 2000e- 2(a) .................................................................................26
42 U.S.C. § 2000e-2(a)(1) .............................................................................27
5 U.S.C. § 706(2) ..........................................................................................25
5 U.S.C. § 706(2)(A) ......................................................................................37
5 U.S.C. §705 ...............................................................................................23
Tex. Health & Safety Code § 170A.002 .........................................................42
Tex. Health & Safety Code § 170A.002(b)(2) .................................................42
Tex. Health & Safety Code §§ 170A.004–.005 ...............................................42
Tex. Penal Code § 12.32–.33 .........................................................................42
Tex. Rev. Civ. Stat. arts. 4512.1–.4, .6 ...................................................42, 43

### Other Authorities

118 Cong. Rec. 5807 (Feb. 28, 1972) ........................................................................4

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 30, at 192–93 (2012) ...................................................................................................................36

Brian A. Pappas, *Procedural Convergence*, 55 Law & Soc'y Rev. 381, 391 (2021) .......................48

Candice Jackson, U.S. Dept. of Educ., *Dear Colleague Letter* (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf ....................11

Catherine E. Lhamon & Vanita Gupta, U.S. Dep'ts of Educ. & Justice, *2016 Dear Colleague Letter on Title IX and Transgender Students,* at 2 (May 13, 2016), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201605-title-ix-transgender.pdf?utm_name= ....................................................................... 9, 10

Catherine E. Lhamon, U.S. Dept. of Educ., *Questions & Answers on Title IX & Sexual Violence* (Apr. 29, 2014), https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf...................8

Exec. Order No. 13,988, 86 Fed. Reg. 7,023 (Jan. 20, 2021) ....................................16

H.R. 1652, 113th Cong. (2013) ....................................................................................9

Joe Biden, *Statement on the Trump Administration Rule to Undermine Title IX & Campus Safety* (May 6, 2020), https://medium.com/@JoeBiden/statement-by-vice-president-joe-biden-on-the-trump-administration-rule-to-undermine-title-ix-and-e5dbc545daa ...................................................15

Jonathan Taylor, *Milestone: 700+ Title IX/Due Process Lawsuits by Accused Students*, Title IX for All (May 11, 2021), https://titleixforall.com/milestone-700-title-ix-due-process-lawsuits-by-accused-students/ ...................................................................................................48

Reed D. Rubinstein, *Memorandum for Kimberly M. Richey, Acting Assistant Sec'y of the Office for Civil Rights, re: Bostock v. Clayton Cty.,* 140 S. Ct. 1731 (2020) (Jan. 8, 2021) at 1, 10, https://www2.ed.gov/about/offices/list/ocr/correspondence/other/ogc-memorandum-01082021.pdf............................................................................................................14

Russlynn Ali, U.S. Dept. of Educ., *Dear Colleague Letter: Sexual Violence* (Apr. 4, 2011), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf........................7

S. 439, 114th Cong. (2015) ..........................................................................................9

Sandra Battle & T.E. Wheeler, II, U.S. Dep'ts of Educ. & Justice, *Dear Colleague Letter on Gender Identity Guidance* (Feb. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201702-title-ix.pdf .............................................................................................11

Suzanne B. Goldberg*, Dear Educator letter on Confronting Anti-LGBTQI+ Harassment in Schools*, at 2 (June 23, 2021), https://www2.ed.gov/about/offices/list/ocr/correspondence/stakeholders/educator-202106-tix.pdf ...................................................................................................................16

Taylor Mooney, *How Betsy DeVos plans to change the rules for handling sexual misconduct on campus*, CBS NEWS (Nov. 24, 2019), https://www.cbsnews.com/news/title-ix-sexual-misconduct-on-campus-trump-administration-changing-obama-rules-cbsn-documentary/........................8

### Regulations

34 C.F.R. § 106 ..........................................................................................................3

34 C.F.R. § 106.33....................................................................................................3, 21

34 C.F.R. § 106.34(a)(3) .............................................................................................3

34 C.F.R. § 106.36(c) .................................................................................................3

34 C.F.R. § 106.37(a)(3) .............................................................................................3

34 C.F.R. § 106.41(c) .................................................................................................3

34 C.F.R. § 106.51(a)(4) .............................................................................................3

34 C.F.R. § 106.58(a) ..................................................................................................3

34 C.F.R. § 106.60(b) .................................................................................................3

34 C.F.R. § 106.61 ......................................................................................................3

34 C.F.R. § 106.41(b)-(c) ...........................................................................................5

34 C.F.R. pt. 86 (1975) ...............................................................................................3

*Enf't of Title IX of the Educ. Amend. of 1972 with Respect to Discrimination Based on Sexual Orientation & Gender Identity in Light of* Bostock v. Clayton County, 86 Fed. Reg. 32,637 (June 22, 2021) .............16

*Nondiscrimination on the Basis of Sex in Educ. Programs or Activities Receiving Fed. Fin. Assistance*, 85 Fed. Reg. 30,026, 30,029 (May 19, 2020) (to be codified at 34 C.F.R. pt 106) ..................................passim

*Nondiscrimination on the Basis of Sex Under Federally Assisted Education Programs and Activities*, 40 Fed. Reg. 24, 128 (Jun. 4, 1975) (codified at 45 C.F.R. pt. 86)........................................................ 3, 21

*Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties*, 62 Fed. Reg. 12,034, 12,039 (Mar. 13, 1997) ................................................................................6

### INTRODUCTION

In 1972, Congress enacted Title IX, which provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

Through an exercise in notice-and-comment rulemaking ordered by President Biden, the U.S. Department of Education (the "Department") has attempted to effect radical social change in our Nation's schools by purporting to "interpret" Title IX to prohibit discrimination based on sexual orientation and gender identity. Stymied in its attempts to implement this agenda through informal agency guidance, and unable to amend Title IX through the legislative process, the Department has now formally amended the Code of Federal Regulations. *Nondiscrimination on the Basis of Sex in Educ. Programs or Activities Receiving Fed. Fin. Assistance*, 89 Fed. Reg. 33,474 (Apr. 29, 2024) (to be codified at 34 C.F.R. pt 106) (the "Final Rule"). The Final Rule tells States and other regulated parties to ignore biological sex or face enforcement actions and the loss of federal education funding.

Contrary to the Department's assertions, the Supreme Court's decision in *Bostock v. Clayton County*, 590 U.S. 644 (2020), does not require—or even allow—the reinterpretation of "on the basis of sex" to include to sexual orientation and gender identity. *Bostock* held only that terminating an employee "simply for being homosexual or transgender" constitutes discrimination "because of … sex" under Title VII. *Id.* at 649–51, 655 (quoting 42 U.S.C. § 2000e-2(a)(1)). The Court "assum[ed]" that the term "sex" means "biological distinctions between male and female," *id.* at 655, and it made clear that its decision did not "sweep beyond Title VII to other federal or state laws that prohibit sex discrimination" or address other issues not before the Court such as "sex-segregated bathrooms, locker rooms, and dress codes." *Id.* at 681; *see also id.* at 669 ("We agree that homosexuality and transgender status are distinct concepts from sex.").

In addition, the Final Rule promises to repeat the disaster that was the Department's ill-advised 2011 Dear Colleague Letter, which had a detrimental impact on publicly funded education across the country, including in Texas. The Final Rule walks back many of the constitutional safeguards issued

1

by the Trump Administration to ensure that students accused of harassment have access to a fair hearing. At the same time, the Final Rule redefines harassment to include constitutionally protected activity. Not only does this put Texas schools in a no-win situation—where adherence to the Constitution risks the loss of federal funds—but students and faculty risk having their futures upended merely for refusing to go along with the Biden Administration's radical social agenda.

The Final Rule violates the Administrative Procedure Act (APA). 5 U.S.C. § 706. It is substantively unlawful because its purported "interpretations" of Title IX squarely conflict with the text of that statute. Title IX, by its plain text, defines "sex" as "one sex" that is male or female. *See* 20 U.S.C. § 1681(a)(5) (describing those institutions which have a policy of admitting "only students of one sex"). The Department, furthermore, engaged in arbitrary-and-capricious decisionmaking when promulgating these regulations because it failed to define the amorphous concepts of "gender identity" and "sexual orientation," failed to adequately consider all relevant factors, and failed to adequately explain its reversal of past policies.

Title IX does not apply to discrimination based on sexual orientation or gender identity. But even if those concepts were protected against discrimination by Title IX, the Final Rule's provisions do not faithfully implement such protections because they mark as unlawful school policies that do not discriminate based on those grounds—instead, the Final Rule *requires* schools to discriminate based on sexual orientation and gender identity by allowing single-sex programs and facilities but requiring opposite-sex access to them for only those individuals purporting to have a transgender identity.

Texas and two Private Plaintiffs employed at the University of Texas seek preliminary relief to prevent irreparable injury from the Final Rule before it goes into effect August 1, 2024. The Court should postpone the effective date of the Final Rule under the stay provision of the APA. 5 U.S.C. § 705. It should also preliminarily enjoin the application and enforcement of the Final Rule against Texas, including its instrumentalities, agencies, and political subdivisions. Preliminary injunctive relief should also preclude Defendants from interpreting, applying, or enforcing Title IX as prohibiting discrimination on the bases of sexual orientation or gender identity.

As indicated in the certificate of conference, Defendants are unable at this time to state

whether or not they oppose this motion.

BACKGROUND

**A.  Early Interpretations of Title IX adopted a biology-based approach.**

The Department's predecessor agency[1] first issued regulations implementing Title IX in 1975. *See* 34 C.F.R. § 106. These regulations treated sex as a binary, referring multiple times to "one sex," especially versus "the other sex," using the phrase "both sexes," and referencing "boys and girls" and "male and female teams." *See, e.g.*, 34 C.F.R. §§ 106.33, 106.34(a)(3), 106.36(c), 106.37(a)(3), 106.41(c), 106.51(a)(4), 106.58(a), 106.60(b), 106.61; *see also* 34 C.F.R. pt. 86 (1975).

This makes sense, as Title IX's test and structure presuppose sexual dimorphism—requiring equal treatment for each sex. *See, e.g., Neese v. Becerra*, No. 2:21-cv-163-Z, 2022 WL 1265925, at *12 (N.D. Tex. Apr. 26, 2022) (Kacsmaryk, J.) ("Title IX presumes sexual dimorphism in section after section, requiring equal treatment for each 'sex.'")

Indeed, at the time of its enactment, the term "sex" in Title IX referred to a person's immutable biological sex—male or female. *See* Webster's Third New International Dictionary (1966) ("One of the two divisions of organic, especially human beings, respectively designated male or female."); American Heritage Dictionary (1969) ("a. The property or quality by which organisms are classified according to their reproduction functions. b. Either of two divisions, designated male and female, of this classification."); Webster's New World Dictionary (1972) ("[E]ither of the two divisions, male or female, into which persons, animals, or plants are divided, with reference to their reproductive functions.").

The structure of Title IX underscores that "sex" means biological sex—not gender identity or any other distinct concept. The statute explicitly permits educational institutions to maintain separate living facilities for the different sexes. 20 U.S.C. § 1686. This provision only makes sense if "sex" refers to the male-female binary and the associated physiological differences. Indeed, Senator Bayh emphasized that Title IX permitted "differential treatment by sex" when necessary, such as "in sport

---

[1] See Nondiscrimination on the Basis of Sex Under Federally Assisted Education Programs and Activities, 40 Fed. Reg. 24, 128 (Jun. 4, 1975) (codified at 45 C.F.R. pt. 86).

facilities or other instances where personal privacy must be preserved." 118 Cong. Rec. 5807 (Feb. 28, 1972) (Statement of Sen. Birch Bayh).[2]

While Title IX generally prohibits discrimination based on biological sex, it recognizes situations where differentiation is appropriate. For instance, it exempts single-sex organizations like fraternities, sororities, the Boy Scouts of America, and Boy or Girl conferences to maintain their exclusivity. 20 U.S.C. § 1681(a)(6)-(7). Traditional single-sex schools and certain religious schools are also exempt and may limit membership to one sex. 20 U.S.C. § 1681(a)(3), (5)).

The early implementing regulations in 1975 recognized that differential treatment was sometimes necessary to ensure equal opportunities based on biological differences. These regulations, which remain in effect as of now,[3] acknowledged that Title IX did not prohibit all differential treatment based on sex but aimed to provide equal opportunities for both sexes despite biological differences. Title IX and its regulations reflect Congress's policy decision to promote equal educational opportunities for both sexes while not disregarding biological differences or mandating identical treatment of males and females in all circumstances. For instance, female college attendance and participation in athletics have soared since Title IX's enactment. *See Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 818–19 (11th Cir. 2022) (Lagoa, J., concurring)).

For decades, the Department operated under the basic premise that "sex" means the

---

[2] Title IX is full of examples of "sex" being referred to as binary:

- The statute exempts a public undergraduate institution with a historic *"policy of admitting only students of one sex."* 20 U.S.C. § 1681(a)(5) (emphasis added).

- Certain organizations whose memberships have *"traditionally been limited to persons of one sex."* 20 U.S.C. § 1681(a)(6) (emphasis added).

- *"Father-son or mother-daughter activities,"* so long as similar opportunities provided for *"one sex"* are offered to *"the other sex."* (20 U.S.C. § 1681(a)(8) (emphasis added).

- Scholarships associated with participation in a beauty pageant *"limited to individuals of one sex only."* (20 U.S.C. § 1681(a)(9) (emphasis added).

Title IX's explicit exclusions for sex-specific organizations further underscore this understanding. *See, e.g.,* 20 U.S.C. § 1681(a)(6) (authorizing certain groups to remain limited to one sex, including fraternities and sororities).

