UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

STATE OF TEXAS ET AL.,
    *PLAINTIFF*,

V.                          NO. 2:24-CV-00086-Z

THE UNITED STATES OF AMERICA ET AL.,
    *DEFENDANTS.*

**PLAINTIFFS' MOTION FOR STAY OF EFFECTIVE DATE OF
AGENCY ACTION AND PRELIMINARY INJUNCTION APPENDIX**

Declaration of Michael Meyer ....................................................................App. 001-2

Declaration of Peter L. Bailey ...................................................................App. 004-5

Declaration of Sarah Keyton....................................................................App. 006-7

Declaration of Rick Olshak .......................................................................App. 008-9

Declaration of Daniel A. Bonevac............................................................App. 010-13

Declaration of John Hatfield ....................................................................App. 014-17

Carroll ISD Facility Standards, Use of Restrooms & Locker Rooms,
July 24, 2023 ............................................................................................App. 018

Carroll ISD, Identification of Students, July 24, 2023...............................App. 019

Frisco ISD, Fac. Standards, Use of Bathrooms &Changing Fac., Nov. 14. 2022......App. 020

Grapevine-Colleyville ISD, Misc. Instructional Policies Teaching about
Controversial Issues, Aug. 22, 2022 .........................................................App. 021-26

Grapevine-Colleyville ISD, Buildings, Grounds, & Equip. Mgmt. Sec.,
Use of Bathrooms & Changing Fac., Aug. 22, 2022..................................App. 027

Governor Abbott's July 25, 2022,
Letter to U.S Dept. of Education................................................................App. 028-29

Attorney General of Texas' Sept. 12, 2022,
Letter to U.S Dept. of Education................................................................App. 030-35

Attorney General of Mont. & Attorney General of Ind.'s June 23, 2022,

Letter to U.S Dept. of Education ...................................................................................App. 036-42

Attorney General of Montana's April 5, 2022,
Letter to U.S Dept. of Education ...................................................................................App. 043-49

Attorney General of Montana's Sept. 12, 2022,
Letter to U.S Dept. of Education ...................................................................................App. 050-86

Attorney General of Indiana's Sept 12, 2022,
Letter to U.S Dept. of Education ...................................................................................App. 087-97

Attorney General of Tennessee's Sept. 14, 2022,
Letter to U.S Dept. of Education ...................................................................................App. 098-112

Dated: May 13, 2024.

Respectfully submitted.

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy Attorney General for Legal Strategy

*/s/Ryan D. Walters*
**RYAN D. WALTERS**
Chief, Special Litigation Division
Ryan.Walters@oag.texas.gov

**AMY SNOW HILTON**
Special Counsel
Amy.Hilton@oag.texas.gov

**KATHLEEN T. HUNKER**
Special Counsel
Kathleen.Hunker@oag.texas.gov

**JOHNATHAN STONE**
Special Counsel
Johnathan.Stone@oag.texas.gov

**GARRETT GREENE**
Special Counsel
Garrett.Greene@oag.texas.gov

**MUNERA AL-FUHAID**
Special Counsel
Munera.Al-fuhaid@oag.texas.gov

**ZACHARY BERG**
Special Counsel
Zachary.Berg@oag.texas.gov

**ETHAN SZUMANSKI**
Special Counsel
Ethan.Szumanski@oag.texas.gov

**KYLE TEBO**
Assistant Attorney General
Kyle.Tebo@oag.texas.gov

Office of the Attorney General of Texas
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: 512-463-2100
Fax: 512-457-4410
**COUNSEL FOR STATE OF TEXAS**

**GENE P. HAMILTON**
America First Legal Foundation
611 Pennsylvania Ave. SE #231
Washington, DC 20003
(202) 964-3721
Gene.Hamilton@aflegal.org

**JONATHAN F. MITCHELL**
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
Jonathan@mitchell.law

**COUNSEL FOR STATE OF TEXAS, DANIEL A. BONEVAC & JOHN HATFIELD**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | |
|---|---|
| State of Texas, | |
| *Plaintiff*, | |
| v. | No. 2:24-cv-00086-Z |
| The United States of America et al., | |
| *Defendants.* | |

### DECLARATION OF MICHAEL MEYER

1. My name is Michael Meyer. I am over 18 years of age, of sound mind, and capable of making this declaration. I have personal knowledge of the facts stated herein.

2. I am the Deputy Commissioner of Finance at the Texas Education Agency (TEA). I have held this position since June 2018.

3. Educational programs and activities in Texas are funded through TEA. *See* Tex. Educ. Code § 7.021; § 7.031.

4. In the 2023 Fiscal Year, approximately $9.4 billion in federal funds were distributed to Texas public schools for educational programs and activities in Texas through TEA, including but not limited to: ongoing programs funded under the Elementary and Secondary Education Act, the Individuals with Disabilities Education Act, and the Strengthening Career and Technical Education for the 21st Century Act (Perkins V), and temporary programs funded through the Elementary and Secondary School Emergency Relief Fund via the Coronavirus Response and Relief Supplemental Appropriations Act, and the American Rescue Plan Act.

5. The information above reflects only the federal funds received by Texas public schools through TEA. In Fiscal Year 2023, public schools in Texas received another approximately $4.8 billion in federal funding, including about $0.4 billion received directly from the federal government and about $4.4 billion distributed through entities other than TEA. In addition, public schools received approximately $26.8 billion in state funding in Fiscal Year 2023.

6. Almost all Texas public schools receive federal funds that are distributed by TEA. Additionally, the Texas School for the Blind and Visually Impaired ("TSBVI") and the Texas School for the Deaf ("TSD"), directly operated by the State of Texas, receive federal funds distributed by TEA.

**App. 001**

7. To receive federal funds, a public school, TSBVI, or TSD must provide assurance of compliance with applicable federal statutes and rules. If a recipient is found to be in non-compliance by the federal entity that awarded the funds, the recipient may be subject to enforcement action such as repayment of funds or loss of future funding.

8. The loss of federal funds would require Texas's public schools to either eliminate certain educational services offered using federal funds or find funding from another source.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on this 10th day of May, 2024, in Austin, Texas.


_____
MICHAEL MEYER

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

STATE OF TEXAS,

     *Plaintiff,*

v.

THE UNITED STATES OF
AMERICA; MIGUEL CARDONA, in
his official capacity as Secretary of
Education; UNITED STATES
DEPARTMENT OF
EDUCATION; CATHERINE
LHAMON, in her official capacity as
Assistant Secretary for Civil Rights,
Department of Education;
RANDOLPH WILLS, in his official
capacity as Deputy Assistant Secretary
for Enforcement, Department of
Education,

     *Defendants.*

Case No. 2:24-cv-00086-Z

---

**Declaration of Peter L. Bailey**

---

Pursuant to 28 U.S.C. § 1746, I, Peter L. Bailey, duly affirm under penalty of perjury as follows:

1.     I am over 18 years of age, have personal knowledge of the matters set forth herein, and am competent to make this Declaration.

2.     My name is Peter L. Bailey, and I serve as Superintendent of the Texas School for the Deaf (TSD).

3.     TSD is a state agency, located in Austin Texas, that provides comprehensive educational services to persons who are 21 years of age or younger, who are deaf or hard of

hearing, and who may have one or more other disabilities.  TSD serves over 500 deaf or hard of hearing students from over 50 counties from around the state of Texas.  TSD maintains a residential setting (dorms) for students who live outside of the Austin area.  Living quarters in these residential settings are maintained on the basis of sex.

4.      TSD provides athletic programs for students to participate in extracurricular activities.  Athletic teams are organized on the basis of sex.  TSD currently maintains separate locker room facilities for males and females.

5.      TSD receives significant federal funds necessary to maintain critical services for its deaf and hard of hearing students and to provide statewide outreach services to families of deaf and hard of hearing children who do not attend TSD's Austin campus.  Because TSD receives federal funding, TSD is subject to the requirements of Title IX.  If any program or activity at TSD is determined to not be in compliance with the requirements of Title IX, the U.S. Department of Education may terminate federal funding to TSD.  TSD's current federal funding sources for Fiscal Year 2024 include:

| Program | Federal Grant Source / Name | FY 24 Federal Funds |
|---|---|---|
| School Nutrition | US Dept of Agriculture: School Breakfast Program | $ 29,968.00 |
| School Nutrition | US Dept of Agriculture: School Lunch Program | $ 130,531.00 |
| Statewide Outreach | US Dept of Education: IDEA-B Discretionary | $ 394,579.00 |
| Early Childhood Education | US Dept of Education: Special Education Consolidated (State) ECI | $ 6,003.00 |
| Classroom Instruction | US Dept of Education: IDEA-B Formula | $ 293,472.00 |
| Classroom Instruction | US Dept of Education: IDEA-B Preschool | $ 18,388.00 |
| Statewide Outreach | Dept of State Health Services: Early Hearing Detection | $ 222,643.00 |
| Career & Technical Education | US Dept of Education: Carl Perkins | $ 45,017.00 |
| Classroom Instruction | US Dept of Education: Title I, Part A | $ 97,444.00 |
| Classroom Instruction | US Dept of Education: Title II, Part A | $ 13,690.00 |
| Classroom Instruction | US Dept of Education: Title IV, Part A | $ 10,000.00 |
| **Texas School for the Deaf Total Federal Funds** | | $ 1,261,735.00 |

6.      Loss of federal funding would require TSD to eliminate certain education, nutritional, and outreach services provided to deaf and hard of hearing students, their families, and support professionals.  Alternate funding sources would need to be identified to replace federal education funding, including those provided by the Carl D. Perkins Act, the Elementary

and Secondary Education Act (ESEA), and the Individuals with Disabilities Education Act (IDEA).

7.     Approximately 60% of TSD students receive free or reduced nutritional services. Loss of federal funds would increase risk of food insecurity, potentially decrease classroom attendance, and result in additional learning loss.

8.     TSD will incur costs to comply with a federal rule implementing Title IX.  These costs will include updating policies and training materials that reflect policies inconsistent with such a rule and incurring additional training costs for Title IX Coordinators, administrators, and other staff.  The amount of time dedicated to Title IX training increases in a year in which the U.S. Department of Education adopts significant changes to Title IX regulations.  Because the U.S. Department of Education has finalized new Title IX regulations, published at 89 Fed. Reg. 33,474 (Apr. 29, 2024), with an effective date of August 1, 2024, TSD will incur greater time and costs associated with Title IX training and other compliance this year than in a year in which the U.S. Department of Education did not revise its Title IX rules.  Because recipients must comply with these new regulations before the next school year begins, TSD's training and other compliance costs will be incurred this summer before the effective date.

9.     I declare under penalty of perjury that the foregoing is true and correct.


Peter L. Bailey

Dated:  May 10, 2024

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

AMARILLO DIVISION

State of Texas,

*Plaintiff,*

v.

No. 2:24-cv-00086-Z

The United States of America et al.,
        *Defendants.*

## DECLARATION OF SARAH KEYTON

Pursuant to 28 U.S.C § 1746, I, Sarah Keyton, duly affirm under penalty of perjury as follows:

1.      I am over 18 years of age, have personal knowledge of the matters set forth herein, and am competent to make this declaration.

2.      My name is Sarah Keyton, and I serve as the Deputy Commissioner of Administration of the Texas Higher Education Coordinating Board. I have served in this capacity since December 2023, and prior to that, I served as the Associate Commissioner of Administration. My responsibilities for the Texas Higher Education Coordinating Board include oversight of the agency divisions responsible for budget preparation and funding analysis.

3.      The Texas Higher Education Coordinating Board was created in 1965 by the Texas Legislature to provide leadership, guidance, expertise, and resources to improve the efficiency and

**App. 006**

quality of higher education in Texas. The Coordinating Board provides oversight, for 148 public colleges, universities, and health-related institutions serving almost 1.4 million students in Texas.

4.     All of Texas' public institutions of higher education receive federal funds and are subject to the requirements of Title IX.

5.     The Texas Higher Education Coordinating Board is a state educational agency covered by Title IX.

6.     If any educational program or activity at one of Texas' public institutions of higher education is determined not to be in compliance with the requirements of Title IX, that could threaten the entity's ability to receive federal funding.

7.     The loss of federal funds to Texas' public institutions of higher education could require these institutions to either eliminate certain educational services currently offered using federal funds or require them to seek new funding to pay for those programs or activities.

8.     I declare under penalty of perjury that the foregoing is true and correct.

Sarah Keyton

Dated: May 10, 2024.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

State of Texas,

*Plaintiff,*

v.                                              No. 2:24-cv-00086-Z

The United States of America et al.,
        *Defendants.*

### <u>Declaration of Rick Olshak</u>

1.      My name is Richard T. Olshak.  I am over the age of 18 and fully competent in all respects to make this declaration.

2.      I have personal knowledge of the facts stated in this declaration, and all of these facts are true and correct.

3.      I am currently employed by The Texas University A&M System (Texas A&M System) as Director of Title IX and Student Conduct and Compliance.

4.      As Director of Title IX, I am responsible for implementing Title IX for the 11 universities and 8 state agencies that comprise the Texas A&M System.

5.      I have reviewed the Title IX regulations issued by the Department of Education on April 29, 2024, *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance.* 89 Fed. Reg. 33, 474 (Apr. 29, 2024), and it is my opinion that the implementation of these regulations will increase the workload of the Texas A&M System Title IX Office and the Title IX Offices of the component universities and agencies of the Texas A&M System.  Below is a list of administrative burdens brought by the new federal regulations as they apply to the universities and agencies that operate under the umbrella of the Texas A&M System.

        a.      The anticipation of a much heavier caseload by lowering the threshold on what

1

**App. 008**

constitutes sex-based harassment;

      b.     Expanded jurisdiction to off-campus behaviors for Title IX cases;

      c.     Expanded responsibilities for mitigating the effects of sex-based discrimination and harassment directed at third parties on our property/at our events;

      d.     The requirement for employees to refer every student they identify as pregnant to the Title IX Coordinator;

      e.     Requiring annual training for employees;

      f.     Expanded jurisdiction to include behaviors taking place outside of the United States; and

      g.     The requirement to maintain two different complaint resolution processes in perpetuity for incidents that take place before August 1, 2024, and those on or after that date.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 10th day of May, 2024.

Richard T. Olshak
Director, Title IX Compliance

2

App. 009

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

**State of Texas**, et al.,

Plaintiffs,

v.

**United States of America**, et al.,

Defendants.

Case No. **2:24-cv-00086-Z**

## DECLARATION OF DANIEL A. BONEVAC

I, Daniel A. Bonevac, declare as follows:

1.  I am over 18 years old and fully competent to make this declaration.

2.  I have personal knowledge of the facts stated in this declaration, and all of these facts are true and correct.

3.  I am a named plaintiff in this litigation.

4.  I am a professor of philosophy of the University of Texas at Austin. The University of Texas at Austin is subject to Title IX and its prohibition on "sex" discrimination. As a professor at UT-Austin, I am also subject to the requirements of Title IX in my capacity as an educator and scholar.

5.  I have no intention of complying with the Biden Administration's recently announced Title IX edict, which has nothing to do with "sex" discrimination and represents nothing more than an attempt to force every educator in the United States to conform to a highly contentious interpretation of gender ideology and abortion rights.

6.  The new Title IX rule purports to define "discrimination on the basis of sex" to include "discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity." *See* 34 C.F.R. § 106.10.

7.   The new Title IX rule also purports to define "pregnancy or related conditions" to include abortion. *See* 34 C.F.R. § 106.2 ("Pregnancy or related conditions means . . . Pregnancy, childbirth, termination of pregnancy, or lactation"). It requires professors to accommodate student absences from class to obtain abortions—including illegal abortions and purely elective abortions that are not medically required. *See* 34 C.F.R. § 106.40(b)(3)(ii)(C); 34 C.F.R. § 106.40(b)(3)(iv); *see also* 34 C.F.R. § 106.40(b)(6)(vi)(4) ("[A] recipient must treat pregnancy or related conditions in the same manner and under the same policies as any other temporary medical conditions").

8.   There are at least four ways in which I will not comply with the Biden Administration's Title IX rule.

9.   First. I will not honor any student's demands to be addressed by the singular pronoun "they"—regardless of whether those demands come from a biological man or a biological woman, and regardless of whether the person making those demands identifies with a gender that matches or departs from his biologically assigned sex. "They" is a plural pronoun, and it is ungrammatical to use a plural pronoun to refer to a single person. I will not violate the rules of grammar or make a fool of myself to accommodate a student's delusional beliefs. Nor will I honor demands to use other "made-up" pronouns that are not a standard part of the English language. This is not "sex" discrimination of any sort, even under *Bostock v. Clayton County*, 590 U.S. 644 (2020), because I will enforce this policy equally against male and female students. *See id.* at 660 ("Take an employer who fires a female employee for tardiness or incompetence or simply supporting the wrong sports team. Assuming the employer would not have tolerated the same trait in a man, Title VII stands silent.").

10.   Second. I will not knowingly permit my teaching assistants to engage in cross-dressing while teaching my classes or interacting with my students. My teaching assistants—both male and female—must wear professional attire while on the job,

DocuSign Envelope ID: 7600480F-52F3-4045-AD39-3D8FD984653E

and I will not allow a male teaching assistant to wear a dress or high heals or any type of drag attire while working for me. Although I am not opposed to hiring a cross-dresser or transvestite as a teaching assistant, they must refrain from this behavior while on the job and when interacting with my students in any way.

11.   Third. I will not knowingly treat an absence from class to obtain an illegal abortion or a purely elective abortion as an excused absence. The law of Texas has outlawed and criminalized abortion in all circumstances unless the mother's life is in danger. *See* Tex. Health & Safety Code § 170A.002(a). And federal law imposes criminal liability on any person who obtains abortion drugs through the mail, or from an express company or common carrier or through an interactive computer service — including pregnant women who obtain these pills for use in a self-managed abortion. *See* 18 U.S.C. § 1461–1462. I will not accommodate or become complicit in these crimes by excusing a student's absence from class if that student skips class to obtain an illegal abortion in Texas, or to perform a self-managed abortion with illegally obtained abortion drugs.

12.   Nor will I knowingly excuse a student's absence from class if that student leaves the state to obtain a purely elective abortion. I will certainly accommodate students who are seeking medically necessary abortions in response to a pregnancy that threatens the student's life or health. But I will not accommodate a purely elective abortion that serves only to kill an unborn child that was conceived through an act of voluntary and consensual  sexual intercourse. Pregnancy is not a disease, and elective abortions are not "health care" or "medical treatment" of any sort. They are purely elective procedures, and I will not accommodate an act of violence against the most vulnerable and defenseless members of the human family.

13.   Fourth. I expect my teaching assistants to obey and respect the laws of Texas and the laws of the United States, so I will not knowingly hire a teaching assistant who has violated the abortion laws of Texas or the federal-law prohibitions on the

shipment or receipt of abortion pills and abortion-related paraphernalia. *See* 18 U.S.C. § 1461–1462. The Title IX rule purports to ban "discrimination" against *anyone* who has had an abortion, even if the abortion was illegal and even if the woman violated or aided or abetted violations of 18 U.S.C. § 1461–1462 to obtain the abortion. But I do not hire criminals or lawbreakers to serve as teaching assistants, and I will not comply with this concocted non-discrimination rule.

I declare under penalty of perjury that the facts stated in this declaration are true and correct.

Dated: 5/13/2024
_____

DocuSigned by:

*Daniel A. Bonevac*
99P7CBPAECB1467...

DANIEL A. BONEVAC

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| **State of Texas**, et al.,<br><br>           Plaintiffs,<br><br>v.<br><br>**United States of America**, et al.,<br><br>           Defendants. | Case No. **2:24-cv-00086-Z** |

## DECLARATION OF JOHN HATFIELD

I, John Hatfield, declare as follows:

1.  I am over 18 years old and fully competent to make this declaration.

2.  I have personal knowledge of the facts stated in this declaration, and all of these facts are true and correct.

3.  I am a named plaintiff in this litigation.

4.  I am the Century Club Professor of Finance at the McCombs School of Business of the University of Texas at Austin. The University of Texas at Austin is subject to Title IX and its prohibition on "sex" discrimination. As a professor at UT-Austin, I am also subject to the requirements of Title IX in my capacity as an educator and scholar.

5.  I have no intention of complying with the Biden Administration's recently announced Title IX edict, which has nothing to do with "sex" discrimination and represents nothing more than an attempt to force every educator in the United States to conform to a highly contentious interpretation of gender ideology and abortion rights.

DocuSign Envelope ID: 7BD92BA3-C63E-48C1-806E-1DAE153239FB

6.  The new Title IX rule purports to define "discrimination on the basis of sex" to include "discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity." *See* 34 C.F.R. § 106.10.

7.  The new Title IX rule also purports to define "pregnancy or related conditions" to include abortion. *See* 34 C.F.R. § 106.2 ("Pregnancy or related conditions means . . . Pregnancy, childbirth, termination of pregnancy, or lactation"). It requires professors to accommodate student absences from class to obtain abortions—including illegal abortions and purely elective abortions that are not medically required. *See* 34 C.F.R. § 106.40(b)(3)(ii)(C); 34 C.F.R. § 106.40(b)(3)(iv); *see also* 34 C.F.R. § 106.40(b)(6)(vi)(4) ("[A] recipient must treat pregnancy or related conditions in the same manner and under the same policies as any other temporary medical conditions").

8.  There are at least four ways in which I will not comply with the Biden Administration's Title IX rule.

9.  First. I will not honor any student's demands to be addressed by the singular pronoun "they"—regardless of whether those demands come from a biological man or a biological woman, and regardless of whether the person making those demands identifies with a gender that matches or departs from his biologically assigned sex. "They" is a plural pronoun, and it is ungrammatical to use a plural pronoun to refer to a single person. I will not violate the rules of grammar or compromise my educational mission to accommodate a student's delusional beliefs. Nor will I honor demands to use other "made-up" pronouns that are not a standard part of the English language. This is not "sex" discrimination of any sort, even under *Bostock v. Clayton County*, 590 U.S. 644 (2020), because I will enforce this policy equally against male and female students. *See id.* at 660 ("Take an employer who fires a female employee for tardiness or incompetence or simply supporting the wrong sports team. Assuming

DocuSign Envelope ID: 7BD92BA3-C63E-48C1-806E-1DAE153239FB

the employer would not have tolerated the same trait in a man, Title VII stands silent.").

10.   Second. I will not knowingly permit my teaching assistants to engage in cross-dressing while teaching my classes or interacting with my students. My teaching assistants—both male and female—must wear appropriate attire while on the job, and I will not allow a male teaching assistant to wear a dress or high heals or any type of drag attire while working for me. Although I am not opposed to hiring a cross-dresser or transvestite as a teaching assistant, they must refrain from this behavior while on the job and when interacting with my students in any way.

11.   Third. I will not knowingly treat an absence from class to obtain an illegal abortion or a purely elective abortion as an excused absence. The law of Texas has outlawed and criminalized abortion in all circumstances unless the mother's life is in danger. *See* Tex. Health & Safety Code § 170A.002(a). And federal law imposes criminal liability on any person who obtains abortion drugs through the mail, or from an express company or common carrier or through an interactive computer service—including pregnant women who obtain these pills for use in a self-managed abortion. *See* 18 U.S.C. § 1461–1462. I will not accommodate or become complicit in these crimes by excusing a student's absence from class if that student skips class to obtain an illegal abortion in Texas, or to perform a self-managed abortion with illegally obtained abortion drugs.

12.   Nor will I knowingly excuse a student's absence from class if that student leaves the state to obtain a purely elective abortion. I will certainly accommodate students who are seeking medically necessary abortions in response to a pregnancy that threatens the student's life or health. But I will not accommodate a purely elective abortion that serves only to kill an unborn child that was conceived through an act of voluntary and consensual  sexual intercourse. Pregnancy is not a disease, and elective abortions are not "health care" or "medical treatment" of any sort. They are purely

elective procedures, and I will not accommodate an act of violence against the most vulnerable and defenseless members of the human family.

13.    Fourth. I expect my teaching assistants to obey and respect the laws of Texas and the laws of the United States, so I will not knowingly hire a teaching assistant who has violated the abortion laws of Texas or the federal-law prohibitions on the shipment or receipt of abortion pills and abortion-related paraphernalia. *See* 18 U.S.C. § 1461–1462. The Title IX rule purports to ban "discrimination" against *anyone* who has had an abortion, even if the abortion was illegal and even if the woman violated or aided or abetted violations of 18 U.S.C. § 1461–1462 to obtain the abortion. But I do not hire criminals or lawbreakers to serve as teaching assistants, and I will not comply with this concocted non-discrimination rule.

I declare under penalty of perjury that the facts stated in this declaration are true and correct.

DocuSigned by:

*John Hatfield*

E661E05325F0426...

JOHN HATFIELD

Dated:  5/13/2024

Carroll ISD
220919

FACILITY STANDARDS                                                        CS
                                                                    (LOCAL)

**Use of Restrooms**        To the extent permitted by law, schools shall maintain separate re-
**and Locker Rooms**        strooms, locker rooms, and other similar facilities designated for
                            and used only by persons based on the person's biological sex. In-
                            dividuals shall be required to use the facility that corresponds to
                            their biological sex assigned at birth.

                            This policy does not prohibit the District from providing reasonable
                            accommodations upon request. Reasonable accommodations may
                            be made for any person seeking privacy (i.e., single user re-
                            stroom). Any information related to accommodations shall be han-
                            dled in such a way as to the protect the individual's privacy.

                            In accordance with law, a person's biological sex is identified on
                            the person's official birth certificate provided the statement was:

                            1.   Entered at or near the time of the person's birth; or

                            2.   Modified only to the extent necessary to correct any type of
                                 scrivener or clerical error in the person's biological sex.

                            [See Birth Certificate Statement in FM(LEGAL)]

                            For the purposes of this policy, "restroom or locker room" means a
                            location where a person may reasonably be in a state of undress,
                            including a shower room.

Carroll ISD
220919

IDENTIFICATION OF STUDENTS                                        FI
                                                              (LOCAL)

District employees, including educators and other District staff, shall not require the use of pronouns that are inconsistent with a student's or other person's biological sex as it appears on the individual's birth certificate or other government-issued record.

In accordance with law, a person's biological sex is identified on the person's official birth certificate provided the statement was:

1.  Entered at or near the time of the person's birth; or

2.  Modified only to the extent necessary to correct any type of scrivener or clerical error in the person's biological sex.

Notwithstanding the provisions above, the District shall not compel District personnel or other students to address or refer to students in any manner that would violate the speaker's constitutionally protected rights.

[See Birth Certificate Statement in FM(LEGAL)]

Frisco ISD
043905

FACILITY STANDARDS

CS
(LOCAL)

**Use of Bathrooms and Changing Facilities**

To the extent permitted by law, each multiple-occupancy bathroom or changing facility owned or operated by the District shall be designated for and used only by persons based on the person's biological sex. This policy does not prohibit the District from providing reasonable accommodations upon request.

In accordance with law, a person's biological sex is identified on the person's official birth certificate provided the statement was:

1.   Entered at or near the time of the person's birth; or

2.   Modified only to the extent necessary to correct any type of scrivener or clerical error in the person's biological sex.

[See Birth Certificate Statement in FM(LEGAL)]

For the purposes of this policy, "bathroom or changing facility" means a location where a person may reasonably be in a state of undress, including a restroom, locker room, or shower room. Also, for purposes of this policy, "multiple-occupancy bathroom or changing facility" means a location designed or designated for use by more than one person at a time, where a person may be in a state of undress in the presence of another person, regardless of whether the facility provides curtains or partial walls for privacy. The term includes a restroom, locker room, changing room, or a shower room.

DATE ISSUED: 11/23/2022
LDU 2022.05
CS(LOCAL)-X

Adopted:
11/14/2022

1 of 1

App. 020

Grapevine-Colleyville ISD
220906

MISCELLANEOUS INSTRUCTIONAL POLICIES                                    EMB
TEACHING ABOUT CONTROVERSIAL ISSUES                                (LOCAL)

The District shall address controversial topics in an impartial and objective manner. Teachers shall not use the classroom to transmit personal beliefs regarding political or sectarian issues. Students and educators shall ensure that, to the extent possible, discussions are conducted fairly and courteously.

Pursuant to Education Code 28.0022(a), teachers shall not be compelled to discuss widely debated and currently controversial issues of public policy or social affairs. However, in the event a teacher chooses to discuss a topic described herein, the teacher must explore that topic objectively and free from political bias. [See EMB(LEGAL)]

**Selection of Topics**

A teacher selecting topics for discussion in the classroom shall be adequately informed about the issue and capable of providing instruction on the subject, free from personal bias. In addition, the teacher shall be certain that:

1.   The issue in question is within the range, knowledge, maturity, and comprehension of the students.

2.   The issue is current and educationally significant.

3.   The consideration of the issue does not interfere with required instruction.

4.   Sufficient relevant information on all aspects of the issue is provided.

If a teacher is unsure about a topic of discussion or about the methods to employ, the teacher may discuss the issue with the principal.

**Political Activism**

In accordance with Education Code 28.0022(a)(3), a teacher shall not require, make part of a course, or award a grade or course credit (including extra credit) for a student's:

1.   Work for, affiliation with, or service learning in association with an organization engaged in:

     a.   Lobbying for or against legislation at any level of government if the student's duties involve attempting to influence social or public policy or the outcome of legislation; or

     b.   Social policy advocacy or public policy advocacy;

2.   Political activism, lobbying, or efforts to persuade members of the legislative or executive branch at any level of government to take specific actions by direct communications; or

Grapevine-Colleyville ISD
220906

MISCELLANEOUS INSTRUCTIONAL POLICIES                                    EMB
TEACHING ABOUT CONTROVERSIAL ISSUES                                   (LOCAL)

3. Participation in any internship, practicum, or similar activity involving social policy advocacy or public policy advocacy.

However, these limitations do not apply to a student's participation in:

1. Community charitable projects;

2. An internship or practicum for which the student receives course credit under a career and technology education program or under the P-TECH program provided the program does not involve the student directly engaging in lobbying, social policy advocacy, or public policy advocacy; or

3. A program that prepares the student for participation and leadership in this country's democratic process at the federal, state, or local level through the simulation of a governmental process, including the development of public policy. [See EMB(LEGAL)]

**Certain Instructional Requirements and Prohibitions**

In accordance with Education Code 28.0022(a)(4), the District, including its teachers and administrators, shall not:

1. Require, make part of a course or training, or otherwise instruct employees or students that:

   a. One race or sex is inherently superior to another race or sex;

   b. An individual, by virtue of that individual's race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

   c. An individual should be discriminated against or receive adverse treatment solely or partly because of the individual's race or sex;

   d. An individual's moral character, standing, or worth is necessarily determined by the individual's race or sex;

   e. An individual, by virtue of the individual's race or sex, bears responsibility, blame or guilt for actions committed by other members of the same race or sex;

   f. Meritocracy or traits such as a hard work ethic are racist or sexist or were created by members of a particular race or group to oppress members of another race or group;

   g. The advent of slavery in the territory that is now the United States constituted the true founding of the United States; or

Grapevine-Colleyville ISD
220906

MISCELLANEOUS INSTRUCTIONAL POLICIES                                    EMB
TEACHING ABOUT CONTROVERSIAL ISSUES                                  (LOCAL)

       h.    With respect to their relationship to American values, slavery and racism are anything other than deviations from, betrayals of, or failures to live up to the authentic founding principles of the United States, which include liberty and equality;

2.    Teach, instruct, or train any administrator, teacher, staff member, employee (full-time or part-time), contractor, contract worker, supervisor, assistant, parent volunteer, agent, vendor, or any other individual or group to adopt a concept listed under section 1 above, or

3.    Teach, instruct, train, introduce, discuss, or require understanding of the 1619 Project. [See EMB(LEGAL)]

The District, including its teachers and administrators while acting as agents or representatives of the District, shall not teach, instruct, advocate, promote, or discuss any ideas, beliefs, concepts, theories, principles, rules, thoughts, or impressions that have any connection to, relationship by, or with, refer to, are influenced by, or are otherwise consistent with so-called "Critical Race Theory" or systemic discrimination ideologies including, but not limited to, those ideologies set forth in sections 1 and 3 herein. This provision, together with sections 1 and 3 above, shall be collectively referred to as "Critical Race Theory" or systemic discrimination ideologies or "CRT/SDI".