[3] *See, e.g.,* 34 C.F.R. § 106.41(b)-(c) (allowing single-sex teams and requiring recipients to provide "equal athletic opportunity for members of both sexes").

biological male-female binary. In its 1997 guidance clarifying that Title IX covers same-sex sexual harassment, the Department affirmed that "both male and female students are protected from sexual harassment … even if the harasser and the person being harassed are members of the same sex." *Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties*, 62 Fed. Reg. 12,034, 12,039 (Mar. 13, 1997). The same guidance stated that "Title IX does not prohibit discrimination on the basis of sexual orientation," *id.* at 12,036, because "sex" refers to the status of being male or female, not to one's heterosexual or homosexual orientation, or "gender identity."

**B.  The Obama Administration tries to redefine "sex" to include gender identity.**

Following the presidential transition in January 2009, activists launched an aggressive campaign lobbying Congress and the White House to recognize gender identity as a protected class under federal civil-rights laws. Those early lobbying efforts focused on democratically enacted laws. In October 2009, for example, Congress passed hate-crime legislation that included "gender identity" and "sexual orientation" as independently protected characteristics alongside other protected traits like race, religion, and national origin. 18 U.S.C. § 249(a)(2).

In 2013, Congress considered a bill to extend Title IX to gender identity. According to the findings of that proposed law, congressional action was necessary because "federal statutory protections expressly address discrimination on the basis of race, color, sex, religion, disability, and national origin" but "do not expressly include 'sexual orientation' or 'gender identity.'" *To end discrimination based on actual or perceived sexual orientation or gender identity in public schools, and for other purposes*, H.R. 1652, 113th Cong. (2013). The bill failed.

Tellingly, the same year that it rejected the bill to expand Title IX, Congress reauthorized the Violence Against Women Act, and, in the process, amended the law to prohibit recipients of federal grants from discriminating "on the basis" of "sex" *or* "gender identity" *or* "sexual orientation." *See* 34 U.S.C. § 12291(b)(13)(A). Right after listing "sex," "gender identity," and "sexual orientation" as distinct concepts, the law emphasizes that "nothing in this paragraph shall prevent any … program or activity from consideration of an individual's sex" if "*sex segregation* or *sex-specific programming* is necessary

to the essential operation of [the] program." *Id.* §12291(b)(13)(B) (emphasis added). And today, section 12291 also prohibits "female genital mutilation or cutting," which it defines in explicitly biological terms. *See id.* § 12291(a)(15) (incorporation definition of female genital mutilation in 18 U.S.C. § 116).

During the Obama Administration, the Department issued its misguided 2011 Dear Colleague Letter and 2014 Questions and Answers on Title IX Sexual Violence. *See* Russlynn Ali, U.S. Dept. of Educ., *Dear Colleague Letter: Sexual Violence* (Apr. 4, 2011), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf; Catherine E. Lhamon, U.S. Dept. of Educ., *Questions & Answers on Title IX & Sexual Violence* (Apr. 29, 2014), https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf.

These guidance documents asserted—for the first time—that *"*Title IX's sex discrimination prohibition extends to claims of discrimination" based solely on "gender identity." *Questions & Answers on Title IX & Sexual Violence*, at 5 (2014).

The Dear Colleague Letter and 2014 Questions and Answers had a detrimental impact on publicly funded education nationwide, including in Texas. Not only did the two guidance documents introduce significant confusion over academic institutions' obligations under Title IX, but they also created incentives for academic institutions to violate students' constitutional rights in order to avoid incurring liability. To offer some context, before 2011, the number of lawsuits filed against universities for failing to provide due process in Title IX cases averaged one per year—by 2019, over 100 such lawsuits were filed in that year alone. *See* Taylor Mooney, *How Betsy DeVos plans to change the rules for handling sexual misconduct on campus*, CBS NEWS (Nov. 24, 2019), https://www.cbsnews.com/news/title-ix-sexual-misconduct-on-campus-trump-administration-changing-obama-rules-cbsn-documentary/.

Although neither underwent notice-and-comment rulemaking, the two guidance documents put recipients in a no-win situation where either conforming or failing to conform to the guidance documents could expose them to significant risk of litigation.

Twice in the past decade, Congress has considered legislation to amend Title IX to apply to gender identity. *See, e.g.*, H.R. 1652, 113th Cong. (2013); S. 439, 114th Cong. (2015). Yet "Congress

has not amended the law to state as much"; so "it is questionable," to put it mildly, "whether the Secretary can alter the term 'sex' by administrative fiat." *Neese*, 2022 WL 1265925, at *13.

As the failed attempts to amend Title IX piled up, so did the pressure from outside groups demanding that the government change Title IX through unilateral executive action. In May 2016, the Department of Education issued another *Dear Colleague* Letter, this time expanding Title IX obligations to transgender students (the "2016 Guidance"). The 2016 Guidance informed federally funded educational institutions that the Department would "treat a student's gender identity as the student's sex for purposes of Title IX and its implementing regulations." Catherine E. Lhamon & Vanita Gupta, U.S. Dep'ts of Educ. & Justice, *2016 Dear Colleague Letter on Title IX and Transgender Students,* at 2 (May 13, 2016), https://www2.ed.gov/ about/offices/list/ocr/letters/colleague-201605-title-ix-transgender.pdf?utm_name=.

The 2016 Guidance further informed schools that any attempt to restrict shower, bathroom, or locker-room use according to biological sex would be unlawful. *Id.* at 3–4. Schools were also warned that failing to *"*use pronouns and names consistent with a student's gender identity" would constitute unlawful harassment under Title IX. *Id.* at 2–3.

Thirteen states led by Texas sued the federal government, alleging that the 2016 Guidance was unlawful under the APA. The Northern District of Texas agreed and issued a preliminary injunction, concluding that the Department's purported interpretive guidance "failed to comply with" the APA by "contradicting the existing legislative and regulatory texts" and "was likely contrary to law." *Texas v. United States*, 201 F. Supp. 3d 810, 815, 816 n.4, 836 (N.D. Tex. 2016).

### C.  The Trump Administration rescinds the Obama Administration guidance.

In a decisive shift from previous policies, the Trump Administration rescinded the Obama-era gender identity guidance in February 2017, and the lawsuit was voluntarily dismissed. Pls.' Notice of Voluntary Dismissal, *Texas v. United States*, No. 7:16-cv-00054-O, 2016 WL 7852331*,* (N.D. Tex. Mar. 3, 2017), ECF No. 128. This action marked a return to the pre-2014 interpretation of Title IX, where the prohibition on sex-based discrimination was understood to mean biological sex, not gender

identity. This return to the longstanding interpretation was formalized through a Dear Colleague Letter issued by the U.S. Department of Justice and U.S. Department of Education, Office for Civil Rights in February 2017, explicitly withdrawing the previous administration's expansive views on gender identity under Title IX. Sandra Battle & T.E. Wheeler, II, U.S. Dep'ts of Educ. & Justice, *Dear Colleague Letter on Gender Identity Guidance* (Feb. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201702-title-ix.pdf.

It soon became apparent, however, that the withdrawal could not repair the damage caused by the two guidance documents on its own. *See* Candice Jackson, U.S. Dept. of Educ., *Dear Colleague Letter* (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf. As the Department later explained, neither action "require[ed] or result[ed] in wholesale changes to the set of expectations guiding recipients' responses to sexual harassment." *Nondiscrimination on the Basis of Sex in Educ. Programs or Activities Receiving Fed. Fin. Assistance*, 85 Fed. Reg. 30,026, 30,029 (May 19, 2020) (to be codified at 34 C.F.R. pt 106) (the "2020 Rule"). Hence, many, if not most, recipients "chose not to change their Title IX policies and procedures" as a precaution against stigma and liability. *Id.*

The Department, therefore, initiated a round of notice-and-comment rulemaking, after which it published a comprehensive set of regulations governing recipients' obligations to prevent sex discrimination in their programs and activities. *See* 85 Fed. Reg. 30,026. The 2020 Rule took effect on August 14, 2020.

The 2020 Rule addressed at least three significant ambiguities in the earlier guidance. *First*, the 2020 Rule clearly demarcated, for the first time, the outer boundaries of recipients' obligations and liability under Title IX with respect to sexual harassment. *Second*, the 2020 Rule clarified the standard under which conduct or speech could constitute sex-based harassment—namely, that it be "so severe, pervasive, and objectively offensive that it effectively denies a person equal access." 85 Fed. Reg. at 30,574. *Third*, the 2020 Rule reaffirmed the primacy of the U.S. Constitution and adopted multiple safeguards to ensure that Title IX enforcement protected the rights and interests of all parties to a disciplinary proceeding.

For example, the 2020 Rule also addressed the question of whether discrimination "on the basis of sex" encompassed sexual orientation and gender identity. Although the Department declined to define "sex" in the 2020 Rule because it was not necessary to effectuate the rules and would have consequences outside of the proposed rulemaking, it noted that "Title IX and its implementing regulations include provisions that presuppose sex as a binary classification," and further observed that "provisions in the Department's current regulations, which the Department did not propose to revise in this rulemaking, reflect this presupposition." 85 Fed. Reg. at 30,178.

And the Department further amended its regulations to clarify the definition of "sexual harassment" for purposes of Title IX enforcement. *See* 85 Fed. Reg. 30,026. The Department adopted the Supreme Court's definition of harassment in *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999), that is, "conduct that is so severe, pervasive, and objectively offensive that it effectively denies a person equal access to education." 85 Fed. Reg. at 30,036.

Finally, the 2020 Rule strengthened the rights of students accused of sexual harassment under Title IX. It required schools to, among other things, provide the accused with written notice of the charges against him, 85 Fed. Reg. at 30,571, let a representative accompany him to disciplinary hearings, *id.* at 30,577, and let that counsel cross-examine witnesses. *Id.* It specified that schools could choose between a preponderance or clear-and-convincing standard to adjudicate accusations of Title IX misconduct, but only if they used the same standard for "all formal complaints of sexual harassment," including "formal complaints against employees." *Id.* at 30,575.

### D.  The Supreme Court decides *Bostock*.

In June 2020, shortly after the Department issued the 2020 Rule, the Supreme Court decided *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644 (2020). The Court held that Title VII's prohibition on sex discrimination prevents an employer from firing an employee "for being homosexual or transgender." *Id.* at 651–52. The Court interpreted Title VII's prohibition against discrimination "because of" sex using a "but-for" causation standard, concluding that "sex plays an unmistakable and impermissible role in [a] discharge decision" based on on employee's homosexuality or transgender status. *Id.* at 660.

But *Bostock* specifically held that "homosexuality and transgender status are distinct concepts from sex," *id.* at 669, and it assumed throughout its opinion that "sex" in Title VII referred "*only to biological distinctions between male and female,*" *id.* at 655 (emphasis added). The Court refrained from extending its decision to other statutes like Title IX and declined to "prejudge" whether it would "sweep beyond Title VII" or impact "sex-segregated bathrooms, locker rooms, and dress codes." *Id.* at 681.

In January 2021, the Department's Office of the General Counsel issued a memo clarifying that *Bostock* did not affect the 2020 Rule. It reiterated that Title IX's "longstanding construction of the term 'sex' to mean biological sex, male or female" aligns with the ordinary public meaning of "sex" at the time of the statute's enactment. Reed D. Rubinstein, *Memorandum for Kimberly M. Richey, Acting Assistant Sec'y of the Office for Civil Rights*, *re:* Bostock v. Clayton Cty., 140 S. Ct. 1731 (2020) (Jan. 8, 2021) at 1, 10, https://www2.ed.gov/about/offices/list/ocr/correspondence /other/ogc-memorandum-01082021.pdf. The memo also emphasized that "schools must consider students' biological sex when determining whether male and female student-athletes have equal opportunities to participate." *Id.* at 7.

### E.  The Biden Administration initiates efforts to redefine "sex" under Title IX.

Despite the well-reasoned analysis of the Department itself that *Bostock* changed nothing in the Title IX context and that "sex" means "biological sex," the Biden Administration, like the Obama Administration before it, once again moved to redefine "sex" as including gender identity.

From the start, President Biden opposed the 2020 Rule, stating on the campaign trail that he would order the Department to put a "quick end" to it if elected. *See* Joe Biden, *Statement on the Trump Administration Rule to Undermine Title IX & Campus Safety* (May 6, 2020), https://medium.com/@JoeBiden/statement-by-vice-president-joe-biden-on-the-trump- administration-rule-to-undermine-title-ix-and-e5dbc545daa. Shortly after taking office, President Biden issued an executive order declaring that *Bostock* applied across all federal law, maintaining that under *Bostock*'s reasoning, laws prohibiting sex discrimination—including Title IX of the Education

Amendments of 1972—should also prohibit discrimination based on gender identity or sexual orientation, "so long as the laws do not contain sufficient indications to the contrary." Exec. Order No. 13,988, 86 Fed. Reg. 7,023 (Jan. 20, 2021). Federal agencies were directed to review their regulations and develop plans to align them with the executive order.

Following this directive, on June 22, 2021, the Department issued guidance interpreting Title IX to prohibit discrimination based on sexual orientation and gender identity. *Enf't of Title IX of the Educ. Amend. of 1972 with Respect to Discrimination Based on Sexual Orientation & Gender Identity in Light of* Bostock v. Clayton County, 86 Fed. Reg. 32,637 (June 22, 2021) ("2021 Guidance"). The Department claimed that this interpretation aligned with Title IX's purpose of "ensuring equal opportunity and protecting individuals from the harms of sex discrimination" *Id.* at 32,639. This was followed by additional guidance from the Department stating its intent to "fully enforce Title IX to prohibit discrimination based on sexual orientation and gender identity in education programs and activities that receive federal financial assistance." Suzanne B. Goldberg, *Dear Educator letter on Confronting Anti-LGBTQI+ Harassment in Schools*, at 2 (June 23, 2021), https://www2.ed.gov/about/offices/list/ocr/correspondence/stakeholders/educator-202106-tix.pdf.