Any instructional resources, as defined in EFA(LOCAL) and EFB(LOCAL), that adopt, support, or promote the subject matter described herein as CRT/SDI shall be placed and kept solely and exclusively in the District's parental consent area, as defined in EFB(LOCAL).

**District Personnel and Agents**

District personnel and agents, as used herein, shall include and refer to teachers, administrators, staff members, employees (full-time or part-time), contractors, contract workers, supervisors, assistants, parent volunteers, agents, vendors, or any individuals or groups operating on the District's behalf or within the District's educational programs or activities.

**Social and Emotional Learning Concepts**

Most traditional social and emotional learning (SEL) teachings are consistent with the District's general education goals, particularly concepts relating to the development of self-awareness, individualism, self-reliance, self-motivation, communication, conflict resolution, and interpersonal skills that are vital for academic, professional, and life success.

The District's personnel and agents shall continue to support, promote and focus on the following ideologies and concepts, which

DATE ISSUED: 9/21/2022            Adopted:                       3 of 6
LDU 2022.07                 8/22/2022
EMB(LOCAL)-X                                  **App. 023**

are generally consistent with the positive components of SEL, District policy, and the District's education goals[1]:

1.  Individualism;

2.  A rejection of victimhood mentality;

3.  Conflict resolution techniques;

4.  Aspiration to serve as business, secular, spiritual, or community leaders;

5.  Financial self-sufficiency;

6.  Importance of the nuclear family;

7.  Liberty;

8.  Hard work and perseverance as the basis for a successful society; and

9.  The virtues of self-discipline, forgiveness, patience, kindness, determination, hope, thankfulness, reliability, honesty, industry, and responsibility.

However, some SEL concepts conflict with District policy, or are inconsistent with the District's education goals. As such, District personnel and agents, while acting as agents or representatives of the District, shall not teach, instruct, train, or otherwise require District personnel or agents to adopt, support, or otherwise promote SEL concepts that conflict with District policy, or are inconsistent with the District's education goals.

Any instructional resources, as defined in EFA(LOCAL) and EFB(LOCAL), that adopt, support, or promote SEL concepts that conflict with District policy or are inconsistent with the District's education goals shall be placed and kept solely and exclusively in the District's parental consent area, as defined in EFB(LOCAL).

**Gender Identity and Fluidity**

District personnel and agents shall not teach, instruct, train, or otherwise require any other District personnel or agents to teach, instruct, train, or otherwise communicate to any individual or group topics regarding sexual orientation or gender identity unless and until those individual persons or the entire group has fully completed the fifth grade.

District personnel and agents, while acting as agents or representatives of the District, shall not teach, instruct, train, or otherwise promote gender fluidity, as defined herein. Nor shall District per-

_____
[1] See also Tex. Educ. Code §29.906

sonnel and agents be required to adopt, support, or promote gender fluidity, as defined herein. This provision shall not be interpreted as requiring, and does not require, any District personnel or agent to violate any rules or regulations propagated by that individual's professional licensing authority.

For purposes of this policy, gender fluidity means any theory or ideology that:

1.  Espouses the view that biological sex is merely a social construct;

2.  Espouses the view that it is possible for a person to be any gender or none (i.e., non-binary) based solely on that person's feelings or preferences; or

3.  Espouses the view that an individual's biological sex should be changed to "match" a self-believed gender that is different from the person's biological sex.

Any instructional resources, as defined in EFA(LOCAL) and EFB(LOCAL), that adopt, support, or promote gender fluidity as defined herein shall be placed and kept solely and exclusively in the District's parental consent area, as defined in EFB(LOCAL).

The District shall not promote, require, or encourage the use of titles or pronoun identifiers for students, teachers, or any other persons in any manner that is inconsistent with the biological sex of such person as listed on:

1.  The person's official birth certificate; or

2.  If the person's official birth certificate is unobtainable, another government-issued record.

A statement of a student's biological sex on the student's official birth certificate is considered to have correctly stated the student's biological sex only if the statement was:

1.  Entered at or near the time of the student's birth; or

2.  Modified to correct any type of scrivener or clerical error in the student's biological sex.[2]

However, to the extent that a student (with the written consent of such student's parent or legal guardian), parent, or legal guardian has specifically requested or directed the use of a specific title or pronoun for that particular student, District personnel interacting with the student may comply with such request at their discretion.

_____

[2] Tex. Educ. Code § 33.0834(c)

MISCELLANEOUS INSTRUCTIONAL POLICIES                                    EMB
TEACHING ABOUT CONTROVERSIAL ISSUES                                   (LOCAL)

District personnel shall not require a student, teacher, administrator, or any other person listed herein to use a title or pronoun in reference to another person that is inconsistent with the biological sex of such person as listed on:

1.   The person's official birth certificate; or

2.   If the person's official birth certificate is unobtainable, another government-issued record.

A statement of a student's biological sex on the student's official birth certificate is considered to have correctly stated the student's biological sex only if the statement was:

1.   Entered at or near the time of the student's birth; or

2.   Modified to correct any type of scrivener or clerical error in the student's biological sex.[3]

**Classroom Discussion**

In guiding classroom discussion of controversial issues, teachers shall:

1.   Foster students' critical thinking skills.

2.   Encourage discussion based on rational analysis.

3.   Create an atmosphere in which students learn to respect others' opinions and disagree courteously.

4.   Ensure that multiple viewpoints about the issue are presented by introducing an unexpressed viewpoint when necessary.

5.   Avoid any attempt to coerce or persuade students to adopt the teacher's point of view.

6.   Comply with the instructional requirements and prohibitions imposed under state law.

**Student or Parent Concerns**

A student or parent with concerns regarding instruction about controversial issues shall be directed to the complaint policy at FNG.

**Student-Led Discussions**

The requirements and prohibitions described in this policy are not intended to and shall not prohibit students from forming student-led groups related to the topics described herein or otherwise discussing these topics privately.

---

[3] Tex. Educ. Code § 33.0834(c)

BUILDINGS, GROUNDS, AND EQUIPMENT MANAGEMENT
SECURITY

CLA
(LOCAL)

**Use of Bathrooms and Changing Facilities**

To the extent permitted by law, each multiple-occupancy bathroom or changing facility owned or operated by the District shall be designated for and used only by persons based on the person's biological sex. This policy does not prohibit the District from providing reasonable accommodations upon request.

In accordance with Education Code 33.0834, a person's biological sex is identified on the person's official birth certificate provided the statement was:

1.   Entered at or near the time of the person's birth; or

2.   Modified only to the extent necessary to correct any type of scrivener or clerical error in the person's biological sex.

For the purposes of this policy, "bathroom or changing facility" means a location where a person may reasonably be in a state of undress, including a restroom, locker room, or shower room. Also, for purposes of this policy, "multiple-occupancy bathroom or changing facility" means a location designed or designated for use by more than one person at a time, where a person may be in a state of undress in the presence of another person, regardless of whether the facility provides curtains or partial walls for privacy. The term includes a restroom, locker room, changing room, or a shower room.

DATE ISSUED: 9/21/2022
LDU 2022.07
CLA(LOCAL)-X

Adopted:
8/22/2022

1 of 1

**App. 027**



GOVERNOR GREG ABBOTT

July 25, 2022

Miguel A. Cardona, Ed.D.
Secretary of Education
U.S. Department of Education
400 Maryland Avenue SW
Washington, D.C.  20202

RE:  Docket ID ED-2021-OCR-0166

Dear Dr. Cardona:

As Governor of Texas, I strongly oppose the Department of Education's proposed changes to the Title IX rules found at 34 C.F.R. Part 106.  The Department should not amend the current rules, because doing so would erode important protections that support women.

The proposed changes are noxious fruit from the poisonous tree of President Biden's Executive Order No. 13988.  That executive overreach already threatens to defund school lunches for schools that refuse to toe the line on radical gender ideology, and ramps up the assault on women's sports.  The Department's proposed rules are more of the same, and women and children will suffer the most.  Under these rules, schoolteachers can be penalized for failure to use preferred pronouns or put a preferred gender identity on a school ID; due process will be stripped away by unaccountable functionaries; and all decisions will be based upon unclear standards and opaque processes.

The proposed rules incorrectly implement *Bostock v. Clayton County*, which by its own terms applies only to Title VII, not to laws like Title IX.  *See* 140 S. Ct. 1731, 1753 (2020).  The rulemaking proposes a vague expansion of the term "sex" that is far outside *Bostock*'s reach, and the Department even *explicitly refuses* to define the word "sex."  87 Fed. Reg. at 41537.  Instead, the proposal indicates that the word "sex" encompasses any of the multiplicity of sexual identities that fall into the broad categories of "sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity."  *Id.* at 41571.  The entire penalty framework of Title IX revolves around the word "sex," yet the Department refuses to define that word or limit its scope.  This will result in an unpredictable, unworkable, and unconscionable application of regulations that can destroy important institutions and upend innocent peoples' lives.

Miguel A. Cardona, Ed.D.
July 25, 2022
Page 2

To that same end, the Department seeks to expand the scope of punishable acts while reducing the protections with which individuals can defend themselves.  The accused will lose important due-process protections when subjected to an unclear standard.  The Department wants to reduce the burden of proving "sex-based harassment" from a clear-and-convincing standard (meaning an accusation is highly probable) to a preponderance-of-evidence standard (meaning an accusation is a mere scintilla more true than not).  It justifies this change by citing a study from the Foundation for Individual Rights in Education (FIRE), "not[ing] that, according to recent research, preponderance of the evidence is the standard of proof already commonly used by postsecondary institutions for evaluating evidence regarding all student conduct allegations, including sex-based harassment." 87 Fed. Red. at 41485.  The Department should read the rest of the FIRE Study it cites, because that document argues that the move away from the clear-and-convincing standard may work a due-process violation.  FOUNDATION FOR INDIVIDUAL RIGHTS IN EDUCATION, *Spotlight on Due Process 2020-2021*, https://perma.cc/N4X5-VDZY.  I agree that the Department's proposed change would be unconstitutional.

The FIRE Study also criticizes postsecondary institutions that frustrate meaningful cross-examination in hearings, yet the Department seeks to do just that.  *See* 87 Fed. Reg. at 41576.  The FIRE Study promotes the use of panels to adjudicate proceedings, yet the Department proposes to use a single "decisionmaker."  *Id.*  The FIRE Study argues that accused individuals should be able to review evidence proffered against them, yet the Department proposes to allow a mere "description" of "relevant" evidence.  *Id.*  In short, the Department's hand-picked source eviscerates its own proposals.

The Department should resist President Biden's wildly inappropriate attempt to manipulate human sexuality, erase women, and endanger children.  Instead of directing educational institutions to implement policies based on a word it won't define, with a scope it won't limit, judged by a functionary it won't hold accountable, the Department should withdraw the proposed rule and rely upon the regulations currently in place.

Sincerely,

Greg Abbott
Governor

GA:jsd



# KEN PAXTON
ATTORNEY GENERAL OF TEXAS

September 12, 2022

Miguel A. Cardona, Ed.D.
Secretary of Education
U.S. Department of Education
400 Maryland Avenue SW
Washington, D.C. 20202

**Re:       Docket No. ED-2021-OCR-0166**

Dear Secretary Cardona:

The State of Texas, as a common provider of education, has a compelling interest in the Department of Education ("Department") issuing clear, practical regulatory guidance regarding recipients' obligations under Title IX of the Education Amendments of 1972.[1] *See* 20 U.S.C. § 1681 *et seq.* For this reason, the Office of the Attorney General of Texas ("Texas OAG") has reviewed the Department's Proposed Rule to its Title IX regulations, published in the Federal Register on July 12, 2022. *See* 87 Fed. Reg. 41,390.

To Texas OAG's disappointment, rather than building upon the good work done by Secretary Betsy DeVos during the Department's last rulemaking,[2] the Proposed Rule promises to repeat the mistakes of the Department's ill-advised 2011 Dear Colleague Letter,[3] which had a detrimental impact on publicly funded education across the country, including in Texas. Specifically, the Proposed Rule would rollback constitutional safeguards while at the same time expanding recipients' liability far beyond what Title IX allows. Indeed, the Proposed Rule goes so far as to reinterpret the word "sex" as to include "sexual orientation" and "gender identity," even though the court opinion the Department cites applies only to employment law.

Texas OAG opposes the Department's efforts to revive the failures of the 2011 Dear Colleague Letter. Experience has shown that the combination of heightened responsibility, along with a deemphasis on individual rights, forces academic institutions that receive federal funds into a no-win situation in which they risk civil rights lawsuits and litigation expenses if they follow the Department's guidance and invite federal or private enforcement actions if they do not. The

---

[1] *See, e.g.,* Tex. Educ. Agency, 2020 *Comprehensive Biennial Report on Texas Public Schools* at 297 (Dec. 4, 2020) (reporting that Texas received $5.3 billion dollars for K-12 education, which represented 16.4 percent of the total funds Texas spent in FY 2020), https://tea.texas.gov/sites/default/files/comp_annual_biennial_2020.pdf.

[2] *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020).

[3] *See, e.g.,* Russlynn Ali, OCR, U.S. Dept. of Educ., Dear Colleague Letter: Sexual Violence (Apr. 4, 2011), http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf.

**App. 030**

consequence is that many academic institutions will be pressured into hyper-policing controversial speech as well as removing procedures that helped guarantee fair process to students accused of discrimination or harassment should the Department proceed with the Proposed Rule.

I.     **Like the 2011 Dear Colleague Letter, the Proposed Rule will bully academic institutions to violate their students' constitutional rights as a way of avoiding accusations of non-compliance.**

Prior to May 2020, the Department of Education had never issued comprehensive regulations that treated sexual harassment, including sexual assault, as unlawful sex discrimination. The Department instead relied on a series of guidance documents, such as the 2011 Dear Colleague Letter, that instructed participants to treat Title IX compliance like a zero-sum calculation, where the rights and interests of some students were sacrificed for the sake of others.[4]  In response to this instruction, many academic institutions, including those located in Texas, found it easier to strip students and faculty of their constitutional rights rather than risk an enforcement action that could imperil their access to federal funds.

The situation did not improve until Secretary DeVos directed the Department to rescind the 2011 Dear Colleague Letter and promulgate regulations via notice and comment rulemaking in 2020 that recognized that combating sexual harassment and protecting civil liberties are not mutually exclusive. Yet, not two years later, the Department is poised to erase all that progress and issue a new Proposed Rule that mimics the worst features of the 2011 Dear Colleague Letter. Absent a major course change, the Proposed Rule promises to produce the same conditions that led academic institutions to abandon their obligation to respect the constitutional rights of their campus community.

The Proposed Rule, like the 2011 Dear Colleague Letter, takes an expansive view of recipients' responsibilities under Title IX. Not only does it reinvent the definition of "sex discrimination" to include "sexual orientation" and "gender identity" impermissibly, *see infra* at 4-6, but the Proposed Rule also expands when, where, and how recipients must respond to claims of sexual harassment. For example:

- According to § 106.44(a), a recipient "must take prompt and effective action to end any sex discrimination that has occurred in its education program or activity, prevent its recurrence, and remedy its effects." 87 Fed. Reg. 41572.

- Additionally, in § 106.2, the Proposed Rule amends the definition of "sexual harassment" to include unwelcome sex-based conduct (1) "that is sufficiently severe *or* pervasive," and (2) "that based on the totality of the circumstances and evaluated *subjectively and objectively*, denies or limits a person's ability to participate in" the recipient's education program or activity. 87 Fed. Reg. 41569 (emphasis added).

---

[4] *See, e.g.*, Russlynn Ali, OCR, U.S. Dept. of Educ., Dear Colleague Letter: Sexual Violence (Apr. 4, 2011) (conditioning student's right to due process on it not "restrict[ing] or unnecessarily delay[ing] the Title IX protections for the complainant"), http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf.

**App. 031**

On its own, the redefinition of "sex discrimination" to include sexual orientation and gender identity increases the odds of academic institutions intruding on protected rights when seeking to enforce Title IX. However, when combined with the other listed changes, the danger becomes especially acute.

When compared to the 2020 regulations, the standards advanced by the Proposed Rule would create far more opportunities for recipients to inadvertently fall out of compliance. The previous version of § 106.44(a) required recipients to "respond promptly in a manner that is not deliberately indifferent"—something they could achieve if their response was not "clearly unreasonable in light of the known circumstances." 85 Fed. Reg. 30574. Recipients therefore had more flexibility in how to craft a response that was appropriate to the facts and parties involved. Recipients were also judged based on the information they had on hand as opposed to the benefit of hindsight, which the Proposed Rule would arguably allow.

The previous definition of sexual harassment, meanwhile, utilized the *Davis* standard, which demarcated sexual harassment as unwelcome conduct that was "so severe, pervasive, *and* objectively offensive that it effectively denies a person equal access," as "determined *by a reasonable person*." 85 Fed Reg. 30574 at § 106.30 (emphasis added). In other words, the conduct needed to be both severe and pervasive before recipients' obligations under Title IX would trigger, not merely one or the other as under the Proposed Rule. In addition, the determination of whether a statement or action met any of these elements was measured by an objective assessment. There was less risk that recipients would be drawn into a Title IX dispute because of a student's idiosyncratic reaction to innocent conduct.

Experience has shown time and again that unless recipients have clear, defined lines, marking when and where their Title IX obligations end, they will air on the side of caution and overregulate anything deemed offensive.[5] Matters related to sexual orientation and gender identity remain hotly contested topics in public discourse, often provoking heightened emotion. Logic dictates that given recipients poor track record, the expansion of recipients' duty to respond to alleged harassment, combined with the addition of subjectivity to the definition of harassment, will prompt academic institutions to target unpopular viewpoints related to these topics.

Of course, the right to free speech and expression are not the only constitutional mainstays at risk. The Proposed Rule would also directly curtail due process protections for Texas students by opting to lower the standard for sex-based harassment to a "preponderance-of-the-evidence" standard; bar accused students from access to evidence, offering them instead a mere "description" of "relevant" evidence; limit students' opportunity to meaningful cross-examination; and permit recipients to adopt the investigator model, in which a single "decisionmaker" adjudicates the proceedings as prosecutor, judge, and jury.

---

[5] *See, e.g.*, Eastern Illinois University, Internal Governing Policies, #175 – Sexual Harassment, https://castle.eiu.edu/auditing/175.php (banning students from "a variety of behaviors including . . . offensive or inappropriate language or jokes;" encouraging complaints before "harassment reaches an intolerable level;" and further stating that that "[t]he university can and will address inappropriate behaviors even if those behaviors are not yet severe or pervasive"); *see also* Council on Postsecondary Education, Sexual Harassment and Sexual Violence Policy, https://tinyurl.com/manbmcm8 (using a definition of sexual harassment that contemplates discipline arising from a single joke, comment, or innuendo from male colleagues, such as calling a female supervisor "bossy").

Not only do these changes rub against multiple court cases, which recognize the need for procedural safeguards during Title IX adjudications,[6] but the weakened standard would be introduced at the same time that recipients' liability would expand. The Department thus poses to give recipients cause to initiate more zealous Title IX enforcement proceedings while simultaneously reducing students' access to a fair hearing when accused of harassment—the exact same combination that led academic institution into believing that constitutional rights and Title IX compliance were in conflict following the 2011 Dear Colleague Letter.

The fallout from the Department's miscalculation will fall on students. In the absence of meaningful safeguards, academic institutions have and will again impose life-altering consequences on students without ever giving them a real opportunity to defend themselves.[7] A finding of guilt can exact severe monetary and reputational costs on students, ranging anywhere from expulsion and academic suspension to loss of tuition, housing, scholarships, and job opportunities. At the very least, it places a black mark on a student's record. At its most extreme, it can topple any chance a student has at a successful career. The consequences are "punishment[s] in any reasonable sense of that term." *Doe v. Univ. of Notre Dame*, 3:17CV298, 2017 U.S. Dist. LEXIS 69645, at *34 (N.D. Ind. May 8, 2017). And they warrant the protections of due process, which the Proposed Rule would deny.

## II.    The U.S. Supreme Court expressly limited *Bostock* to Title VII. The Department cannot cite the opinion as justification for redefining "sex discrimination" in a totally unrelated statute.

For the entire half century since Title IX has taken effect, both the Department and recipients have understood Title IX's prohibition on sex discrimination to mean that no person could "be excluded from participation in, be denied the benefits of, or be subject to discrimination under any educational program or activity" on account of their *biological sex.* Notwithstanding this history, the Department, by means of the Proposed Rule, seeks to overturn Title IX's well-established definition of sex discrimination so that the statute's protections extend to a person's sexual orientation and gender identity as well.

Putting aside the merits of such a policy, the Department lacks the legal justification to initiate and support such a radical departure in the interpretation of Title IX, which is evident from the Department's own explanation for the change. The Department hinges its redefinition of sex discrimination almost entirely on the U.S. Supreme Court's opinion in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020). There, the Court was posed with the question of whether sex discrimination, as defined in Title VII of the Civil Rights Act of 1964, included discrimination on the bases of sexual

---

[6] *See, e.g.*, *Doe v. Univ. of Sciences*, 961 F.3d 203, 214 (3rd Cir. 2020) (notions of fairness are satisfied when the accused has a chance to test witness credibility and a live, adversarial hearing); *Doe v. Purdue Univ.*, 928 F.3d 652, 663 (7th Cir. 2019) (student's hearing must be "a real one, not a sham or pretense"); *Doe v. Baum*, 903 F.3d 575, 581 (6th Cir. 2018) (student has a right to cross-examine witnesses and accuser when credibility is at issue); *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 603–07 (D. Mass. 2016) (single investigator model did not allow for effective review by a neutral party).

[7] Jonathan Taylor, Milestone: 700+ Title IX/Due Process Lawsuits by Accused Students, Title IX for All (May 11, 2021), https://titleixforall.com/milestone-700-title-ix-due-process-lawsuits-by-accused-students/

**App. 033**

orientation and gender identity. After assessing the statue's text and legislative history, the Court determined that it did. *Id.* at 1737.

Although *Bostock* may warrant an update to federal employment regulations, the Court's reading of Title VII does not justify upending the interpretation of another, unrelated statute that was enacted nearly a decade later, pursuant to a different constitutional power. The Court in fact stipulated as such in *Bostock*, stating that its holding did not "sweep beyond Title VII to other federal or state laws that prohibit sex discrimination," such as Title IX; nor did its holding address other issues that were not before the Court such as "sex segregated bathrooms, locker rooms, and dress codes"—all of which make an appearance in the Proposed Rule. 140 S. Ct. at 1753; *see also Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021) ("[T]he Court in *Bostock* was clear on the narrow reach of its decision and how it was limited only to Title VII itself.").

Thus, while it might be accurate to say that *Bostock* influenced the Department, *Bostock* did not necessitate the reinterpretation of Title IX; nor did it provide the Department any guidance on whether Title IX should encompass sexual orientation and gender identity as bases for sex discrimination, let alone what policies the Department might promulgate given the new definition. The Department instead acted of its volition. Because of this, the Department had an obligation to articulate why *Bostock* precipitated the Department's about-face, as well as expound how the Court's reasoning in *Bostock* applied to each regulation the Department crafted to implement its revised interpretation. But no explanation was ever offered.

Had the Department analyzed *Bostock* and compared the two statutes, it would have become apparent that not only does "Title VII differ[] from Title IX in important respects," *Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021), but that Title IX is governed by a separate standard that makes *Bostock* inapposite. Congress enacted Title IX pursuant to the Spending Clause. Title IX must therefore comply with the Clear Statement Rule, which requires "Congress [to] speak with a clear voice" and "unambiguously" put state funding recipients on notice of the conditions of federal funds. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). The U.S. Supreme Court explains, "[u]nlike legislation enacted under § 5," such as Title VII, "legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *Pennhurst*, 451 U.S. at 17. "The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" *Id.*

Despite clear precedent that the Clear Statement Rule governs Title IX, *see Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 181 (2005), the Department ignores this feature of spending legislation when rationalizing its decision to graft *Bostock* onto Title IX. This is a mistake. As the *Bostock* Court acknowledged, its interpretation of "sex discrimination" in Title VII to include "sexual orientation" and "gender identity" was unexpected. 140 S. Ct. at 1750-1753. "[I]t would have been hard to find any who thought that discrimination because of sex meant discrimination because of sexual orientation—not to mention gender identity, a concept that was essentially unknown at the time." *Id.* at 1755 (Alito, J., dissenting).

**App. 034**

There are of course naysayers who argue that the States should have anticipated that the definition of "sex discrimination" would ultimately evolve to include these categories, but fifty years of Title IX rulemaking establish otherwise. The Department did not interpret "sex discrimination" in Title IX as encompassing anything beyond biological sex until the recent presidential administration. As the Department admitted in its explanation of the Proposed Rule, "The Department's Title IX regulations have never directly addressed the application of Title IX to discrimination based on sexual orientation or gender identity." 87 Fed. Reg. 41394. To the contrary, when the Department had the opportunity to expand the definition of "sex" in 2020, it refrained from doing so. 85 Fed. Reg. 30177.

What's more, even if the revised definition was foreseeable when Title IX was passed, that would not justify the Proposed Rule's requirement that recipients take the affirmative step of providing accommodations for individuals whose gender identity diverges from their biological sex to avoid a "more than de minimis harm." *See* 87 Fed. Reg. at 41,534–37. Title IX, after all, has no accommodation requirement, and the provision in Title VII relating to sex discrimination similarly lacks such language. Neither Texas nor her sister states therefore would have had clear notice that their acceptance of federal funds was conditioned on them dismantling sex-separate spaces in public education—a policy that many states, including Texas, have deemed harmful to students.

CONCLUSION

Everyone agrees that academic institutions should take a hard stance against sexual harassment and discrimination in education, including by enforcing Title IX, as enacted by Congress. That commitment, however, should not come at the expense of other students' rights; nor should it force recipients to assume responsibilities that are not prescribed by statute. The Proposed Rule violates both principles. We advise the Department to reject it and leave the regulations promulgated by the Department's rulemaking in 2020 in place.

Very truly yours,

Ken Paxton
ATTORNEY GENERAL OF TEXAS

App. 035



June 23, 2022

Dr. Miguel Cardona
Secretary of Education
U.S. Department of Education
400 Maryland Avenue, SW
Washington, DC 20202

*Re: Proposed Title IX Rulemaking*

Dear Secretary Cardona:

As you are aware, we as State Attorneys General play a critical role in preserving federalism and the balance of power among the States and the federal government. This is especially true with statutes such as Title IX that implicate the education system where primary responsibility rests with parents, local governments, and the states—**not** the federal government.[1] To that end, we have fought steadfastly to protect the rights of girls and women under Title IX against attacks from this Administration. Your proposed rule merely pretends to reserve the issue of biological males participating in women's sports for a separate rulemaking. This wolf comes as wolf: defining the term "sex" to include gender identity will destroy women's sports. **Because the Biden Administration's attempt to change the focus and meaning of Title IX is an attack on the rights of girls and women and will make them less safe and cause them to lose vital opportunities, we will fight your proposed changes to Title IX with every available tool in our arsenal.**

Today, Title IX turns fifty. While Title IX has broad applications, perhaps its greatest success has been in providing women the benefits of enhanced athletic participation. Duke Law Professor Doriane Coleman reports that due to the "empowering" impact of Title IX: "Women and girls today have the opportunity only boys and men had in the previous period to reap the widely recognized and highly valued benefits of being physically strong, of being

---

[1] As President Carter noted when signing the bill, Congress enshrined this principle in the Department of Education Organization Act: "[P]arents have the primary responsibility for the education of their children, and States, localities, and private institutions have the primary responsibility for supporting that parental role." 20 USC § 3401(3) & (4) (Pub. L. 96–88, title I, § 101(3) & (4), Oct. 17, 1979, 93 Stat. 669).

**App. 036**

on teams and developing the myriad skills associated with competitive sport, of attending college on athletic scholarships, and of high-end competitive experiences."[2]

The Women's Sports Policy Working Group, which includes female athletic champions such as Donna De Varona, Martina Navratilova, and Nancy Hogshead-Makar, recognizes that the protection of the girls' and women's category in sport is vital, saying:

> If sports were not sex-segregated, female athletes would rarely be seen in finals or on victory podiums . . .. Girls and women learn the benefits of teamwork in pursuit of conference, state and national championships; the confidence and self-esteem that flows from competent performance of physical skills; the life-changing power of competing against the best and standing on the podium; confidence borne of testing the limits of strength, speed, skill and reaction time; and the power of personal achievement and public recognition when setting school, meet and other records. And as sports double as an academic and social tool, these lessons and benefits reverberate well beyond the playing field throughout the lives of all female athletes.[3]

The Biden Administration's Title IX revisions, however, will end sex-based protections for biological women in sports which threatens the safety of female athletes and will lead directly to the demise of women's sports and regression in the progress of women generally.

Since its enactment in 1972, Title IX has led to an explosion in the participation of girls and women in sports. In 2021, 3.4 million girls played high school sports and 219,000 women played NCAA sports. In fact, NCAA statistics show that since 1982 (when the NCAA began separating male and female participation rates) female participation rates in athletics have risen from 43% of the male participation rate (74,329 to 169,800) in 1982 to 78% (219,177 to 278,988) in 2021—almost doubling.[4] And just like the Women's Sports Policy Working Group, we, along with many Americans, believe these successes of women on America's playing fields correlate directly to greater opportunities for women in America's board rooms. Thus, your effort to roll back progress for biological women in sports is a civil rights issue of the highest order.

The Biden Administration's insistence on redefining "sex" in Title IX ignores science. In so doing, it will walk back decades of progress for women in sports. Not only that, the misguided move to gut Title IX's protections greatly increases risks of concussive injuries for girls and women in contact and combat sports.

---

[2] Coleman, D.L., Joyner, M.J., Lopiano, D., "Re-Affirming the Value of the Sports Exception to Title IX's General Non-Discrimination Rule," *Duke Journal of Genera Law & Policy*, Vol. 27:69-134, p. 72.
[3] Women's Sports Policy Working Group, Science not Ideology Dictates the Need for Sex Segregation in Sports, https://womenssportspolicy.org/the-issue/
[4] NCAA Sports Sponsorship and Participation Rates Database, https://www.ncaa.org/sports/2018/10/10/ncaa-sports-sponsorship-and-participation-rates-database.aspx.

2

**App. 037**

The scientific evidence is clear. The performance advantage of men over women is typically 10-50% depending on the sport.[5] The reason for male athletic advantage is biology. Males have 45% higher lean body mass, 33% higher lower body muscle mass and 40% higher upper body muscle mass, 54% higher knee extension strength, and 30% higher maximum cardiac output.[6] The result is that by the ages of 14-15 many adolescent males have surpassed the best measurable elite (i.e., Olympic and world championship level) female performances in nearly all sports.[7]

Nor are these male advantages capable of suppression to a level that would allow meaningful competition of transgender girls and women (biological males) with biological girls and women, through so-called reassignment surgery or testosterone suppression.[8] Furthermore, male advantages begin *in utero* with males experiencing surges in testosterone in the womb and during a mini-puberty stage during the first six months after birth.[9] These early surges of testosterone lead, for instance, to higher bone density in the male spine and larger size of the axial skeleton in infant males.[10] Male athletic performance advantages are observable well before adolescence.[11] Even with hormone suppression from pre-puberty, transgender

---

[5] Hilton, E.N., Lundberg, T.R., Transgender Women in the Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage, *Sports Med.* 2021 Feb;51(2): 199-214.