Like the 2016 Guidance, the enforcement of the 2021 Guidance was swiftly enjoined. In *Tennessee v. United States Dep't of Educ.*, 615 F. Supp. 3d 807 (E.D. Tenn. 2022), the Eastern District of Tennessee enjoined the Department from enforcing the 2021 guidance, ruling that it likely acted unlawfully by creating "new rights and obligations" without following the APA's notice-and-comment requirements. *Id.* at 842.

The court identified two main flaws in the 2021 Guidance: (1) It was inconsistent with existing regulations. Title IX allows for sex-separation in some cases, but the Department's guidance "appear[ed] to suggest such conduct will be investigated as unlawful discrimination," *id.* at 839; and (2) it "create[d] rights for students and obligations for regulated entities not to discriminate based on sexual orientation or gender identity *that appear nowhere in Bostock, Title IX, or its implementing regulations.*" *Id.* (emphasis added).

**F. The Biden Administration publishes the Proposed Rule to replace the 2020 Rule and overhaul Title IX.**

Undeterred, in July 2022, the Department issued a notice of proposed rulemaking, reiterating its position from the 2021 Guidance and introducing other significant revisions to Title IX. *Nondiscrimination on the Basis of Sex in Educ. Programs or Activities Receiving Fed. Fin. Assistance*, 87 Fed. Reg. 41,390 (July 12, 2022) (the "Proposed Rule").

The Proposed Rule sought to formally rescind the 2020 Rule's biology-based definition of sex—based almost entirely on the supposed applicability of *Bostock*. 87 Fed. Reg. at 41,410, 41,531. It also dropped the 2020 Rule's adoption of the *Davis* standard for actionable sexual harassment, *id.* at 41,568–69, and removed procedural protections for students accused of misconduct, *id.* at 41,485, 41,488, 41,497, 41,577–78.

The Department received over 240,000 comments on the Proposed Rule—overwhelmingly negative. 89 Fed. Reg. at 33,477. Texas, through its Attorney General and Governor, submitted multiple comments before the 60-day comment period for the Proposed Rule closed on September 12, 2022. App.028–112.

In its comments, Texas highlighted the burden the Proposed Rule would impose on the State, as well as the risk the regulations posed to constitutional rights. The comments explained that the combination of expanding recipients' obligation to respond to sex discrimination, while also lowering the threshold of what fell within that description, meant, in practice, that recipients would hyper-police interactions among students, parents, and faculty for fear of being found noncompliant if individuals affiliated with the recipient failed to recognize each person's highly individualized, potentially fluid, and unverifiable gender identity.

The Proposed Rule also weakened procedural protections for students accused of sexual harassment, such as the right to present witnesses, inspect all evidence, and have a live hearing. *Id.* at 41,485, 41,497, 41,577. It also abandoned the *Davis* standard for actionable sexual harassment, instead adopting a broader, less stringent definition. *Id.* at 41,568–69.

The comments added that much of Proposed Rule departed from the Department's past

policies, yet the changes were neither adequately explained nor grounded in the text, structure, or purpose of Title IX. As an example, the Department hinged its redefinition of sex to include sexual orientation and gender identity almost entirely on the U.S. Supreme Court's opinion in *Bostock*. Yet as Texas pointed out in its comments, App.034, *Bostock* involved an unrelated statute that was enacted nearly a decade earlier, pursuant to a different constitutional power, and did not address questions involving "sex segregated bathrooms, locker rooms, and dress codes"—all of which appeared in the Proposed Rule.

### G.  The Final Rule is published in substantially the same form as the Proposed Rule.

Despite these deficiencies, the Biden Administration pressed on. On April 29, 2024, the Department published its Final Rule, dramatically reshaping Title IX by redefining what constitutes sex discrimination and broadening the definition of prohibited "harassment." 89 Fed. Reg. 33,474.

Despite strong opposition and over 240,000 public comments—mostly negative—the Department published the Final Rule largely unchanged from the Proposed Rule. Set to take effect on August 1, 2024, it expands schools' liability risks and Title IX obligations by expanding the definition of sex discrimination and harassment beyond what Title IX's text and purpose originally intended.

The Final Rule redefines Title IX's prohibition on sex discrimination to include "discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity." 89 Fed. Reg. at 33,476. It asserts that it preempts all state and local laws conflicting with its terms and applies to any school "program or activity," regardless of whether the activity occurs within the school or even within the United States. *Id.* at 33,885–86.

While the Final Rule allows schools to maintain sex-segregated programs, activities, and facilities, it prohibits schools from enforcing these distinctions in a way that causes "more than de minimis harm"—but the Final Rule simultaneously contends that prohibiting a person from participating in education programs or activities consistent with their gender identity *inherently* inflicts more than de minimis harm. *Id.* at 33,816, 33,819–20. Thus, the Final Rule threatens to withhold

federal funding from schools that deny students access to bathrooms and locker rooms based on their claimed gender identity or maintain dress codes based on biological sex.

The Final Rule claims that it does not affect athletics programs in schools because there is currently a regulation that allows sex-separated sports teams. 89 Fed. Reg. at 33,817–18, 33,839. Yet that was also true for bathrooms and locker rooms, but the Final Rule declares that invalid when exceptions are not made for those who identify as transgender. *See id.* at 33,819–21. The Final Rule claims sex-separate athletics does not suffer the same fate because of the Javits Amendment, 88 Stat. 484, 612 (1974), and because Congress reviewed the regulation that explicitly allows them before it went into effect. *See* 89 Fed. Reg. at 33,816–17. But the Javits Amendment only applies to "intercollegiate athletic activities," 88 Stat. at 612, and the bathroom regulation was part of the same set of regulations as the one relating to sports and also not disapproved by Congress. *See* 40 Fed. Reg. 24,128, 24,141; 34 C.F.R. § 106.33. And the Department fails to address its own position taken in litigation that Title IX forbids categorically limiting sports teams to one biological sex. *See B.P.J. v. W. Virginia*, ECF 42, No. 2:21-cv-316 (S.D. W. Va. Jun. 17, 2021); United States Amicus Br. 24–27, *B.P.J. v. W.V. State Bd. of Educ.*, Nos. 23-1078, 23-1130 (4th Cir. Apr. 3, 2023).

The Final Rule also prohibits schools from even seeking confirmation of a student's gender identity, deeming such inquiries as causing "more than de minimis harm." 89 Fed. Reg. at 33,819. So schools cannot require documentary evidence confirming a student's gender dysphoria diagnoses prior to permitting their participation in sex-segregated activities or facilities of the opposite sex.

The Final Rule also broadens the definition of harassment by lowering the standard set by the 2020 Rule, moving away from the Supreme Court's standard in *Davis* and instead defining sex-based harassment as "subjectively and objectively offensive" and "sufficiently severe or pervasive to limit or deny a student's ability to participate in or benefit from a recipient's education program or activity." *Id.* at 33,516. This new standard does not require harassment to be both severe and pervasive, meaning a single serious incident or a pattern of non-severe incidents might qualify.

The Final Rule also expands the definition of harassment to cover conduct that is "subjectively and objectively" offensive from the complainant's position—so referring to a

transgender-identifying male using male pronouns instead of female pronouns could be considered harassment based on the individual's eccentric, subjective viewpoint.

## STANDARD

The issuance of a preliminary injunction is appropriate when the movant shows (1) a likelihood of success on the merits, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and that (4) an injunction is in the public interest. *Valley v. Rapides Parish School Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997) (citing *Roho Inc. v. Marquis*, 902 F.2d 356, 358 (5th Cir. 1990)). The final two elements merge when the opposing party is the government.[4] *Nken*, 556 U.S. at 435.

Section 705 of the APA, meanwhile, "authorizes reviewing courts to stay agency action pending judicial review."[5] *Affinity Healthcare Servs., Inc. v. Sebelius*, 720 F. Supp. 2d 12, 15 n.4 (D.D.C. 2010) (citing 5 U.S.C. § 705). "Motions to stay agency action pursuant to these provisions are reviewed under the same standards used to evaluate requests for interim injunctive relief." *Id.* (citing *Cuomo v. U.S. Nuclear Regulatory Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985)); *see also Texas v. EPA*, 829 F.3d 405, 435 (5th Cir. 2016) (granting stay of agency action under 5 U.S.C. § 705 and applying preliminary injunction factors).

While "[a] stay [of an agency action] pending appeal certainly has some functional overlap with an injunction, particularly a preliminary one … [due to both having] the practical effect of preventing

---

[4] This Court should consider this motion for preliminary relief without waiting for Defendants to produce an administrative record for the Final Rule. See, e.g., *Franciscan All., Inc. v. Burwell*, 7:16-cv-10, 2016 WL 9281524, at *3 (N.D. Tex. Nov. 1, 2016) (O'Connor, J.) (setting a briefing schedule "to consider the pending motion for preliminary injunction" despite "no administrative record" and deferring consideration of summary judgment so that the court could consider the "administrative record in the normal course of this litigation"); *Doe v. Trump*, 3:19-cv-1743, 2020 WL 1853657, at *3 (D. Or. Apr. 13, 2020) (noting that the court relied on a "partial record produced before the preliminary injunction" and then set a later deadline "to supplement the administrative record" after the preliminary injunction decision).

[5] The stay provision of the APA provides that: "On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process *to postpone the effective date of an agency action* or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. §705 (emphasis added).

some action before the legality of that action has been conclusively determined," *Nken v. Holder*, 556 U.S. 418, 428 (2009), "a stay achieves this result by temporarily suspending the source of authority to act—the order or judgment in question—not by directing an actor's conduct." *Id.* at 428–29.

"In the same way that a preliminary injunction is the temporary form of a permanent injunction, a stay [under section 705] is the temporary form of vacatur." *All. for Hippocratic Med. v. U.S. Food & Drug Admin.*, 78 F.4th 210, 254 (5th Cir. 2023). "Under 5 U.S.C. § 705, [courts] may, under 'certain conditions[,] ... and to the extent necessary to prevent irreparable injury, ... issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." *Wages & White Lion Invs., L.L.C. v. United States Food & Drug Admin.*, 16 F.4th 1130, 1143 (5th Cir. 2021) (quoting 5 U.S.C. § 705).

Texas and the Private Plaintiffs easily satisfy these standards.

**ARGUMENT**

This Court should postpone the Final Rule's effective date (*i.e.*, stay it), and preliminarily enjoin Defendants from interpreting, applying, or enforcing Title IX to apply to discrimination based on sexual orientation or gender identity. For either form of relief, the relevant factors are the same: likely success, irreparable harm, the balance of equities, and the public interest. Plaintiffs satisfy all factors for both forms of preliminary relief.

## I.    Texas is Likely to Prevail on the Merits.

The likelihood of success on the merits "is arguably the most important" factor for preliminary relief. *Career Colleges & Sch. of Texas v. United States Dep't of Educ.*, 98 F.4th 220, 239 (5th Cir. 2024); *see also Mock v. Garland*, 75 F.4th 563, 587 n.60 (5th Cir. 2023) ("There is authority" that "likelihood of success on the merits ... is the most important of the preliminary injunction factors.").

The Final Rule violates the APA. It unlawfully redefines discrimination on the basis of sex to include sexual orientation and gender identity, exceeds the limits of how the Supreme Court has defined sexual harassment, and removes protections for those accused of misconduct.  It does all of this contrary to the text, structure, and purpose of Title IX, and through arbitrary-and-capricious

16

decioonamking. The Final Rule is "arbitrary," "capricious," "not in accordance with law," "in cexcess of statutory … authority," and "contrary to constitutional right." 5 U.S.C. § 706(2).

**A.  The Rule illegally redefines Title IX's prohibition on "sex" discrimination.**

The Final Rule's application of Title IX's anti-discrimination mandate to sexual orientation and gender identity is both contrary to law and arbitrary and capricious.

**1.  The Final Rule illegally redefines "sex."**

In deciding whether the Final Rule is consistent with Title IX, "[w]e start where we always do: with the text of the statute." *Career Colleges & Sch. of Texas*, 98 F.4th at 240 (quoting *Bartenwerfer v. Buckley*, 598 U.S. 69, 74 (2023)). "Other sources that are helpful in determining what Congress meant when it passed [Title IX in 1972] include contemporaneous dictionaries, related statutes, and past statements of the Department." *Id.*

For almost a half century since its enactment, both the Department and recipients have understood Title IX's prohibition on sex discrimination to refer to a person's *biological sex*. Notwithstanding this history, the Final Rule redefines Title IX's prohibition on sex discrimination to include "discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity." 89 Fed. Reg. at 33,886.

The Final Rule threatens to withhold federal funding from schools that do not allow students access to "restrooms and locker rooms" and comply with any "appearance codes (including dress and grooming codes)" based on gender identity. See, e.g., 89 Fed. Reg. at 33,816. The Final Rule dictates that a school violates Title IX's nondiscrimination mandate if a transgender student is denied access to a bathroom or locker room of the opposite biological sex. *See, e,g.*, 89 Fed. Reg. at 33,818.

**a.  The Final Rule wrongly relies on *Bostock*.**

The Department lacks the legal justification to initiate and support such radical departures in the interpretation of Title IX. It rests its redefinition of sex discrimination almost entirely on the U.S. Supreme Court's opinion in *Bostock*. But that case's "reasoning applies only to Title VII, as *Bostock* itself and [] subsequent cases make clear." *L.W. ex rel. Williams v. Skrmetti*, 73 F.4th 408, 420 (6th Cir.