[6] *Id.*

[7] *Id.*

[8] *Id.*; Wiik, A., Lundberg, T.R., Rullman, E., Andersson, D.P., Holmberg, M., Mandic, M., Brismar, T.B., Dahlqvist Leinhard, O., Chanpen, S., Flanagan, J.N., Arver, S., Gustaffson, T., Muscle Strength, Size, and Composition Following 12 Months of Gender-affirming Treatment in Transgender Individuals, *J. Clin. Endocrinol. Metab.* 2020 Mar 1;105(3):dgz247.

[9] *See, e.g.,* Pedersen, Ultrasound evidence of sexual difference in fetal size in first trimester, *Br. Med. J.* 1980 281(6250): 1253; Persson et al., Impact of fetal and maternal factors on the normal growth of the biparietal diameter, *Scandinavian Association of Obstetricians and Gynaecologists* 1978 78: 21-27; Schwartzler et al., Sex-specific antenatal reference growth charts for uncomplicated singleton pregnancies at 15—40 weeks of gestation, *Ultrasound in Obstetrics and Gynaecology* 2004 23(1): 23-29; Broerre-Brown, et al., Sex-specific differences in fetal and infant growth patterns: a prospective population-based cohort study, *Biology of Sex Differences* 2016 7: 65; Galjaard, et al., Sex differences in fetal growth and immediate birth outcomes in a low-risk Caucasian population, 2019 *Biology of Sex Differences* 10: 48; Gilsanz, et al., Differential Effect of Gender on the Sizes of the Bones in the Axial and Appendicular Skeletons, *J. of Clin. Endocrin. And Metabol.* 1997 21(3): 415-430; Lanciotti, et al., Up-To-Date Review About Minipuberty and Overview on Hypothalamic-Pituitary-Gonadal Axis Activation in Fetal and Neonatal Life, *Frontiers in Endocrinology* 2018 9:410; Boas, et al., Postnatal penile length and growth rate correlate to serum testosterone levels: a longitudinal study of 1962 normal boys, *Eur. J. of Endocrin.* 2006 154(1): 125-129; Kiviranta, et al., Transient Postnatal Gonadal Activation and Growth Velocity in Infancy, *Pediatrics* 2016 138(1): e20153561; Becker, et al., Hormonal 'minipuberty' influences the somatic development of boys but not of girls up to the age of 6 years, *Clin. Endocrin.* 2015 83: 694-701.

[10] *Id.*

[11] Catley, M.J., Tomkinson, G.R., Normative health-related fitness values for children: analysis of 85347 test results on 9-17-year-old Australians since 1985. *Br. J. Sports Med.* 2013 Jan;47(2):98-108 (showing 9-yr. old males 9.8% faster in short sprints, 16.6% faster in mile run, 9.5% better standing long jump, completed 33% more push-ups in 30 seconds and had a 13.8% stronger grip); Tambalis K.D., Panagiotakos, D.B., Psarra, G., Daskalakis, S., Kavouras, S.A., Geladas, N., Tokmakidis, S., Sidossis, L.S., Physical fitness normative values for 6-18-year-old Greek boys and girls, using the empirical distribution and the lambda, mu, and sigma statistical method, *Eur. J. Sport Sci.* 2016 Sep;16(6):736-46 (6-yr. old boys when compared to 6-yr. old girls completed 16.6% more shuttle runs in a given time and could jump 9.7% further from a standing position).

3

**App. 038**

females will still have a height advantage over biological girls and women.[12] Of course, height is a key factor in athletic success in many sports. In short, girls and boys, men and women are biologically distinct, and those key biological differences cannot be realistically undone.

Importantly, not only do these biological differences mean that girls and women are at an enormous competitive disadvantage when facing biological men in sport, but because of significant size, speed, and strength disparities girls and women are at greater risk of injury when competing against biological males in contact and combat sports. The risk of injury to girls and women is heightened by scientific evidence showing females are at greater risk of concussive injury in sports.[13] Thus, while the last several decades have been marked by an intense focus on reducing concussions in sports, the Biden Administration would unwisely create a risk of rolling back progress on sport concussions, thereby increasing risk of severe injury to girls and women.

Unfortunately, by redefining "sex" in Title IX to mean little more than whatever gender identity an individual believes himself to be at a particular moment, the Biden Administration's Department of Education (the "Department") has made a mockery of Title IX's fundamental organizing principle—basic biology. As we warned in our prior correspondence,[14] the proposed rule will take these benefits from girls and women throughout the United States by allowing biological males with demonstrable physical advantages to compete in women's athletics. This ruins opportunities for many girls and women. While there are many examples of this,[15] the highly publicized case of Lia Thomas, the first transgender athlete to win a Division I national championship,[16] is the most noteworthy. Kentucky swimmer Riley Gaines,

---

[12] Boogers, L.S., Wiepjes, C.M., Klink, D.T., Hellinga, I., van Trotsenburg, A.S.P., de Heijer, M., Hannema, S.E., Trans girls grow tall: adult height is unaffected by GnRH analogue and estradiol treatment, *J. Clin. Endocrinol. Metab.* 2022 Jun 6:dgac349. Doi: 10.1210/cinlnem/dgac349.

[13] *See, e.g.*, Brown, K.A., Patel, D.R., Participation in sports in relation to adolescent growth and development, *Transl Pediatr* 2017;6(3):150-159; Gill, N., Study: State Concussion Laws Effective in Reducing Rates of Injury, *NFHS* (Nov. 2, 2017), *available at*: https://www.nfhs.org/articles/study-state-concussion-laws-effective-in-reducing-rates-of-injury/ (When "comparing the rates in gender comparable/available sports (basketball, soccer, baseball/softball), females had almost double the annual rate of concussions as males."); https://www.rugbypass.com/news/long-term-brain-damage-could-be-a-significantly-bigger-issue-in-womens-rugby-than-mens-says-lead-concussion-doctor/.

[14] Attorney General Knudsen Leads 15-State Coalition Against Federal Attempt To Weaken Title IX, https://media.dojmt.gov/wp-content/uploads/Title-IX-Coalition-Letter-4.5.22.pdf

[15] *See e.g.* "Concerned Women for America announced Thursday that the organization filed a Title IX complaint against the University of Pennsylvania. CWA contends that Penn is violating Title IX by allowing Thomas to compete on the women's team …. This is not the first Title IX complaint CWA has filed in response to a prominent transgender athlete. After Franklin Pierce University (FPU) track athlete CeCe Telfer won a Division II national championship in the 400m hurdles in 2019, CWA filed a Title IX complaint with the Office for Civil Rights (OCR) at the Department of Education. OCR found that FPU's transgender inclusion policy violated Title IX and the school was forced to rescind its policy." https://www.espn.com/college-sports/story/_/id/33529775/amid-protests-pennsylvania-swimmer-lia-thomas-becomes-first-known-transgender-athlete-win-division-national-championship, *Equality Florida, et al. v. Florida, et al.*, Cause No. 4:22-cv-00134-AW-MJF, pending in the United States District Court for the Norther District of Florida, filed on March 31, 2022; and, "21 conservative AGs push back on Education Department's Title IX guidance." https://www.politico.com/news/2021/07/16/conservative-ags-education-department-title-ix-499867.

[16] https://www.espn.com/college-sports/story/_/id/33529775/amid-protests-pennsylvania-swimmer-lia-thomas-becomes-first-known-transgender-athlete-win-division-national-championship.

**App. 039**

who swam against Thomas in the 200-yard freestyle NCAA swimming championships, put it best: "The majority of us female athletes, or females in general, really, are not okay with this, and they're not okay with the trajectory of this and how this is going and how it could end up in a few years"—and called on the NCAA to change its rules to protect female competitive sports.[17]

While Lia Thomas stands athwart biology—aiming for Olympic glory as a self-declared woman[18]—swimming's worldwide governing body, FINA, has finally acknowledged the harms that accompany the willful disregard of science and sense: allowing biological males to compete in women's athletics irreparably destroys opportunities for women and girls. On June 19, 2022, FINA adopted a new gender eligibility policy that only permits swimmers who transitioned by age 12 or the onset of male puberty (known as Tanner Stage 2) whichever is later and who have since transition continuously suppressed testosterone to a level within the female range to compete in women's events. As James Pearce, spokesperson for FINA president Husain Al-Musallam, told The Associated Press: "This is not saying that people are encouraged to transition by the age of 12. It is what the scientists are saying, that if you transition after the start of puberty, you have an advantage, which is unfair."[19] This is a step in the right direction, but it's still deeply problematic. Transitioning by age 12—or before puberty—still doesn't erase the relative physical advantages characteristic in biological males. As explained above, biological males acquire male sport advantages as a result of different body structure from birth, males are genetically different, and experience several early surges of testosterone that females do not. Furthermore, puberty can begin for some as early as age 9, thereby allowing as much as a three-year period for acquisition of significant male performance advantage through male puberty before the FINA cut-off. Finally, while we appreciate FINA's focus on a level playing field, we do not consider it wise public policy to encourage hormonal intervention at such an early age merely to attempt to alter the category in which one may later compete in sports.

Beyond the gender identity issue, the Department has failed to offer sufficient justification as to why the Title IX regulations require revision. The May 2020 Rule, *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30026 (May 19, 2020) ("2020 Rule"), was an historic rulemaking that better aligned Title IX regulations with the text and purpose of 20 U.S.C. § 1681, Supreme Court precedent and other caselaw, and addressed the practical challenges facing students, employees, and schools with respect to sexual harassment allegations. For the first time in history, and despite the shadow governance of former administrations, sexual harassment regulations under Title IX were codified into law.

Your newly proposed rule guts the historic 2020 Rule. And it does so for no reason other than some apparent need to pander to your far-left constituencies. The 2020 Rule guarantees victims and accused students strong, clear, procedural rights in a predictable, transparent

---

[17] https://www.foxnews.com/politics/kentucky-swimmer-lia-thomas-female-sports-trajectory.
[18] "Transgender swimmer Lia Thomas reveals her Olympic dream as US trials for Paris draw closer." https://www.abc.net.au/news/2022-06-01/transgender-swimmer-lia-thomas-reveals-olympic-dream/101116092.
[19] "FINA effectively bans transgender athletes from competing in women's swimming events." https://www.usatoday.com/story/sports/olympics/2022/06/19/fina-adopts-new-policy-transgender-athletes-swimming-events/7677611001/.

process designed to reach reliable outcomes. It also provides essential provisions protecting free speech, academic freedom, and religious liberty. Your proposed rule decimates this fair and thoughtful framework.

We also requested that Assistant Secretary for Civil Rights, Catherine Lhamon, recuse herself from the Title IX rulemaking process given her past statements and record. As Assistant Secretary for Civil Rights at the Department of Education from 2013 to 2017, Ms. Lhamon played a crucial role in creating the Title IX catastrophe cleaned up by the 2020 Rule. The Department did not merely put its thumb on the scale of justice under her leadership, it became a biased institution. What followed were hundreds of successful lawsuits against schools for denying basic due process[20] and widespread criticism from across the ideological spectrum. We reiterate that her past record as Assistant Secretary for Civil Rights and her statements about the 2020 Rule make it impossible for the Department to include her in reasoned rulemaking on these topics.

The Biden Administration's regulatory changes threaten to destroy Title IX's entire *sine qua non*. **American women and girls deserve better. And if this Administration won't commit to protecting women's rights under Title IX, rest assured, we will.**

Respectfully,

AUSTIN KNUDSEN
ATTORNEY GENERAL OF MONTANA

TODD E. ROKITA
ATTORNEY GENERAL OF INDIANA

STEVE MARSHALL
ATTORNEY GENERAL OF ALABAMA

TREG R. TAYLOR
ATTORNEY GENERAL OF ALASKA

LESLIE RUTLEDGE
ATTORNEY GENERAL OF ARKANSAS

CHRISTOPHER M. CARR
ATTORNEY GENERAL OF GEORGIA

---

[20] These lawsuits, more often than not resulted in victories for accused students across the country in state and federal court, including key wins at the appellate level. *See, e.g., Doe v. Oberlin Coll.,* 963 F.3d 580, 581 (6th Cir. 2020); *Doe v. Univ. of the Scis.,* 961 F.3d 203, 205 (3d Cir. 2020); *Doe v. Purdue Univ.,* 928 F.3d 652, 656 (7th Cir. 2019); *Haidak v. Univ. of Mass.-Amherst,* 933 F.3d 56, 60 (1st Cir. 2019); *Doe v. Miami Univ.,* 882 F.3d 579 (6th Cir. 2018); *Doe v. Baum,* 903 F.3d 575 (6th Cir. 2018); *Doe v. Univ. of Cincinnati,* 872 F.3d 393 (6th Cir. 2017); *Doe v. Claremont McKenna Coll.,* 25 Cal. App. 5th 1055, 1070 (2018); *Doe v. Regents of Univ. of Cal.,* 28 Cal. App. 5th 44, 61 (2018).

**App. 041**

LAWRENCE G. WASDEN
ATTORNEY GENERAL OF IDAHO

DEREK SCHMIDT
ATTORNEY GENERAL OF KANSAS

DANIEL CAMERON
ATTORNEY GENERAL OF KENTUCKY

JEFF LANDRY
ATTORNEY GENERAL OF LOUISIANA

LYNN FITCH
ATTORNEY GENERAL OF MISSISSIPPI

ERIC S. SCHMITT
ATTORNEY GENERAL OF MISSOURI

DOUG PETERSON
ATTORNEY GENERAL OF NEBRASKA

JOHN M. O'CONNOR
ATTORNEY GENERAL OF OKLAHOMA

ALAN WILSON
ATTORNEY GENERAL OF SOUTH CAROLINA

KEN PAXTON
ATTORNEY GENERAL OF TEXAS

SEAN D. REYES
ATTORNEY GENERAL OF UTAH

PATRICK MORRISEY
ATTORNEY GENERAL OF WEST VIRGINIA

 

**AUSTIN KNUDSEN**                                   STATE OF MONTANA

April 5, 2022

Ms. Catherine E. Lhamon
Assistant Secretary
Office for Civil Rights
U.S. Department of Education
400 Maryland Avenue, SW
Washington, DC 20202

*Re: U.S. Department of Education's Title IX Rulemaking*

Dear Assistant Secretary Lhamon:

As the Attorneys General of our respective States, we are alarmed about the Department of Education's ("Department" or "ED") intent to propose new regulations implementing Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, in April 2022.[1] The Department, chiefly, has failed to provide sufficient justification for engaging in a new rulemaking. We therefore urge the Department to halt its effort and not disturb the current Title IX regulations. Relatedly, due to your key role in creating the Obama-era Title IX system and your public comments on the recently enacted Title IX Regulations from 2020, we call on you to recuse yourself from taking part in any rulemaking on Title IX. The Department should also not illegally re-write Title IX to include gender identity. Make the right choice for the rule of law as well as students, parents, teachers, and schools.

We are particularly perplexed as to why the Department believes the Title IX regulations require revision. In May 2020, after thoroughly considering over 124,000 public comments, the Department issued its historic Title IX Regulations, *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30026 (May 19, 2020) ("2020 Rule"), to better align the Title IX regulations with the text and purpose of 20 U.S.C. § 1681, Supreme Court precedent and other case law, and to address the practical challenges facing students, employees, and schools with respect to sexual harassment allegations. For the first time in history, regulations regarding sexual harassment under Title IX were codified into law. And, unlike in previous administrations,

---

[1] *See* U.S. Department of Education, Statement by U.S. Department of Education Assistant Secretary for Civil Rights Catherine E. Lhamon on Title IX Update in Fall 2021 Unified Agenda and Regulatory Plan, Dec. 10, 2021, https://www.ed.gov/news/press-releases/statement-us-department-education-assistant-secretary-office-civil-rights-catherine-lhamon-title-ix-update-fall-2021-unified-agenda-and-regulatory-plan.

DEPARTMENT OF JUSTICE

215 North Sanders                    (406) 444-2026
PO Box 201401                        Contactdoj@mt.gov
Helena, MT 59620-1401                mtdoj.gov

**App. 043**

the 2020 Rule holds public elementary and secondary schools accountable for sexual harassment, including sexual assault.[2]

The 2020 Rule, which became effective on August 14, 2020, sets forth clear legal obligations that require schools to promptly respond to allegations of sexual harassment, follow a fair grievance process to resolve those allegations, and provide remedies to victims. It guarantees victims and accused students strong, clear procedural rights in a predictable, transparent process designed to reach reliable outcomes.[3] It offers important new protections and benefits for victims of sexual harassment and sexual assault.[4] It provides essential provisions protecting free speech and academic freedom.[5] The 2020 Rule also clarifies an institution's entitlement to a religious exemption under § 1681(a)(3).[6] The Department should not eliminate or modify any of these vital provisions.

If the Department nevertheless decides to engage in rulemaking, you must recuse yourself from the process. The 2020 Rule was enacted in response to a constitutional and regulatory mess created by OCR from 2011 to 2016. As Assistant Secretary for Civil Rights from 2013 to 2017, you played a crucial role in creating this problem. OCR's infamous 2011 *Dear Colleague Letter: Sexual Violence* ("2011 DCL") and 2014 *Questions and Answers on Title IX and Sexual Violence* ("2014 Q&A")[7] wreaked havoc on campuses across the country. OCR compelled schools to adopt the lowest standard of proof for proving sexual harassment and sexual assault claims—preponderance of the evidence—and pressured schools to find accused students responsible for sexual misconduct even where there was significant doubt about culpability.[8]

Your OCR pressured schools to employ a "single investigator" model that gives one person appointed by the school's Title IX coordinator authority both to investigate alleged

---

[2] Pursuant to the 2020 Rule, an elementary and secondary school must respond whenever any employee has notice of sexual harassment or allegations of sexual harassment. *See* 34 C.F.R. § 106.30(a).

[3] *See, e.g.,* U.S. Dep't of Educ. YouTube Channel, *OCR Webinar on Due Process Protections under the New Title IX Regulations* (July 21, 2020), https://youtu.be/48UwobtiKDI; U.S. Dep't of Educ. YouTube Channel, *OCR Title IX Webinar: Bias and Conflicts of Interest* (Jan 15, 2021), https://www.youtube.com/watch?v=vHppcOdrzCg.

[4] *See, e.g.,* U.S. Dep't of Educ. YouTube Channel, *OCR Webinar on New Title IX Protections Against Sexual Assault* (July 7, 2020), https://www.youtube.com/watch?v=i-BCnhUsJ4s.

[5] *See, e.g.,* U.S. Dep't of Educ. YouTube Channel, *The First Amendment and Title IX: An OCR Short Webinar* (July 29, 2020), https://www.youtube.com/watch?v=XzSJ4uNspq8.

[6] 85 Fed. Reg. 59,916, 59,980–59,981 (Sept. 23, 2020).

[7] U.S. Dep't of Education, Office for Civil Rights, Dear Colleague Letter: Sexual Violence (April 4, 2011) (hereinafter "2011 DCL"), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf.

[8] OCR found numerous institutions in violation of Title IX for failing to adopt the preponderance of the evidence standard in its investigations of sexual harassment, even though the notion that the preponderance of the evidence standard is the only standard that might be applied under Title IX was set forth in the 2011 Dear Colleague Letter—not in the Title IX statute, regulations, or other guidance. *E.g.,* U.S. Dep't. of Education, Office for Civil Rights, Letter of Findings to Harvard Law School 7, Dec. 10, 2014, https://www2.ed.gov/documents/press-releases/harvard-law-letter.pdf ("[I]n order for a recipient's grievance procedures to be consistent with the Title IX evidentiary standard, the recipient must use a preponderance of the evidence standard for investigating allegations of sexual harassment, including sexual assault/violence."); *see also* Blair A. Baker, *When Campus Sexual Misconduct Policies Violate Due Process Rights*, 26 CORNELL J. L. & PUB. POL'Y 533, 542 (2016) (The 2011 DCL "forced universities to change their former policies drastically, with regards to their specific procedures as well as the standard of proof, out of fear that the Department of Education will pursue their school for a violation of Title IX.").

App. 044

misconduct and to determine guilt and innocence.[9]  Schools housed these investigators/adjudicators in their Title IX offices, which had strong incentives to ensure the school stayed compliant with the DCLs to avoid losing federal funding.  Many Title IX offices assumed every role in the process, acting as prosecutor, judge, jury, and appeals board.[10]

OCR created an expansive definition of sexual harassment that included "verbal conduct" (i.e., speech) such as "making sexual comments, jokes or gestures," "spreading sexual rumors," and "creating e-mails or Web sites of a sexual nature."[11]  The environment became so precarious that Harvard Law School professor Jeannie Suk Gersen wrote in 2014 that law school faculty were increasingly reluctant to teach rape law for fear of offending or upsetting their students.[12]  When the University of Montana sensibly incorporated the Supreme Court's definition of sexual harassment (discriminatory conduct "that is so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that the victim-students are effectively denied equal access to an institution's resources and opportunities")[13] into its sexual harassment policy, OCR objected.[14]  It insisted in 2013 that the university establish policies to "encourage students to report sexual harassment early, before such conduct becomes severe or pervasive, so that it can take steps to prevent the harassment from creating a hostile environment."[15]  The broad definition of sexual harassment was a so-called "national blueprint" for schools[16] and led OCR to regulate conduct that was not covered under Title IX.[17]

---

[9] *See Doe v. Univ. of Scis.*, 961 F.3d 203, 213 (3d Cir. 2020) (describing the pressure universities faced as a result of the Dear Colleague Letter).  In the "single investigator" model, there is no hearing. One person conducts interviews with each party and witness, and then makes the determination whether the accused is responsible. No one knows what the investigator hears or sees in the interviews except the people in the room at the time. This makes the investigator all powerful. Neither accuser nor accused can guess what additional evidence to offer, or what different interpretations of the evidence to propose, because they are completely in the dark about what the investigator is learning and are helpless to fend off the investigator's structural and personal biases as they baked them into the evidence-gathering.

[10] A laundry list of due process violations—reminiscent of Star Chamber—stacked the deck against accused students.  Schools failed to give students notice of the complaint against them, factual bases of charges, the evidence gathered, or the identities of witnesses.  Schools failed to provide hearings or to allow the accused student's lawyer to attend or speak at hearings.  Schools barred the accused from putting questions to the accuser or witnesses, even through intermediaries.  Schools denied parties the right to see the investigative report or get copies for their lawyers for preparing an appeal.  Schools allowed appeals only on very narrow grounds such as new evidence or procedural error, providing no meaningful check on the initial decisionmaker.

[11] *Id.*

[12] The New Yorker, Dec. 15, 2014, http://www.newyorker.com/news/news-desk/trouble-teaching-rape-law.

[13] *Davis v. Monroe County Board of Education*, 526 U.S. 629, 633 (1999).

[14] U.S. Dep't. of Education, Office for Civil Rights, Letter of Findings to University of Montana, May 8, 2013, https://www2.ed.gov/documents/press-releases/montana-missoula-letter.pdf.

[15] Brookings Institution, Jan. 24, 2019, https://www.brookings.edu/blog/brown-center-chalkboard/2019/01/24/the-department-of-educations-proposed-sexual-harassment-rules-looking-beyond-the-rhetoric/.

[16] Foundation for Individual Rights in Education, Departments of Education and Justice: National "Blueprint" for Unconstitutional Speech Codes, https://www.thefire.org/cases/departments-of-education-and-justice-national-requirement-for-unconstitutional-speech-codes/.

[17] Jacob Gersen and Jeannie Suk, *The Sex Bureaucracy*, 104 Calif. L. Rev. 881, 902-03 (2016) (Asserting that the Obama OCR's guidance required schools to regulate student conduct "that [was] not creating a hostile environment and therefore is not sexual harassment and therefore not sex discrimination" and concluding that OCR's guidance overstep[ped] OCR's jurisdictional authority).

**App. 045**

OCR didn't merely put its thumb on the scale of justice under your leadership, it became a biased institution. Investigations were not an inquiry into discrete complaints, but instead fishing expeditions into every aspect of schools' adjudication process and campus life.[18] By 2016, "the average investigation had been open for 963 days, up from an average in 2010 of 289 days."[19] Former and current OCR investigators told the media "the perceived message from Washington was that once an investigation into a school was opened, the investigators in the field offices were not meant to be objective fact finders. Their job was to find schools in violation of Title IX."[20] By 2014, OCR had stopped using the terms "complainant/alleged victim" and "alleged perpetrator" and replaced them with "victim/survivor" and "perpetrator." OCR then began keeping a public list of the schools at which it was investigating possible Title IX violations, putting schools under a cloud of suspicion. Under your leadership, the Title IX system quite literally resembled Kafka's *The Trial*.[21] What followed were hundreds of successful lawsuits against schools for denying basic due process[22] and widespread criticism from across the ideological spectrum. And one of the more tragic ironies is that the 2011 DCL resulted in a disproportionate number of expulsions and scholarship losses for Black male students.[23]

Given your past statements and record, there's no possible way OCR or the Department can conduct the rulemaking process in accordance with the Administrative Procedure Act's requirements for reasoned decision-making.[24] When the 2020 Rule was released, you claimed that it was "taking us back to the bad old days, when it was permissible to rape and sexually harass students with impunity."[25] During your subsequent Senate Confirmation hearing, you confirmed that this was still your view.[26] With your mind already made up regarding the 2020 Rule—and your attachment to the defective regime it replaced—your involvement would taint the rulemaking process with bias. *See, e.g.*, *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) (a strong showing of bad faith may require the

---

[18] THE ATLANTIC, Sept. 6, 2017, https://www.theatlantic.com/education/archive/2017/09/the-uncomfortable-truth-about-campus-rape-policy/538974/.

[19] *Id.*

[20] *Id.*

[21] *See, e.g.*, COMMENTARY MAGAZINE, June 2017, https://www.commentarymagazine.com/articles/kc-johnson/kafka-u/.

[22] These lawsuits, more often than not resulted in victories for accused students across the country in state and federal court, including key wins at the appellate level. *See, e.g.*, *Doe v. Oberlin Coll.*, 963 F.3d 580, 581 (6th Cir. 2020); *Doe v. Univ. of the Scis.*, 961 F.3d 203, 205 (3d Cir. 2020); *Doe v. Purdue Univ.*, 928 F.3d 652, 656 (7th Cir. 2019); *Haidak v. Univ. of Mass.-Amherst*, 933 F.3d 56, 60 (1st Cir. 2019); *Doe v. Miami Univ.*, 882 F.3d 579 (6th Cir. 2018); *Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018); *Doe v. Univ. of Cincinnati*, 872 F.3d 393 (6th Cir. 2017); *Doe v. Claremont McKenna Coll.*, 25 Cal. App. 5th 1055, 1070 (2018); *Doe v. Regents of Univ. of Cal.*, 28 Cal. App. 5th 44, 61 (2018).

[23] REALCLEAREDUCATION, Jan. 21, 2019, https://www.realcleareducation.com/articles/2019/01/21/black_men_title_nine_and_the_disparate_impact_of_discipline_policies_110308.html.

[24] We also note that then-Former Vice President Biden called supporters of the Title IX Reform "cultural neanderthals" and compared them to neo-Nazis. THE COLLEGE FIX, Sept. 14, 2017, https://www.thecollegefix.com/joe-biden-compares-supporters-due-process-nazis-marched-charlottesville/.

[25] Catherine Lhamon (@CatherineLhamon), Twitter (May 5, 2020, 6:48pm) https://twitter.com/CatherineLhamon/status/1257834691366772737?s=20&t=brCKjSXrdnvf7CUhfM-WNA.

[26] *See* KC Johnson YouTube Channel, *Excerpt of Catherine Lhamon Confirmation Hearing* (July 13, 2021), https://youtu.be/vqip7Dj8jwI.

**App. 046**

administrative officials who participated in a decision to give testimony explaining their action); *United States v. Oregon*, 44 F.3d 758, 772 (9th Cir. 1994) (decisionmaker cannot possess "an unacceptable probability of actual bias").[27]  Further, any future rationale for changing the 2020 Rule that's offered by the Department would be invalid because your statements prove the Department's outcome is pre-ordained.  *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2573 (2019) (uncontested that decision resting on "pretextual basis" "warrant[s] a remand to the agency").

Finally, we strongly urge the Department not to extend Title IX by regulatory fiat to cover discrimination on the basis of gender identity.[28]  This would plainly exceed the Department's rulemaking authority under Title IX.  Title IX prohibits discrimination "on the basis of sex" in any education program or activity receiving Federal financial assistance.  Statutory and regulatory text and structure,[29] contemporaneous Supreme Court authorities,[30] and the U.S. Department of Education's historic practice[31] demonstrate that the ordinary public meaning of the term "sex" at the time of Title IX's enactment could only have been biological distinctions between male and female.  A person's biological sex is relevant for Title IX considerations involving athletics, and distinctions based on sex are permissible (and may be required) because the sexes are—simply—not similarly situated.  *See* 20 U.S.C. §§ 1681(a), 1686; 34 C.F.R. §§ 106.32(b), 106.33, 106.34, 106.40, 106.41, 106.43. 106.52, 106.59, 106.61; *Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021) (noting Title IX expressly authorizes separation based on sex in certain circumstances).  This is because biological females and biological males possess profound physiological differences that are relevant in certain circumstances.  *See United States v. Virginia*, 518 U.S. 515, 533 (1996) ("Physical differences between men and women, however, are enduring.").

One of Title IX's crucial purposes, for example, is protecting athletic opportunity for women and girls.  Adding gender identity to the definition of "sex" in Title IX would have a detrimental effect on the great strides made over the last 50 years to create equal athletic opportunity.  Several of our states have enacted legislation to protect athletic opportunities for women by prohibiting biological males from competing in female athletics.  *See, e.g.*, H.B. 112, 2021 Leg. (Mt. 2021); H.B. 25, 87th Sess. (Tx. 2021); H.B. 3293, 2021 Leg., H.B. 500,

---

[27] A reviewing court may delve outside the administrative record under a strong showing of bad faith or improper behavior.  *See, e.g.*, *Citizens for Alternatives to Radioactive Dumping v. U.S. Dep't of Energy*, 485 F.3d 1091, 1096 (10th Cir. 2007); *Voyageurs Nat'l Park Ass'n v. Norton*, 381 F.3d 759, 766 (8th Cir. 2004); *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir. 1996); *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 907 (5th Cir. 1983); *Pub. Power Council v. Johnson*, 674 F.2d 791, 795 (9th Cir. 1982).

[28] Laura Meckler, *New Title IX rules set to assert rights of transgender students*, WASH. POST. (Mar. 30, 2022), https://www.washingtonpost.com/education/2022/03/30/transgender-discrimination-title-ix-rule-students/.

[29] *See* 20 U.S.C. §§ 1681(a); 34 C.F.R. §§ 106.32(b)(1), 106.33, 106.34, 106.40, 106.41, 106.43. 106.52, 106.59, 106.61.