2023) (Sutton, C.J.).

How does Title IX differ from Title VII? To start, Title VII prohibits employment discrimination "because of such individual's … sex[],"42 U.S.C. § 2000e- 2(a), but Title IX prohibits education discrimination "on the basis of sex," 20 U.S.C. § 1681(a). The statutes thus contain different language with different results for different contexts. *Neese v. Becerra*, 640 F. Supp. 3d 668, 675–84 (N.D. Tex. 2022) (Kacsmaryk, J.) (*Bostock* and its reasoning do not apply to Title IX). And "*Bostock* … was limited only to Title VII itself" and "d[id] not stretch to [other statutes]." *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021); *see also Adams v. Sch. Bd. of St. Johns County*, 57 F.4th 791, 808 (11th Cir. 2022) (en banc) (holding that *Bostock*'s reasoning applies only to Title VII, and describing the argument that it applies to Title IX as "faulty").

Defendants conflate Title IX's prohibition of discrimination "on the basis of sex," 20 U.S.C. § 1681(a), with Title VII's prohibition on discrimination "because of … sex," 42 U.S.C. § 2000e-2(a)(1). But the *Bostock* court ruled that the phrase "because of" in Title VII mandated a sweeping but-for causation requirement. *Bostock*, 590 U.S. at 656. The U.S. Supreme Court has tendered no such ruling regarding the phrase "on the basis of sex" as used in Title IX. 20 U.S.C. § 1681(a). To the contrary. "On the basis of sex" references to one's "biological sex"—it does not mean does not mean "on the basis of gender identity" or "on the basis of sexual orientation."

Indeed, even though Title IX provides that recipients of federal funding for education programs or activities shall not discriminate "on the basis of sex," 20 U.S.C. § 1681(a), Title IX explicitly authorizes separation based on sex in certain situations, including "maintaining separate living facilities for the different sexes," 20 U.S.C. § 1686, and specified single-sex educational institutions, organizations, activities, and scholarship awards, 20 U.S.C. § 1681(a). These exceptions presume—and only make sense in the context of—biological sex as the relevant category.

In any event, the Final Rule misinterprets the holding of *Bostock* and the definition of "sex" discrimination adopted there. *Bostock* does not hold that discrimination on account of "sexual orientation" or "gender identity" is discrimination on account of "sex"; rather, it holds only that Title VII's prohibition on "sex" discrimination prohibits employers from firing or refusing to hire

individuals "for being homosexual or transgender."

*Bostock* explains that an employer who fires an employee for conduct or personal attributes that it would tolerate in a person of the opposite biological sex has made the employee's sex the "but-for cause" of his discharge, and that (in the Court's view) automatically violates the statutory command of Title VII. The Court explained:

> If the employer fires the male employee for no reason other than the fact he is attracted to men, the employer discriminates against him for traits or actions it tolerates in his female colleague. Put differently, the employer intentionally singles out an employee to fire based in part on the employee's sex, and the affected employee's sex is a but-for cause of his discharge. Or take an employer who fires a transgender person who was identified as a male at birth but who now identifies as a female. If the employer retains an otherwise identical employee who was identified as female at birth, the employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth. Again, the individual employee's sex plays an unmistakable and impermissible role in the discharge decision.

*Bostock*, 590 U.S. at 660.

*Bostock* also makes clear that an employer does *not* violate Title VII or engage in "sex" discrimination if it fires an employee for conduct or personal attributes that it would not tolerate in an employee of the opposite biological sex:

> Take an employer who fires a female employee for tardiness or incompetence or simply supporting the wrong sports team. Assuming the employer would not have tolerated the same trait in a man, Title VII stands silent.

*Id.*

*Bostock* does not prohibit employers (or anyone else) from discriminating on account of sexual orientation or gender identity, so long as they do not engage in "sex" discrimination when doing so. For example, *Bostock* does not prohibit discrimination against bisexual students or individuals, so long as the employer regards bisexual behavior or orientation as equally unacceptable in a man or a woman. *See, e.g.*, *Bostock*, 590 U.S. at 660; *see also id.* at 658 ("[F]iring [a] person for actions or attributes it would tolerate in an individual of another sex … discriminates against that person in violation of Title VII."). Discrimination against bisexuals is certainly discrimination on account of "sexual orientation," but it is not discrimination on account of "sex." *Bostock* allows discrimination against homosexual or transgender individuals, so long as it is done pursuant to rules or policies that apply equally to both

sexes and would lead to the same result if the individual's biological different were different. A teacher or professor, for example, may refuse to accommodate a transgender or nonbinary student's demands to be referred to by the singular pronoun "they"—so long as the teacher or professor refuses demands for such pronoun usage on equal terms from a biological male or a biological woman, and would equally refuse to honor the transgender or nonbinary student's request if that student's biological sex were different.

Even if the Department considers policies or practices of that sort to be regarded as discrimination against transgender or non-binary individuals, they do not constitute "sex" discrimination as defined in *Bostock* because the policies apply equally to both biological sexes. *See Bostock*, 590 U.S. at 669 ("We agree that homosexuality and transgender status are distinct concepts from sex."). The Final Rule wrongly equates discrimination on account of sexual orientation and gender identity with "sex" discrimination. Yet there are many ways in which entities covered by Title IX could discriminate against homosexual, bisexual, transgender, or non-binary individuals without engaging in the kind of "sex"–based discrimination described in *Bostock*.

The Final Rule further conflicts with the reasoning of *Bostock* because that case did not find that all sex-based distinctions were prohibited. *Bostock* repeatedly cited the Court's earlier decision in *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998), as authority. *Oncale* explained that Title VII "does not reach genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex," and "requires neither asexuality nor androgyny in the workplace." *Id.* at 75, 81.

The *Oncale* Court noted the central concern of Title VII was not every aspect of interaction in the workplace but "whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Id.* at 80 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 25 (1993) (Ginsburg, J., concurring)).

The *Oncale* Court—in one of the cases consolidated with and affirmed in *Bostock*—also favorably cites *Oncale* as "arguably" supporting the view that "sex-specific bathroom and grooming policies [do not] impose disadvantageous terms or conditions" because not all distinctions of "'sexual

content or connotations' rise to the level of discrimination." *Zarda v. Altitude Express, Inc.,* 883 F.3d 100, 119 & n.16 (2d Cir. 2018) (en banc) (quoting *Oncale*, 523 U.S. at 79–80)); *see also West v. Radtke*, 48 F.4th 836, 849 (7th Cir. 2022) (finding Title VII would not be violated by preventing transgender prison guard from performing strip searches of opposite-sex inmates).

Relatedly, *Bostock* also cautioned that "Title VII does not concern itself with everything that happens 'because of' sex," *Bostock*, 590 U.S. at 657—only discrimination that is "inextricably" related to sex is forbidden; distinctions "related to sex in some vague sense" or having only "some disparate impact on one sex or the other" are not reached by the statute. *Id.* at 660–61.

*Bostock* did not overturn any Supreme Court precedents, instead resting on those dating to the 1970s. It also did not disturb lower-court precedent that has long applied those same precedents. "[T]the Court relied in *Bostock* on the same well established Title VII principles that animated the outcome in those prior decisions [of lower courts that applied the same key precedents, so those courts] effectively anticipated *Bostock*'s rationale." *Maner v. Dignity Health*, 9 F.4th 1114, 1124 (9th Cir. 2021) (Bea, J.) (explaining *Bostock* did not overturn decades of lower-court precedents rejecting "paramour preference" theory of liability).

This is consistent with *Willingham v. Macon Tel. Publ'g Co.*, 507 F.2d 1084 (5th Cir. 1975) (en banc), which upheld sex-specific grooming codes under Title VII. *Willingham* applied *Phillips v. Martin Marietta Corp.*, 400 U.S. 542 (1971) one of the key cases the Supreme Court relied on in *Bostock*. The Second Circuit in *Zarda*— which relied on the same key precedents that the Supreme Court would later adopt in *Bostock* (*Martin Marietta* and *L.A. Dep't of Water & Power v. Manhart*, 435 U.S. 702 (1978))—favorably cited *Willingham* as consistent with its analysis. *Zarda*, 883 F.3d at 118–19. In short, *Bostock* did not nullify the Supreme Court's longstanding acceptance of differences between the sexes. It did not question any longstanding precedent beyond the narrow question before it: whether "[a]n employer who fires an individual *merely for being* gay or transgender defies the law." *Bostock*, 590 U.S. at 683 (emphasis added).

              **b. The Final Rule's expansion of Title IX's scope into sexual orientation and gender identity violates the Clear Statement Rule**

**and the Major Questions Doctrine.**

Even if there were ambiguity on whether Title IX adopts the Final Rule's definition of discrimination "on the basis of sex," that ambiguity must be resolved in favor of the State because conditions on federal funding must be stated clearly. *Adams*, 57 F.4th at 815.

Congress enacted Title IX pursuant to its powers under the Spending Clause. *Davis*, 526 U.S. at 640 ("[W]e have repeatedly treated Title IX as legislation enacted pursuant to Congress' authority under the Spending Clause[.]"). If Congress intends to impose a condition on the grant of federal funding under Title IX, it must do so with "a clear voice," "unambiguously." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).

This clear statement rule is required when imposing a condition on federal funding because "legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *Adams*, 57 F.4th at 815 (citing *Pennhurst*, 451 U.S. at 17). "Recipients cannot knowingly accept the deal with the Federal Government unless they would clearly understand the obligations that would come along with doing so." *Cummings v. Premier Rehab Keller, PLLC*, 596 U.S. 212, 219 (2022) (internal quotations omitted).

The use of the word "sex" in Title IX did not put educational institutions and programs on notice that by accepting funding from the federal government for educational services and activities, they are prohibited from providing bathrooms or other facilities for the two sexes. *See Adams,* 57 F.4th at 816. That is clear not only from historical practice but from Defendants' longstanding interpretation of Title IX and its implementing regulations, which "include provisions that presuppose sex as a binary classification." 85 Fed. Reg. at 30,178.

Similarly, courts will not assume that Congress has assigned questions of "deep economic and political significance" to an agency unless Congress has done so expressly. *See King v. Burwell*, 576 U.S. 473, 486 (2015); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000). "We expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance." *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021) (quoting *Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014)). "Congress typically [does not]

use oblique or elliptical language to empower an agency to make a radical or fundamental change to a statutory scheme …We presume that Congress intends to make major policy decisions itself, not leave those decisions to agencies." *Id.* (cleaned up); *see also FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120,160 (2000).

The Final Rule will affect all elementary schools, secondary schools, postsecondary institutions, and other recipients of federal financial funds with far-reaching social and economic impact. Yet Title IX's language cannot be plausibly read to smuggle in a power for federal agencies to overturn the "unremarkable—and nearly universal—practice[s]" such as separating bathrooms by biological sex, common in States' governance of schools. *Adams*, 57 F.4th at 796.

### c.  In the alternative, if *Bostock* applies to Title IX, the Final Rule violates it.

In addition, even if Title IX covered discrimination on the bases of sexual orientation and gender identity, the Final Rule interprets Title IX's anti-discrimination provision as requiring accommodations for gender identity even though Title IX—unlike Title VII's prohibition on religious discrimination and the disability discrimination provisions of the Rehabilitation Act and the Americans with Disabilities Act—has no accommodation requirement.

The Final Rule requires exceptions from admittedly lawful sex-segregated policies and facilities for those whose gender identity is transgender—and only for them, as schools would still be allowed to prevent biological males who do not identify as women from entering female-only spaces and programs. *See* 89 Fed. Reg. at 33,818 (under Final Rule, "sex separation in certain circumstances, including in the context of bathrooms or locker rooms, is not presumptively unlawful sex discrimination" but when a school "denies a transgender student access to a sex-separate facility or activity consistent with that student's gender identity, this would violate Title IX's general nondiscrimination mandate"); *id.* at 33,887 (to be codified at 34 C.F.R. § 106.31: where Title IX permits "different treatment or separation in a manner that discriminates on the basis of sex," the Final Rule requires "sex" to be determined by gender identity); *id.* at 33,820 (reasoning that non-transgender students are not harmed by being denied access to sex-separated facilities such as restrooms and locker

rooms, so only transgender students are protected by the new 34 C.F.R. § 106.31(a)(2) that prohibits "more than de minimis harm").

The types of school policies targeted by the Final Rule do not discriminate based on gender identity. While *Bostock* held that "discrimination based on homosexuality or transgender status necessarily entails discrimination based on sex," 590 U.S. at 669, the Final Rule instead addresses "the converse question: whether discrimination on the basis of sex necessarily entails discrimination based on transgender status." *Adams v. Sch. Bd. of St. Johns County*, 3 F.4th 1299, 1332 (11th Cir. 2021) (Pryor, C.J., dissenting), *rev'd by Adam.*, 57 F.4th 791.

The Final Rule never addressed the question of whether the policies "impose[d] disadvantageous terms or conditions" based on sex. The Second Circuit ruling affirmed in *Bostock* left this question open but indicated the serious possibility that such policies were not covered by Title VII even if discrimination based on sexual orientation and gender identity were forbidden. *Zarda*, 883 F.3d at 118–19 (favorably citing on this ground *Oncale*, 523 U.S. 75, and *Willingham*, 507 F.2d 1084). This distinction is alluded to in *Bostock* itself. *See* 590 U.S. at 681 (after noting that its reasoning does not settle the issue of "bathrooms, locker rooms, or anything else of the kind," referring to Title VII's limitation to "distinctions or differences in treatment that injure protected individuals"; while "firing employees surely counts other policies and practices might or might not qualify as unlawful discrimination") (cleaned up). But if such policies *are* covered by Title IX, then the Final Rule violates the prohibition on treating people differently based on gender identity.