[30] *See Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality opinion) ("[S]ex, like race and national origin, is an immutable characteristic determined solely by the accident of birth"); *see also Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1738 (2020) (assuming that the ordinary public meaning of the term "sex" in Title VII means biological distinctions between male and female); *id. at* 1784–91 (Appendix A) (Alito, J. dissenting) (collecting definitions of "sex"); *Newport News Shipbuilding & Dry Dock Co. v. EEOC, 462* U.S. 669, 684 (1983) ("discrimination based on a woman's pregnancy is, on its face, discrimination because of her sex.").

[31] *See* U.S. Dep't of Educ., Memorandum for Kimberly M. Richey Acting Assistant Secretary of the Office for Civil Rights Re: Bostock v. Clayton Cnty., at 2–3 (Jan. 8, 2021) (discussing Department's longstanding interpretation of "sex" in Title IX as meaning biological sex), available at https://www2.ed.gov/about/offices/list/ocr/correspondence/other/ogc-memorandum-01082021.pdf.

**App. 047**

65th Leg., 2d Sess. (Id. 2020). Those laws would undoubtedly conflict with the Department's intended rulemaking. We are prepared to take legal action to uphold Title IX's plain meaning and safeguard the integrity of women's sports.

In addition to the foregoing, we are also concerned that an interpretation of Title IX that goes beyond sex to include gender identity has and will be used by schools to improperly intrude into parental decision-making regarding the education and upbringing of their children. For example, as has been well documented in the controversy over Florida's Parental Rights in Education law[32], certain organizations and advocates have taken the position that laws which require parental notification about healthcare services offered at school or impose limitations on curricula for young children on gender identity issues violates Title IX. Specifically, advocates allege that the Florida law violates "Title IX by discriminating against them on the basis of sex, which includes sexual orientation and gender identity."[33] An interpretation of Title IX that supports such radical positions runs contrary to the role of the Department of Education,[34] the text of Title IX, and parents' constitutional right to decide what is in the best interests of their children.

The courts, as well as commentators across the political spectrum, agreed the Title IX system was broken under your watch. The 2020 Rule fixed those problems and created a better, more reliable system for victims and accused students. The Department has provided no rationale for why the 2020 Rule has proven unworkable or in need of adjustment. The COVID-19 pandemic has also provided a variety of challenges for education at all levels. Modifying or eliminating the 2020 Rule now will only add to the uncertainty and regulatory burden on schools, parents, teachers, and students across America.

We strongly urge the Department to cancel its plans to engage in rulemaking on Title IX. If the Department elects to continue with the process, we firmly believe you should have no role in it.

Respectfully,

AUSTIN KNUDSEN
ATTORNEY GENERAL OF MONTANA

---

[32] Florida House Bill 1557.

[33] *Equality Florida, et al. v. Florida, et al.*, Cause No. 4:22-cv-00134-AW-MJF, pending in the United States District Court for the Norther District of Florida, filed on March 31, 2022, Count VI, ¶ 247.

[34] *See* 20 USC § 3401(3) & (4) (Pub. L. 96–88, title I, § 101(3) & (4), Oct. 17, 1979, 93 Stat. 669) (As President Carter noted when signing the Department of Education Organization Act: "[P]arents have the primary responsibility for the education of their children, and States, localities, and private institutions have the primary responsibility for supporting that parental role").

**App. 048**



**AUSTIN KNUDSEN**                              STATE OF MONTANA

STEVE MARSHALL
ATTORNEY GENERAL OF ALABAMA

LESLIE RUTLEDGE
ATTORNEY GENERAL OF ARKANSAS

CHRISTOPHER M. CARR
ATTORNEY GENERAL OF GEORGIA

LAWRENCE G. WASDEN
ATTORNEY GENERAL OF IDAHO

THEODORE E. ROKITA
ATTORNEY GENERAL OF INDIANA

DANIEL CAMERON
ATTORNEY GENERAL OF KENTUCKY

JEFF LANDRY
ATTORNEY GENERAL OF LOUISIANA

ERIC SCHMITT
ATTORNEY GENERAL OF MISSOURI

DOUG PETERSON
ATTORNEY GENERAL OF NEBRASKA

DAVE YOST
ATTORNEY GENERAL OF OHIO

JOHN M. O'CONNOR
ATTORNEY GENERAL OF OKLAHOMA

ALAN WILSON
ATTORNEY GENERAL OF SOUTH CAROLINA

JASON RAVNSBORG
ATTORNEY GENERAL OF SOUTH DAKOTA

KEN PAXTON
ATTORNEY GENERAL OF TEXAS

DEPARTMENT OF JUSTICE

215 North Sanders          (406) 444-2026
PO Box 201401              Contactdoj@mt.gov
Helena, MT 59620-1401      mtdoj.gov

**App. 049**



**AUSTIN KNUDSEN**                    STATE OF MONTANA

Hon. Miguel Cardona
Secretary of Education
U.S. Department of Education
400 Maryland Avenue SW
Washington, DC 20202

September 12, 2022

**Re: Docket ID ED-2021-OCR-0166, RIN 1870-AA16**

**Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance**

Dear Secretary Cardona:

We submit these formal comments to duly note our opposition to the Department of Education's proposed rulemaking on Title IX of the Education Amendments of 1972 ("Title IX"). As a general matter, the Department has not provided sufficient reasoning for why it's embarking on a new Title IX rulemaking less than two years after the 2020 regulations went into effect. In May 2020, after thoroughly considering over 124,000 public comments, the Department issued its historic Title IX Regulations, *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30026 (May 19, 2020) ("2020 Rule"), to better align the Title IX regulations with the text and purpose of 20 U.S.C. § 1681, Supreme Court precedent and other case law, and to address the practical challenges facing students, employees, and schools with respect to sexual harassment allegations. For the first time in history, regulations regarding sexual harassment under Title IX were codified into law. The Department has not presented sufficient evidence that the current Title IX system requires modification. In many instances, moreover, the Department's Proposed Rule conflicts with the text, purpose, and longstanding interpretation of Title IX. It also negatively impacts free speech, academic freedom, and campus life. We also once again call for Assistant Secretary Lhamon to recuse herself from the rulemaking process.

I. THE PROPOSED RULE WRONGLY INCLUDES "GENDER IDENTITY" IN THE DEFINITION OF "SEX."

### A. The proposed rule exceeds the Department's statutory authority.

The Department proposes defining "sex discrimination" under Title IX to include discrimination on the basis of "gender identity." 87 Fed. Reg. 41390, 41391, 41392, 41410 (July 12. 2022). With this proposal, the rule would make it unlawful for a school to deny participation in any education program or activity consistent with a student's "gender identity." 87 Fed. Reg. at 41410. These changes constitute a stunning affront to the purpose of Title IX, which is to provide equal access to education and prohibit denial of education benefits and opportunities on the basis of sex. "Sex" means what it has meant since the beginning of time: the immutable fact of being male or female.

The Department's reimagining of Title IX to cover discrimination on the basis of gender identity plainly exceeds its rulemaking authority under Title IX. Title IX prohibits discrimination "on the basis of sex" in any education program or activity receiving Federal financial assistance. Statutory and regulatory text and structure, contemporaneous Supreme Court authorities, and the U.S. Department of Education's historic practice demonstrate that the ordinary public meaning of the term "sex" at the time of Title IX's enactment could only have been biological distinctions between male and female. A person's biological sex is relevant for Title IX considerations involving athletics, and distinctions based on sex are permissible (and may be required) because the sexes are—simply—not similarly situated for all purposes. *See* 20 U.S.C. §§ 1681(a), 1686; 34 C.F.R. §§ 106.32(b), 106.33, 106.34, 106.40, 106.41, 106.43. 106.52, 106.59, 106.61; *Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021) (noting Title IX expressly authorizes separation based on sex in certain circumstances). This is because biological females and biological males possess profound physiological differences that are relevant in certain circumstances. *See United States v. Virginia*, 518 U.S. 515, 533 (1996) (per Ginsburg, J.) ("Physical differences between men and women, however, are enduring.").

### B. The Proposed Rule fails to define the terms "sex" and "gender identity."

The proposed rule asserts that discrimination on the basis of sex includes discrimination on the basis of "gender identity," 87 Fed. Reg. at 41,410, but fails to define either. Without definitions for these terms, the rule is vague, arbitrary, and capricious.

Additionally, in the preamble to the current regulations, the Department stated: "Title IX and its implementing regulations include provisions that presuppose

2

**App. 051**

sex as a binary classification, and provisions in the Department's current regulations … reflect this presupposition." 85 Fed. Reg. 30,178.  It continued, "[i]n promulgating regulations to implement Title IX, the Department expressly acknowledged physiological differences between the male and female sexes." *Id.*

The Proposed Rule clearly attempts to change the starting point for all of Title IX—the definition of sex.  Yet the Department provides no alternate definition(s) for the public to evaluate and scrutinize.  It simply waives its hand and—by regulatory fiat—alters a fundamental term, as if its novel definition was axiomatic.  As discussed, the baseline, historical, scientific definition currently used by the Department (biological sex) cannot include gender identity.

Without a definition, the concept of "gender identity"—already an extremely amorphous concept—becomes a moving target.  It's also internally inconsistent to fail to define a key term such as "sex" but then claim the Department understands sex to include "gender identity.  As a result, the Proposed Rule fails to provide recipients adequate notice of the types of discrimination they must address to meet their obligations under Title IX.

### C. Defining sex discrimination to include gender identity will cause discrimination on the basis of sex.

#### 1. The Proposed Rule will harm students by eliminating single-sex facilities.

The Proposed Rule's inclusion of gender identity in its definition of sex discrimination will harm students and violate Title IX.  Single-sex spaces, such as bathrooms and locker rooms, are important for students to preserve bodily privacy and personal dignity from exposure of one's body to members of the opposite sex.  This would fall especially hard on young females because in addition to privacy and dignity harms, girls and women are vulnerable in intimate spaces to being sexually harassed and even assaulted by boys and men. For example, the NPRM fails to take into consideration incidents such as one in Loudon County, Virginia in 2021 where a transgender teenager was allowed access to the girls' restroom.[1] After the assault, the perpetrator was transferred to another school where he allegedly assaulted a second female student in early October.[2]

That also violates Title IX.  The ordinary public meaning of the term "sex" at the time of Title IX's enactment (and now) was biological sex, male or female. That

---

[1] Caroline Downey, *Judge Rules Loudoun County Teen Sexually Assaulted Female Student in Girls' Bathroom*, YAHOO NEWS (Oct. 26, 2021), https://news.yahoo.com/judge-rules-loudoun-county-teen-131413442.html.

[2] *Id.*

too was the meaning given to the term when it was used in the Department's implementing regulations approved by Congress. *See, e.g.*, *Bell*, 456 U.S. at 531–32; 34 CFR §§ 106.32(b)(1), 106.33, 106.34, 106.40, 106.41, 106.43. 106.52, 106.59, 106.61. 34 C.F.R. § 106.33 permits schools to provide separate bathrooms, locker rooms, and showers "on the basis of sex," as long as the school provides comparable facilities for "each sex." So under Title IX's ordinary public meaning, the law *requires* a recipient to provide a "separate toilet, locker room, and shower facilities on the basis of sex" to regulate access based on *biological* sex.

## 2. The Proposed Rule will deny equal access to athletics for women and girls and jeopardize their safety.

The Department's Proposed Rule defeats the entire original purpose of Title IX and will have a devastating impact on women's athletics. Since its enactment in 1972, Title IX has led to an important increase in athletic opportunity for girls and women in sports.[3] In the name of equity, the proposed Rule travels backward to a pre-Title IX era when schools had no obligation to provide equal, safe, and fair athletic opportunities for women and girls. It mandates open access to every education program and activity based on the amorphous concept of "gender identity." So now, any school, college, or university that separates athletic teams based solely on biological sex will be actively committing a federal civil rights violation.

In turn, the Department's definition of discrimination will actually discriminate against female athletes by denying them equal athletic opportunity and endangering their safety. Forcing female athletes to compete against male athletes is unfair and ignores science.[4] Biological differences between males and females mean that girls and women are at an enormous disadvantage when competing against biological men in many sports. This also puts women and girls at greater risk of injury when competing against biological males in contact and combat sports.

---

[3] In 2021, 3.4 million girls played high school sports and 219,000 women played NCAA sports. In fact, NCAA statistics show that since 1982 (when the NCAA began separating male and female participation rates) female participation rates in athletics have risen from 43% of the male participation rate (74,329 to 169,800) in 1982 to 78% (219,177 to 278,988) in 2021—almost doubling. NCAA Sports Sponsorship and Participation Rates Database, https://www.ncaa.org/sports/2018/10/10/ncaa-sports-sponsorship-and-participation-rates-database.aspx.

[4] Males typically have a 10-50% performance advantage, depending on the particular sport. Males have 45% more lean body mass, 33% more lower body muscle mass and 40% more upper body muscle mass, 54% higher knee extension strength, and 30% higher maximum cardiac output. By the ages of 14–15, many adolescent males have surpassed the best measurable elite female performances in nearly all sports. *See* Hilton, E.N., Lundberg, T.R., Transgender Women in the Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage, *Sports Med.* 2021 Feb;51(2): 199-214.

**App. 053**

Several of the states have enacted legislation to protect athletic opportunities for women by prohibiting biological males from competing in female athletics. *See, e.g.*, H.B. 112, 2021 Leg. (Mt. 2021); H.B. 25, 87th Sess. (Tx. 2021); H.B. 3293, 2021 Leg., H.B. 500, 65th Leg., 2d Sess. (*Id.* 2020). Those laws undoubtedly conflict with the Department's Proposed Rule. *Cf. City of L.A. v. Barr*, 929 F.3d 1163, 1174 (9th Cir. 2019) ("[I]f Congress decides to impose conditions on the allocation of funds to the states, it 'must do so unambiguously … enabl[ing] the States to exercise their choice knowingly, cognizant of the consequences of their participation.'") (quoting *South Dakota v. Dole*, 483 U.S. 203, 207 (1987)).

### D. The Proposed Rule infringes on parental rights.

Even more pernicious, the Proposed Rule would federally coerce schools to indoctrinate children into gender identity theories that are heavy on political asperity and light on scientific corroboration. This would require everyone in the school environment to accept that being a boy, girl, both, or neither is only a matter of subjective identity. Under this Proposed Rule, schools would have to treat any skepticism of "gender identity" as discrimination/harassment, which would effectively override the fundamental rights of parents to rear their own children in matters of reason, morality, and faith. Because it treats failure to affirm gender identity the same as traditional forms of discrimination (*e.g.*, excluding girls from the debate team), a school wouldn't need to obtain parental consent before pushing "gender affirmation" of whatever self-declared identity a child announces in school; the school would never have to disclose that affirmation program to the child's parents, and must—at any rate—pursue it even over parents' objections.

## II. THE PROPOSED RULE WILL INFRINGE UPON AND CHILL FREE SPEECH BY VASTLY EXPANDING THE DEFINITION OF SEXUAL HARASSMENT IN 34 C.F.R § 106.30.

The Department proposes changing the current definition of "sexual harassment" contained in 34 C.F.R § 106.30. The Department's new definition of hostile environment sexual harassment not only conflicts with Supreme Court precedent, but will have a detrimental impact on free speech, campus life, and the free exchange of ideas. When combined with the Department's proposed changes to the current due process protections, the proposed rule will chill protected speech—allowing unscrupulous students and ideologically biased bureaucrats to weaponize Title IX against those with whom they disagree on hotly contested issues of political, societal, religious, and moral importance. At private schools, where the First Amendment does not apply, the Department still lacks the power to compel schools to suppress speech that would violate the First Amendment.

5

### A. The Proposed Rule improperly deviates from the Supreme Court's Title IX threshold.

#### 1. The *Gebser/Davis* standard

Not every unpleasant interaction in the course of an educational program or activity automatically amounts to a federal civil rights violation. The Supreme Court, in fact, has set a relatively high threshold for when sex-based speech rises to that level. The current regulations respect that threshold. The Proposed Rule does not.

In *Cannon v. Univ. of Chi.,* 441 U.S. 677, 680 (1979), the Supreme Court held that a judicially implied private right of action exists under Title IX. In *Franklin v. Gwinnett Cty. Pub. Sch.,* 503 U.S. 60, 62 (1992), the Court held that money damages are an available remedy in a private lawsuit alleging a school's intentional discrimination in violation of Title IX. The Court acknowledged in *Franklin* that sexual harassment and sexual abuse of a student by a teacher may mean the school itself engaged in intentional sex discrimination.

In *Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274 (1998), the Court analyzed the conditions under which a school district will be liable for money damages for an employee sexually harassing a student. The *Gebser* Court began its analysis by stating that while *Franklin* acknowledged that a school employee sexually harassing a student may constitute the school itself committing intentional discrimination on the basis of sex, it was necessary to craft standards defining "the contours of that liability." *Gebser* held that where a school has "actual knowledge" of an employee sexually harassing a student but responds with "deliberate indifference" to such knowledge, the school itself has engaged in discrimination, subjecting the school to money damages in a private lawsuit under Title IX. The *Gebser* Court was particularly concerned about the possibility of requiring a school to pay money damages for harassment of which it was not aware and in amounts that exceeded the recipient's level of Federal funding. *Gebser*, 524 U.S. 289–90.

In 1999, the Court decided *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, (1999), and held that where sexual harassment is committed by a peer rather than an employee, the same standards of actual knowledge and deliberate indifference apply. The *Davis* Court additionally crafted a definition of when sex-based conduct becomes actionable sexual harassment, defining the conduct as "so severe, pervasive, and objectively offensive" that it denies its victims equal access to education. *Id.* at 651. *Davis* and *Gebser* built upon the Supreme Court's previous Title IX decisions in *Cannon* and *Franklin* to establish a three-part framework describing when a school's inadequate response to sexual harassment constitutes the school itself committing discrimination. The three parts of this framework are: definition of actionable sexual harassment, the school's actual knowledge, and the school's deliberate indifference (sufficiency of the school's response).

Nothing in the *Gebser* or *Davis* framework purports to restrict the *Gebser/Davis* framework only to private lawsuits for money damages. For example, a variety of courts have used the framework to award injunctive relief. *E.g.*, *Fitzgerald v. Barnstable Sch. Dist.*, 555 U.S. 246, 255 (2009) ("In addition, this Court has recognized an implied private right of action …. In a suit brought pursuant to this private right, both injunctive relief and damages are available.") (internal citations omitted; emphasis added); *Hill v. Cundiff*, 797 F.3d 948, 972–73 (11th Cir. 2015) (reversing summary judgment against plaintiff's claims for injunctive relief because a jury could find that the alleged conduct was "severe, pervasive, and objectively offensive" under Davis); *B.H. ex rel. Hawk v. Easton Area Sch. Dist.*, 725 F.3d 293, 322–23 (3d Cir. 2013) (upholding preliminary injunction against school for banning students from wearing bracelets because the school failed to show that the "bracelets would breed an environment of pervasive and severe harassment" under *Davis*); *Haidak v. Univ. of Mass. at Amherst*, 299 F. Supp. 3d 242, 270 (D. Mass. 2018) (denying plaintiff's request for a preliminary injunction because he failed to show that the school was deliberately indifferent to an environment of severe and pervasive discriminatory conduct under *Davis*), *aff'd in part, vacated in part, remanded by Haidak v. Univ. of Mass.-Amherst*, 933 F.3d 56 (1st Cir. 2019).

Accordingly, the starting place for describing a school's legal obligations under Title IX is adoption of the *Gebser/Davis* framework because that framework describes when sexual harassment amounts to a school, itself, discriminating on the basis of sex. The definition of "hostile environment sexual harassment" should, likewise, continue to align with the standard set by the Supreme Court's cases assessing liability under Title IX for money damages in private litigation. The Supreme Court's decisions in *Gebser* and *Davis* are based on a textual interpretation of Title IX and important policy rationales that the Department has failed to consider in its NPRM. The current Title IX regulations predominantly follow the *Davis* standard—and for good reason.

There are several key reasons why the Department shouldn't depart from the *Gebser/Davis* framework. The Court, importantly, held that Title IX governs misconduct by *recipients*, not by third parties such as teachers and students. Title IX was "designed primarily to prevent recipients of federal financial assistance from using the funds in a discriminatory manner." *Gebser*, 524 U.S. at 292; *see also Cannon v. Univ. of Chicago*, 414 U.S. 677, 704 (1979) (primary congressional purpose behind the statutes was "to avoid the use of federal resources to support discriminatory practices"). So it's a recipient's own misconduct—not that of employees, students, or other third parties—that subjects the recipient to liability under Title IX.

Next, since Congress enacted Title IX under its Spending Clause authority, the obligations it imposes on recipients resemble those of a contract. *Gebser*, 524 U.S. at

**App. 056**

286; *Davis*, 526 U.S. at 640. The Supreme Court reasoned in *Davis* that it follows from this that recipients must be on clear notice of what conduct is prohibited and that recipients must be held liable only for conduct over which they have control. *Id.* at 644–45. As its (now-repealed) 2001 Guidance said, the Department has an interest in providing recipients with "consistency and simplicity in understanding what is sexual harassment for which the school must take responsive action." U.S. Dep't. of Education, Office for Civil Rights, *Revised Guidance on Sexual Harassment: Harassment of Students by School Employees, Other Students, or Third Parties* (Jan. 19, 2001), at vi.

Third, the Court reasoned in *Davis* that any interpretation of Title IX must leave room for flexibility in schools' disciplinary decisions and not place courts in the position of second-guessing disciplinary decisions made by administrators and faculty. *Davis*, 526 U.S. at 648.

Finally—and most importantly—the plain text of Title IX prohibits only discrimination that has the *effect of denying access* to the recipient's educational program or activities. *Id.* at 650–52. Title IX, therefore, does not prohibit sex-based misconduct that does not rise to that level of severity. All speech related considerations in the Final Rule should follow this principle.

The current Title IX regulations define sexual harassment as:

(1) An employee of the recipient conditioning the provision of an aid, benefit, or service of the recipient on an individual's participation in unwelcome sexual conduct;
(2) Unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity; or
(3) "Sexual assault" as defined in 20 U.S.C. 1092(f)(6)(A)(v), "dating violence" as defined in 34 U.S.C. 12291(a)(10), "domestic violence" as defined in 34 U.S.C. 12291(a)(8), or "stalking" as defined in 34 U.S.C. 12291(a)(30).

34 C.F.R. § 106.30. The law currently applies the *Davis* standard verbatim for category 2 (hostile environment sexual harassment).

The Proposed Rule changes the definition of hostile environment sexual harassment to:

Unwelcome sex-based conduct that is sufficiently severe or pervasive, that, based on the totality of the circumstances and evaluated subjectively and objectively, denies or limits a person's ability to

8

**App. 057**

participate in or benefit from the recipient's education program or activity (i.e., creates a hostile environment).

87 Fed. Reg. at 41410.  The Department's "tentative view" that this proposed hostile environment framework appropriately captures the key concepts articulated by the Supreme Court in *Davis* and protects the First Amendment rights and interests of students and employees is sorely mistaken.  *Id.* at 41413.

The Department should withdraw its proposal to change the definition of hostile environment sexual harassment.

### 2.   *The proposed definition of sexual harassment lowers the threshold for what counts as "harassment."*

Title IX prohibits *discrimination*—not offensive speech. The *Davis* standard forces recipients to punish true harassment under Title IX while leaving lesser disciplinary matters to school conduct codes (and applicable legal requirements such as the First Amendment).  Incidents such as so-called "microaggressions," offensive jokes, and social media banter are not *per se,* or even putative, federal civil rights violations.  But the proposed new definition radically lowers the threshold for what counts as "harassment."   This will allow schools to investigate speech that is subjectively offensive to anyone—even if it is neither severe, nor pervasive, or nor objectively offensive.    This will massively chill academic and campus debates over sex, gender identity, and other issues implicated by the Proposed Rule.[5]

Offensive speech is protected in many instances and contexts.  Indeed, the preamble to the current regulations emphasizes that offensive speech is protected, particularly at the postsecondary level:

> The Supreme Court has also rejected the idea that "because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large. Quite to the contrary, 'the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.'" *Healy v. James*, 408 U.S. 169, 180 (1972) (internal citations omitted). Further, these protections apply even to highly offensive speech on campus: "[T]he mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'" *Papish v. Bd. of Curators*, 410 U.S. 667, 670 (1973) (internal citations omitted).

---

[5] *See, e.g.*, Cantu and Jussim, *Microaggressions, Questionable Science, and Free Speech*, Tᴇx. Rᴇv. L. & Pᴏʟ. (Feb. 2021), *available at* https://ssrn.com/abstract=3822628.

9

85 Fed. Reg. at 30141 n. 623.  Higher education institutions differ from the workplace. In workplaces, it may be natural to ban offensive speech to maximize efficiency or prevent a hostile or offensive environment.  Colleges, however, exist for the very purpose of exchanging ideas and pursuing the truth—even if words and ideas offend listeners.  *See, e.g., Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177 (6th Cir. 1995) (holding hostile environment harassment code was unconstitutionally vague and overbroad and was not a valid prohibition of fighting words).  The Proposed Rule's new lower threshold will no doubt stifle the airing of controversial (but protected) ideas on campus.

As for elementary and secondary education, the *Davis* Court expressly required that conduct be severe *and* pervasive for Title IX liability.  This is because, unlike workplace conduct under Title VII, elementary and secondary school students frequently behave in ways that would be unacceptable among adult workers.  *Davis*, 526 U.S. at 651–52 (citing *Meritor*, 477 U.S. at 67).

### 3. The Department has failed to provide adequate reasoning for the definition change to sexual harassment in § 106.30.

The Proposed Rule recognizes that the new definition of hostile environment sexual harassment abandons the verbatim *Davis* standard used in the current regulations, but reasons that that caselaw allows the Department to promulgate rules requiring conduct that—in its absence—would not constitute sex discrimination. 87 Fed. Reg. at 41413. The Department then adopts its new standard "because the [new] definition of 'sex-based harassment' covers a broader range of sexual misconduct than that covered … in the current regulations," and because "Title IX's plain language prohibits any discrimination on the basis of sex." *Id.* To be sure, the Department may adopt prophylactic requirements that are broader than the requirement to refrain from discrimination on the basis of sex.  But such prophylaxis must be designed to prevent *discrimination on the basis of sex*—not some other undefined classification.  Here, instead, the Department is attempting to redefine sex discrimination itself, broadening that discernable concept beyond recognition.  Because the NPRM neither defines the concept nor explains why it must be expanded so dramatically, the Proposed Rule reveals its own arbitrariness.

Next, the Department fails to explain why it dropped the "objectively offensive" element from the current definition.  *See* 34 C.F.R. 106.30 ("(2) Unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity"). The objectively offensive element is important because it judges the content by the standards of what a reasonable person would observe. Thus, in order for speech to create a hostile environment, it must offend a reasonable person. The Department has no good reason for dropping this crucial element of the *Davis* standard.

10

Finally, the Department fails to adequately explain why its new definition is tied to the Title VII framework.  In fact, the only insight provided is the Department's tentative assertion that "this alignment will better facilitate recipients' ability to comply with their obligations" under both statutes.  87 Fed. Reg. at 41415.  But elsewhere, the Department also admits that the analysis of whether a hostile environment exists is necessarily fact-specific and, among other things, must consider how a student—versus an employee—reasonably perceives the environment.  Since the analyses differ for students and employees, it's unclear what benefits accrue to schools from similarity between the Title VII and Title IX formulations (especially where analysis of peer-on-peer discrimination is at issue).  In contrast, the Preamble to the current regulations explained that aligning the Title VII and Title IX definitions of sexual harassment didn't further the purpose of Title IX or benefit students and employees participating in education programs or activities. 85 Fed. Reg. at 30151 (citing, *e.g.*, Azhar Majeed, *The Misapplication of Peer Harassment Law on College and University Campuses and the Loss of Student Speech Rights*, 35 J. COLL. & UNIV. L. 385, 449 (2009) (arguing that restrictions on workplace speech "ultimately do not take away from the workplace's essential functions—to achieve the desired results, make the client happy, and get the job done" and free expression in the workplace "is typically not necessary for that purpose" such that workplaces are often "highly regulated environments" while "[o]n the other hand, freedom of speech and unfettered discussion are so essential to a college or university that compromising them fundamentally alters the campus environment to the detriment of everyone in the community" such that free speech and academic freedom are necessary preconditions to a university's success.).

The Department must provide a sufficient explanation.

## B. The proposed change to the definition of sexual harassment in § 106.30 will violate First Amendment rights and chill the free exchange of ideas.

The NPRM pays lip service to free speech in its preamble.  *See* 87 Fed. Reg. at 41415 ("Title IX protects individuals from sex discrimination and does not regulate the content of speech as such. OCR has expressed this position repeatedly in discussing Title IX in prior guidance. See 2001 Revised Sexual Harassment Guidance at 22; 2003 First Amendment Dear Colleague Letter; 2014 Q&A on Sexual Violence at 43-44. The Department emphasizes that in cases of alleged sex-based harassment, the protections of the First Amendment must be considered if, for example, issues of speech or expression.").

The Department has failed to heed the warnings of the past and account for the reasons why the current regulations were put into place. In the preamble to the 2020 regulations, the Department stated:

**App. 060**

> The "Sexual Harassment" subsection of the "Section 106.30 Definitions" section of this preamble discusses in greater detail how the *Davis* definition of sexual harassment as "severe, pervasive, and objectively offensive" comports with First Amendment protections, and the way in which a broader definition, such as severe, persistent, or pervasive (as used in the 1997 Guidance and 2001 Guidance), has led to infringement of rights of free speech and academic freedom of students and faculty.

85 Fed. Reg. at 30036 n.88; *see also id.* at 30130 ("Failure to recognize and respect principles of free speech and academic freedom has led to overly broad anti-harassment policies that have resulted in chilling and infringement of constitutional protections.").  The current definition contained in § 106.30 captures categories of misconduct likely to impede educational access while avoiding a chill on free speech and academic freedom.  The failure to recognize and respect free speech principles and academic freedom has led to overly broad anti-harassment policies in the past that have resulted in chilling and infringement of constitutional protections.  Several provisions in the Proposed Rule tread the same, anti-speech path.

> **1.  The Proposed Rule would modify 34 C.F.R. § 106.44 to require schools to respond to sex discrimination, regardless of whether schools know about it, and impose monitoring duties on Title IX coordinators, which would chill speech.**

The current regulations require that a recipient must possess "actual knowledge" in order to be held liable under Title IX.  *See* 34 CFR § 106.44(a) ("A recipient with actual knowledge of sexual harassment in an education program or activity of the recipient against a person in the United States, must respond promptly in a manner that is not deliberately indifferent."); see also 85 Fed. Reg. at 30038 ("These final regulations adopt the actual knowledge condition from the *Gebser/Davis* framework so that these final regulations clearly prohibit a recipient's own intentional discrimination, but adapt the *Gebser/Davis* condition of actual knowledge to include notice to more recipient employees than what is required under the Gebser/Davis framework, in a way that takes into account the different needs and expectations of students in elementary and secondary schools, and in postsecondary institutions, with respect to sexual harassment and sexual harassment allegations."); *id.* at 30035 ("The withdrawn 2011 Dear Colleague Letter continued to recommend that schools act upon constructive notice (rather than actual knowledge) and to hold schools accountable under a strict liability standard rather than deliberate indifference.").

The NPRM proposes modifying 34 C.F.R. 106.44(a) and (b) to say:

App. 061

(a) A recipient must take prompt and effective action to end any sex discrimination that has occurred in its education program or activity, prevent its recurrence, and remedy its effects.

(b) A recipient must …. Require its Title IX Coordinator to monitor the recipient's education program or activity for barriers to reporting information about conduct that may constitute sex discrimination under Title IX.

87 Fed. Reg. at 41572.

This new duty will lead to Title IX coordinators zealously policing protected speech as a prophylactic measure to avoid Title IX violations. Unsurprisingly, this will have a detrimental effect on campus culture and campus life.