Consider standard bathroom norms. All biological males, regardless of their gender identity, may use the men's bathroom; all biological females, regardless of their gender identity, may use the women's bathroom. "Separating bathrooms based on sex dates back as far as written history will take us," long before the concept of gender identity even existed. *Adams*, 3 F.4th at 1328 (Pryor, C.J., dissenting) (cleaned up), *rev'd*, 57 F.4th 791. These policies do not even consider "gender identity," and therefore cannot be described as discriminating based on that category. *Cf. Raytheon Co. v. Hernandez*, 540 U.S. 44, 54 n.7 (2003) ("[I]f no part of the hiring decision turned on [the applicant's] status as disabled, he cannot, *ipso facto*, have been subject to disparate treatment"). "Separating

bathrooms by sex treats people differently on the basis of sex … [but] the mere act of determining an individual's sex, using the same rubric for both sexes, does not treat anyone differently on the basis of sex." *Adams*, 3 F.4th at 1325–26 (Pryor, C.J., dissenting), *rev'd*, 57 F.4th 791.

The Final Rule purports to allow sex-specific bathrooms, locker rooms, and showers (explicitly) and sex-specific dress codes and pronoun usage policies (implicitly) as a general matter. But it then "tr[ied] to work around [those concessions] with a linguistic device." *Doe 2 v. Shanahan*, 917 F.3d 694, 723 (D.C. Cir. 2019) (Williams, J., concurring in the result) (criticizing plaintiffs' concession that military may have sex-specific standards while arguing that "sex" should be determined by subjective gender identity). It is no consolation to tell schools they can still have sex-specific bathrooms (or dress codes or pronoun usage) so long as they allow exceptions for individuals who subjectively identify as the opposite sex.

If schools may have separate facilities or policies for men and women, as the Final Rule concedes, then they may also require compliance with those policies. *Cf.* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 30, at 192–93 (2012) ("[W]henever a power is given by a statute, everything necessary to making it effectual or requisite to attaining the end is implied.") (citation omitted). The same is true for sex-specific dress codes or allowing the use of gendered pronouns as part of standard English in schools; such policies do not classify based on the gender identity of anyone but disregard that concept altogether, exactly as *Bostock* requires. Indeed, to allow schools to have sex-specific policies, but then require them to have exemptions only for transgender employees or students, violates *Bostock* because such a rule discriminates based on gender identity.

### The Final Rule's transformation of "sex" is arbitrary and capricious.

Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary," "capricious," or "an abuse of discretion." 5 U.S.C. § 706(2)(A). This means if an agency action is not "reasonable and reasonably explained," it must be vacated. *Wages & White Lion Invs.L.L.C v. FDA*, 16 F.4th 1130, 1136 (C.A.5, 2021) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)); *see*

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 224 (2016) ("[A] lack of reasoned explication for a regulation that is inconsistent with the Department's longstanding earlier position results in a rule that cannot carry the force of law.").

"Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). Defendants did not engage in reasoned decision-making, but instead acted arbitrarily and capriciously in issuing the Final Rule.

To summarize a few flaws, the Rule is internally inconsistent, fails to define key terms, disregards evidence submitted, makes decisions that are counter to the evidence before the Department, fails to properly balance all the relevant interests that would be affected by the Department's changed position, and routinely offers "conclusory statements" rather than real responses to valid and serious concerns submitted by commenters. *See Louisiana v. U.S. Dep't of Energy*, 90 F.4th 461, 473 (5th Cir. 2024).

The Final Rule fails arbitrary-and-capricious review because the Department neglected to offer a reasoned explanation for the Final Rule's departure from the historic understanding—including within previous Title IX regulations—of Title IX's prohibition on "sex" discrimination. The Department noted during its 2020 regulations that "Title IX and its implementing regulations include provisions that presuppose sex as a binary classification." It further observed that provisions in the Department's then-existing regulations reflected that premise. 85 Fed. Reg. at 30,178.

Instead of confronting this history, the Department deflected by referencing the Supreme Court's decision in *Bostock*, but that is insufficient given the textual and structural differences between the two statutes and the express disclaimer in *Bostock* that its holding did not apply to other laws. The Department compounds the problems with its analysis by dismissing multiple court opinions, including from this Court, that recognized "*Bostock* … was limited only to Title VII itself" and "does

not stretch to [other statutes]." *Pelcha*, 988 F.3d at 324; *Neese*, 640 F. Supp. 3d 668; *compare* 89 Fed. Reg. at 33,806.

In addition, when an agency changes its position, the agency must "recognize[ ] the change, reason[ ] through it without factual or legal error, and balance[ ], all relevant interests affected by the change." *Louisiana*, 90 F.4th at 469. The Department, however, refused to dutifully consider the reliance interest Texas and other recipients had with respect to the Department's historic understanding of Title IX.

Nor did the Department address the States' practical concerns about authenticating gender identity or the risk that the Department's policy would pose to student safety and privacy. The Final Rule also fails the test of reasoned decision-making by failing to address how its gender-identity mandate applies to "nonbinary," "bisexual," or "questioning individuals."The Department had before it significant evidence that permitting individuals who identify as transgender to use bathrooms or locker rooms associated with their gender identity, as opposed to their biological sex, subjected students to distress and embarrassment as well as an increased risk of harassment or assault. Yet, its response simply stated that the Department "does not agree." 89 Fed. Reg.at 33,820. This dismissal of commenters' substantive concerns characterized the entire rulemaking process.

The Final Rule also fails arbitrary-and-capricious review because it is contradictory, failing to reasonably explain treating like circumstances differently. It declines to apply its gender-identity mandate to "living facilities" by pointing to the statutory exceptions in 20 U.S.C. § 1681(1)-(9). 89 Fed. Reg. at 33,816, 33,818–19. But it applies its mandate to "toilet, locker room, and shower facilities," permitted to be sex-separated by rule, 34 C.F.R. § 106.33.

The Final Rule's cost-benefit analysis is also wholly deficient. The Final Rule assumes the average time to read and understand the final, 423-page regulation will be 4 hours for a Title IX Coordinator and lawyers, which defies belief. *See* 89 Fed. Reg at 33,867. The Rule's other cost-and-benefit assumptions are equally absurd, including its failure to include any construction costs based on Defendants' refusal to acknowledge the Final Rule will require schools to modify bathrooms and locker rooms. *See, e.g.*, 89 Fed. Reg. at 33,876.

The Final Rule also fails to recognize how its standard regarding gender-identity discrimination undercuts its separate ongoing rulemaking process specific to athletics. *Cf. Portland Cement Ass'n v. EPA*, 665 F.3d 177, 187 (D.C. Cir. 2011) ("an agency must have a similar obligation to acknowledge and account for a changed regulatory posture the agency creates—especially when the change impacts a contemporaneous and closely related rulemaking"); *Office of Commc'n of the United Church of Christ v. FCC,* 707 F.2d 1413, 1441–42 (D.C. Cir. 1983) (finding it "seriously disturbing" and "almost beyond belief" that an agency would take rulemaking action undercutting another "concurrent" rulemaking process).

Finally, the Department repeatedly failed to adequately consider the effects of its terms on the States and their reliance interests of over 50 years of Title IX and its regulations. When commentators raised concerns about preemption, Defendants expressly "decline[d] to opine on how [the Final Rule] interacts or conflicts with any specific State laws because it would require a fact-specific analysis," and instead "refer[red] the public to § 106.6(b), which affirms that a [school's] obligation to comply with Title IX and the regulations is not obviated or alleviated by any State or local law." 89 Fed. Reg. at 33,822. This does not satisfy Defendants' obligation to "adequately assess reliance interests" or "reasonably consider[] the relevant issues and reasonably explain[] the decision." *Texas v. Biden*, 10 F.4th 538, 552, 555 (5th Cir. 2021).

## B.  The Final Rule wrongfully protects abortion.

The Final Rule also purports to override Texas's abortion prohibitions. The Final Rule purports to protect women who abort their unborn children, even when doing so violates State law. It also purports to protect women who engage in the shipment or receipt of abortion pills and abortion-related paraphernalia. *See* 18 U.S.C. § 1461–462. The Final Rule defines "pregnancy or related conditions" to include "termination of pregnancy." 89 Fed. Reg. at 33,883 (to be codified at 34 C.F.R. § 106.2). The Final Rule stipulates that every recipient of federal funds, including educational institutions, must treat abortion on the same terms as "any other temporary medical condition." *See* 89 Fed. Reg. at 33,887–888 (to be codified at 34 C.F.R. § 106.40(b)(6)(vi)(4) ("[A] recipient must treat

pregnancy or related conditions in the same manner and under the same policies as any other temporary medical conditions."). Accordingly, the Final Rule requires all healthcare plans offered by every educational institution to cover abortion on the same terms as "any other temporary medical condition." *Id.*

The Final Rule also requires schools to excuse a student's absence for "terminat[ing] [her] pregnancy" even when doing so violates Texas law. *See id.* This provision of the Final Rule is another attempt by the Biden Administration to nullify *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2242 (2022). The Supreme Court has held that "the Constitution does not confer a right to abortion" and "does not prohibit the citizens of each State from regulating or prohibiting abortion." *Id.* at 2279, 2284.

In accordance with *Dobbs*, Texas regulates and prohibits abortions. Under Texas's Human Life Protection Act, "[a] person may not knowingly perform, induce, or attempt an abortion." Tex. Health & Safety Code § 170A.002. That prohibition does not apply if the woman on whom the abortion is performed "has a life-threatening physical condition" arising from a pregnancy that places her "at risk of death or poses a serious risk of substantial impairment of a major bodily function unless the abortion is performed." Tex. Health & Safety Code § 170A.002(b)(2). Texas law imposes criminal and civil penalties for violation of this law. *See* Tex. Health & Safety Code §§ 170A.004–.005; Tex. Penal Code § 12.32–.33.

In addition to the Human Life Protection Act, Texas statutes predating *Roe v. Wade* also address the subject of abortion. *See* Tex. Rev. Civ. Stat. arts. 4512.1–.4, .6 Under those statutes, any person who causes an abortion is guilty of an offense and shall be confined in a penitentiary. *Id.* at 4512.1. Moreover, an individual may not act as an accomplice to abortion or an attempted abortion. *Id.* at 4512.2–.3. However, it is not an offense if the abortion is performed under "medical advice for the purpose of saving the life of the mother." *Id.* at 45.12.6. The Final Rule purports to preempt Texas's laws by requiring schools and professors to protect actions that would otherwise violate State or federal law. Plaintiffs Bonevac and Hatfield, both of whom are professors at the University of Texas at Austin, have no intention to accommodate students who obtain an illegal abortion or a purely

elective abortion, nor do they intend to hire teaching assistants who have violated the abortion laws of Texas or the federal-law prohibitions on the mailing of abortifacients. *See* Declarations of Bonevac and Hatfield at ¶¶ 11, 13, App.10–17.

### C. The Final Rule illegally redefines "sex-based harassment."

In direct contradiction to Supreme Court precedent, and in service of the Biden Administration's radical political agenda, the Final Rule unlawfully redefines what constitutes "sex-based harassment" under Title IX. Specifically, the Final Rule now prohibits "[u]nwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe *or* pervasive that it *limits* or denies a person's ability to participate in or benefit from the recipient's education program or activity." 89 Fed. Reg. at 33,517 (emphases added). By drafting this new standard for sex-based harassment, the Final Rule becomes contrary to law and arbitrary and capricious.

#### 1. The Final Rule's unlawful redefinition of sex-based harassment is contrary to law.

To start, the Final Rule violates the First and Fourteenth Amendments because it imposes viewpoint-based and content-based restrictions on students and employees affiliated with recipients and compels public entities, like Texas, to enforce said restrictions at risk of the federal funds. Specifically, the Final Rule deliberately discards the definition of sexual harassment articulated by the Supreme Court in *Davis* and adopted by the Department in its 2020 rulemaking, in favor of a weaker standard that encompasses wide swaths of constitutionally protected activity.

The Final Rule accomplishes this because it expands Title IX to cover harassment that's "severe *or* pervasive," 89 Fed. Reg. at 33,884, rather than "severe *and* pervasive," *Davis*, 526 U.S. at 652–53. And the Final Rule applies even if the harassment merely "limits" a person's "ability to participate in or benefit from" a program or activity, 89 Fed. Reg. at 33,884, rather than "denies" a person "access to the educational opportunities or benefits provided by the school," *Davis*, 526 U.S. at 651–53. Broader still, the rule requires recipients to "promptly and effectively end any sex discrimination," regardless whether they were deliberately indifferent to it. *See* 89 Fed. Reg. at 33,889

(Proposed 34 C.F.R. §106.44(f)(1)); *contra Davis*, 526 U.S. at 650–52. As a result, the Final Rule's new hostile-environment definition thus covers a single or isolated incident and all negative effects like "a mere 'decline in grades,'" a choice to skip class, or a decision not to attend a campus activity. *Davis*, 526 U.S. at 652–53; *accord* 89 Fed. Reg. at 33,511 ("[A] complainant must demonstrate some impact on their ability to participate or benefit from the education program or activity, but the definition does not specify any particular limits or de-nials."). And the Final Rule's new definition would force students and teachers to, for example, use someone's "preferred pronouns." What's worse, the Final Rule extends to conduct that occurs online, off campus, outside the United States, or even before the relevant individuals attended the school. 89 Fed. Reg. at 33,886, 33,527.