### 2. Schools are expected to counter "derogatory" speech.

Under the Proposed Rule, schools must *counter* "derogatory opinions," making a non-response to any such opinions a potential Title IX violation. The NPRM says:

> For instance, although the First Amendment may prohibit a recipient from restricting the rights of students to express opinions about one sex that may be considered derogatory, the recipient can affirm its own commitment to nondiscrimination based on sex and take steps to ensure that competing views are heard. The age of the students involved and the location or forum in which such opinions are expressed may affect the actions a recipient can take consistent with the First Amendment.

87 Fed. Reg. at 41515. Institutions of higher education cannot suppress student thought on controversial issues simply because some students find it "offensive." Under the proposed rule (particularly in light of the lower threshold for hostile environment claims), cancel culture will become the norm on K-12 and college campuses, as students, teachers, and professors are threatened or punished for engaging in protected First Amendment speech on sex or LGBT issues. *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.). And, even without official action to enforce these new rules, the threat of Title IX investigations will intimidate students and faculty into keeping quiet on controversial issues. Schools are likely to ostracize students who express disfavored political, moral, and social opinions, including on gender identity. But, as the Supreme Court has said:

**App. 062**

Probably no deeper division of our people could proceed from any provocation than from finding it necessary to choose what doctrine and whose program public educational officials shall compel youth to unite in embracing. Ultimate futility of such attempts to compel coherence is the lesson of every such effort from the Roman drive to stamp out Christianity as a disturber of its pagan unity, the Inquisition, as a means to religious and dynastic unity, the Siberian exiles as a means to Russian unity, down to the fast failing efforts of our present totalitarian enemies. Those who begin coercive elimination of dissent soon find themselves exterminating dissenters. Compulsory unification of opinion achieves only the unanimity of the graveyard.

*Id.* at 641. This principle has even more teeth at institutions of higher learning. *See Healy v. James*, 408 U.S. 169, 180 (1972) ("[T]he precedents of this Court leave no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large. Quite to the contrary, the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.") (cleaned up).

The Department should withdraw this proposed change to protect free speech.

### 3. The NPRM Removes the current prohibition in § 106.44(a) on using speech suppression to prevail in OCR investigations.

The current regulations provide that: "The Department may not deem a recipient to have satisfied the recipient's duty to not be deliberately indifferent under this part based on the recipient's restriction of rights protected under the U.S. Constitution, including the First Amendment, Fifth Amendment, and Fourteenth Amendment." 34 CFR § 106.44(a). This means that institutions—public and private—cannot use Title IX as an excuse for suppressing protected student or faculty speech. The Proposed Rule removed this provision. See 87 Fed. Reg. at 41432, 41572-41575. The Department has not explained why it removed this provision and must do so. The Department should withdraw this proposal to prevent schools from using their obligations under federal civil rights law to shut down protected speech.

### 4. The Proposed Rule's gender identity provisions turn protected speech into harassment.

As discussed above, the proposed rule defines sex-based harassment to include offensive conduct on the basis of "gender identity." The proposed Rule effectively requires schools to micromanage and control the speech of all students, teachers, and staff. This now includes things like (1) compelling the use of each person's preferred

14

pronouns that may contradict the person's sex; and (2) characterizing as punishable harassment any objection to allowing male participation on girls sports teams.

The Proposed Rule vaguely defines both the hostile environment standard and the obligation of the school to provide "supportive measures." Under this paradigm, an accusation by a student or teacher of "sex-based harassment" could arise from any other student or teacher refusing to "validate" or "affirm" the person's "gender identity." This could happen when a student refuses to use another student's neo-pronoun or if a lesbian turns down a date with a man, who has "identified" as a woman and tells the man the objective fact that she doesn't date men.

This clearly violates students' and teachers' First Amendment rights to express their views on scientific, moral, and religious issues. *See Janus v. AFSCME*, Council 31, 138 S. Ct. 2448, 2464 (2018) ("Forcing free and independent individuals to endorse ideas they find objectionable is always demeaning, and … a law commanding involuntary affirmation of objected-to beliefs would require even more immediate and urgent grounds than a law demanding silence) (internal quotations omitted); *Reed v. Town of Gilbert*, 576 U.S. 155, 168 (2015) ("Government discrimination among viewpoints—or the regulation of speech based on the specific motivating ideology or the opinion or perspective of the speaker—is a more blatant and egregious form of content discrimination.")  (internal quotations omitted)).

Even worse, it compels students and faculty to deny objective truth.[6]

### 5. *The Proposes Rule removes the provision in 34 C.F.R. § 106.71(b)(1) that makes clear that exercise of rights protected under the First Amendment does not constitute retaliation*

34 C.F.R. § 106.71 prohibits recipients or individuals from retaliating against individuals who participate in the Title IX process:

> No recipient or other person may intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by title IX or this part, or because the individual has made a report or complaint, testified, assisted, or participated or refused to participate in any manner in an investigation, proceeding, or hearing under this part. Intimidation, threats, coercion, or discrimination, including charges against an individual for code of conduct violations that do not involve sex discrimination or sexual harassment, but arise out of the same facts or circumstances as a report

---

[6] Legend has it that when Galileo was put on trial for his heretic belief that the Earth revolved the Sun and eventually forced to recant, he muttered under his breath "*Eppur si muove*" or "it still moves."

or complaint of sex discrimination, or a report or formal complaint of sexual harassment, for the purpose of interfering with any right or privilege secured by title IX or this part, constitutes retaliation. The recipient must keep confidential the identity of any individual who has made a report or complaint of sex discrimination, including any individual who has made a report or filed a formal complaint of sexual harassment, any complainant, any individual who has been reported to be the perpetrator of sex discrimination, any respondent, and any witness, except as may be permitted by the FERPA statute, 20 U.S.C. 1232g, or FERPA regulations, 34 CFR part 99, or as required by law, or to carry out the purposes of 34 CFR part 106, including the conduct of any investigation, hearing, or judicial proceeding arising thereunder. Complaints alleging retaliation may be filed according to the grievance procedures for sex discrimination required to be adopted under § 106.8(c).

34 C.F.R. § 106.71(a).  The regulations also, however, make clear that "the exercise of rights protected under the First Amendment does not constitute retaliation prohibited under paragraph (a) of this section."   34 C.F.R. § 106.71(b)(1).

The Proposed Rule eliminates § 106.71(b)(1).  The NPRM reasons that "106.71(b)(1) is redundant and its removal would be appropriate" because "[a]s explained in the discussion of the definition of prohibited "sex-based harassment" (proposed § 106.2), the Department has long made clear that it enforces Title IX consistent with the requirements of the First Amendment." This discussion and rationale are wholly inadequate.  Removal of § 106.71(b)(1) will chill free speech and infringe on First Amendment rights.

The NPRM fails to take into account the real-life examples of Title IX's retaliation provisions being abused to chill free speech.  For example, the saga of Northwestern Professor Laura Kipnis is instructive:

In 2015, she published a polemic in *The Chronicle of Higher Education* titled "Sexual Paranoia Strikes Academe." Kipnis argued that students' sense of vulnerability on campus was expanding to an unwarranted degree, partly owing to new enforcement policies around Title IX, which prohibits sex discrimination at educational institutions that receive federal funds. The new Title IX policies on sexual misconduct which were then sweeping campuses perpetuated "myths and fantasies about power," Kipnis wrote, which enlarged the invasive power of institutions while undermining the goal of educating students in critical thinking and resilience. "If you wanted to produce a pacified, cowering citizenry, this would be the method," she concluded. Kipnis wrote of a philosophy

16

**App. 065**

professor, Peter Ludlow, whom Northwestern disciplined for sexual harassment; Kipnis questioned the logic of the accusations against him. One of Ludlow's accusers, a graduate student (unnamed in Kipnis's essay), then joined a fellow graduate student in the philosophy department in filing Title IX complaints against Kipnis, under Northwestern's sexual-misconduct policy. Through her essay and a subsequent tweet about the essay, Kipnis was alleged to have violated the part of the sexual-misconduct policy prohibiting "retaliation"; additionally, she was alleged to have created a "hostile environment" and a "chilling effect" on complaints. Northwestern launched a formal Title IX investigation of Kipnis.

Most people under Title IX investigation don't speak publicly about it, even to defend themselves. But Kipnis responded by publishing a follow-up essay in the Chronicle, called "My Title IX Inquisition," decrying the investigation as a misuse of Title IX that allowed "intellectual disagreement to be redefined as retaliation." On the same day, Northwestern cleared Kipnis of wrongdoing, finding that "viewpoint expression" is not retaliation, and that a "reasonable person" in the complainant's position "would not suffer a hostile environment on account of" the essay and the tweet.[7]

The Department demonstrates absolutely no awareness of harmful instances such as this—and its effects on free speech and weaponization of the Title IX process. The Department fails to provide a reasoned explanation for eliminating § 106.71(b)(1).

### 6. The Proposed Rule plainly ignores the mountain of evidence demonstrating that it will chill free speech on campus.

The Proposed Rule is arbitrary and capacious because it wrongly believes its new definition of sexual harassment will not chill free speech. The Department claims that "Title IX protects individuals from sex discrimination and does not regulate the content of speech as such. OCR has expressed this position repeatedly in discussing Title IX in prior guidance. *See* 2001 Revised Sexual Harassment Guidance at 22; 2003 First Amendment Dear Colleague Letter; 2014 Q&A on Sexual Violence at 43-44." 87 Fed. Reg. at 41415. But this proclamation is contradicted by a mountain of public evidence and the Department's past statements.

---

[7] Jeanie Suk Gersen, Laura Kipnis's Endless Trial by Title IX, THE NEW YORKER (Sept. 20, 2017); see also Laura Kipnis, *My Title IX Inquisition*, THE CHRONICLE OF HIGHER EDUCATION, May 29, 2015, http://laurakipnis.com/wp-content/uploads/2010/08/My-Title-IX-Inquisition-The-Chronicle-Review-.pdf.

Free speech was routinely suppressed or punished from 2011 to 2017 under Title IX. Through sub-regulatory guidance and administrative enforcement OCR created an expansive definition of sexual harassment that included "verbal conduct" (i.e., speech) such as "making sexual comments, jokes or gestures," "spreading sexual rumors," and "creating e-mails or Web sites of a sexual nature."[8] The environment became so precarious that Harvard Law School professor Jeannie Suk Gersen wrote in 2014 that law school faculty were increasingly reluctant to teach rape law for fear of offending or upsetting their students.[9] When the University of Montana sensibly incorporated the *Davis* standard into its sexual harassment policy, OCR objected.[10] OCR insisted in 2013 that the university establish policies to "encourage students to report sexual harassment early, before such conduct becomes severe or pervasive, so that it can take steps to prevent the harassment from creating a hostile environment."[11] The broad definition of sexual harassment was a so-called "national blueprint" for schools[12] and led OCR to regulate conduct that was not covered under Title IX.[13] Two scholars wrote that OCR's guidance required schools to regulate student conduct "that is not creating a hostile environment and therefore is not sexual harassment and therefore not sex discrimination."[14]

The Department itself recognized this in 2020. *See, e.g.*, 85 Fed Reg. at 20036 ("The 'Sexual Harassment' subsection of the 'Section 106.30 Definitions' section of this preamble discusses in greater detail how the *Davis* definition of sexual harassment as 'severe, pervasive, and objectively offensive' comports with First Amendment protections, and the way in which a broader definition, such as severe, persistent, or pervasive (as used in the 1997 Guidance and 2001 Guidance), has led

---

[8] *Id.*

[9] THE NEW YORKER, Dec. 15, 2014, http://www.newyorker.com/news/news-desk/trouble-teaching-rape-law.; *see also* Jacob Gersen and Jeannie Suk, The Sex Bureaucracy, The Chronicle of Higher Educ. (Jan. 6, 2017) (https:// www.chronicle.com/article/The-College-Sex-Bureaucracy/238805) (OCR's "broad definition" of sexual harassment has "grown to include most voluntary and willing sexual contact").

[10] U.S. Dep't. of Education, Office for Civil Rights, Letter of Findings to University of Montana, May 8, 2013, https://www2.ed.gov/documents/press-releases/montana-missoula-letter.pdf.

[11] BROOKINGS INSTITUTION, Jan. 24, 2019, https://www.brookings.edu/blog/brown-center-chalkboard/2019/01/24/the-department-of-educations-proposed-sexual-harassment-rules-looking-beyond-the-rhetoric/.

[12] FOUNDATION FOR INDIVIDUAL RIGHTS IN EDUCATION, Departments of Education and Justice: National "Blueprint" for Unconstitutional Speech Codes, https://www.thefire.org/cases/departments-of-education-and-justice-national-requirement-for-unconstitutional-speech-codes/.

[13] *See, e.g.*, Jacob Gersen and Jeannie Suk, *The Sex Bureaucracy*, 104 CALIF. L. REV. 881, 902–03 (2016) (Asserting that the Obama OCR's guidance required schools to regulate student conduct "that [was] not creating a hostile environment and therefore is not sexual harassment and therefore not sex discrimination" and concluding that OCR's guidance overstep[ped] OCR's jurisdictional authority).

[14] *E.g.*, Jacob Gersen and Jeannie Suk, The Sex Bureaucracy, 104 CALIF. L. REV. 881, 902–03 (2016).

18

**App. 067**

to infringement of rights of free speech and academic freedom of students and faculty.").

The Department's failure to recognize these incontrovertible facts renders its explanation insufficient, arbitrary, and capricious.

### III. THE PROPOSED RULE REMOVES KEY DUE PROCESS PROTECTIONS FROM THE CURRENT REGULATIONS.

Due process is a fundamental constitutional principle in American jurisprudence. Due process is a legal principle which has been shaped and developed through the process of applying and interpreting a written constitution. "Fair process" or "procedural justice" increases outcome legitimacy. Indeed, "[r]esearch demonstrates that people's views about their outcomes are shaped not solely by how fair or favorable an outcome appears to be but also by the fairness of the process through which the decision was reached. A fair process provided by a third party leads to higher perceptions of legitimacy; in turn, legitimacy leads to increased compliance with the law."[15]

As a result, due process protections are a critical part of a Title IX. Fair grievance procedures benefit both complainants and respondents, as well as recipients. Both parties benefit from equal opportunities to participate by setting forth their own views of the allegations. Everyone benefits from processes geared toward reaching factually accurate outcomes. The grievance process prescribed in the current regulations provides a fair process rooted in due process protections that improves the accuracy and legitimacy of the outcome for the benefit of both parties.

---

[15] Rebecca Holland-Blumoff, *Fairness Beyond the Adversary System: Procedural Justice Norms for Legal Negotiation*, 85 FORDHAM L. REV. 2081, 2084 (2017) (internal citations omitted).

Any Title IX grievance procedure mandated by the Department must comport with due process guarantees[16] as well as fundamental fairness.[17]

### A. The Proposed Rule removes or modifies important due process safeguards in the Title IX grievance process.

#### 1. The Proposed Rule violates due process because it removes the provisions in 34 CFR § 106.45 requiring evidence to be provided to both parties.

The Department should withdraw its proposal to modify the provisions of 34 CFR § 106.45 relating to the opportunities of parties to inspect and review evidence during the grievance process.  The current regulations require the recipient to:

> Provide both parties an equal opportunity to inspect and review any evidence obtained as part of the investigation that is directly related to the allegations raised in a formal complaint, including the evidence upon which the recipient does not intend to rely in reaching a determination regarding responsibility and inculpatory or exculpatory evidence whether obtained from a party or other source, so that each party can meaningfully respond to the evidence prior to conclusion of the investigation.

34 CFR § 106.45.

---

[16] *See Goss v. Lopez*, 419 U.S. 565, 583–84 (1975) ("On the other hand, requiring effective notice and informal hearing permitting the student to give his [or her] version of the events will provide a meaningful hedge against erroneous action. At least the disciplinarian will be alerted to the existence of disputes about facts and arguments about cause and effect. He may then determine himself to summon the accuser, permit cross-examination, and allow the student to present his own witnesses. In more difficult cases, he may permit counsel. In any event, his discretion will be more informed and we think the risk of error substantially reduced."); Nicola A. Boothe-Perry, *Enforcement of Law Schools' Non-Academic Honor Codes: A Necessary Step Towards Professionalism?*, 89 NEB. L. REV. 634, 662–63 (2012) ("Thus, while well-settled that there is no specific procedure required for due process in school disciplinary proceedings, the cases establish the bare minimum requirements of: (1) adequate notice of the charges;  (2) reasonable opportunity to prepare for and meet them; (3) an orderly hearing adapted to the nature of the case; and (4) a fair and impartial decision .... Where disciplinary measures are imposed pursuant to non-academic reasons (e.g., fraudulent conduct), as opposed to purely academic reasons, the courts are inclined to reverse decisions made by the institutions without these minimal procedural safeguards.") (internal citations omitted).

[17] *E.g.*, Kathryn M. Reardon, *Acquaintance Rape at Private Colleges and Universities: Providing for Victims' Educational and Civil Rights*, 38 SUFFOLK UNIV. L. REV. 395, 406–07 (2005) ("Courts around the nation have taken a relatively consistent stance on what type of process private colleges and universities owe to their students .... Courts expect that schools will adhere to basic concepts of fairness in dealing with students in disciplinary matters. Schools must employ the procedures set out in their own policies, and those policies must not be offensive to fundamental notions of fairness.").

**App. 069**

The Department proposes allowing parties to be given, instead, an "oral description" of the evidence: "(4) Provide each party with a description of the evidence that is relevant to the allegations of sex discrimination and not otherwise impermissible, as well as a reasonable opportunity to respond." 87 Fed. Reg. at 41481. To maintain a transparent process, however, the parties need a complete understanding of the evidence obtained by the recipient and how a determination regarding responsibility is made. A written description places parties—particularly respondents—at a severe disadvantage, forcing them to trust that a school has provided a complete and accurate description of every piece of relevant evidence. We know from experience that the single-investigator model has a tremendous potential for abuse. *See* Part III(B), *infra*.

Additionally, this puts educational institutions in the position to pre-judge important issues such as relevance. It would, thus, permit these institutions to make a determination regarding relevance and then withhold evidence on that basis.

The Department should withdraw the proposal.

## 2. The Department should require schools to maintain a consistent evidentiary standard in 34 CFR 106.45.

The current regulations provide:

> Schools must use either "the preponderance of the evidence standard or the clear and convincing evidence standard, [and] apply the same standard of evidence for formal complaints against students as for formal complaints against employees, including faculty, and apply the same standard of evidence to all formal complaints of sexual harassment."

34 CFR § 106.45. The Proposed Rule tweaks the current evidentiary rule in 34 C.F.R. § 106.45: "Schools must "[u]se the preponderance of the evidence standard of proof to determine whether sex discrimination occurred, unless the recipient uses the clear and convincing evidence standard of proof in all other comparable proceedings, including proceedings relating to other discrimination complaints, in which case the recipient may elect to use that standard of proof in determining whether sex discrimination occurred." 87 Fed. Reg. at 41576.

First, this creates an internal contradiction. One reason the NPRM gives for this provision is that "a singular imposition of a higher standard for sex discrimination complaints would impermissibly discriminate on the basis of sex." 87 Fed. Reg. at 41486. But the Proposed Rule permits using a lower standard for sex discrimination than for other complaints, including racial discrimination complaints.

**App. 070**

So by the Rule's own logic, schools may discriminate on the basis of race by imposing a lower standard for racial than for sex discrimination.  That makes no sense.

And, the Department fails to offer a justification for mandating that sex discrimination complaints be addressed under no higher standard than other complaints but—at the same time—refusing to mandate that they also be addressed under no lower a standard.

The Department should maintain the current evidentiary standard requirements set forth in 34 CFR 106.45.  If it, however, does wish to change the current standard, it should not deviate further from the Proposed Rule.  It's important that (1) recipients not use an evidentiary standard below the preponderance of the evidence; (2) a recipient's grievance process state up front which of the two permissible standards of evidence the recipient has selected and (3) apply that selected standard to all formal complaints of sexual harassment, including those against employees.

### 3.   The Proposed Rule modifies 34 CFR § 106.45 to bring back the biased and unfair single-investigator model

The current regulations flatly prohibit the single investigator model.  *See* 34 CFR § 106.45 ("The role of Title IX Coordinator and the role of the Title IX investigator must be distinct from the role of Title IX adjudicator.").  This is because fundamental fairness to both parties requires that the intake of a report and formal complaint, the investigation (including party and witness interviews and collection of documentary and other evidence), drafting of an investigative report, and ultimate decision about responsibility should not be left in the hands of a single person (or team of persons each of whom performed all those roles).  Rather, after the recipient has conducted its impartial investigation, a separate decision-maker must reach the determination regarding responsibility; that determination can be made by one or more decision-makers (such as a panel), but no decision-maker can be the same person who served as the Title IX Coordinator or investigator.

The Proposed Rule eliminates this prohibition and expressly permits the decision-maker to be the same person as the Title IX coordinator.  Integrating the investigative and decision-making functions will (1) substantially impair the overall fairness of the grievance process; (2) decrease the reliability of fact-finding and the accuracy of outcomes; (3) lower party and public confidence in outcomes; and (4) decrease the accuracy of the determination regarding responsibility in Title IX cases because individuals who perform both roles may have confirmation bias and other prejudices that taint the proceedings, whereas separating those functions helps prevent bias and prejudice from impacting the outcome.

**App. 071**

Prior to the current regulations, Both OCR and the White House pressured schools to employ the single investigator model.[18]    Schools housed these investigators/adjudicators in their Title IX offices, which had strong incentives to ensure the school stayed compliant with the DCLs to avoid losing federal funding. Many Title IX offices assumed every role in the process, acting as prosecutor, judge, jury, and appeals board

The biases of individuals in the single-investigator role had disastrous consequences. *See, e.g.*, Laura Kipnis, UNWANTED ADVANCES 33 (2017) ("The reality is that a set of incomprehensible directives, issued by a branch of the federal government, are being wielded in wildly idiosyncratic ways, according to the whims and biases of individual Title IX officers operating with no public scrutiny or accountability. Some of them are also all too willing to tread on academic and creative freedom as they see fit"). Even proponents of a strong role for Title IX coordinators acknowledged that corruption existed in the process.[19]

Indeed, courts have called the fairness of this model into question over the last few years. *See, e.g.*, *Doe v. Claremont McKenna Coll.*, 25 Cal. App. 5th 1055, 1072–73 (Cal. App. 2018) (all decision makers "must make credibility determinations, and not simply approve the credibility determinations of the one Committee member who was also the investigator."); *Doe v. Miami Univ.*, 882 F.3d 579, 601, 605 (6th Cir. 2018) (court found "legitimate concerns" raised by the investigator's "alleged dominance on the three-person [decision-making] panel" because "she was the only one of the three with conflicting roles."); *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 573 (D. Mass. 2016) (referring to the "obvious" "dangers of combining in a single individual the power to investigate, prosecute, and convict, with little effective power of review"); *Doe v. Allee*, 30 Cal. App. 5th 1036, 1068 (Cal. App. 2019) ("As we have explained, in USC's system, no in-person hearing is ever held, nor is one required. Instead, the Title IX investigator interviews witnesses, gathers other evidence, and prepares a

---

[18] *See Doe v. Univ. of Scis.*, 961 F.3d 203, 213 (3d Cir. 2020) (describing the pressure universities faced as a result of the Dear Colleague Letter). In the "single investigator" model, there is no hearing. One person conducts interviews with each party and witness, and then makes the determination whether the accused is responsible. No one knows what the investigator hears or sees in the interviews except the people in the room at the time. This makes the investigator all-powerful. Neither accuser nor accused can guess what additional evidence to offer, or what different interpretations of the evidence to propose because they are completely in the dark about what the investigator is learning and are helpless to fend off the investigator's structural and personal biases as they get cooked into the evidence-gathering.

[19] *See, e.g.*, Association of Title IX Administrators (ATIXA), *ATIXA Position Statement: Why Colleges Are in the Business of Addressing Sexual Violence* 3–4 (Feb. 17, 2017) (acknowledging that due process has been denied in some recipients' Title IX proceedings but insisting that "Title IX isn't the reason why due process is being compromised .... Due process is at risk because of the small pockets of administrative corruption ... and because of the inadequate level of training currently afforded to administrators. *College administrators need to know more about sufficient due process protections and how to provide these protections in practice*.") (emphasis added).

App. 072

written report in which the investigator acts as prosecutor and tribunal, making factual findings, deciding credibility, and imposing discipline. The notion that a single individual, acting in these overlapping and conflicting capacities, is capable of effectively implementing an accused student's right of cross-examination by posing prepared questions to witnesses in the course of the investigation ignores the fundamental nature of cross-examination: adversarial questioning at an in-person hearing at which a neutral fact finder can observe and assess the witness' credibility.").

The Proposed Rule pays lip service to the concerns of the 2020 rule in ensuring that a person's experience investigating a claim of harassment does not bias him or her in a subsequent role of determining whether harassment occurred. It somehow concludes, however, that unifying the investigatory and adjudicatory roles does not raise a substantial risk of bias because "the recipient is not in the role of prosecutor seeking to prove a violation of its policy," but rather "the recipient's role is to ensure that its education program is free of unlawful sex discrimination, a role that does not create an inherent bias or conflict of interest in favor of one party or another." 87 Fed. Reg. at 41467.

Perhaps most shockingly, the Department wrongly claims that a separate adjudicator would not help the reliability of the grievance process. 87 Fed. Reg. at 41466–41467. It cites no evidence in support of this claim. *Id.* This rationale is inadequate and fails to account for the real-world evidence that led to the 2020 Regulations.

A separate, neutral adjudicator is also necessary because of the Title IX incentive structure. The incentive structure pushes recipients toward findings of fault. That is, if there is discrimination that a recipient fails to redress, they could lose federal funding, so they are incentivized to stamp out as many Title IX violations as possible. On the other hand, however, if there is non-discriminatory conduct that schools redress, it often costs the recipient nothing. It's common sense, moreover, that an investigator may come to hold views that favor one party or another during an investigation. A neutral decisionmaker is one of the best ways to ensure a fair process.

The Department's proposed change would return to the flawed and highly unfair system that led to the enactment of the 2020 Regulations.

### 4. The Proposed Rule violates Due Process by removing written notice provisions in 34 C.F.R. 106.45(b)(2)(i)(B).

The current regulations require the recipient to provide written notice of a formal complaint to a respondent. In that written notice, a respondent must be

provided with (1) presumption of innocence statement; (2) right to advisor of choice; (3) penalty for false statements:

> The written notice must include a statement that the respondent is presumed not responsible for the alleged conduct and that a determination regarding responsibility is made at the conclusion of the grievance process. The written notice must inform the parties that they may have an advisor of their choice, who may be, but is not required to be, an attorney, under paragraph (b)(5)(iv) of this section, and may inspect and review evidence under paragraph (b)(5)(vi) of this section. The written notice must inform the parties of any provision in the recipient's code of conduct that prohibits knowingly making false statements or knowingly submitting false information during the grievance process.

34 CFR 106.45(b)(2)(i)(B). The Proposed Rule removes those three requirements from the written notice:

> (c) Notice of allegations. Upon initiation of the recipient's grievance procedures, a recipient must provide notice of the allegations to the parties whose identities are known. (1) The notice must include: (i) The recipient's grievance procedures under this section, and if applicable § 106.46, and any informal resolution process under § 106.44(k); (ii) Sufficient information available at the time to allow the parties to respond to the allegations. Sufficient information includes the identities of the parties involved in the incident, the conduct alleged to constitute sex discrimination under Title IX, and the date and location of the alleged incident, to the extent that information is available to the recipient; and (iii) A statement that retaliation is prohibited.

87 Fed. Reg. at 41575. The Department has failed to provide any justification for why it removed the requirements that recipients inform accused students about the presumption of innocence, the right to counsel, or the penalties for false statements.

### 5. The Proposed Rule removes the due process protection of mandating live hearings for postsecondary settings.

The Title IX regulations currently require a live hearing at the postsecondary level. 34 CFR § 106.45(b)(6)(i) ("For postsecondary institutions, the recipient's grievance process must provide for a live hearing."). The Proposed Rule removes that requirement. 87 Fed. Reg. at 41462, 41497, 41498. "A postsecondary institution's sex-based harassment grievance procedures may, but need not, provide for a live hearing."

**App. 074**

Relatedly, under the current regulations the parties must be allowed at live hearings to ask questions directly through their advisors:

> At the live hearing, the decision-maker(s) must permit each party's advisor to ask the other party and any witnesses all relevant questions and follow-up questions, including those challenging credibility. Such cross-examination at the live hearing must be conducted directly, orally, and in real time by the party's advisor of choice and never by a party personally, notwithstanding the discretion of the recipient under paragraph (b)(5)(iv) of this section to otherwise restrict the extent to which advisors may participate in the proceedings.

34 C.F.R. § 106.45(b)(6)(i).

At the postsecondary level, live hearings are key to seeking truth and determining responsibility. Because most parties and witnesses are adults there, grievance procedures' live cross-examination at a hearing is both appropriate and worthwhile. The current regulations require institutions to provide a live hearing, and to allow the parties' advisors to cross-examine the other party and witnesses.

The current regulations balance the importance of cross-examination with any potential harm from personal confrontation between the complainant and the respondent by requiring questions to be asked by an advisor aligned with the party. Further, they allow either party to request that the recipient facilitate the parties being located in separate rooms during cross-examination while observing the questioning live via technological means. The current regulations thereby provide the benefits of cross-examination while avoiding any unnecessary trauma that could arise from personal confrontation between the complainant and the respondent.[20]

The Proposed Rule obviously doesn't require a live hearing. But it also now appears to only require schools to let parties submit written questions to each other on the limited topic of "credibility":

> This assessment of credibility includes either (i) Allowing the decisionmaker to ask the parties and witnesses, during individual

---

[20] *Cf. Baum*, 903 F.3d at 583 ("Universities have a legitimate interest in avoiding procedures that may subject an alleged victim to further harm or harassment. And in sexual misconduct cases, allowing the accused to cross-examine the accuser may do just that. But in circumstances like these, the answer is not to deny cross-examination altogether. Instead, the university could allow the accused student's agent to conduct cross-examination on his behalf. After all, an individual aligned with the accused student can accomplish the benefits of cross-examination— its adversarial nature and the opportunity for follow-up—without subjecting the accuser to the emotional trauma of directly confronting her alleged attacker.").

**App. 075**

meetings with the parties or at a live hearing, relevant and not otherwise impermissible questions under §§ 106.2 and 106.45(b)(7) and follow-up questions, including questions challenging credibility, before determining whether sex-based harassment occurred and allowing each party to propose to the decisionmaker or investigator relevant and not otherwise impermissible questions under §§ 106.2 and 106.45(b)(7) and follow-up questions, including questions challenging credibility, that the party wants asked of any party or witness and have those questions asked during individual meetings with the parties …

87 Fed. Reg. at 41577–41578.  The wording of this provision is vague, but it appears that recipients can exclude questions between parties as long as credibility isn't in dispute.  **We request further clarification as to when a recipient may exclude questions between the parties.**  If the Department does not provide clarification, the Proposed Rule is arbitrary and capricious.

Finally, at the postsecondary level, the Proposed Rule imagines that college students will mostly "self-advocate" in harassment proceedings. Although students would be entitled to an advisor, postsecondary institutions would not have to permit parents to be involved in the process.  The Department has failed to give any meaningful reason for excluding parents from these proceedings.  Students in higher education would undoubtedly benefit from a parent's counsel and the Proposed Rule fails to provide a single reason for excluding parents from the process.