At the same time, the Final Rule expands recipients' obligations far beyond what Title IX allows, such as by reinterpreting the word "sex" to include "sexual orientation" and "gender identity." Hence, not only does the Final Rule fundamentally rewrite Title IX's prohibition on sex-based discrimination, but the failure to affirm a student's gender identity would constitute "sex-based harassment" under the new regulations since it could have negative effects that constitute more than a de minimis harm.

**2. The Final Rule's unlawful redefinition of sex-based harassment is also arbitrary and capricious.**

On top of contravening the law, the Final Rule further fails arbitrary-and-capricious review because the Department neglected to reasonably consider the constitutional concerns raised by its new definition of sex-based harassment. Specifically, because the Final Rule thus raises First Amendment and other constitutional concerns, Defendants acted arbitrarily and capriciously when they failed to engage in reasoned decisionmaking in addressing these concerns.

Defendants also acted arbitrarily and capriciously when they failed to reasonably consider the lose-lose situation the Final Rule places on funding recipients through its illegal redefinition of "sex-based harassment." Justice Kennedy warned in his dissent for four Justices that "[o]n college campuses, and even in secondary schools, a student's claim that the school should remedy a sexually hostile environment will conflict with the alleged harasser's claim that his speech, even if offensive, is

protected by the First Amendment. In each of these situations, the school faces the risk of suit, and maybe even multiple suits, regardless of its response." *Davis*, 526 U.S. at 682–83 (Kennedy, J., dissenting). The majority avoided this problem by stressing the deliberate-indifference requirement to liability and the stringent definition of actionable harassment. By abandoning the deliberate-indifference requirement, the Department unravels *Davis*'s reasoning.

The Department's hostile-environment definition is also internally inconsistent, rendering the rule arbitrary and capricious. It stresses a "totality of circumstances" test that considers, among other things, "[t]he degree to which the conduct affected the complainant's ability to access the recipient's education program or activity." 89 Fed. Reg. at 33,884 (34 C.F.R. §106.2). But that factor is in tension with the Department's other statement that "sex-based conduct meets the 'severe or pervasive' standard of sex-based harassment if it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity." 89 Fed. Reg. at 33,508. The Department reads out "severe or pervasive" from its definition. It is not clear why the degree of harm matters if the only requirement is that the harassment "limits" the individuals' ability to participate in education, and the Department provides no reasonable explanation justifying this tension.

Further, the Department's action is arbitrary and capricious because it fails to reasonably address comments on so-called "misgendering." The Department noted that a commenter raised the Department's "recent resolution letter finding that a school district violated Title IX when it failed to effectively respond to a misgendering of a student." 89 Fed. Reg. at 33,516. Other commentators also "urged" the Department to state that "misgendering is a form of sex-based harassment that can create a hostile environment." 89 Fed. Reg. at 33,516. Many commentators also raised the notice of proposed rulemakings seeming approval of the 2016 Dear Colleague Letter, stating that misgendering is punishable harassment. Rather than address these comments or the 2016 letter, the Department did not meaningfully engage with either comment or even cite the 2016 letter, but merely stated that the issue "is necessarily fact-specific" and that "a stray remark, such as a misuse of language, would not constitute harassment under this standard." 89 Fed. Reg. at 33,516. The terse statement is hardly "reasoned decisionmaking." *Michigan v. EPA*, 576 U.S. 743, 750 (2015). Commentators put the

Department on notice of the 2016 letter and the resolution, so the Department was obligated to address those "relevant authorit[ies]" and explain any "inconsistencies" or differences in position. *Data Mktg. v. United States Dep't of Labor*, 45 F.4th 846,857 (C.A.5 (Tex.), 2022).

### D. The Final Rule illegally changes procedural safeguards in the Title IX grievance process.

For students accused of sex-based harassment, the Title IX grievance process can have life-altering consequences. At the very least, a finding of guilt places a black mark on a student's record. At its most extreme, it can topple any chance a student has at a successful career. Despite these stakes, the Department has elected to roll back many of due process protections promulgated during the 2020 rulemaking that guaranteed students a fair opportunity to defend themselves. These changes were not backed by reasoned decision-making. The Department failed to consider how the amended procedures interacted, first, with each other and, second, with other provisions in the Final Rule that expand recipients' liability. The Department also failed to reasonably justify its departure from past policy or reasonably consider the relevant issues. The changes thesefore represent an arbitrary and capricious action by the Department and should be enjoin and/or have the effective postponed.

### 1. The Department only considered the changes in isolation.

The Final Rule creates a litigation trap, as explained above. If recipients comply with the Department's new regulations, they risk civil rights lawsuits and litigation expenses. If they side with the constitutional rights of their students and employees, they invite federal or private enforcement actions, jeopardizing not only their reputation but their access to federal funds. The Department's decision to remove or diminish procedural safeguards in the Title IX grievance process exacerbates this problem. *See generally* 89 Fed. Reg. 33,891–96 (34 C.F.R. §§ 106.45, 106.46). The 2020 Rule established a baseline that would pass constitutional muster in most, if not all cases. That baseline provided recipients cover from accusations that recipients were falling short of their Title IX obligations if they offered due process protections to those accused of sex-based harassment. By amending the 2020 Rule, the Department eliminated that safe harbor. This reintroduced uncertainty, exposing recipients to possible enforcement actions.

The Texas Attorney General alerted the Department to this complication during the notice-and-comment period and explained that the additional exposure to enforcement actions would pressure recipients, including those in Texas, to revert to the kangaroo courts that plagued Title IX proceedings prior to the 2020 rulemaking. *See* App.030–033; Brian A. Pappas, *Procedural Convergence*, 55 Law & Soc'y Rev. 381, 391 (2021) (concluding that "Universities faced a choice of what constituted the larger risk: OCR enforcement or civil lawsuits?"). He noted that the 2011 Dear Colleage Letter bred similar incentives, which resulted in a record number of lawsuits and judgments against public universities for failing to abide by students' constutional rights. *See* App.031; *see also* Jonathan Taylor, *Milestone: 700+ Title IX/Due Process Lawsuits by Accused Students*, Title IX for All (May 11, 2021), https://titleixforall.com/milestone-700-title-ix-due-process-lawsuits-by-accused-students/.

Instead of responding to this concern, the Department emphasized that the new standards gave schools discretion over the procedures they adopted during the grievance process. However, this assertion is neither accurate nor on point. Not only do many of the changes further restrict recipients' options, *see, e.g.*, 89 Fed. Reg. 33,893 (34 C.F.R § 106.45(h)(1)) (burden of proof), but the Department failed to take into account that other parts of the Final Rule push recipients towards a specific outcome. The Final Rule charges recipients to "promptly and effectively" respond to "conduct that reasonably may constitute sex discrimination." 89 Fed. Reg. at 33,888. It then defines sex discrimination so broadly that recipients would be in violation of their obligations if they did not step in to "end" even protected activity, "prevent its recurrence, and remedy its effects." *Id.* at 33,592; *see supra* (discussing rejection of the *Davis* standard). The combination imposes serious pressure on recipients to curtail due process rights lest they be found deficient in their response to alleged harassment.

In other words, the Department considered the effect of watering down each procedural protection separately; it did not consider how these procedures would interact with other changes introduced by the Final Rule. This is not reasoned decisionmaking. The Department must consider the regulations as a whole if it is to have complete picture of the Final Rule's benefits and costs. *See State Farm*, 463 U.S. at 43. Furthermore, the Texas Attorney General notified the Department that

the totality of its proposed regulations would incentive recipients to offer the least amount of process possible. The failure to adequately consider and respond to significant comments received during the period for public comment demonstrates that the agency's decision was not based on a consideration of the relevant factors. *See*, *e.g.*, *Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 973 (5th Cir. 2023) (citing  failure to respond as reason for finding regulation unlawful).

To make matters worse, the Department did not consider the cumulative effect the diluted procedures would have on the accused's ability to offer a meaningful defense. For example, the risk of bias and unreliable outcomes from the single-investigator model is especially pronounced when the rule also gives the school officials the power to prosecute even "[i]n the absence of a complaint." 89 Fed. Reg. 33,889 (34 C.F.R. §106.44(f)(1)(v)). Courts have long recognized that students subject to disciplinary hearings are entitled to due process. *See Goss v. Lopez*, 419 U.S. 565, 581 (1975). And although the "specific dictates" of that process may vary depending on the ccircumstances, *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), the grievance process at public institutions must meet a constitutional minimum, in that it gives students a reasonable and fair opportunity to answer the charges levied against them. Accordingly, the Department had a duty to assess whether the combined changes made to Title IX grievance process brought recipients' due process protections beneath that threshold. Its failure to do so is evidence of arbitrary-and-capricious rulemaking and violates the APA.

### 2.  The Department's reasoning was flawed even when the changes are considered one-by-one.

In addition to its failure to consider the changes the Final Rule made to Title IX's grievance process in context, the Department erred when assessing the procedures individually. This is because the Department, among other things, neglected to adequately explain its rejection of the factual findings it published following the 2020 rulemaking. The Department at that time understood that promises of fair process were empty without real procedural and structural safeguards. The Final Rule, however, retracts many of these practices without ever really addressing the evidence before the

35

Department in 2020 or the consequence such revisions have on the accused. To offer a handful of examples:

**Single Investigator Model**: The Final Rule reverses the policy promulgated by the 2020 Rule and permits recipients to once again adopt the single investigator model, in which a single school employee—often the Title IX coordinator—adjudicates disciplinary proceedings as prosecutor, judge, and jury. This change threatens to inject bias into the proceedings. As the Department previously found, "[I]ndividuals who perform both roles may have confirmation bias and other prejudices that taint the proceedings, whereas separating those functions helps prevent bias and prejudice from impacting the outcome." 85 Fed. Reg. at 30,367. The Department, however, now says this reasoning from just a few years ago was wrong. 89 Fed. Reg. at 33,857. But when an agency's "new policy rests upon factual findings that contradict those which underlay its prior policy," agencies must "provide a more detailed justification." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). The Department fails to do that here, despite the "obvious" dangers the single investigator model engenders. *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 606 (D. Mass. 2016).

The Department attempts to downplay negative ramifications that will result from its policy by pointing out that the single investigators are instructed by the Final Rule to treat the participants "equitably" and not be "biased" or have a "conflict of interest." 89 Fed. Reg. at 33,662–63. However, these protections are not reasonably connected to the stated concerns. A simple directive to be unbiased does nothing concrete to protect parties or ensure reliability. And an opportunity to appeal is no solace to the accused, where a finding of guilt can exact severe monetary and reputational costs on students, ranging anywhere from expulsion and academic suspension to loss tuition, housing, scholarships, and job opportunities. *See Doe v. Baum*, 903 F.3d 575, 582 (6th Cir. 2018) At the very least, it places a black mark on a student's record—at its most extreme, it can topple any chance a student has at a successful career.

The 2020 Rule eliminated the single investigator  because it found that a "follow the law" directive did not work in practice and real protections were necessary. The Department neither reasonably addressed the relevant issues nor "provide[d] a more detailed justification" explaining this

reversal. *Fox*, 556 U.S. at 515 .

**Notice of Charges**: The challenged regulations allow an investigation to begin without any formal written complaint. The accused need only receive an "oral" statement that a person would "objectively"understand as a "request" to "investigate." 89 Fed. Reg. 33,882 (proposed 34 C.F.R. § 106.2). Verbal complaints, however, are often vague and imprecise, making it difficult (if not impossible) to provide accurate and adequate notice. Perhaps worse, the rule now permits the Title IX coordinator to initiate a grievance procedure even in "the absence of a complaint or the withdrawal of any or all of the allegations in a complaint." *Id.* at 33,889 (34 C.F.R. § 106.44(f)(1)(v)). The Fianl Rule thus empowers Title IX coordinators to go beyond their mandatory reporting duties and to police activities on campus that they think constitute sex discrimination. Given the overall breadth of "sex discrimination" and "sex-based harassment" under the rule, this provision gives Title IX coordinators and other employees the power to open investigations and start proceedings based solely on what they have heard. The Department failed to reasonably address the extraordinary implications of these changes or reasonably explain why a formal written complaint is unfair, impractical, or unwise.

**Access to Evidence**: The Final Rule removes the right of students to inspect all the evidence against them. Recipients have the option of offering students a mere "description" of the "relevant and not otherwise impermissible evidence," unless students go out of their way to request an "equal opportunity to access the evidence." 89 Fed. Reg. 33,892 (proposed 34 C.F.R. § 106.45(f)). The accused, however, has no way of knowing what relevant evidence was missing (or incompletely summarized in) the report. And because the Final Rule lets the decisionmaker and the investigator be the same person, the decisionmaker could know and base his decision on information that the parties never got a fair opportunity to contextualize or challenge. This limited access to the evidence raises more due-process concerns, which the Department does not reasonably address in its analysis. *See, e.g.*, *Doe v. Purdue Univ.*, 928 F.3d 652, 663 (7th Cir. 2019); *Averett v. Hardy*, 2020 WL 1033543, *5–8 (W.D. Ky. Mar. 3, 2020). The Department likewise failed to reasonably explain why providing the accused the evidence without a request, along with a description, is impractical or unwise and why the broader scope of evidence available under the 2020 Rule is problematic.

**Live Cross Examination**: The Final Rule eliminates the right to a live hearing at postsecondary institutions. Even if some form of live hearing is offered, the accused still lacks the right to directly cross-examine witnesses through a chosen representative. 89 Fed. Reg. at 33895 (34 C.F.R. § 106.46(g)). Setting due process concerns aside, the Department failed to provide a "detailed justification" for adopting "findings that contradict" the ones underlying the 2020 Rule. *Fox*, 556 U.S. at 515. The Department previously found that the alternatives it now champions were problematic,[6] *see* 85 Fed. Reg. at 30,330–31, and "stifled the value of cross-examination" if, for example, the recipient "refus[ed] to ask relevant questions posed by a party, chang[ed] the wording of a party's question, or refus[ed] to allow follow-up questions." *Id.* at 30,313; *accord id.* at 30,316, 30,330, 30,340.