### 6. The Proposed Rule's "Supportive Measures" provision is internally inconsistent.

The proposed rule allows "supportive measures" that temporarily burden a respondent only during the pendency of the proceedings. 87 Fed. Reg. at 41421.  This provision is internally contradictory because, elsewhere in the NPRM, it emphasizes the need for equitable treatment in the Title IX process between complainants and respondents.  *Id.* at 41453.  Here, however, both are not subject to the same rules and the Department has not acknowledged or explained that departure.  This is also irrational because there's no basis for distinguishing between complainants and respondents on the basis of their conduct.   Since respondents are afforded the presumption of innocence by the NPRM, *id.* at 41488, 41508, this makes no sense.

This provision is also flawed because there are no limits to how burdensome the supportive measures may be. In theory, a respondent could be suspended from all classes and dismissed from campus on the basis of an unproven allegation. A school wouldn't even need to find that the complainant is likely to prevail on his or her claim of discrimination to impose that *de facto* sanction.

**App. 076**

**B. The totality of the Proposed Rule returns to the problematic paradigm from the 2011–17 era and fails to adequately consider the mountain of evidence that strong due process protections are necessary for Title IX grievances procedures.**

The current regulations in 34 CFR § 106.45 (and elsewhere) set forth clear legal obligations that require schools to promptly respond to allegations of sexual harassment, follow a fair grievance process to resolve those allegations, and provide remedies to victims. It guarantees victims and accused students strong, clear procedural rights in a predictable, transparent process designed to reach reliable outcomes.[21] When taken as a whole, the current regulations were enacted following regulatory and constitutional mess from 2011 to 2017. The proposed rule would re-institute many of those flawed policies.

OCR's 2011 *Dear Colleague Letter: Sexual Violence* ("2011 DCL") wreaked havoc on campuses across the country (The 2011 DCL was expanded upon by a 2014 *Questions and Answers on Title IX and Sexual Violence*). It was a Kafkaesque disciplinary disaster that resulted in hundreds of successful lawsuits against schools and widespread criticism from across the ideological spectrum. The 2011 DCL compelled schools to adopt the lowest standard of proof for proving sexual harassment and sexual assault claims—preponderance of the evidence—and pressured schools to find accused students responsible for sexual misconduct even where there was significant doubt about culpability.[22]

A laundry list of due process violations—reminiscent of Star Chamber—stacked the deck against accused students: schools failed to give students the complaint against them, or notice of the factual basis of charges, the evidence gathered, or the identities of witnesses; schools fail to provide hearings or to allow

---

[21] *See, e.g.*, U.S. Dep't of Educ. YouTube Channel, *OCR Webinar on Due Process Protections under the New Title IX Regulations* (July 21, 2020), https://youtu.be/48UwobtiKDI; U.S. Dep't of Educ. YouTube Channel, *OCR Title IX Webinar: Bias and Conflicts of Interest* (Jan 15, 2021), https://www.youtube.com/watch?v=vHppcOdrzCg.

[22] OCR found numerous institutions in violation of Title IX for failing to adopt the preponderance of the evidence standard in its investigations of sexual harassment, even though the notion that the preponderance of the evidence standard is the only standard that might be applied under Title IX was set forth in the 2011 Dear Colleague Letter and not in the Title IX statute, current regulations, or other guidance. *E.g.*, U.S. Dep't. of Education, Office for Civil Rights, Letter of Findings to Harvard Law School 7, Dec. 10, 2014, https://www2.ed.gov/documents/press-releases/harvard-law-letter.pdf ("[I]n order for a recipient's grievance procedures to be consistent with the Title IX evidentiary standard, the recipient must use a preponderance of the evidence standard for investigating allegations of sexual harassment, including sexual assault/violence."); *see also* Blair A. Baker, *When Campus Sexual Misconduct Policies Violate Due Process Rights*, 26 CORNELL J. L. & PUB. POL'Y 533, 542 (2016) (The 2011 DCL "forced universities to change their former policies drastically, with regards to their specific procedures as well as the standard of proof, out of fear that the Department of Education will pursue their school for a violation of Title IX.").

the accused student's lawyer to attend or speak at hearings; schools barred the accused from putting questions to the accuser or witnesses, even through intermediaries; schools denied parties the right to see the investigative report or get copies for their lawyers for preparing an appeal; schools allowed appeals only on very narrow grounds such as new evidence or procedural error, providing no meaningful check on the initial decisionmaker.  A study by the Foundation for Individual Rights in Education found that 73% of the top universities in America did not guarantee the presumption of innocence in campus proceedings.[23]

By 2014, OCR had stopped using the terms complainant/alleged victim and alleged perpetrator and replaced them with victim/survivor and perpetrator.  OCR then began keeping a public list of the schools at which it was investigating possible Title IX violations, putting schools under a cloud of suspicion.

This resulted in a Title IX system that quite literally resembled Kafka's *The Trial*.[24]  Here are just a few examples of the infamous system created during the 2011–17 paradigm:

- An athlete of color at Colorado State University-Pueblo was accused of sexually assaulting a female trainer, but not by her. Despite the trainer saying that she had not been raped, University officials pointed out that according to Title IX, they got to decide the accused student's fate and the student was found guilty and expelled.[25]

- At USC, a student-athlete was kicked out of school for abusing his girlfriend—despite the fact his girlfriend never reported any abuse and vehemently denied any abuse ever took place—after a neighbor saw the couple playfully roughhousing in the front yard.[26]

- A Howard University law professor was punished, following a 16-month investigation, because an exam question he wrote involving a bikini wax was deemed to have created an unsafe environment after a student "allegedly

---

[23] FOUNDATION FOR INDIVIDUAL RIGHTS IN EDUCATION, Dec. 18, 2018, https://www.thefire.org/report-as-changes-to-title-ix-enforcement-loom-americas-top-universities-overwhelmingly-fail-to-guarantee-fair-hearings-for-students/.

[24] *See, e.g.*, COMMENTARY MAGAZINE, June 2017, https://www.commentarymagazine.com/articles/kc-johnson/kafka-u/.

[25] REASON, Apr. 19, 2016, https://reason.com/2016/04/19/female-student-said-im-fine-and-i-wasnt/.

[26] REASON, Aug. 2, 2017, https://reason.com/2017/08/02/student-athletes-torn-apart-by-title-ix/.

**App. 078**

believed the question's premise somehow required her to reveal to the class whether she'd had a Brazilian wax."[27]

- A judge rebuked Brandeis University for denying fundamental due process rights to a student who was found guilty of sexual misconduct for a variety of non-violent offenses: most notably, because he had awakened his then-boyfriend with nonconsensual kisses.[28]

- Northwestern University Professor Laura Kipnis (herself a liberal feminist) faced a Title IX complaint and investigation simply for writing an essay about sex on campus and criticizing sexual harassment policies (the complaint alleged she created a "chilling environment" for reporting sexual harassment or assaults).[29]

- Carleton College suspended a student for drunken sex and then expelled the student as soon as he appealed the suspension, with the Dean writing to him that "the fact you continue to assert that it was okay to engage in sexual activity with a person in [Jane Doe's] condition is deeply troubling."[30]

- A University of Tennessee student was investigated for sexual harassment because he wrote his instructor's name wrong.[31]

- Resident Advisors at University of Massachusetts-Amherst told students that making jokes about Harambe, the dead gorilla and internet meme, could constitute a violation of Title IX.[32]

---

[27] FOUNDATION FOR INDIVIDUAL RIGHTS IN EDUCATION, July 6, 2017, https://www.thefire.org/a-sticky-situation-at-howard-university-brazilian-wax-test-question-nets-professor-a-504-day-title-ix-investigation-sanctions/.

[28] REASON, Apr. 1, 2016, https://reason.com/2016/04/01/judge-sides-with-gay-brandeis-student-gu/; https://www.washingtonexaminer.com/federal-judge-rebukes-lack-of-due-process-in-campus-sex-assault-procedures.

[29] THE CHRONICLE OF HIGHER EDUCATION, May 29, 2015, http://laurakipnis.com/wp-content/uploads/2010/08/My-Title-IX-Inquisition-The-Chronicle-Review-.pdf.

[30] REASON, Aug. 1, 2019, https://reason.com/2019/08/01/carleton-college-title-ix-expelled-football-student-lawsuit/.

[31] REASON, Oct. 12, 2016, https://reason.com/2016/10/12/ut-student-now-being-investigated-for-se/.

[32] REASON, Sept. 6, 2016, https://reason.com/2016/09/06/umass-amherst-harambe-jokes-are-racist-m/.

App. 079

One of the more tragic ironies is that the 2011 DCL resulted in a disproportionate number of expulsions and scholarship losses for Black male students.[33]

The criticisms of the 2011–17 system spanned the ideological spectrum. Here are just a few examples:

- Four feminist law professors at Harvard wrote that the Biden/Lhamon Title IX system "put pressure on [schools] to stack the system so as to favor alleged victims over those they accuse and that "procedures for enforcing [definitions of sexual harassment] are frequently so unfair as to be truly shocking."[34]

- More than two dozen other Harvard Law School professors wrote a letter in 2014 objecting to the school's Title IX process as unfair.[35]

- A group of 16 law professors from the University of Pennsylvania argued "we believe that OCR's approach exerts improper pressure upon universities to adopt procedures that do not afford fundamental fairness."[36]

- Janet Halley, a self-described feminist and professor at Harvard Law School told Congress that "the rate of complaints and sanctions against male (including transitioning to male) students of color is unreasonably high."[37]

---

[33] REALCLEAREDUCATION, Jan. 21, 2019, https://www.realcleareducation.com/articles/2019/01/21/black_men_title_nine_and_the_disparate_impact_of_discipline_policies_110308.html.

[34] Elizabeth Bartholet et al., *Fairness For All Students Under Title IX*, Aug. 21, 2017, https://dash.harvard.edu/bitstream/handle/1/33789434/Fairness%20for%20All%20Students.pdf?sequence=1&isAllowed=y.

[35] BOSTON GLOBE, Oct. 14, 2014, https://www.bostonglobe.com/opinion/2014/10/14/rethink-harvard-sexual-harassment-policy/HFDDiZN7nU2UwuUuWMnqbM/story.html ("Harvard has adopted procedures for deciding cases of alleged sexual misconduct which lack the most basic elements of fairness and due process").

[36] Open Letter from Members of the Penn Law School Faculty, *Sexual Assault Complaints: Protecting Complainants and the Accused Students at Universities*, WALL ST. J., Feb. 18, 2015, http://online.wsj.com/public/resources/documents/ 2015_0218_upenn.pdf (statement of 16 members of the University of Pennsylvania Law School faculty).

[37] THE COLLEGE FIX, Aug. 4, 2015, https://www.thecollegefix.com/shut-out-of-sexual-assault-hearing-critics-of-pro-accuser-legislation-flood-senate-committee-with-testimony/ ; Additionally, Harvard Law Professor Jeannie Suk Gersen wrote in The New Yorker in 2015 that the administrators and faculty members she'd spoken with who "routinely work on sexual-misconduct cases" said that "most of the complaints they see are against minorities." The New Yorker, Dec. 11, 2015, https://www.newyorker.com/news/news-desk/argument-sexual-assault-race-harvard-law-school.

**App. 080**

- The past President of the American Civil Liberties Union remarked in 2015 that "OCR's distorted concept of sexual harassment actually does more harm than good to gender justice, not to mention to free speech."[38]

- The American College of Trial Lawyers issued a report concluding that OCR had imperiled due process and free speech.[39]

The due-process deficiencies in the 2011 DCL and 2014 Q&A led to over 600 lawsuits by accused students against their academic institutions.[40] These lawsuits, more often than not,[41] resulted in victories for accused students across the country in state and federal court, including key wins at the appellate level. *See, e.g., Doe v. Oberlin Coll.,* 963 F.3d 580, 581 (6th Cir. 2020); *Doe v. Univ. of the Scis.*, 961 F.3d 203, 205 (3d Cir. 2020); *Doe v. Purdue Univ.*, 928 F.3d 652, 656 (7th Cir. 2019); *Haidak v. Univ. of Mass.-Amherst*, 933 F.3d 56, 60 (1st Cir. 2019); *Doe v. Miami Univ.*, 882 F.3d 579 (6th Cir. 2018); *Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018); *Doe v. Univ. of Cincinnati*, 872 F.3d 393 (6th Cir. 2017); *Doe v. Claremont McKenna Coll.*, 25 Cal. App. 5th 1055, 1070 (2018); *Doe v. Regents of Univ. of Cal.*, 28 Cal. App. 5th 44, 61 (2018).

The Department has proposed returning—in large part—to the problematic Title IX grievance system from the 2011–17 era. It has utterly failed to reconcile these past failures of OCR policy with its Proposed Rule.

---

[38] Shorenstein Center, *Nadine Strossen: "Free Expression: An Endangered Species on Campus?" Transcript*, https://shorensteincenter.org/nadine-strossen-free-expression-an-endangered-species-on-campus-transcript/.

[39] American College of Trial Lawyers, *Task Force on the Response of Universities and Colleges to Allegations of Sexual Violence, White Paper on Campus Sexual Assault Investigations*, 2017, https://www.actl.com/docs/defaultsource/defaultdocumentlibrary/positionstatementsandwhitepapers/task_force_allegations_of_sexual_violence_white_paper__final.pdf.

[40] *See Milestone: 600+ Title IX/Due Process Lawsuits in Behalf of Accused Students*, TITLE IX FOR ALL, Apr. 1, 2020, https://www.titleixforall.com/milestone-600-title-ix-due-process-lawsuits-in-behalf-of-accused-students; *see also* Diane Heckman, *The Assembly Line of Title IX Mishandling Cases Concerning Sexual Violence on College Campuses*, 336 WEST'S EDUC. L. REP. 619, 631 (2016) (stating that since 2014 "there has been an influx of lawsuits contending post-secondary schools have violated Title IX due to their failure to properly handle sexual assault claims. What is unusual is that both sexes are bringing such Title IX mishandling cases due to lack of or failure to follow proper process and due process from each party's perspective. A staggering number of cases involve incidents of alcohol or drug usage or intoxication triggering the issue of the negating a voluntary consent between the participants.") (internal citations omitted).

[41] *See* Samantha Harris & KC Johnson, *Campus Courts in Court: The Rise in Judicial Involvement in Campus Sexual Misconduct Adjudications*, 22 N.Y.U. J. LEGIS. & PUB. POL'Y 49 (2019).

## IV.   ASSISTANT SECRERTARY LHAMON MUST RECUSE FROM THE RULEMAKING PROCESS

Assistant Secretary Lhamon must recuse herself from the rulemaking process. The 2020 Rule was enacted in response to a constitutional and regulatory mess created by OCR from 2011 to 2016.  As Assistant Secretary for Civil Rights from 2013 to 2017, Assistant Secretary Lhamon played a crucial role in creating this problem. OCR's infamous 2011 Dear Colleague Letter: Sexual Violence ("2011 DCL") and 2014 Questions and Answers on Title IX and Sexual Violence ("2014 Q&A") wreaked havoc on campuses across the country.  OCR compelled schools to adopt the lowest standard of proof for proving sexual harassment and sexual assault claims—preponderance of the evidence—and pressured schools to find accused students responsible for sexual misconduct even where there was significant doubt about culpability.

At OCR, Assistant Secretary Lhamon pressured schools to employ the single investigator model that gives one person appointed by the school's Title IX coordinator authority both to investigate alleged misconduct and to determine guilt and innocence.  OCR didn't merely put its thumb on the scale of justice under her leadership, it became a biased institution.  Investigations were not an inquiry into discrete complaints, but instead fishing expeditions into every aspect of schools' adjudication process and campus life.  By 2016, "the average investigation had been open for 963 days, up from an average in 2010 of 289 days."  Former and current OCR investigators told the media "the perceived message from Washington was that once an investigation into a school was opened, the investigators in the field offices were not meant to be objective fact finders. Their job was to find schools in violation of Title IX."

Given her past statements and record, there's no possible way OCR or the Department can conduct the rulemaking process in accordance with the Administrative Procedure Act's requirements for reasoned decision-making.  When the 2020 Rule was released, Assistant Secretary Lhamon claimed that it was "taking us back to the bad old days, when it was permissible to rape and sexually harass students with impunity."  During her subsequent Senate Confirmation hearing, she confirmed that this was still her view.  With her mind already made up regarding the 2020 Rule—and her attachment to the defective regime it replaced—her involvement would taint the rulemaking process with bias. *See, e.g.*, *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) (a strong showing of bad faith may require the administrative officials who participated in a decision to give testimony explaining their action); *United States v. Oregon*, 44 F.3d 758, 772 (9th Cir. 1994) (decisionmaker cannot possess "an unacceptable probability of actual bias"). Further, any future rationale for changing the 2020 Rule that's offered by the Department would be invalid because her statements prove the Department's outcome is pre-ordained. *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2573

(2019) (uncontested that decision resting on "pretextual basis" "warrant[s] a remand to the agency").

We brought this conflict of interest to the Department's attention via letter on April 5, 2022 (Attachment A), and then again on June 23, 2022 (Attachment B).  The Proposed Rule, however, doesn't discuss these concerns.  If the Department doesn't provide an adequate explanation regarding Assistant Secretary Lhamon's involvement, the rulemaking process is tainted and the Final Rule is arbitrary and capricious.

## V. THE DEPARTMENT MUST CLARIFY THAT TAX-EXEMPT STATUS ALONE DOES NOT CONSTITUTE "FEDERAL FINANCIAL ASSISTANCE."

Title IX applies only to entities that are recipients of federal financial assistance.  20 U.S.C. § 1681(a).  The current Title IX regulations define the term federal financial assistance:

Federal financial assistance means any of the following, when authorized or extended under a law administered by the Department:

(1) A grant or loan of Federal financial assistance, including funds made available for:

(i) The acquisition, construction, renovation, restoration, or repair of a building or facility of any portion thereof; and

(ii) Scholarships, loans, grants, wages or other funds extended to any entity for payment to or on behalf of students admitted to that entity, or extended directly to such students for payment to that entity.

(2) A grant of Federal real or personal property or any interest therein, including surplus property, and the proceeds of the sale or transfer of such property, if the Federal share of the fair market value of the property is not, upon such sale or transfer, properly accounted for to the Federal Government.

(3) Provision of the services of Federal personnel.

(4) Sale or lease of Federal property or any interest therein at nominal consideration, or at consideration reduced for the purpose of assisting the recipient or in recognition of public interest to be served thereby, or permission to use Federal property or any interest therein without consideration.

34

**App. 083**

(5) Any other contract, agreement, or arrangement which has as one of its purposes the provision of assistance to any education program or activity, except a contract of insurance or guaranty.

34 C.F.R. § 106.2(g).

Two federal district courts have now determined that an entity's tax-exempt status under Section 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3), constitutes federal financial assistance. *See E.H. v. Valley Christian Acad.*, 2022 U.S. Dist. LEXIS 132893, at *17 (C.D. Cal. July 25, 2022); *Buettner-Hartsoe v. Balt. Lutheran High Sch. Ass'n*, 2022 U.S. Dist. LEXIS 130429, at *15 (D. Md. July 21, 2022). Both decisions held that 501(c)(3) status made private high schools indirect recipients of federal financial assistance, therefore, subjected them to Title IX.

Prior to these decisions, 501(c)(3) had never been considered federal financial assistance. Income tax exemptions are "conspicuously absent from [the] laundry list" of examples in 34 C.F.R. § 106.2(g). *Johnny's Icehouse, Inc. v. Amateur Hockey Ass'n*, 134 F. Supp. 2d 965, 971 (N.D. Ill. 2001); see also *Zimmerman v. Poly Prep Country Day Sch.*, 888 F. Supp. 2d 317, 332 n.2 (E.D.N.Y. 2012) (citing, *e.g.*, *Stewart v. New York Univ.*, 430 F. Supp. 1305, 1314 (S.D.N.Y. 1976)).

The Department should clarify in 34 C.F.R. § 106.2(g) that 501(c)(3) status does not constitute federal financial assistance. Extending Title IX to schools because of 501(c)(3) status would be a drastic extension of Title IX. It would force every private school enjoying tax-exempt status to comply with Title IX.

## VI. THE DEPARTMENT MUST ASSESS THE IMPACT OF THE PROPOSED REGULATIONS ON FAMILIES AND PARENTAL RIGHTS PURSUANT TO 5 U.S.C § 601.

Section 654 of the Treasury and General Government Appropriations Act, 1999, Pub. L. 105-277, codified at 5 U.S.C § 601, provides:

Before implementing policies and regulations that may affect family well-being, each agency shall assess such actions with respect to whether … the action strengthens or erodes the authority and rights of parents in the education, nurture, and supervision of their children.

5 U.S.C § 601 (statutory notes). As discussed in Part I(D), the Proposed Rule infringes on parental rights because it treats failure to "affirm[] gender identity" the same as traditional forms of discrimination (*e.g.*, excluding girls from the debate team), a school wouldn't need to obtain parental consent before pushing "gender affirmation" of whatever self-declared identity a child announces in school; the school would never

35

have to disclose that affirmation program to the child's parents, and must—at any rate—pursue it even over parents' objections. The statute clearly provides that the Department must evaluate its proposed actions with respect to whether the "action strengthens or erodes the authority and rights of parents in the education, nurture, and supervision of their children." *Id.*

The Department must conduct the impact analysis as required by Pub. L. 105-277, codified at 5 U.S.C § 601, or the Proposed Rule is arbitrary, capricious, and not in accordance with law.

Sincerely,

AUSTIN KNUDSEN
ATTORNEY GENERAL OF MONTANA

STEVE MARSHALL
ATTORNEY GENERAL OF ALABAMA

LESLIE RUTLEDGE
ATTORNEY GENERAL OF ARKANSAS

CHRISTOPHER M. CARR
ATTORNEY GENERAL OF GEORGIA

THEODORE E. ROKITA
ATTORNEY GENERAL OF INDIANA

DEREK SCHMIDT
ATTORNEY GENERAL OF KANSAS

DANIEL CAMERON
ATTORNEY GENERAL OF KENTUCKY

JEFF LANDRY
ATTORNEY GENERAL OF LOUISIANA

LYNN FITCH
ATTORNEY GENERAL OF MISSISSIPPI

App. 085

DOUG PETERSON
ATTORNEY GENERAL OF NEBRASKA

JOHN M. O'CONNOR
ATTORNEY GENERAL OF OKLAHOMA

ALAN WILSON
ATTORNEY GENERAL OF SOUTH
CAROLINA

MARK VARGO
ATTORNEY GENERAL OF SOUTH DAKOTA

JONATHAN SKRMETTI
ATTORNEY GENERAL OF TENNESSEE

KEN PAXTON
ATTORNEY GENERAL OF TEXAS

SEAN D. REYES
ATTORNEY GENERAL OF UTAH

JASON MIYARES
ATTORNEY GENERAL OF VIRGINIA

37

**App. 086**



OFFICE OF THE ATTORNEY GENERAL
STATE OF INDIANA

302 W. WASHINGTON ST. IGCS 5TH FLOOR
INDIANAPOLIS, IN 46204-2770

**TODD ROKITA**
ATTORNEY GENERAL

September 12, 2022

Dr. Miguel Cardona
Secretary of Education
U.S. Department of Education
400 Maryland Avenue, SW
Washington, DC 20202

*Re: Title IX Notice of Proposed Rulemaking Docket ID ED-2021-OCR-0166*

Dear Secretary Cardona:

As you are aware, State Attorneys General play a critical role in preserving federalism and the constitutionally prescribed balance of power between the States and the federal government. The threat of federal overreach is particularly acute with statutes such as Title IX that regulate education, where, as Congress recognized when enacting the Department of Education Organization act, "parents have the primary responsibility for the education of their children, and States, localities, and private institutions have the primary responsibility for supporting that parental role." 20 U.S.C.A. § 3401(3) (Pub. L. 96–88, title I, § 101(3), Oct. 17, 1979, 93 Stat. 669). To that end, we have steadfastly fought to protect the rights of girls and women under Title IX against attacks from this Administration, including by obtaining an injunction against your efforts to weaken Title IX through administrative "guidance." *Tennessee et al. v. United States Dep't of Educ.*, No. 3:21-CV-308, 2022 WL 2791450, at *1 (E.D. Tenn. July 15, 2022).

Rather than protect the rights of girls and women, your Notice of Proposed Rulemaking (hereinafter, "Proposed Rule") redefining the term "sex" in Title IX from "biological sex" to mean "gender identity" harms the rights of women and girls. Your erroneous reliance on the Supreme Court's decision in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), destroys the progress made to protect the rights of girls and women under Title IX over the past fifty years. Worse, your misguided and illegal efforts seek to preempt protections afforded girls and women by individual States. Just as we are successfully fighting your gross violation and disregard of federalism and the law in courts, so too will we fight the overreach in your Proposed Rule.

The Proposed Rule is unlawful for many reasons, but this letter will address only three specific legal defects:

1

**App. 087**

1. The Proposed Rule's reliance on *Bostock v. Clayton County* is erroneous and contradicts the Department of Education's General Counsel's prior guidance on the subject.

2. The Proposed Rule's attempt to preempt State laws protecting the rights of girls and women lacks grounding in a clear statement of authority by Congress.

3. The Proposed Rule's restriction of the role of parents in directing their children's education violates parents' constitutional rights.

### 1. *Bostock* does not apply to Title IX.

In seeking to expand the definition of "discrimination on the basis of sex" from biological sex, which was the meaning intended by Congress when it passed Title IX in 1972, to include "discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity,"[1] the Proposed Rule ignores fifty years of precedent limiting the term to biological sex. Indeed, the Proposed Rule attempts to rewrite Title IX's fifty-year-old definition of "sex" to mean gender identity, a 180-degree change from the position taken by the Department on the exact same issue one year earlier.

The Proposed Rule cites *Bostock v. Clayton County.* as the legal basis for reinterpreting the term "sex" to mean gender identity,[2] but that misconstrues and improperly extends *Bostock*, which did not redefine the term "sex." As noted by The Department's General Counsel in 2021, the Supreme Court expressly limited its decision in *Bostock* to Title VII and merely held that under Title VII, discrimination on the basis of "sexual orientation," "gender identity," or "transgender" status was prohibited because discrimination involving these characteristics "necessarily and intentionally applies sex-based rules."[3] *Bostock* "assum[ed]" that the term "sex" means "biological distinctions between male and female." 140 S. Ct. at 1739, 1746–47.

*Bostock* also narrowly addressed employment termination and explicitly refrained from addressing key items under Title IX, such as "sex-segregated bathrooms, locker rooms, and dress codes."[4] Indeed, *Bostock* expressly stated that its decision did not "sweep beyond Title VII to other federal or state laws that prohibit sex discrimination" or address other issues not before the Court. 140 S. Ct. at 1753. *Bostock*'s holding thus "extends no further than Title VII." *Pelcha v. MW Bancorp.*, 988 F.3d 318, 324 (6th Cir. 2021); *see Tennessee v. U.S. Dep't of Educ.*, No. 3:21-CV-308, 2022 WL 2791450, at *21 (E.D. Tenn. July 15, 2022) ("in applying *Bostock* to Title IX, the Department overlooked the caveats expressly recognized by the Supreme Court and created new law").

In addition, Title IX expressly recognizes the biological differences between male and female students. Its text explicitly states that, "[n]otwithstanding anything to the contrary in this chapter, nothing contained herein shall be construed to prohibit any educational

---

[1] 87 Fed. Reg. at 41398.

[2] 140 S. Ct. 173 (2020).

[3] *Id.* at 1745.

[4] *Id.* at 1753; *see also U.S. Dep't of Justice, Application of Bostock*, at 4 ("*Bostock* does not require any changes to . . . sex-specific facilities or policies.").

institution receiving funds under this Act, from maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686. Regulations embrace the same understanding when they provide that Title IX recipients "may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." 34 C.F.R. § 106.41(b).

The Proposed Rule departs most significantly from *Bostock* when it protects gender identity at the expense of biological sex,  saying that "adopting a policy or engaging in a practice that prevents a person from participating in an education program or activity consistent with the person's gender identity subjects a person to more than *de minimis* harm on the basis of sex" and therefore violates Title IX.[5] The Proposed Rule undermines Title IX: Schools cannot "provide equal athletic opportunity for the [members of both] sexes" if the Department functionally forbids them from acknowledging two biologically distinct sexes.[6]

Since Title IX's enactment in 1972, participation of girls and women in sports  has  exploded.  In 2021, 3.4 million girls played high school sports, and 219,000 women played NCAA sports.[7] The Proposed Rule's departure from the sex dichotomy ignores science. The athletic performance advantage of men over women is typically 10-50% depending on the sport.[8] The reason for male athletic advantage is biology: males on average have 45% higher lean body mass, 33% higher lower body muscle mass, 40% higher upper body muscle mass, 54% higher knee extension strength, and 30% higher maximum cardiac output.[9] The result is that by the age of 14-15, many adolescent males athletes have surpassed the best measurable elite (i.e., Olympic and world-championship level) female performances in nearly all sports.[10]

Male athletic advantages, which begin with surges in testosterone in the womb and during a mini-puberty stage during the first six months after birth, cannot be suppressed to an extent that would allow meaningful competition between males who identify as women and biological females.[11] Early surges of testosterone lead, for instance, to higher bone density in

---

[5] 87 Fed. Reg. at 41571.

[6] 87 Fed. Reg. at 41537; *See* NPRM § 106.41(c).

[7] NCAA Sports Sponsorship and Participation Rates Database, https://www.ncaa.org/sports/2018/10/10/ncaa-sports-sponsorship-and-participation-rates-database.aspx. In fact, NCAA statistics show that since 1982 (when the NCAA began separating male and female participation rates), female participation rates rose from 43% of the male participation rate (74,329 to 169,800) to 78% (219,177 to 278,988) in 2021—almost doubling.

[8] Hilton, E.N., Lundberg, T.R., Transgender Women in the Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage, *Sports Med.* 2021 Feb;51(2): 199-214.

[9] *Id.*

[10] *Id.*

[11] *Id.*; Wiik, A., Lundberg, T.R., Rullman, E., Andersson, D.P., Holmberg, M., Mandic, M., Brismar, T.B., Dahlqvist Leinhard, O., Chanpen, S., Flanagan, J.N., Arver, S., Gustaffson, T., Muscle Strength, Size, and Composition Following 12 Months of Gender-affirming Treatment in Transgender Individuals, *J. Clin. Endocrinol. Metab.* 2020 Mar 1;105(3):dgz247. *See, e.g.*, Pedersen, Ultrasound evidence of sexual difference in fetal size in first trimester, *Br. Med. J.* 1980 281(6250): 1253; Persson et al., Impact of fetal and maternal factors on the normal growth of the biparietal diameter, *Scandinavian Association of Obstetricians and Gynaecologists* 1978 78: 21-27; Schwartzler et al., Sex-specific antenatal reference growth charts for uncomplicated singleton pregnancies at 15—40 weeks of gestation, *Ultrasound in Obstetrics and Gynaecology* 2004 23(1): 23-29; Broerre-Brown, et al., Sex-specific differences in fetal and infant growth patterns: a prospective population-based cohort study, *Biology of Sex Differences* 2016 7: 65; Galjaard, et al., Sex differences in fetal growth and immediate birth outcomes in a low-risk Caucasian population, 2019 *Biology of Sex Differences* 10: 48; Gilsanz, et al., Differential

the spine and larger axial skeletons in infant males.[12] Male athletic-performance advantages are observable well before adolescence.[13] Even with pre-puberty hormone suppression, biological males who identify as women will still have a height advantage, among other advantages, over biological females.[14] Of course, height is a key factor in athletic success in many sports.