Lacking evidence to refute its prior finding, the Department claims that "live hearings with advisor-conducted cross-examination" can be "burdensome" and these "resources … could have been spent on other things, including additional training for decisionmakers." 89 Fed. Reg. at 33732. But "cheapness alone cannot save an arbitrary agency policy." *Judulang v. Holder*, 565 U.S. 42, 64 (2011). The Department, in any event, does not explain how a single live hearing is more burdensome than multiple individual meetings with each witness where credibility might be an issue and there are follow-up questions. 89 Fed. Reg. at 33,894. Nor does the Department reasonably explain why the many benefits of a live hearing with adversarial cross-examination are outweighed by increased administrative burdens—an omission all the more striking given the Department's previous finding that cross-examination by the parties "appropriately and reasonably balances the truth-seeking function of" the the grievance process. 85 Fed. Reg. at 30,330.

**Burden of Proof:** The Final Rule limits recipients' discretion to require a higher burden of proof before punishing the accused under Title IX. The Department lets recipients use a higher burden of proof (clear and convincing, rather than a preponderance) only if they use that higher

---

[6] For example, the Department determined that "require[ing] a recipient to step into the shoes of an advocate by asking each party cross-examination questions designed to challenge that party's plausibility, credibility, reliability, motives, and consistency would place the recipient in the untenable position of acting partially (rather than impartially) toward the parties, or else failing to fully probe the parties' statements for flaws that reflect on the veracity of the party's statements." *Id.* at 30,331 (cleaned up).

burden "in all other comparable proceedings, including proceedings relating to other discrimination complaints." 89 Fed. Reg. 33,893 (34 C.F.R. § 106.45(h)(1)). Though the Department claims to care about "flexibility," this change is mandatory, and the Department does not provide an adequate explanation why it gives recipients less discretion. Additionally, the Department nowhere explains what constitutes a "comparable proceedin[g]." *Id.*; *see id.* at 33,704 ("declin[ing] to define that term"). This uncertainty makes the Department's rule a de facto ban on the clear-and-convincing-evidence standard without ever having to justify such a rule.

### E. The Final Rule illegally expands scope of recipients' liability beyond the scope of the statute.

The Final Rule's redefinition of "sex" discrimination is not the only instance where the Department attempts to illegally expand when, where, and how recipients must act to remain in compliance its regulations. For instance, Title IX limits recipients' obligations to discrimination that occur "under" their "education programs or activities." 20 U.S.C. § 1681(a); *see also id.* at § 1687 (defining programs and activities). This means that the discrimination or harassment "must take place in a context subject to the school district's control." *Davis*, 526 U.S. at 645. Nevertheless, the Final Rule obliges recipients to "promptly and effectively" address "conduct that occurs in a building owned or controlled by a student organization," 89 Fed. Reg. at 33,886 (34 C.F.R. § 106.11), 33,888 (34 C.F.R. § 106.44); misconduct occurring off campus (online or otherwise) or even "outside the United States," *id.*; and activities that occurred before any of the individuals attended the academic, *id.* at 33,527. The Department does not have authority to inflate recipients' liability beyond the plain text of the statute.

## II.    Texas will suffer irreparable harm if the Final Rule takes effect, as will other recipients.

"To show irreparable injury if threatened action is not enjoined, it is not necessary to demonstrate that harm is inevitable and irreparable." *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir. 1986). Instead, "[t]he plaintiff need show only a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Id.* (footnote omitted). "When determining whether injury is irreparable, it is not so much the magnitude but the irreparability that counts." *Id.* at 433–34 (cleaned up). Irreparable

injury includes "increased costs of compliance, necessary alterations in operating procedures, and immediate threats of costly and unlawful adjudications of liability all inflicted by the Rule's new provisions." *Career Colleges & Sch. of Texas*, 98 F.4th at 235.

Because the federal government "generally enjoy[s] sovereign immunity for any monetary damages," *Wages & White Lion Invs., L.L.C.*, 16 F.4th at 1142, Texas cannot compel the federal government to reimburse it. Without immediate judicial intervention, the Final Rule will inflict irreparable harm on Texas,  its school systems, and its citizens.

**F.  Texas is the object of the Final Rule and faces compliance costs.**

Texas suffer the irreparable harm of nonrecoverable compliance costs. *Career Colleges & Sch. of Texas*, 98 F.4th at 235. "[C]omplying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1994) (Scalia, J., concurring in part and in the judgment)).

A plaintiff "need not convert each allegation of harm into a specific dollar amount," *Career Colleges & Sch. of Texas*, 98 F.4th at 236 (cleaned up)—"alleged compliance costs need only be more than de minimis." *Id.* (cleaned up). Even the Department admits that the gender-identity mandate would require many schools to "updat[e] policies or training materials" and host trainings for employees and Title IX coordinators at substantial expense, among other compliance-related costs. 89 Fed. Reg. at 33,867, 33,876 (discussing 34 C.F.R. § 106.31(a)(2)); *see also Career Colleges & Sch. of Texas*, 98 F.4th at 236 (crediting evidence that plaintiffs would have to "expend more time and resources to train their staff due to the Rule"). Texas's declarations confirm the Final Rule would require it to undertake significant and costly compliance activities to prepare for the August 1, 2024 effective date.

Texas administers numerous education programs and operates thousands of educational institutions through its constituent agencies and political subdivisions, including programs and institutions that receive federal funding and are subject to Title IX and its effectuating regulations.

Texas independent school districts and Texas public universities are instrumentalities of the State. *See, e.g., Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 660 (Tex. 2008).

The Texas Constitution charges the Texas Legislature "to establish and make suitable provision for the support and maintenance of an efficient system of public free schools." Tex. Const. art. VII, § 1. Pursuant to this charge, Texas funds, regulates, and oversees the Nation's second-largest K–12 public education system, serving over 5.4 million students across 1,200 school districts. Tex. Educ. Agency, *Enrollment in Texas Public Schools 2021-22* at ix (June 2022), https://tea.texas.gov/reports-and-data/school-performance/accountability-research/enroll-2021-22.pdf. The Texas Education Agency ("TEA") is a state agency charged by State law to oversee the State's public school system's compliance with Title IX. *See* Tex. Educ. Code § 7.021. As part of its mandate, TEA allocates the majority of federal funding for Texas K-12 education. *See* Decl. of Michael Meyer ¶ 6, App.001.

In the 2021–2022 biennium, Texas received approximately $6.6 billion dollars in federal funds for its K-12 education. Tex. Educ. Agency, 2022 *Comprehensive Biennial Report on Texas Public Schools* at 239 (Dec. 2020), https://tea.texas.gov/reports-and-data/school-performance/accountability-research/comp-annual-biennial-2022.pdf. In fiscal year 2023, Texas public schools received approximately $9.4 billion in federal funding distributed by TEA and an additional $4.8 billion in federal disbursements that were allocated by the federal government directly or another intermediary. *See* Decl. of Michael Meyer ¶¶ 4–5, App.001.

State statute requires TEA to operate a number of educational programs directly. These include "regional day programs" for deaf students and a school network for students with "visual impairments." Tex. Educ. Code 7.021(b)(10), (11). The Texas School for the Deaf is a state agency that provides educational services, on a day and residential basis, to students who are deaf or hard of hearing. Tex. Educ. Code § 30.051; Decl. of Peter L. Bailey ¶ 3, App.003–004.  The school's dormitories, athletic teams, and locker rooms are separated by biological sex. *Id.* at ¶¶ 3–4, App.003–004. The Texas School for the Deaf relies on federal funding for the services it provides to students and their families. *Id.* at ¶ 5, App.004. The school received $1,261,735.00 in federal funds for fiscal

year 2024. *Id.*

Texas also funds, supports, and administers a robust higher education network. Texas is home to 119 public postsecondary institutions, including 37 universities and 82 two-year colleges and technical schools. *See* Tex. Higher Educ. Coordinating Bd., *2020 Texas Public Higher Education Almanac* at 28, 47 (Sept. 28, 2020), https://reportcenter.highered.texas.gov/agency-publication/almanac/2020-texas-public-higher-education-almanac/.

While most States have just one or two public university systems, Texas has six. The largest of these systems—the University of Texas—has 14 separate locations that educate approximately 256,000 students each year. *See About The University of Texas System*, The University of Texas System, https://www.utsystem.edu/about. All told, the State's entire higher education network includes 148 public institutions and currently enrolls approximately 1.4 million students. *See* Decl. of Sarah Keyton ¶ 3, App.006–007. Public postsecondary education institutions in Texas received approximately $2.5 billion in federal funding during fiscal year 2022.

As a condition of receiving federal funding, Title IX protections against sex-based discrimination apply to state educational institutions. *See* 20 U.S.C. § 1681. Hence, should Texas, or any of Texas's affiliated academic institutions, deviate from the Department's guidance effectuating Title IX, that departure would invite enforcement actions at the risk of significant monetary penalties, up to and including the loss of federal money.

Public education in Texas depends on federal funds. Institutions that lose their federal funding will need to eliminate certain educational services if they cannot find alternative funding sources. *See* Decl. of Michael Meyer ¶ 8, App.002; Decl. of Peter L. Bailey ¶¶ 6–7, App.004–005; Decl. of Sarah Keyton ¶ 7, App.007. Texas educational institutions rely on federal funding and will be irreparably harmed if they lose their funding because of their reliance on 50 years of Title IX practice and legal precedent interpreting "on the basis of sex" to mean biological sex, *not* "sexual orientation" and "gender identity." *Id.*

It is a "fundamental canon of statutory construction" that, "unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning" at the time of

enactment. *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)); Scalia & Garner, *supra*, at 16 (same). No dictionary at the time Title IX was enacted defined "sex" to include "gender identity" or "sexual orientation." *Adams*, 57 F.4th at 812–13.

Texas, relying on the contemporary (and etymological) meaning of "sex" when Title IX was enacted, adopted laws, policies, and procedures, and significantly invested in an entire infrastructure to implement its education systems. The Final Rule upends these important reliance interests and usurps Texas's sovereignty by adding "gender identity" and "sexual orientation."

The Final Rule refuses to define "gender identity" and "sexual orientation," nor whether both fixed and fluid identities and orientations are protected. Its protections for an ever-fluctuating number of gender identities and sexual orientations, which individuals can allegedly change at any time, anywhere, and for any (or no) reason, undermines Title IX's original sex-based protections. *See United States v. Varner*, 948 F.3d 250, 256–58 (5th Cir. 2020) (examining bewildering assortment of purported gender identities and bespoke pronouns).

Federal funding allocated to Texas's post-secondary public universities, technical educational institutions, health-related educational institutions, and community colleges is managed by the Texas Higher Education Coordinating Board ("THECB"). Decl. of Sarah Keyton ¶ 3, App.006–007. In fiscal year 2022, Texas public universities received more than $3.8 billion in federal funding; Texas community colleges received more than $2.1 billion in federal funds; Texas technical educational institutions received more than $100 million in federal funds; and Texas health-related educational institutions received more than $1.5 billion in federal funds. *See* Tex. Higher Educ. Coordinating Bd., Sources and Uses Report, at https://www.highered.texas.gov/our-work/supporting-our-institutions/institutional-funding-resources/sources-and-uses/.

The Final Rule threatens to withdraw federal funding from Texas educational institutions. The Department may pursue enforcement actions against educational facilities that are out of compliance with its aberrant interpretation of Title IX and penalize any institution deemed non-compliant by withholding funds. *See* U.S.C. §§ 1681, 1682; Decl. of Michael Meyer ¶¶ 7–8, App.002; Decl. of Peter L. Bailey ¶¶ 6–8, App.004–005; Decl. of Sarah Keyton ¶¶ 6–7, App.007.

Complying with Title IX costs Texas money. Texas educational institutions undertake internal efforts to ensure compliance with Title IX, including federal regulations promulgated pursuant to Title IX. These efforts involve but are not exhausted by hiring staff to perform compliance reviews, facilitate the Title IX grievance process, and respond to lawsuits that stem from allegations of liability under Title IX protections. *See* Decl. of Rick Olshak ¶¶ 4–5, App.008–009. These and other compliance efforts incur considerable expense to state educational facilities. The costs of complying with Title IX will likely increase when the Department adopts new regulations that create additional requirements or make existing requirements more demanding. *See id.* These include the administrative costs due to the increased caseload caused by the Final Rule's lower standard for harassment, the extension of coverage to off-campus behavior, regulating covered third-party entities, increased referrals to the Title IX Coordinators, updating training and educational materials for employees, and maintaining two different complaint processes. *Id.*

Even the Department's low regulatory cost estimates reveal a substantial monetary burden on state educational facilities. Overall, the Department estimates more than $98 million in short-term compliance costs, some of which will fall on Texas schools. *See* 89 Fed. Reg. at 33,861.

### G.  The Final Rule expands liability to Texas and other recipients of federal education funds.

Enforcement of the Final Rule threatens to strip Texas and their Title IX recipients of billions of dollars in federal support—endangering important programs that serve attendees of the State's public schools, special schools, and higher education institutions. The Final Rule makes clear that its gender-identity mandate and other provisions displace contrary state and school policies. 89 Fed. Reg. at 33,542. Because Texas has and allows policies that conflict with the Final Rule, it and its components face Title IX funding losses should the Final Rule remain in place.