In short, females and males are biologically distinct, and those key biological differences cannot be undone, leaving females at an enormous competitive disadvantage when facing biological males in sports. Permitting males who identify as women to compete against biological females would subject biological females to far more than *de minimis* harm on the basis of sex.

### 2. The Proposed Rule's attempt to preempt State laws protecting the rights of girls and women confuses spending conditions for law, undermines representative government, and violates the *Pennhurst* clear-statement rule.

The Proposed Rule also seeks to preempt State laws that protect the rights of girls and women based on biological sex. "The Department proposes eliminating § 106.6(h) entirely and simplifying § 106.6(b) to clarify that all Title IX regulations preempt State or local law."[15]

The Supremacy Clause, which authorizes federal preemption in some circumstances, provides that "the Laws of the United States . . . shall be the supreme Law of the Land." U.S. Const. art. VI. Title IX and its implementing regulations, however, simply impose conditions on federal grants. And conditions on federal grants are not "law" under the Supremacy Clause. Historically, "regulation was traditionally a matter of public congressional enactment" and Congress was "reluctan[t] . . . to use conditions as a means of national domestic regulation." Philip Hamburger, *Purchasing Submission: Conditions, Power, and Freedom* 91 n.* (2021). Attaching conditions to federal grants affords a way to incent desired behavior without commanding it. "Unlike ordinary legislation, which 'imposes congressional policy' on regulated parties 'involuntarily,' Spending Clause legislation operates based on consent," *i.e.*,

---

Effect of Gender on the Sizes of the Bones in the Axial and Appendicular Skeletons, *J. of Clin. Endocrin. And Metabol.* 1997 21(3): 415-430; Lanciotti, et al., Up-To-Date Review About Minipuberty and Overview on Hypothalamic-Pituitary-Gonadal Axis Activation in Fetal and Neonatal Life, *Frontiers in Endocrinology* 2018 9:410; Boas, et al., Postnatal penile length and growth rate correlate to serum testosterone levels: a longitudinal study of 1962 normal boys, *Eur. J. of Endocrin.* 2006 154(1): 125-129; Kiviranta, et al., Transient Postnatal Gonadal Activation and Growth Velocity in Infancy, *Pediatrics* 2016 138(1): e20153561; Becker, et al., Hormonal 'minipuberty' influences the somatic development of boys but not of girls up to the age of 6 years, *Clin. Endocrin.* 2015 83: 694-701.
[12] *Id*.
[13] Catley, M.J., Tomkinson, G.R., Normative health-related fitness values for children: analysis of 85347 test results on 9-17-year-old Australians since 1985. *Br. J. Sports Med.* 2013 Jan;47(2):98-108 (showing 9-yr. old males 9.8% faster in short sprints, 16.6% faster in mile run, 9.5% better standing long jump, completed 33% more push-ups in 30 seconds and had a 13.8% stronger grip); Tambalis K.D., Panagiotakos, D.B., Psarra, G., Daskalakis, S., Kavouras, S.A., Geladas, N., Tokmakidis, S., Sidossis, L.S., Physical fitness normative values for 6-18-year-old Greek boys and girls, using the empirical distribution and the lambda, mu, and sigma statistical method, *Eur. J. Sport Sci.* 2016 Sep;16(6):736-46 (6-yr. old boys when compared to 6-yr. old girls completed 16.6% more shuttle runs in a given time and could jump 9.7% further from a standing position).
[14] Boogers, L.S., Wiepjes, C.M., Klink, D.T., Hellinga, I., van Trotsenburg, A.S.P., de Heijer, M., Hannema, S.E., Trans girls grow tall: adult height is unaffected by GnRH analogue and estradiol treatment, *J. Clin. Endocrinol. Metab.* 2022 Jun 6:dgac349. Doi: 10.1210/cinlnem/dgac349.
[15] 87 Fed. Reg. at 41404.

4

**App. 090**

the consent of the individual accepting a federal grant, as opposed to the consent of the people writ large. *Cummings v. Premier Rehab Keller*, 142 S. Ct. 1562, 1570 (2022) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 16–17 (1981)).

The distinction is critical to a proper understanding of the spending power and its limits. In sum, "the 'legitimacy of Congress' power' to enact Spending Clause legislation rests not on its sovereign authority to enact binding laws, but on 'whether the [recipient] voluntarily and knowingly accepts the terms of th[at] contract.'" *Id.* (quoting *Barnes v. Gorman*, 536 U.S. 181, 186 (2002)). In other words, "Congress' *legislative* powers *cannot be avoided* by simply opting out," but "Congress' power to spend money is *not* a *legislative* power." David Engdahl, *The Contract Thesis of the Federal Spending Power*, 52 S.D. L. Rev. 496, 498 (2007). That limitation protects critical state interests. Thus, "unlike statutory provisions that are grounded in Congress' *legislative* powers, spending terms and conditions are obligatory and enforceable only if voluntarily accepted." *Id.* at 500. The "knowing acceptance" standard preserves the vertical balance of power between States and the federal government, "ensuring that Spending Clause legislation does not undermine the status of the States as independent sovereigns in our federal system." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 577 (2012) (opinion of Roberts, C.J., joined by Breyer and Kagan, JJ.).

For this reason, the Supreme Court has set limits on the conditions that Congress may impose on federal funding. For instance, Congress may impose "conditions that define the limits of the government spending program" but not "conditions that seek to leverage funding to regulate speech outside the contours of the program itself." *United States Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214–15 (2013). And while Congress may financially induce States to accept policy changes, it may not impose conditions "so coercive as to pass the point at which pressure turns into compulsion." *NFIB*, 567 U.S. at 580 (quoting *South Dakota v. Dole*, 483 U.S. 203, 211 (1987)).

Critically, a grantee need not accept a federal contract in the first instance, and if it does, the remedy for violation of its terms is a matter between the grantee and the United States. Thus, "when a federal statute does not directly require adherence to its provisions, but instead proposes them as terms of a contractual promise, it is not giving them the obligation of law." Hamburger, *supra*, at 132. Because "conditions do not purport to bind . . . in the manner of law," "[n]o federal condition, by whatever means adopted, should be understood to defeat the obligation of contrary state law." *Id.* at 131. Otherwise, "[i]n shifting legislative power to . . . private decisions, conditions displace public representative self-government . . . with private barter." *Id.* at 92. Treating grant conditions as "law" that trumps a generally applicable state exercise of the police power thus threatens a fundamental alteration of the relationships among citizens, their States, and the federal government, whereby the federal government may induce citizens and political subdivisions to violate state law with impunity.

The Supreme Court has never countenanced such a capacious understanding of congressional spending power, and the Department should not attempt to exercise such power here. It is worth observing that neither of the two existing Title IX regulations that purport to preempt state law, 34 CFR § 106.6(b) & (h), have been contested and upheld. And indeed, when the Department promulgated § 106.6(h) in 2020, it did not cite any Supreme Court cases upholding its authority to use spending conditions to preempt state law. Each of the cases it cited upheld preemption under Commerce Clause legislation, not spending power legislation. *See* 85 Fed. Reg. 97,30454 fn. 1653 (May 19, 2020) (codified at 34 C.F.R. § 106.6 (2020)) (citing *Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985) (FDA regulations authorized by the Public Health Service Act); *Geier v. Am. Honda*

5

*Motor Co., Inc.*, 529 U.S. 861, 873 (2000) (National Traffic and Motor Vehicle Safety Act); *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 396 (1986) (FCC regulations authorized by the Communications Act); *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995) (National Traffic and Motor Vehicle Safety Act).

Furthermore, unlawful coercion occurs in violation of the Tenth Amendment where Congress uses its taxing-and-spending power to enter the arena of general police power and override contrary state laws. So, for example, in *Linder v. United States*, 268 U.S. 5 (1925), the Court rejected use of the power to tax for the general welfare to regulate the practice of medicine. It said that "[o]bviously, direct control of medical practice in the states is beyond the power of the federal government," which meant that "[i]ncidental regulation of such practice by Congress through a taxing act cannot extend to matters plainly inappropriate and unnecessary to reasonable enforcement of a revenue measure." *Id.* at 18; *see also United States v. Doremus*, 249 U.S. 86, 93 (1919) (invalidating a federal regulation of physicians predicated on the taxing power because it invaded the police power of States and observing, "[o]f course Congress may not in the exercise of federal power exert authority wholly reserved to the states").

The Proposed Rule's preemption threat constitutes just such an invasion of core state police power. As the Supreme Court has observed, "States traditionally have been accorded the widest latitude in ordering their internal governmental processes, and school boards, as creatures of the State, obviously must give effect to policies announced by the state legislature." *Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 476 (1982) (citation omitted). Congress noted in the Department of Education Organization Act that "in our Federal system, the primary public responsibility for education is reserved respectively to the States and the local school systems and other instrumentalities of the States." 20 USC § 3401(4); *see also* 20 USC § 3403(a)&(b) ("The establishment of the Department of Education shall not increase the authority of the Federal Government over education or diminish the responsibility for education which is reserved to the States and the local school systems and other instrumentalities of the States"). Indeed, the Department's own website acknowledges that "[e]ducation is primarily a State and local responsibility in the United States." The Federal Role in Education," U.S. Department of Education, June 15, 2021, https://www2.ed.gov/about/overview/fed/role.html.

Moreover, because the Proposed Rule would suspend state police power regulations without the State's consent, it undermines state sovereignty in a way that implicates the Republican Form of Government Clause. While the federal government may "induce the states to adopt policies that the Federal Government itself could not impose," it cannot induce citizens (corporate or otherwise) or political subdivisions to violate state law. A "republican form of government" is one where the people are governed by legislatively enacted laws, not one where a different sovereign tempts some citizens or political subdivisions to exempt themselves from state laws. Manifestly, "the purchase of submission is not what traditionally was understood as a republican form of government." Hamburger, *supra*, at 147. That observation is particularly apt where the submission is not undertaken by the State itself, but by a citizen or political subdivision being paid by the federal government to violate state law. And while the Supreme Court has never directly enforced the Guarantee Clause against the United States, it has observed that "perhaps not all claims under the Guarantee Clause present nonjusticiable political questions." *New York v. United States*, 505 U.S. 144, 185 (1992). Where Congress (or the Executive Branch) "actively interfere[s] in the states' republican self-governance," courts do not face unanswerable questions about how the United States itself should "guarantee" republican government. Hamburger, *supra*, at 147.

6

**App. 092**

Even assuming that the Department could theoretically use spending conditions to preempt state law, any attempt to do so would run afoul of basic preemption doctrine, including the presumption against preemption, which is grounded in the structural disfavor of preemption. *See e.g., Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). "In all preemption cases, and particularly in those in which Congress has 'legislated ... in a field which the States have traditionally occupied,' ... we 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Wyeth v. Levine*, 555 U.S. 555, 565 (2009). "[W]here a statute regulates [a] field traditionally occupied by states, such as health, safety, and land use, a 'presumption against preemption' adheres." *Atay v. Cnty. of Maui*, 842 F.3d 688, 699 (9th Cir. 2016) (quoting *Wyeth v. Levine*, 555 U.S. 555, 565 n.3 (2009)). Courts "assume that a federal law does not preempt the states' police power absent a clear and manifest purpose of Congress." *Atay*, 842 F.3d at 699; *Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 885 (2000). The presumption against preemption is particularly strong in areas of core state responsibility, including (as described above) education.

Next, under the clear-statement rule of *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1 (1981), the Department cannot change the conditions attached to federal funds without statutory text expressly authorizing it to do so. No one takes seriously the idea that, from the get-go, grant recipients understood Title IX to make a clear statement that gender identity discrimination was prohibited. *See Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 295–96 (2006) (observing that the Court must consider conditions on federal grants "from the perspective of a state official who is engaged in the process of deciding" whether to accept grant funds and "ask whether such a state official would clearly understand" the asserted condition). Put another way, preempting state and local laws protecting girls and women based on biological sex would breach the contractual agreement by which States and their educational entities accepted federal funds under Title IX and other federal statutes.

The Proposed Rule erroneously relies on *Bostock* to claim falsely that the term "sex" has always meant gender identity, and that States and their officials "would clearly understand" as much. But when Title IX was enacted in 1972, "sex" carried a "narrow, traditional interpretation." *Ulane v. E. Airlines, Inc.*, 742 F.2d 1081, 1085–86 (7th Cir. 1984). The Supreme Court did not apply Title VII to transgender employees until 2020. And even then, the majority stopped short of holding that its reasoning would condemn "sex-segregated bathrooms," "locker rooms," "dress codes," or "anything else of the kind" under Title VII. *Bostock*, 140 S. Ct. at 1753. So recent a decision under Title VII cannot be the basis for invaliding separate-sex sports policies under Title IX, especially given the differences between the two statutes.

When Title IX was enacted, the term "sex," scientific in nature, referred to the "two divisions" of organisms, "designated *male* and *female*," classified "according to their reproductive functions." *The American Heritage Dictionary of the English Language* 1187 (1980). Title IX reflects Congress's understanding that "sex" refers to a binary, biological characteristic. It even distinguishes between institutions, organizations, and activities open to "only students of one sex" and those open to "students of both sexes." 20 U.S.C. § 1681(a)(2); *see also* § 1681(a)(5), (a)(6), (a)(7), (a)(8), (a)(9), (b). And as examples of organizations and activities open to "one sex," Title IX lists the "Young Men's Christian Association, Young Women's Christian Association, Girl Scouts, Boy Scouts, Camp Fire Girls," "father-son" activities, "mother-daughter" activities, and "beauty pageants." § 1681(a)(6)(B), (a)(7), (a)(8), (a)(9). Title IX also speaks of "separate living facilities for the different sexes," authorizing separate

7

**App. 093**

showers, bathrooms, and bunks. § 1686. All of these provisions presume two discrete sexes with different anatomies and physiologies—not "gender identity," *i.e.*, an "individual's self-identification as being male, female, neither gender, or a blend of both genders." *The American Heritage Dictionary of the English Language* (5th ed. 2022).

Preempting state laws governing education would unlawfully "diminish the responsibility for education which is reserved to the States" and thereby violate a host of constitutional limits and doctrines. Preemption should therefore be removed from the Proposed Rule.

### 3. The Proposed Rule would sharply restrict a parent's right to direct their child's education and thereby violate parents' constitutional rights.

The Proposed Rule would allow school officials to provide counseling to any student about gender identity issues, to allow the child to choose a gender identity without regard to biological sex, and even to refer a child for medical attention, all without parental notice. By requiring public elementary and secondary schools to affirm a child's gender identity without parental approval or knowledge, the Proposed Rule would strip parents of the right to direct education decisions relating to their children, as protected by a century of Supreme Court precedent and the Department of Education's own Organization Act.

The right of parents to direct the education and upbringing of their children is deeply rooted in our Nation's history and traditions, as the Supreme Court recently reaffirmed. *See Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2257 (2022) (reaffirming "the right to make decisions about the education of one's children"). In *Pierce v. Society of Sisters*, 268 U.S. 510 (1925), where the Court upheld the right of parents to educate their children in a private religions school, the Court observed that "[t]he child is not the mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." Congress embraced this conception of parental rights in the Department's organizing act, where it found that "parents have the primary responsibility for the education of their children, and States, localities, and private institutions have the primary responsibility for supporting that parental role."[16]

Many cases apply this right. *See Meyer v. Nebraska*, 262 U.S. 390 (1923) (affirming the right of parents to teach their children German); *Wisconsin v. Yoder*, 406 U.S. 205, 233 (1972) (permitting parents to educate children at home); *Parham v. J. R.*, 442 U.S. 584, 621 (1979) (upholding a juvenile civil commitment process that depended substantially on parental judgment because, "[f]or centuries it has been a canon of the common law that parents speak for their minor children" and "[t]he statist notion that governmental power should supersede parental authority in all cases because some parents abuse and neglect children is repugnant to American tradition."); *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (invalidating presumption of grandparent visitation over parental objection because "the liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court"); *Zelman v. Simmons-Harris*, 536 U.S. 639, 680 n. 5 (2002) (upholding school choice scholarships in part because "[t]his Court has held that parents have the fundamental liberty to choose how and in what manner to educate their children.").

---

[16] 20 U.S.C.A. § 3401(3).

Ignoring this "fundamental liberty," the Proposed Rule strips parents of their rights by requiring public elementary and secondary schools to affirm a child's gender identity without the approval or knowledge of parents. It even goes so far as to encourage school officials, without prior parental knowledge or consent, to provide counseling to children about gender identity issues and even refer a child for medical attention and procedures such as sex change surgery. The concern seems to be that many parents will discourage their children from adopting a gender identity at odds with biological sex. And the solution is to keep the parents in the dark and permit federally funded schools to do the work of raising the children. The Constitution does not permit such parental bypass.

The Court's decision in *Parham v. J. R.*, 442 U.S. 584 (1979), is particularly instructive on this point, as it addressed methods of treating children with mental health issues. The Court permitted the juvenile commitment procedures at issue over the objections of children committed to mental hospitals principally because those procedures required parental assent. Of critical importance here, the Court observed that, "[s]imply because the decision of a parent is not agreeable to a child, or because it involves risks, does not automatically transfer the power to make that decision from the parents to some agency or officer of the state." *Id.* at 603. As if anticipating the Proposed Rule, the Court recognized that "[m]ost children, even in adolescence, simply are not able to make sound judgments concerning many decisions, including their need for medical care or treatment. Parents can and must make those judgments." *Id.* Even more to the point: "The fact that a child may . . . complain about a parental refusal to provide cosmetic surgery does not diminish the parents' authority to decide what is best for the child." *Id. at* 604. In the end, "[n]either state officials nor federal courts are equipped to review such parental decisions." *Id.* The Proposed Rule, however, proceeds as if the opposite were true by preventing parents from making decisions for their children.

Perhaps even worse, the Proposed Rule requires schools to hide information relating to a child's professed gender identity from parents even as it disclaims any obligation of a grant recipient to "[r]estrict any other rights guaranteed against government action by the U.S. Constitution."[17] The Department needs to concern itself with everyone's constitutional rights, not merely those that it prefers.

***

The Proposed Rule threatens to destroy Title IX. Our States will ensure that American women and girls are treated with more respect than this Administration offers in the proposed rule.

Respectfully,

Todd Rokita
Attorney General of Indiana

---

[17] 34 C.F.R. §106.6(d).



STEVE MARSHALL
Attorney General of Alabama



MARK BRNOVICH
Attorney General of Arizona



LESLIE RUTLEDGE
Attorney General of Arkansas



CHRIS CARR
Attorney General of Georgia



DEREK SCHMIDT
Attorney General of Kansas



DANIEL CAMERON
Attorney General of Kentucky



JEFF LANDRY
Attorney General of Louisiana



LYNN FITCH
Attorney General of Mississippi



AUSTIN KNUDSEN
Attorney General of Montana

DOUGLAS J. PETERSON
Attorney General of Nebraska



JOHN M. O'CONNOR
Attorney General of Oklahoma

ALAN WILSON
Attorney General of South Carolina

App. 096

MARK VARGO
Attorney General of South Dakota

JONATHAN SKRMETTI
Attorney General of Tennessee

KEN PAXTON
Attorney General of Texas

SEAN REYES
Attorney General of Utah

JASON MIYARES
Attorney General of Virginia

PATRICK MORRISEY
Attorney General of West Virginia

**App. 097**

STATE OF TENNESSEE

# Office of the Attorney General



**Jonathan Skrmetti**
**Attorney General and Reporter**

P.O. Box 20207
Nashville, TN 37202
Telephone: (615) 741-3491
Facsimile: (615) 741-2009

September 14, 2022

**SUBMITTED ELECTRONICALLY**
**VIA REGULATIONS.GOV**

The Honorable Miguel Cardona
Secretary of Education
Department of Education Building
400 Maryland Ave., SW
Washington, D.C. 20202

**Re:**   **Docket No. ED-2021-OCR-0166 ("Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance")**

Dear Secretary Cardona,

The People and State of Tennessee, joined by nineteen co-signing States, appreciate the opportunity to comment on the U.S. Department of Education's recent proposal to amend the federal regulations implementing Title IX. *See* Dep't of Educ., *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance* ("Proposal"), 87 Fed. Reg. 41,390 (July 12, 2022). We share the Department's interest in providing every primary, secondary, and post-secondary student an educational environment free from harassment and incongruous discrimination. Unfortunately, the Department's proposed rule changes would force educators to pursue that end through unreasonable, unlawful, and counter-productive means.

As you are doubtless aware, Title IX's general prohibition on sex-based discrimination, *see* 20 U.S.C. § 1681(a), applies to "all the operations" of nearly every school in the country, *id.* § 1687; *see* 34 C.F.R. § 106.2(g). Read in that light, the Department's proposed amendments to 34 C.F.R. Part § 106 give us pause. In particular, the Department intends to expand the "scope" of Title IX by specifying that "[d]iscrimination on the basis of sex" in 20 U.S.C. § 1681 includes "discrimination on the basis of … gender identity," Proposal at 41,571 (proposed 34 C.F.R. § 106.10), despite Congress omitting the term "gender identity" from all of Title IX's numerous provisions.

State of Tennessee Comments
ED-2021-OCR-0166
Page 2

The Department has also proposed equally atextual additions to 34 C.F.R. § 106.31(a).  At present, 34 C.F.R. § 106.31(a) largely tracks the language of Title IX itself, stating in relevant part that:

> Except as provided elsewhere in this part, no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any academic, extracurricular, research, occupational training, or other education program or activity operated by a recipient which receives Federal financial assistance.

To this, the Department proposes adding:

> In the limited circumstances in which Title IX or [34 C.F.R. pt. 106] permits different treatment or separation on the basis of sex, a recipient must not carry out such different treatment or separation in a manner that discriminates on the basis of sex by subjecting a person to more than de minimis harm, unless otherwise permitted by Title IX or this part.  Adopting a policy or engaging in a practice that prevents a person from participating in an education program or activity consistent with the person's gender identity subjects a person to more than de minimis harm on the basis of sex.

Proposal at 41,571 (proposed 34 C.F.R. § 106.31(a)(2)).

These new rules lack statutory foundation and will trench on constitutional rights.  They will also negatively impact countless students, teachers, and school administrators in ways the Department has failed to address — or even recognize.  We thus offer the following comments with the hope that the Department will reconsider the proposed rules and avoid potential litigation:

## I.     The Department's proposed rules conflict with Title IX and violate the Constitution.

The Department has an obligation to "reasonably explain[]" how its rules fit within its lawful administrative authority.  *Advocs. for Highway & Auto Safety v. FMCSA*, 41 F.4th 586, 596 (D.C. Cir. 2022) (quoting *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021)).   But because the Department has disregarded the text of Title IX and multiple constitutional restraints, there can be no reasonable explanation for its proposals.

### A.     The Department has not grounded its proposed rules in the text, structure, or purpose of Title IX.

The Department cannot lawfully promulgate rules that conflict with Title IX.  *E.g.*, *Children's Health Def. v. FCC*, 25 F.4th 1045, 1052 (D.C. Cir. 2022).  Title IX's meaning comes from its terms, "read in context," and in light of "the problem Congress sought to solve." *Goldstein v. SEC*, 451 F.3d 873, 878 (D.C. Cir. 2006) (quoting *PDK Labs. Inc. v. DEA*, 362 F.3d 786, 796 (D.C. Cir. 2004)).  On every level of analysis, however, the Department's proposed rules run counter to the statute.  *See Tennessee v. U.S. Dep't of Educ.*, No. 3:21-cv-00308, 2022 WL 2791450, at *21 (E.D. Tenn. July 15, 2022) (noting that the Department's proposed policies "create[] rights for students and obligations for regulated entities … that appear nowhere in … Title IX").

To begin with, Title IX explicitly addresses "sex," not gender identity.  It starts by prohibiting discrimination "on the basis of sex" and "sex" alone.  20 U.S.C. § 1681.  It then identifies examples of "sex"-based discrimination to which the prohibition does *not* apply.  *See id.* § 1681(a).  Following this, the statute clarifies that discrimination "on the basis of sex" does *not* encompass the "maintain[ence of] separate living facilities for the different sexes."  20 U.S.C. § 1686.

These repeated references to "sex" must be read "in accord with the ordinary public meaning of ['sex'] at the time of [Title IX was] enact[ed]."  *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1738 (2020).  And at that time, "virtually every dictionary definition of 'sex' referred to the physiological distinctions between males and females."  *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 632 (4th Cir. 2020) (Niemeyer, J. dissenting), *cert. denied*, 141 S. Ct. 2878 (2021).  In 1961, the Oxford English Dictionary defined "Sex" as "[t]he sum of those differences in the structure and function of the reproductive organs on the ground of which beings are distinguished as male and female, and of the other physiological differences consequent on these."  9 Oxford English Dictionary 578 (1961).  In 1970, the American College Dictionary defined "Sex" to mean "the sum of the anatomical and physiological differences with reference to which the male and the female are distinguished."  The American College Dictionary 1109 (1970).  A year later, Webster's Third New International Dictionary defined "Sex" to mean "the sum of the morphological, physiological, and behavioral peculiarities of living beings that subserves biparental reproduction."  Webster's Third New International Dictionary 2081 (1971).  The year after Title IX became law, Random House defined "Sex" as "either the male or female division of a species, esp. as differentiated with reference to the reproductive functions."  The Random House College Dictionary 1206 (rev. ed. 1973).  And a few years after that, the American Heritage Dictionary defined "Sex" as "[t]he property or quality by which organisms are classified according to their reproductive functions."  American Heritage Dictionary 1187 (1976).  Each of these sources indicates that Title IX uses "sex" as a reference to the categories of "male" and "female," which "simply are not physiologically the same."  *Bauer v. Lynch*, 812 F.3d 340, 350 (4th Cir. 2016) (citing and discussing *United States v. Virginia*, 518 U.S. 515 (1996)).

Linguistic context and statutory structure both confirm that Congress meant "sex" as a reference to this biological dichotomy, not the abstruse concept of gender identity.  Advocates for gender-identity-based public policy often stress that a person's "innermost concept of" gender may fluctuate over time and defy biology's "male" or "female" binary.  *See, e.g., Sexual Orientation and Gender Identity Definitions*, Human Rights Campaign (last visited Sept. 8, 2022).[1]  Title IX, by contrast, speaks of permitting sex-based discrimination among "Men's" and "Women's" associations and organizations for "Boy[s]" and "Girls," "the membership of which has traditionally been limited to persons of one [or the other] sex."  20 U.S.C. § 1681(a)(6)(B).  The statute also describes how an institution may change "from ... admit[ting] only students of one sex" (that is, male *or* female) "to ... admit[ting] students of both sexes," (male *and* female).  20 U.S.C. § 1681(a)(2).  In addition to implying that "sex" means "sex," those provisions foreclose any reading of "sex" that incorporates gender identity.  It would make no sense to reference schools that "admit students of *both* [gender identities]," *id.*, if in fact such "identities" have "no fixed number" and populate an "infinite" spectrum of "possibilities,"

___
[1] https://www.hrc.org/resources/sexual-orientation-and-gender-identity-terminology-and-definitions (attached hereto as Exhibit A).

State of Tennessee Comments
ED-2021-OCR-0166
Page 4

Veronica Zambon, *What Are Some Different Types of Gender Identity?*, Medical News Today (Updated May 12, 2022) ("Medically reviewed by Francis Kuehnle, NSN, RN-BC").[2]

Clues from history cut against the Department as well. To begin with, "[t]he phrase 'gender identity' did not exist" in 1972 "outside of some esoteric psychological publications." Ryan T. Anderson, Ph.D, & Melody Wood, *Gender Identity Policies in Schools: What Congress, the Courts, and the Trump Administration Should Do* (Heritage Found. Backgrounder No. 3201, 2017).[3] In fact, "the word 'gender'" itself "had been coined only recently in contradistinction to sex." *Id.* It thus comes as no surprise that the earliest Title IX rulemaking codified sex-separated "toilet, locker room, and shower facilities" without a whiff of discussion about gender identity. HEW, *Nondiscrimination on Basis of Sex*, 40 Fed. Reg. 24,127, 24,141 (June 4, 1975) (now codified at 34 C.F.R. § 106.33); *see* HEW, *Education Programs and Activities Receiving or Benefiting from Federal Financial Assistance*, 39 Fed. Reg. 22,227, 22,230 (June 20, 1974) (proposing the rule without explanation); 40 Fed. Reg. at 24,141 (finalizing the rule without justification or response to commentary). And those same regulations (again) implied that "sex" would naturally differentiate athletes by virtue of "competitive skill" and raise safety issues when "the activity involved is a contact sport" — something that cannot be said of gender identity. 40 Fed. Reg. at 24,134 (discussing 45 C.F.R. § 86.41, predecessor to 34 C.F.R. § 106.41).

Finally, reading "sex" to mean "sex" neatly aligns with Title IX's indisputable aim: ending the "corrosive and unjustified discrimination against *women*" that was "overt and socially acceptable within the academic community" in the early 1970s. 118 Cong. Rec. 5803 (1972) (remarks of Senator Bayh) (emphasis added). *That* invidious, sex-based discrimination prompted a series of congressional hearings, which eventually inspired the legislation. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 696 n.16 (1979). And in recognition of this fact, the courts have long construed Title IX as conferring a "special benefit" on "persons discriminated against because they are biologically female — not because they *identify* as women. *Id.* at 694; *see also id.* at 680 ("Petitioner's complaints allege that her applications for admission to medical school were denied by the respondents because she *is* a woman." (emphasis added)).

The Department nonetheless insists that discrimination "on the basis of sex" necessarily *includes* discrimination "on the basis of gender identity" under the Supreme Court's decision in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020). *See, e.g.*, Proposal at 41,530–32. That's wrong. The *Bostock* case concerned a funeral home employee who had been fired "simply for being … transgender." 140 S. Ct. at 1737. The question was whether that firing constituted discrimination "because of ... sex" under Title VII. *Id.* at 1738 (quoting 42 U.S.C. § 2000e-2(a)(1)). The Court "proceed[ed] on the assumption that 'sex'" was a "biological distinction[] between male and female," nothing more or less. *Id.* at 1739. In fact, it explicitly "agree[d]" with the defendants that "transgender status" is a "distinct concept[] from sex." *Id.* at 1747. Even so, the Court held that the firing violated Title VII specifically because a male employee was punished for behavior permitted for the employee's female colleagues. *Id.* at 1744.

In reaching that holding, however, the Court explicitly declined to address sex segregation at schools under Title IX. *See id.* at 1753; *see also Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021)

---

[2] https://www.medicalnewstoday.com/articles/types-of-gender-identity (attached hereto as Exhibit B).

[3] https://www.heritage.org/sites/default/files/2017-03/BG3201.pdf (attached hereto as Exhibit C).

State of Tennessee Comments
ED-2021-OCR-0166
Page 5

(recognizing *Bostock*'s "narrow reach").  And for good reason: Title VII is *not* Title IX.  *Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021).  Whereas Title VII prohibits any adverse employment action "because of … sex," full stop, 42 U.S.C. § 2000e-2, Title IX explicitly *permits* discrimination "on the basis of sex" in numerous circumstances, 20 U.S.C. § 1681(a)(1)–(9).  More importantly, Title IX dictates that "maintaining separate living facilities for the different sexes" is *not* sex-based discrimination in the first place.  20 U.S.C. § 1686.  The Department fails to account for those distinctions in its misapplication of *Bostock*.