Educational institutions are subject to liability for alleged violations of Title IX. *See generally, Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979); *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, (2009). The Final Rule forces a waiver of Texas's sovereign immunity as to certain regulatory requirements without its consent. The Final Rule rolls back constitutional safeguards for students while expanding

recipients' liability far beyond what title IX allows. These changes are unconstitutional.

Not only does it reinvent the definition of "sex discrimination" to include "sexual orientation" and "gender identity" impermissibly, but the Final Rule also expands when, where, and how recipients must respond to claims of sexual harassment—extending to conduct that occurs online, off campus, outside the United States, or even before the relevant individuals attended the school. 89 Fed. Reg. at 33,386, 33,527.

Additionally, the Final Rule amends the definition of "sexual harassment" in 34 C.F.R. § 106.2 to include unwelcome sex-based conduct (1) "that is sufficiently severe *or* pervasive," and (2) "that based on the totality of the circumstances and evaluated *subjectively and objectively*, denies or *limits* a person's ability to participate in" the recipient's education program or activity. 89 Fed. Reg. at 33,517 (emphasis added).

On its own, the redefinition of "sex discrimination" to include sexual orientation and gender identity increases the odds of academic institutions intruding on protected rights when seeking to enforce Title IX. But when combined with the other listed changes, the danger becomes especially acute.

For example, the Final Rule directly curtails First Amendment and Due Process protections for Texas students. It does this by lowering he standard for sex-based harassment to a "preponderance-of-the-evidence" standard; barring accused students from access to evidence, offering them instead a mere "description" of "relevant" evidence; and permitting recipients to adopt the investigator model, in which a single "decisionmaker" adjudicates the proceedings as prosecutor, judge, and jury. *See* 89 Fed. Reg. at 33,891–95.

These weakened standards are introduced at the same time the recipient's liability expands. The Department thus gives recipients cause to initiate more zealous Title IX enforcement proceedings, reducing students' access to a fair hearing when accused of harassment.

Additionally, compared to the 2020 Rule, the standards advanced by the Final Rule would create far more opportunities for recipients to inadvertently fall out of compliance. The previous version of § 106.44(a) required recipients to "respond promptly in a manner that is not deliberately

indifferent"—something they could achieve if their response was not "clearly unreasonable in light of the known circumstances." 2020 Rule, 85 Fed. Reg. at 30,574. Recipients therefore had more flexibility in how to craft a response that was appropriate to the facts and parties involved. Recipients were also judged based on the information they had on hand without the benefit of hindsight, which the Final Rule could allow.

But the language in the Final Rule unlawfully shifts from the deliberate indifference standard which requires institutions to take actions reasonably calculated to address allegations to a standard that requires their actions to be "effective."[7] Yet institutions do not have an obligation under Title IX to eliminate discrimination; they are merely obligated to respond in a manner that is not clearly unreasonable.[8]

The Final Rule greatly expands the scope of Title IX protections, thereby expanding the range of conduct that could give rise to a lawsuit against Texas educational institutions. *See, e.g.*, 89 Fed. Reg. at 33,563 ("the recipient need not have incontrovertible proof that conduct violates Title IX for it to have an obligation to respond," but rather "if the conduct reasonably *may* be sex discrimination, the recipient must respond in accordance with § 106.44" (emphasis added)).

Because the Final Rule contradicts existing case law, including the departure from *Davis,* grants institutions the permission to ditch live hearings, permits a single-investigator model, and revokes the right to cross-examination—the likelihood that Texas institutions will get sued and lose lawsuits is significant. Texas schools are placed in a no-win situation—where adherence to the Constitution risks the loss of federal funds.

**H. The Final Rule infringes on Texas's sovereignty.**

The Final Rule derogates Texas's sovereign interests in enforcing duly enacted state laws. *See*

---

7 "§ 106.44(a) (1) a recipient with knowledge of conduct that reasonably may constitute sex discrimination in its education program or activity must respond promptly and effectively; and (2) a recipient must also comply with this section to address sex discrimination in its education program or activity." 89 Fed. Reg. at 33563 (emphasis added).

8 *See Davis*, 526 U.S. at 648–49 ("[C]ourts should refrain from second guessing the disciplinary decisions made by school administrators," who "must merely respond to known peer harassment in a manner that is not clearly unreasonable.") (citations omitted).

*Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 595 U.S. 267, 277 (2022) (describing this power as "[p]aramount among the States' retained sovereign powers"). Texas's "inability to enforce its duly enacted" laws "inflicts irreparable harm on the State." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018); *see also Texas v. United States*, 809 F.3d 134, 153 (5th Cir. 2015) ("[S]tates may have standing based on (1) federal assertions of authority to regulate matters they believe they control, (2) federal preemption of state law, and (3) federal interference with the enforcement of state law[.]"). Together, therefore, the injuries to Texas's financial and sovereign interests are irreparable and should be protected pending a merits determination.

Texas has enacted laws to protect sex separation in K-12 and higher education athletics programs. Texas law provides that "an interscholastic athletic competition team sponsored or authorized by a school district or open-enrollment charter school may not allow [] a student to compete in an interscholastic athletic competition sponsored or authorized by the district or school that is designated for the biological sex opposite to the student's biological sex." Tex. Educ. Code § 33.0834; *see also* University Interscholastic League Non-Discrimination Policy, Const. sub. J (accessed May 12, 2024) (policy segregating certain school sports based on sex), https://www.uiltexas.org/policy/constitution/general/nondiscrimination.

The Final Rule prohibits separation based on biological sex in K-12 athletics teams, which indicates that the Department will investigate K-12 schools for following Texas law and provides that the Department may sanction the schools by withholding federal funding for complying with Texas law. *See* 89 Fed. Reg. at 33,886. Texas law also provides that "an intercollegiate athletic team sponsored or authorized by an institution of higher education may not allow a student to compete on the team in an intercollegiate athletic competition sponsored or authorized by the institution that is designated for the biological sex opposite to the student's biological sex." Tex. Educ. Code. § 51.980. The Final Rule's prohibition on the separation of education athletics teams based on biological sex will subject institutions of higher education to investigation (and possibly sanctions) by the Department merely for complying with Texas law. *See* 89 Fed. Reg. at 33,886.

The Final Rule also conflicts with the policies adopted by some of Texas's political

subdivisions—pursuant to authority granted by state law—regarding separating school bathrooms and locker rooms by biological sex.   For example, the Carroll, Frisco, and Grapevine–Colleyville Independent School Districts require schools owned or operated by the districts to separate bathrooms, locker rooms, shower rooms, and other similar facilities based on biological sex determined at birth and correctly identified on a person's birth certificate. App.018, 020, 027.

Under Texas statute, independent school districts are expressly authorized to exercise State power by implementing local policies; the trustees of ISDs "have the exclusive power and duty to govern and oversee the management of the public schools of the district." Tex. Educ. Code § 11.151(b).The Final Rule conflicts with each of these policies by treating them as unlawful sex discrimination and by requiring school districts to change their policies to separate bathrooms, locker rooms, showers, and changing facilities based on gender identity instead of biological sex to remain in compliance with the Rule. *See* 89 Fed. Reg. at 33,886.

The Final Rule requires using pronouns that are consistent with a person's gender identity rather than biological sex, which conflicts with policies adopted by some of Texas's political subdivisions and is not required by Texas state law. For example, the Carroll and Grapevine–Colleyville Independent School Districts have adopted policies that prohibit district employees from requiring the use of pronouns that are inconsistent with a person's biological sex as correctly identified on a person's birth certificate or other government-issued record. App.019, 021–026.

The Final Rule conflicts with these policies by treating them as unlawful sex discrimination and by requiring school districts to change their policies to use pronouns based on a person's gender identity instead of biological sex to remain in compliance with the Final Rule. *See* 89 Fed. Reg. at 33,886. Compliance with the Final Rule would expose the school districts to liability for violating district employees' and students' religious freedom and free speech rights, despite district policies protecting those rights.The Final Rule explicitly preempts contrary state laws and directs recipients of Title IX funding to comply with the Final Rule in the event of a conflict with state law.  *See* 89 Fed. Reg. at 33,885. These injuries are sufficient to establish Texas's standing.

**III.    The public interest and balance of equities favors Plaintiffs.**

For the reasons given above, Plaintiffs have a strong likelihood of success on the merits and confront substantial, imminent irreparable harm—the two most important factors in the analysis for preliminary relief. *See Career Colleges & Sch. of Texas*, 98 F.4th at 239 (likelihood of success on the merits); *Mock*, 75 F.4th at 587 n.60 (same); *Spectrum WT v. Wendler*, ---F.Supp.3d---, No. 2:23-cv-48, 2023 WL 6166779, at *14 (N.D. Tex. Sept. 21, 2023) (Kacsmaryk, J.) (irreparable harm). The Defendants thus "face[] a high hurdle" in establishing that the remaining two factors weigh against granting relief. *Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023). Granting a stay  and preliminary injunction would serve the public interest by ensuring that Texas may continue to enforce its laws and policies without risking the loss of Title IX funding. And the public interest would be served by preventing the loss of federal funds to Texas's educational institutions. *See Career Colleges & Sch. of Texas*, 98 F.4th at 254–55 (5th Cir. 2024) ("Evidence CCST points to in the record shows that a failure to stay the Rule would significantly constrain schools' operations and prevent them from devoting resources to educating their students, upgrading facilities, and constructing new ones. The only alternative to incurring these costs is for the school to withdraw from Title IV entirely, which would be to the detriment of students who rely on the availability of Direct Loans. Such a consequence would harm the public at large.").

Moreover, granting a stay will merely preserve the status quo pending review. The "status quo" is "the last peaceable uncontested status existing between the parties before the dispute developed." Wright & Miller, *11A Fed. Prac. & Proc. Civ.* § 2948 (3d ed.) (cleaned up). The Fifth Circuit has held that staying an agency action—even *after* the effective date—preserves the *status quo ante* and is properly imposed via Section 705. *Wages & White Lion Invs.*, 16 F.4th at 1143–44.

"[T]he maintenance of the *status quo* is an important consideration in granting a stay." *Barber v. Bryant*, 833 F.3d 510, 511 (5th Cir. 2016) (quotation omitted). And the "public interest is in having governmental agencies abide by the federal laws that govern their existence and operations," *Texas v. Biden*, 10 F.4th 538, 559 (5th Cir. 2021) (quotation omitted), because "there is generally no public interest in the perpetuation of unlawful agency action." *Id.* at 560 (cleaned up); *BST Holdings, L.L.C.*

*v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021). If Defendants failed to satisfy the requirements of reasoned decisionmaking and abiding the the law, the public interest lies in staying their action. Defendants may claim fighting discrimination is an important public interest, "[b]ut our system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Wages & White Lion Invs., LLC,* 16 F.4th at 1143 (citation omitted).

Defendants also cannot cannot credibly claim that a delay of the effective date of the Final Rule is a harm sufficient to outweigh those imposed on Texas, after taking nearly two years to complete this rulemaking and half a century to reach the novel conclusion that Title IX's prohibition of discrimination based on "sex" refers to sexual orientation and gender identity.

CONCLUSION

The Court should grant this Motion, stay the Final Rule, preliminarily enjoin its application to Palintiffs, and preliminarily enjoin Defendants from interpreting, applying, or enforcing Title IX consistent with the Final Rule.

Dated: May 13, 2024.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy Attorney General for Legal Strategy

*/s/ Ryan D. Walters*
RYAN D. WALTERS
Chief, Special Litigation Division
Ryan.Walters@oag.texas.gov

AMY SNOW HILTON
Special Counsel
Amy.Hilton@oag.texas.gov

KATHLEEN T. HUNKER
Special Counsel
Kathleen.Hunker@oag.texas.gov

JOHNATHAN STONE
Special Counsel
Johnathan.Stone@oag.texas.gov

GARRETT GREENE
Special Counsel
Garrett.Greene@oag.texas.gov

MUNERA AL-FUHAID
Special Counsel
Munera.Al-fuhaid@oag.texas.gov

ZACHARY BERG
Special Counsel
Zachary.Berg@oag.texas.gov

ETHAN SZUMANSKI
Special Counsel
Ethan.Szumanski@oag.texas.gov

KYLE TEBO
Assistant Attorney General
Kyle.Tebo@oag.texas.gov

Office of the Attorney General of Texas
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: 512-463-2100
Fax: 512-457-4410

**COUNSEL FOR STATE OF TEXAS**

GENE P. HAMILTON
America First Legal Foundation
611 Pennsylvania Ave. SE #231
Washington, DC 20003
(202) 964-3721
Gene.Hamilton@aflegal.org

**COUNSEL FOR STATE OF TEXAS, DANIEL A. BONEVAC & JOHN HATFIELD**

JONATHAN F. MITCHELL
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
Jonathan@mitchell.law

**COUNSEL FOR DANIEL A. BONEVAC & JOHN HATFIELD**

### CERTIFICATE OF CONFERENCE

I certify that around 10:45 am CT on May 13, 2024, I conferred by telephone and email with George Padis, Assistant U.S. Attorney for the Northern District of Texas, about this motion.  Via email at 4:44 pm CT, he forwarded my email request to Elizabeth Tulis at DOJ, the attorney assigned to this case. At 8:32 pm CT on May 13, 2024, Ms. Tulis informed me that she could not give me an answer regarding this motion until May 14, 2024.

*/s/ Ryan D. Walters*
RYAN D. WALTERS

### CERTIFICATE OF SERVICE

I certify that on May 13, 2024, this document was filed through the Court's CM/ECF system, which served it upon all counsel of record. The U.S. Attorney for the Northern District of Texas accepted service of process on that office via email today, and I served this document via email to Elizabeth.Tulis@usdoj.gov and George.Padis@usdoj.gov on May 13, 2024.

*/s/ Ryan D. Walters*
RYAN D. WALTERS