Moreover, even if the Department had the correct reading of *Bostock*, its rules would still conflict with Title IX.  Most strikingly, the Department wants to mandate accommodation of a person's gender identity *even* when "Title IX … permits different treatment or separation on the basis of sex."  Proposal at 41,571 (proposed 34 C.F.R. § 106.31(a)(2)).  The Department has neither identified a textual basis for that rule nor explained how it follows from *Bostock* or any other precedent.  And although the rule includes a carveout in cases where discrimination is "otherwise permitted by Title IX or [34 C.F.R. part 106]," *id.*, the Department has not explained how the rule's general prohibition and exception work together.  The regulation seems to contemplate circumstances where "Title IX … permits different treatment … on the basis of sex" but does *not* "otherwise permit" a failure to accommodate "gender identity."  *Id.*  What are those circumstances?  If the Department believes they exist, it should specify them now rather than cause "unfair surprise" through sporadic, after-the-fact applications. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2404 (2019) (quoting *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 159 (2007)).

Indeed, the Department's "erratic[]" and "inconsistent[]" approach to the gender-identity issue only heightens the need for a cogent and clearly articulated interpretation of Title IX, grounded in the statute's actual terms.  *Nat'l Treasury Emps. Union v. FLRA*, 399 F.3d 334, 337 (D.C. Cir. 2005) (quoting *Am. Fed'n of Gov't Employees v. FLRA*, 712 F.2d 640, 643 n.17 (D.C.Cir.1983)).  If the Department cannot provide that logical underpinning, it must abandon its rulemaking proposal.

Further, the Department repeatedly relies upon a 2021 Notice of Interpretation that the U.S. District Court for the Eastern District of Tennessee has preliminarily enjoined the Department from enforcing against twenty States, including Tennessee and several other signatories to this letter.  *E.g.*, Proposal at 41,531–33 (citing Dep't of Educ., *Enforcement of Title IX with Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of* Bostock v. Clayton County, 86 Fed. Reg. 32,637 (June 22, 2021)); *see Tennessee*, 2022 WL 2791450, at *24.  In its filings in that case, the Department has agreed that it may "not cite, reference, treat as binding, or otherwise rely upon" the 2021 Notice of Interpretation in any enforcement or administrative action against the twenty States.  Notice of Compliance at 2, *Tennessee*, ECF No. 97.  To comply with the preliminary injunction, the Department cannot continue to treat the enjoined 2021 Notice of Interpretation as binding.  Further, if the Department insists on pursuing its rulemaking proposal, the Department must "make appropriate changes" to the proposed rule, *Mann Constr., Inc. v. United States*, 27 F.4th 1138, 1142 (6th Cir. 2022), that acknowledge how such proposed rulemaking "creates rights for students and obligations for regulated entities not to discriminate based on … gender identity that appear nowhere in *Bostock*, Title IX, or its [current] implementing regulations." *Tennessee*, 2022 WL 2791450, at *21.

State of Tennessee Comments
ED-2021-OCR-0166
Page 6

### B.   The proposed rules would infringe on the constitutional rights and interests of students, parents, school faculty, and the States.

The Department has also failed to account for the impact its proposed rules will have on fundamental constitutional rights and interests.  Attempting to expand the reach of its preferred policies, the Department says it will require schools to "take prompt and effective action to end any sex discrimination …, prevent its recurrence, and remedy its effects."  Proposal at 41,572 (proposed 34 C.F.R. § 106.44(a)).  In practice, that means policing interactions among students, parents, and faculty to compel public accommodation of each person's highly individualized, potentially fluid, and unverifiable gender identity.  *See id.* at 41,571 (proposed 34 C.F.R. §§ 106.10, 106.31(a)(2)).  This will trench on multiple constitutional rights and interests in ways that are easy to predict.

*First*, state-run public colleges will have to compel speech in violation of the First Amendment.  This issue will predictably arise from the forced used of certain pronouns and other referential terms. *Meriwether*, 992 F.3d at 498.  Advocates for transgender rights have repeatedly stressed that the language others use to refer to a person is "pivotal to [that person's] gender identity and how [he or she] relate[s] to the world," *Pronouns*, The Center (last visited Sept. 8, 2022),[4] and that referring to someone with language that does *not* fit that person's gender identity can thus cause feelings of "exhaust[ion]," "demoralize[ation]," and "invalidat[ion]," Sabra L. Katz-Wise, *Misgendering: What It Is and Why It Matters*, Harvard Health Blog (July 23, 2021).[5]  In light of this, the Department's rules suggest that any failure to police referential speech could be considered "sex discrimination" if it "prevents a person from participating in an education program or activity consistent with the person's gender."  Proposal at 41,571 (proposed 34 C.F.R. § 106.31(a)(2)).  If that is the case, however, the new prohibitions will necessarily compel public schools to violate the First Amendment.  There can be no doubt that some college faculty will resist referring to students and colleagues by their "preferred pronouns."  *See, e.g.*, *Meriwether*, 992 F.3d at 498–503.  And whether motivated by faith, pedagogical theory, or simple disagreement, those speakers will have a right to express themselves under the First Amendment.  *See id.* at 506.  Indeed, "[i]f professors lacked free-speech protections when teaching, a university would wield alarming power to compel ideological conformity."  *Id.*  Yet the Department's rules *require* schools to wield such power without so much as acknowledging the ensuing First Amendment problem.

*Second*, school administrators may feel forced — or empowered — to insert themselves into constitutionally protected family affairs.  The Department must recognize that "[t]here [is] a 'private realm of family life which the state cannot enter,' that has been afforded both substantive and procedural protection[s]" under our Constitution.  *Smith v. Org. of Foster Fams. for Equal. & Reform*, 431 U.S. 816, 842 (1977) (quoting *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944)) (citation and footnote calls omitted).  Those protections extend to cover the rights of parents to "bring up" their children as they deem fit, including through instruction on matters of behavior and ethics.  *See M.L.B. v. S.L.J.*, 519 U.S. 102, 116 (1996) (citing *Meyer v. Nebraska*, 262 U.S. 390 (1923)); *see also Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 822 (2011) (Thomas, J., dissenting) (explaining "the founding generation['s]" fundamental belief that "parents had absolute authority … to direct the proper development of their

---

[4] https://gaycenter.org/pronouns/#more (attached hereto as Exhibit D).
[5] https://www.health.harvard.edu/blog/misgendering-what-it-is-and-why-it-matters-202107232553 (attached hereto as Exhibit E).

State of Tennessee Comments
ED-2021-OCR-0166
Page 7

[minor] children"). All parents thus retain a constitutionally protected right to guide their own children on matters of identity, including the decision to adopt or reject various gender norms and behaviors.

The Department's proposed rules threaten that right by requiring school administrators to "take prompt and effective action" to accommodate the stated gender identity of each student — including very small children. Proposal at 41,571–72 (proposed 34 C.F.R. § 106.44(a)). At a minimum, those provisions bind school faculty to treat such children "consistent with [their] gender ident[ies]" on school grounds, even if that conflicts with a parent's preferences or nurturing judgment. *Id.* at 41,571 (proposed 34 C.F.R. § 106.31(a)(2)). But the rules could go much further. For example, parents have already reported instances of school administrators, clothed in Title IX's auspices, taking extreme measures to ensure gender-identity "affirmance" in the *home*. *See* Kaylee McGhee White, *Biden's New Title IX Rules Deputize Teachers to Override Parents on Gender Identity*, Independent Women's Forum (Aug. 16, 2022).[6] Nothing could be more noxious to the "enduring American tradition" that grants parents the "primary role … in the upbringing of their children." *Barrett v. Steubenville City Sch.*, 388 F.3d 967, 972 (6th Cir. 2004) (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972)).

*Finally*, the Department's novel attempt to expand Title IX would push the statute beyond Congress's lawmaking authority. Congress does not have the ability to set education policy directly. Instead, it enacted Title IX through its broader power to tax and spend in pursuit of the "general Welfare." U.S. Const. art. I, § 8, cl. 1. But the exercise of that power comes with special limitations. Most notably, when Congress aims to direct State and local policy via the Spending Clause, it must do so through "clear[ ]statement[s]" in the legislation itself. *Haight v. Thompson*, 763 F.3d 554, 568 (6th Cir. 2014) ("Clarity is demanded *whenever* Congress legislates through the spending power …."); *see also Texas Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 361 (5th Cir. 2021) ("Relying on regulations to present the clear condition, therefore, is an acknowledgment that Congress's condition was not unambiguous …."). Only then can States "voluntarily and knowingly accept[]" or decline any obligations attached to federal funds. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). In this case, however, the Department wants to read new gender identity protections into Title IX without grounding them in clear statutory text. *See supra* Part I.A; *Tennessee*, 2022 WL 2791450, at *21. And the Department's reliance on *Bostock* provides no retort, for reasons already stated. *See supra* at 4–5. The upshot is that the new regulations would push Title IX beyond what the Constitution allows.

These constitutional concerns warrant greater attention if the Department intends to defend its new rules as anything other than arbitrary. The bedrock principles of administrative law require that all Title IX regulations reasonably fit the statute's language after the "ordinary tools of statutory construction" have been brought to bear. *Air Transp. Ass'n of Am., Inc. v. USDA*, 37 F.4th 667, 672 (D.C. Cir. 2022). One of those tools is the canon of constitutional avoidance, which requires that statutes "be construed to avoid serious constitutional doubts," whenever possible. *Brawner v. Scott Cnty.*, 14 F.4th 585, 592 (6th Cir. 2021) (quoting *FCC v. Fox Televisions Stations, Inc.*, 556 U.S. 502, 516 (2009)). Yet the constitutional issues just discussed receive scant, if any, consideration in the Department's rulemaking proposal. We urge the Department to consider and address those issues or else abandon this rulemaking exercise.

---

[6] https://www.iwf.org/2022/08/16/bidens-new-title-ix-rules-deputize-teachers-to-override-parents-on-gender-identity/ (attached hereto as Exhibit F).

**App. 104**

State of Tennessee Comments
ED-2021-OCR-0166
Page 8

## II.   The Department has ignored crucial policy issues that undermine its proposed rules.

Even if the Department could fit its new regulations within the proper constitutional and statutory boundaries, it still has not grappled with several knotty issues of policy.  In wielding its rulemaking authority, the Department must "'reasonably consider[] the relevant issues' and factors" bearing on its course, *Advocates*, 41 F.4th at 586 (quoting *Prometheus*, 141 S. Ct. at 1158), and it must draw "rational connection[s] between the facts" and its proposed rules, *id.* (quoting *State Farm*, 463 U.S. at 43).  The Proposal fails to do so in multiple critical respects.

### A.   The Department has not considered or addressed the difficulties of authenticating gender identity.

The Department's first and most fundamental error is a failure to consider how school administrators can put these new rules into practice.  Specifically, although the Department wants students to "participat[e] in … education program[s and] activit[ies] consistent with th[ier] gender identit[ies]," Proposal at 41,571 (proposed 34 C.F.R. § 106.31(a)(2)), it does not explain how school faculty should go about *determining* each student's gender identity.

That is no small feat.  As already mentioned, the proponents of transgender rights often stress that gender identity "differ[s] from sex" precisely because it cannot be "define[d]" or verified as a matter of "genetic[s]" or biology.  Zambon, *supra*.  Instead, gender identity comes from "the inside," and "only the person themselves can determine what their gender identity is."  *Id.*; *see also id.* ("The term gender identity refers to the personal sense of an individual's own gender."); Am. Psych. Ass'n, *Guidelines for Psychological Practice with Transgender and Gender Nonconforming People*, 70 Am. Psychologist 862 (Dec. 2015) ("[G]ender identity is internal …."). [7]   Although "[p]eople *may* use clothing, appearances, and behaviors to express the gender that they identify with," they also may not — it is up to them.  Zambon, *supra*.  In addition, and again unlike sex, gender identity cannot be "divided along the binary lines of 'man' and 'woman.'"  *Id.*  Instead, it is thought to exist on a "spectrum," from which a person may choose any number of gender identities — or none at all — and may alter that choice at a moment's notice, "shift[ing] between, or … outside of, society's expectations."  *Id.*; *accord* Jason Rafferty, *Ensuring Comprehensive Care & Support for Transgender & Gender-Diverse Children & Adolescents*, Pediatrics, Oct. 2018, at 2[8]; *see also* Zambon, *supra* (identifying and defining various gender identities, including "agender," "bigender," "omnigender," "polygender," "genderqueer," and "gender outlaw," to name just a few).

How, then, can teachers and school administrators determine and accommodate each student's gender identity?  Should students be required "to meet with … trained and licensed … counselors" and be assigned to sex-separated facilities, events, and activities on a "case-by-case basis"?  *Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 524 (3d Cir. 2018).  Or should faculty simply accept and rely on each student's own reporting of what it means to live "consistent with [that student's] gender identity"?  Proposal at 41,571 (proposed 34 C.F.R. § 106.31(a)(2)).  If the Department proposes the latter, then how (if at all) should schools account for a student's mental and emotional maturity or possible ulterior motives?  More pointedly, if *outwardly* identifying as a girl grants access to the girls' locker room after gym class, what will stop pubescent males from taking advantage of that means of

---

[7] https://www.apa.org/practice/guidelines/transgender.pdf (attached hereto as Exhibit G)
[8] https://perma.cc/EE6U-PN66 (attached hereto as Exhibit H).

State of Tennessee Comments
ED-2021-OCR-0166
Page 9

access?  *Cf.* Expert Declaration and Report of Kenneth V. Lanning at 10, 13, *Carcaño v. McCrory*, 203
F. Supp. 3d 615 (M.D.N.C. 2016) (No. 1:16-cv-00236-TDS-JEP), ECF No. 149-14 [hereinafter
"Lanning Report"] (attached hereto as Exhibit I) (noting that "some adolescent high school boys or
college males … might want to get into the girls' locker room" without "realiz[ing] that such activity
is illegal" or "consider[ing] its effect on victims," *id.* at 10).  The Department's proposed rules seem
to require "prompt and effective action" to enable that very scenario.  Proposal at 41,572 (proposed
34 C.F.R. § 106.44(a)).

Unless the Department addresses this problem, it cannot claim to have "reasonably considered" every
"relevant issue[]" arising from its Proposal.  *Advocates*, 41 F.4th at 586 (quoting *Prometheus*, 141 S. Ct.
at 1158).  And until the Department can produce a cogent response, it should refrain from finalizing
new rules.

### B.     The Department's proposal dismisses well-founded concerns regarding student and faculty safety.

On a related note, the Department has not adequately accounted for the risks these new regulations
could pose to student and faculty safety.  Schools at every level of the education system have long
provided sex-separated facilities — including locker rooms, restrooms, and dormitories — as a means
of protecting *all* students, staff, and visitors in their most vulnerable moments.  But what makes these
places private also makes them susceptible to abuse by bad actors.  Public restrooms and locker rooms,
in particular, have long been designed to feature deliberately obstructed sightlines, few entrances or
exits, and a categorical exemption from most forms of surveillance.  Add the fact that most people
using these facilities are partially or completely undressed, and the potential for voyeurism, harassment,
and even violent crime should be obvious.

Contrary to the Department's apparent assumptions, last year's nationally recognized story of a "15-
year-old [Virginia] boy" who "sexually assault[ed] a female classmate in a school bathroom" was no
anomaly.  Laura Wainman & Nicole DiAntoniao, *Teen Boy Sexually Assaulted Classmate in a School
Bathroom, Judge Says*, WUSA 9 (Oct. 26, 2021).[9]  News reports and court records have long illustrated
the unfortunate truth "that public toilets … are often the locale of [numerous crimes]," *People v. Young*,
214 Cal. App. 2d 131, 135 (Cal. Dist. Ct. App. 1963), specifically because they provide offenders the
opportunity to "seek out victims in a planned and deliberate way," Expert Opinion of Sheriff Tim
Hutchinson (Retired) at 6, *Carcaño*, ECF No. 149-15 [hereinafter "Hutchinson Report"] (attached
hereto as Exhibit K).  Take, for example, the recent report from Detroit of a fifteen-year-old male
suspect "hid[ing] inside a stall" in a women's restroom "for about 20 minutes" before attacking a
twenty-nine-year-old female.  *See, e.g.*, Amber Ainsworth, *15-Year-Old Boy Charged After Trying to Sexually
Assault Woman in Downtown Plymouth Public Bathroom*, Fox 2 Detroit (Nov. 24, 2021).[10]  And the sixteen-
year-old Michigan girl allegedly groped by "a man [who] came up behind her in the women's
bathroom" at a bookstore.  Roxanne Werly, *Surveillance Video Released Following Alleged Bathroom Assault*,

---

[9] https://www.wusa9.com/article/news/legal/teen-found-guilty-loudoun-county-bathroom-sexual-
assault/65-e383c241-afd1-4539-8fa3-4ccb01562ea9 (attached hereto as Exhibit J).
[10] https://www.fox2detroit.com/news/15-year-old-boy-charged-after-trying-to-sexually-assault-
woman-in-downtown-plymouth-public-bathroom (attached hereto as Exhibit L).

State of Tennessee Comments
ED-2021-OCR-0166
Page 10

UpNorthLive (Nov. 9, 2017).[11]  And the seven-year-old San Francisco girl accosted by a male suspect "in the female restroom at [a public] park."  Nick Smith, *Young Girl Assaulted in SF Park Bathroom*, ABC 7 News (Nov. 22, 2014).[12]  And the Los Angeles man who reportedly "walked into the women's restroom" at a restaurant "and sexually assaulted" a ten-year-old "as she got out of a stall."  Juan Flores, *Man Sought in Sexual Assault of Girl, 10, in Denny's Restroom*, DTLA 5 Morning News (updated Jan. 7, 2014).[13]  And the nightmare experienced by the eight-year-old Oklahoma girl locked inside a restroom by "a mostly naked man" who reportedly "got between her and the door[,] … wrapped a … coat around her neck[,] and began choking her."  *Update: Homeless Man Suspected of Attacking Child in Gas Station Bathroom*, Oklahoma's News 4 (Sept. 16, 2013).[14]  In each of those instances, and countless others, *see, e.g.*, Hutchinson Report at 7–8, 20–23, a male perpetrator exploited a bathroom's privacy-enhancing features to prey on a vulnerable female victim.

The Department nonetheless fails to recognize that its new rules will *enable* this nefarious conduct.  At present, a woman encountering a male in a "sex-segregated space … do[es] not have to wait until the man has already assaulted her before she can fetch security."  Cambridge Radical Feminist Network, *There Is Nothing Progressive About Removing Women-Only Bathrooms*, Medium (Jan. 13, 2019) [hereinafter "CRFM"].[15]  But if a person's self-reported (and potentially multifaceted or shifting) gender identity can determine the bathrooms he may use, that safety valve will be bolted shut.  *See id.*  Some women may not even have recourse *following* abuse if their male perpetrators had every right to be present, expose themselves, or witness others changing in a restroom or locker room space.  *See, e.g.*, *Man in Women's Locker Room Cites Gender Rule*, King 5 Seattle (Feb. 16, 2016).[16]  In fact, the victims of voyeurism might not even realize when it has occurred or have any hope of identifying a suspect afterwards.  *See, e.g.*, *Man Dressed as Woman Arrested for Spying into Mall Bathroom Stall, Police Say*, 4 Washington (last updated Nov. 18, 2015).[17]

Given that "children often delay reporting of sexual abuse until adulthood" and "only about 30% of sex crimes are reported overall," Hutchinson Report at 10, the Department cannot credibly dismiss these security concerns as "unsubstantiated," Proposal at 41,535; *see also* Hutchinson Report at 11 (noting additional reasons why schools and localities may not observe "an increase in reported offenses" following implementation of a gender-identity-based bathroom policy, including the ever-

---

[11] https://upnorthlive.com/news/local/gallery/surveillance-video-released-following-bathroom-assault (attached hereto as Exhibit M).

[12] https://abc7news.com/sfpd-search-suspect-man/407219/ (attached hereto as Exhibit N).

[13] https://ktla.com/news/man-sought-in-sexual-assault-of-girl-10-in-palmdale-restroom/ (attached hereto as Exhibit O).

[14] https://kfor.com/news/police-okc-homeless-man-attacks-8-year-old-girl-in-bathroom/ (attached hereto as Exhibit P).

[15] https://medium.com/@camradfems/there-is-nothing-progressive-about-removing-women-only-bathrooms-37729064cfb7 (attached hereto as Exhibit Q).

[16] https://www.king5.com/article/news/local/seattle/man-in-womens-locker-room-cites-gender-rule/281-65533111 (attached hereto as Exhibit R).

[17] https://www.nbcwashington.com/news/local/man-dressed-as-woman-arrested-for-spying-into-mall-bathroom-stall-police-say/1979766/#:~:text=Richard%20Rodriguez%2C%2030%2C%20filmed%20a,been%20filming%20her%2C%20police%20said (attached hereto as Exhibit S).

State of Tennessee Comments
ED-2021-OCR-0166
Page 11

present incentive "to minimize the appearance of a sex offense problem"); Lanning Report at 10–11 (explaining the many reasons why "nuisance" sex offenses go unreported, unrecorded, uninvestigated, and unprosecuted).  Rather, they are the factually grounded and predictable outgrowth of an all-comers approach to bathrooms and other living facilities.  And although "many women and young children would choose to leave a facility without reporting a sex offense, the scars from the crime would live on forever with these victims."  Hutchinson Report at 11.

The Department will doubtless respond that these crimes can occur with or without sex-segregated living spaces.  It may even note that most sexual crimes and offenses against children occur at home, not in public restrooms or locker rooms.  Respectfully, that is no response at all.  The problem with the Proposal is *not* that it fails to prevent these crimes in all instances; the problem with the Proposal is that it demonstrably *facilitates* these crimes in at least *some* instances by stripping away crucial safeguards.  "[E]xisting trespassing, indecent exposure, peeping and other laws deter at least some" of the abovementioned offenses if and when facilities have clear and enforced sex designations.  *Id.*  But "[i]f someone c[an] enter a public facility based entirely upon their 'internal sense of gender,' then law enforcement personnel, bystanders, and potential victims would have to be able to read minds … to determine whether a man entering a women's facility was really transgender or was instead there to commit a sex offense."  *Id.*  And even after an incident — particularly voyeurism or exposure — has occurred, "offenders aren't as likely to be observed by or reported to police."  *Id.*; *see id.* at 12.

Nor can the Department counter with any hard, contradictory data to allay these concerns.  The law requires the Department to identify "the most critical factual material … used to support" its new rules *before* they are finalized, specifically for the purpose of "expos[ing]" such material "to refutation" in the public comment process.  *Chamber of Com. of U.S. v. SEC*, 443 F.3d 890, 900 (D.C. Cir. 2006) (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 745 F.2d 677, 684 (D.C. Cir. 1984)).  "An agency commits serious procedural error when it fails to reveal … the technical basis for a proposed rule in time to allow for meaningful commentary."  *Connecticut Light & Power Co. v. NRC*, 673 F.2d 525, 530–31 (D.C. Cir. 1982).  In this instance, the Department has declined to provide any credible empirical analysis supporting its new policies.  That silence speaks volumes.  Indeed, how can the Department conclude that "the benefits" of these new rules "far outweigh [their] estimated costs," Proposal at 41,547, when it fails to account for even the possibility that abolishing sex-separated facilities could increase crime and deter students and faculty from using public accommodations?  *See id.* at 41,561.

### C.   The Department has not adequately accounted for the sex-based discrimination that will *result* from its proposed rule.

Finally, the Department has all but ignored the discrimination its new rules will visit on Title IX's primary intended beneficiaries: female students.  Despite generally prohibiting invidious sex-based discrimination, the law has long preserved certain female-only spaces and activities precisely because they *benefit* female students and enrich their educational experiences.  *See* 20 U.S.C. § 1681(a)(1)–(9); *id.* § 1686; *see also* Proposal at 41,534 ("The Department's regulations have recognized limited contexts in which recipients are permitted to employ sex-specific rules or to separate students on the basis of sex because the Department has determined that in those contexts such treatment does not generally impose harm on students." (citing 34 CFR §§ 106.33, 106.34(a)(3))).  If male students can nonetheless enter those same spaces and engage in those same activities by merely professing a particular gender identity, female students will necessarily be harmed.

State of Tennessee Comments
ED-2021-OCR-0166
Page 12

*First*, female students will suffer mental, emotional, and developmental harm from the loss of female-only dormitories, bathrooms, locker rooms, and showers. "[L]eaving aside the risk of assault, sex-segregated bathrooms give women the peace of mind of knowing they can use the bathroom, attend to their menstrual needs and to small children, with a degree of privacy and dignity that would otherwise not exist." CRFM, *supra*. And the loss of that private space will fall most heavily on "those individuals who — due to having a history of sexual assault, or for religious reasons — do not feel comfortable using a shared intimate space with male strangers." *Id*. Some female students may thus feel compelled to avoid certain bathrooms and other facilities, or even school altogether, which would undermine Title IX's principal aim. This concern is not hypothetical. By way of example, a group of young female students in Nebraska recently walked out of their high school classes to protest the loss of their sex-segregated bathrooms under a policy inspired by the statements of this Department. *See* Tara Campbell, *Transgender Rights Clash Prompts Walkout at CB Abraham Lincoln High*, 6 News WOWT (Apr. 11, 2019).[18] Yet the Department's proposal does not acknowledge this issue, much less explain why the purported interest of transgender students should take precedence over the interest of the female students that Title IX was enacted to serve.

*Second*, female students will be deprived of opportunities to participate in safe and fair athletics. The Department once championed those opportunities, *see, e.g.*, U.S. Dep't of Ed., *Athletics* (last visited Sept. 8, 2022),[19] and its Proposal apparently contemplates a separate rulemaking on "the question of what criteria, if any, [schools] should be permitted to use to establish students' eligibility to participate on a particular male or female athletics team," Proposal at 41,537. Nevertheless, an overarching policy allowing all students to "participat[e] in" school "program[s and] activit[ies] consistent with th[eir] gender identity" could effectively guarantee male students an absolute right to play women's sports. Proposal at 41,571. That is not fair to female athletes.

Following puberty, in particular, the androgenized bodies of male athletes give them "categorically different strength, speed, and endurance" as measured by both elite and average performance. Doriane Lambelet Coleman & Wickliffe Shreve, Comparing Athletic Performances the Best Women to Boys and Men (last visited Sept. 9, 2022)[20]; *see also* Lydia C. Hallam & Fabiano T. Amorim, *Expanding the Gap: an Updated Look into Sex Differences in Running Performance*, Frontiers in Physiology, Jan. 2022, at 2 (explaining that "[t]he sex gap in sports performance is primarily rooted in biological differences between the sexes, namely in relation to male[s'] superior skeletal muscle mass, oxidative capacities and lower fat mass").[21] To illustrate, the Olympic gold medalist Tori Bowie — an incredible female sprinter — has run the one-hundred-meters in a lifetime-best 10.78 seconds. *Id*. In 2017, no fewer than 15,000 male runners beat that mark in recorded competition. *Id*. That example "is far from the exception. It's the rule." *Id*. In fact, "the sex gap is smaller between elite males and females compared to sub-elite and recreational runners." Hallam & Amorim, *supra*. And it persists "across sporting

---

[18] https://www.wowt.com/content/news/Transgender-rights-clash-prompts-walkout-at-CB-Abraham-Lincoln-High-508449271.html (attached hereto as Exhibit T).
[19] https://www2.ed.gov/about/offices/list/ocr/frontpage/pro-students/issues/sex-issue04.html (attached hereto as Exhibit U).
[20] https://law.duke.edu/sites/default/files/centers/sportslaw/comparingathleticperformances.pdf (attached hereto as Exhibit V).
[21] https://www.frontiersin.org/articles/10.3389/fphys.2021.804149/full (attached hereto as Exhibit W).

**App. 109**

State of Tennessee Comments
ED-2021-OCR-0166
Page 13

events," with "the best male athletes consistently outperform[ing] their female peers" by anywhere "between 5 and 17%, depending on the sporting discipline, event duration and competitive standard." *Id.* Both the National Collegiate Athletic Association and the U.S. Olympic and Paralympic Committee have recognized this, which is why those organizations seek to "balanc[e] fairness, inclusion and safety for all who compete" by limiting the participation of transgender athletes based on testosterone levels. *Board of Governors Updates Transgender Participation Policy*, NCAA Media Center (Jan. 19, 2022).[22]

The Department's rules, by contrast, could push schools to allow students to choose their sports and teams based on self-reported gender identity alone. *See* Proposal at 41,571 (proposed 34 C.F.R. § 106.31(a)(2)). The result would threaten decades worth of gains in women's athletics and all the character-building benefits that have come along with those gains. For every male athlete permitted in women's competition, a female athlete is denied that same opportunity. *See* Editorial Staff, *16 Penn Swim Team Members Ask School, Ivy League to Refrain from Litigation to Allow Lia Thomas to Race at NCAAs*, Swimming World (Feb. 3, 2022).[23] For every male athlete who sets a new women's performance record, a female predecessor is robbed of a signature achievement. *See id.* And for every new policy implemented to ensure these results, legions of female athletes are affirmed in their belief that speaking out for their own rights and interests will only invite hostility and ridicule. *See id.*

Again, the Department has not delineated clear limits to its new policies. *See supra* at 5. But if its past pronouncements are any indication, it would rather dictate orthodoxy with respect to gender identity than actually prohibit discrimination in education on the basis of sex. Be that as it may, the law requires the Department to reason through the abovementioned issues before promulgating its new rules. To do any less would be an arbitrary and capricious exercise of administrative power and would have no legitimacy in our constitutional system.

\* \* \*

Thank you, again, for your consideration of these concerns. Any further failure to "clearly disclose[]" or "adequately sustain[]" the new rules, especially in light of the deficiencies detailed above, will justify Tennessee and the co-signing States in taking further action to protect their citizens' rights and interests under the Administrative Procedure Act. *Oncor Elec. Delivery Co. LLC v. NLRB*, 887 F.3d 488, 493 (D.C. Cir. 2018) (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943)); *see also Cytori Therapeutics, Inc. v. FDA*, 715 F.3d 922, 926 (D.C. Cir. 2013) (noting that agency action must be both "reasonable and reasonably explained" (citing *Motor Vehicle Manufacturers Assn. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29 (1983)). We therefore urge the Department to comply with the law or else abandon this misguided rulemaking.

---

[22] https://www.ncaa.org/news/2022/1/19/media-center-board-of-governors-updates-transgender-participation-policy.aspx (attached hereto as Exhibit X).

[23] https://www.swimmingworldmagazine.com/news/penn-swim-team-members-ask-school-ivy-league-to-refrain-from-litigation-to-allow-lia-thomas-to-race-at-ncaas/ (attached hereto as Exhibit Y).

State of Tennessee Comments
ED-2021-OCR-0166
Page 14

Sincerely,

Jonathan Skrmetti
Tennessee Attorney General & Reporter


Steve Marshall
Alabama Attorney General

Treg R. Taylor
Alaska Attorney General

Mark Brnovich
Arizona Attorney General

Leslie C. Rutledge
Arkansas Attorney General

Chris Carr
Georgia Attorney General

Todd Rokita
Indiana Attorney General

Derek Schmidt
Kansas Attorney General

Daniel Cameron
Kentucky Attorney General

Jeff Landry
Louisiana Attorney General

Lynn Fitch
Mississippi Attorney General

Austin Knudsen
Montana Attorney General

Douglas J. Peterson
Nebraska Attorney General

**App. 111**

State of Tennessee Comments
ED-2021-OCR-0166
Page 15


John M. O'Conner
Oklahoma Attorney General

Alan Wilson
South Carolina Attorney General


Mark Vargo
South Dakota Attorney General

Ken Paxton
Texas Attorney General


Sean D. Reyes
Utah Attorney General

Jason S. Miyares
Virginia Attorney General


Patrick Morrisey
West Virginia Attorney General