**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | |
|---|---|
| STATE OF TEXAS, *et al.,* | |
| Plaintiffs, | |
| v. | Case No. 2:24-cv-86-Z |
| | District Judge Matthew J. Kacsmaryk |
| UNITED STATES DEPARTMENT OF EDUCATION, *et al*., | |
| Defendants. | |

**BRIEF IN SUPPORT OF DEFENDANTS' RESPONSE TO**
**PLAINTIFFS' MOTION FOR STAY OF AGENCY ACTION**
**AND PRELIMINARY INJUNCTON**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND .................................................................................................. 4

I.     Title IX, Implementing Regulations, and Guidance ................................. 4

II.    Procedural History ................................................................................. 6

LEGAL STANDARD ............................................................................................ 6

ARGUMENT ...................................................................................................... 7

I.     Plaintiffs Are Unlikely To Succeed on the Merits. ................................... 7

      A.    The Rule's Interpretation of Title IX To Prohibit Discrimination on the Basis of Gender Identity or Sexual Orientation Is Compelled by the Statutory Text ................................................................................ 7

      B.    The Final Rule's Limitations on Sex Separation Are Lawful and Properly Account for Congressional Direction. ................................ 14

      C.    The Final Rule Does Not "Wrongfully Protect Abortion." ................ 21

      D.    The Final Rule Does Not Raise a Spending Clause Issue or Violate the Major Questions Doctrine ............................................................ 24

      E.    The Final Rule's Definition of Hostile Environment Sex-Based Harassment is a Lawful Exercise of the Department's Statutory Authority and Consistent with the Requirements of the First Amendment. ........ 26

      F.    Plaintiffs Fail To Establish Standing To Challenge the Provisions Regarding Grievance Procedures and Fail To Show These Provisions Violate the APA. ................................................................................ 32

          1.    Plaintiffs Lack Standing To Challenge the Grievance Procedures. .......... 33

          2.    The Grievance Procedures Are Not Arbitrary or Capricious ................... 35

      G.    Plaintiffs Do Not Demonstrate that the Department Failed To Adequately Assess Reliance Interests or Conduct a Reasonable Cost-Benefit Analysis ........ 43

II.    Plaintiffs Have Not Established Irreparable Harm. .............................. 45

III.   The Equities and Public Interest Weigh Against Preliminary Relief. .............. 47

IV.   Any Relief Afforded by the Court Should Be Limited in Accordance with the APA and Equitable Principles.. ................................................................ 48

CONCLUSION ...................................................................................................................... 50

# TABLE OF AUTHORITIES

## CASES

*Adams v. School Board of St. John's County*,
    57 F.4th 791 (11th Cir. 2022) ............................................................... 11, 12

*ADT, LLC v. Cap. Connect, Inc.*,
    145 F. Supp. 3d 671 (N.D. Tex. 2015) ........................................................ 46

*Air Transp. Ass'n v. FAA*,
    169 F.3d 1 (D.C. Cir. 1999) ....................................................................... 44

*Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin.*,
    724 F.3d 243 (D.C. Cir. 2013) .................................................................... 45

*Ams. for Prosperity Found. v. Bonta*,
    594 U.S. 595 (2021) ................................................................................... 29

*Anibowei v. Morgan*,
    70 F.4th 898 (5th Cir. 2023) ...................................................................... 45

*Arizona v. Biden*,
    40 F.4th 375 (6th Cir. 2022) ...................................................................... 48

*Ayotte v. Planned Parenthood of N. New England*,
    546 U.S. 320 (2006) ................................................................................... 50

*Benning v. Georgia*,
    391 F.3d 1299 (11th Cir. 2004) ........................................................... 24, 25

*Big Tyme Invs., L.L.C. v. Edwards*,
    985 F.3d 456 (5th Cir. 2021) ...................................................................... 47

*Bostock v. Clayton County*,
    590 U.S. 644 (2020) ........................................................................... *passim*

*Braidwood Mgmt., Inc. v. EEOC*,
    70 F.4th 914 (5th Cir. 2023) ................................................................ 12, 13

*Califano v. Aznavorian*,
    439 U.S. 170 (1978) ................................................................................... 16

*Califano v. Yamasaki*,
    442 U.S. 682 (1979) ................................................................................... 48

*Cannon v. Univ. of Chi.*,
    441 U.S. 677 (1979) ................................................................................... 47

*Cargill v. Garland*,
  57 F.4th 447 (5th Cir. 2023), *cert. granted*, 144 S. Ct. 374 (2023) ........................................ 48

*Central & S.W. Servs., Inc. v. EPA*,
  220 F.3d 683 (5th Cir. 2000) ........................................................................................... 48

*Cherokee Pump & Equip., Inc. v. Aurora Pump*,
  38 F.3d 246 (5th Cir. 1994) ............................................................................................... 6

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ......................................................................................................... 24

*Cornish v. Dudas*,
  540 F. Supp. 2d 61 (D.D.C. 2008) .................................................................................... 47

*Davis v. Federal Election Comm'n*,
  554 U.S. 724 (2008) ......................................................................................................... 33

*Davis ex rel. LaShonda D. v. Monroe County Board of Education*,
  526 U.S. 629 (1999) .......................................................................................... 27, 28, 32

*Dep't of Com. v. New York*,
  588 U.S. 752 (2019) ......................................................................................................... 35

*Def. Distributed v. U.S. Dep't of State*,
  838 F.3d 451 (5th Cir. 2016) ........................................................................................... 48

*DHS v. New York*,
  140 S. Ct. 599 (2020) ....................................................................................................... 48

*DHS v. Regents of the Univ. of Calif.*,
  591 U.S. 1 (2020) ............................................................................................................. 43

*Dixon v. Love*,
  431 U.S. 105 (1977) ......................................................................................................... 41

*Doe v. Manor College*,
  587 F. Supp. 3d 249 (E.D. Pa. 2022) ............................................................................... 13

*EEOC v. Bass Pro Outdoor World, L.L.C.*,
  826 F.3d 791 (5th Cir. 2016) ........................................................................................... 47

*FCC v. Fox Tele. Stations, Inc.*,
  556 U.S. 502 (2009) ........................................................................................ 35, 36, 40, 41

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021) ......................................................................................................... 20

iv

*Fla. Bankers Ass'n v. U.S. Dep't of Treas.*,
  19 F. Supp. 3d 111 (D.D.C. 2014), *vacated on other grounds*,
  799 F.3d 1065 (D.C. Cir. 2015) ............................................................... 44

*Franklin v. Gwinnett Cnty. Pub. Sch.*,
  503 U.S. 60 (1992) ...................................................................................... 8

*Gebser v. Lago Vista Independent School District*,
  524 U.S. 274 (1998) ................................................................................... 27

*Goss v. Lopez*,
  419 U.S. 565 (1975) ................................................................................... 39

*Gross v. FBL Fin. Servs., Inc.*,
  557 U.S. 167 (2009) ............................................................................... 8, 11

*Harris v. Forklift Sys., Inc.*,
  510 U.S. 17 (1993) ............................................................................... 26, 29

*Jackson v. Birmingham Bd. of Educ.*,
  544 U.S. 167 (2005) ............................................................................... 4, 25

*Jordan v. Fisher*,
  823 F.3d 805 (5th Cir. 2016) ...................................................................... 6

*Kowalski v. Tesmer*,
  543 U.S. 125 (2004) ............................................................................. 33, 34

*L.W. ex rel. Williams v. Skrmetti*,
  83 F.4th 460 (6th Cir. 2023) ................................................................. 10, 11

*L.W. ex rel. Williams v. Skrmetti*,
  73 F.4th 791 (11th Cir. 2022) ................................................................... 11

*Lakoski v. James*,
  66 F.3d 751 (5th Cir. 1995) .................................................................. 8, 10

*Lewis v. Casey*,
  518 U.S. 343 (1996) ................................................................................... 33

*Little v. KPMG LLP*,
  575 F.3d 533 (5th Cir. 2009) ..................................................................... 35

*Louisiana v. Biden*,
  55 F.4th 1017 (5th Cir. 2022) ................................................................... 45

*Lowrey v. Texas A&M Univ. Sys.*,
  117 F.3d 242 (5th Cir. 1997) ...................................................................... 8

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992)..................................................................................... 33

*Mayo v. United States*,
   319 U.S. 441 (1943)..................................................................................... 47

*Meritor Sav. Bank, FSB v. Vinson*,
   477 U.S. 57 (1986)........................................................................................ 8

*Morrissey v. Brewer*,
   408 U.S. 471 (1972)..................................................................................... 39

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto Ins. Co.*,
   463 U.S. 29 (1983)........................................................................... 14, 33, 35

*Muldrow v. City of St. Louis*,
   601 U.S. ---, 144 S. Ct. 967 (2024)..................................................... 2, 15, 17

*Munaf v. Geren*,
   553 U.S. 674 (2008)....................................................................................... 6

*Nat'l Ass'n of Home Builders v. EPA*,
   682 F.3d 1032 (D.C. Cir. 2012)................................................................... 44

*Neese v. Becerra*,
   640 F. Supp. 3d 668 (N.D. Tex. 2022), *appeal filed*, No. 23-10078 (5th Cir. Jan. 25, 2023).. 12

*NFIB v. Sebelius*,
   567 U.S. 519 (2012)..................................................................................... 24

*Nken v. Holder*,
   556 U.S. 418 (2009)..................................................................................... 47

*O'Shea v. Littleton*,
   414 U.S. 488 (1974)..................................................................................... 24

*Pelcha v. MW Bancorp, Inc.*,
   988 F.3d 318 (6th Cir. 2021) ....................................................................... 11

*Pennhurst State Sch. & Hosp. v. Halderman*,
   451 U.S. 1 (1981)......................................................................................... 24

*Rest. L. Ctr. v. United States Dep't of Lab.*,
   66 F.4th 593 (5th Cir. 2023) ....................................................................... 45

*Riggan v. Midland Indep. Sch. Dist.*,
   86 F. Supp. 2d 647 (W.D. Tex. 2000)......................................................... 39

*Safeco Ins. Co. of Am. v. Burr*,
    551 U.S. 47 (2007) ................................................................................................ 8

*Sampson v. Murray*,
    415 U.S. 61 (1974) .............................................................................................. 49

*Serrano v. CBP*,
    975 F.3d 488 (5th Cir. 2020) .............................................................................. 39

*Sullo & Bobbitt P.L.L.C. v. Abbott*,
    536 F. App'x 473 (5th Cir. 2013) ...................................................................... 35

*Texas v. EPA*,
    829 F.3d 405 (5th Cir. 2016) .............................................................................. 46

*United States v. Texas*,
    599 U.S. 670 (2023) ............................................................................................ 49

*Virginia v. Hicks*,
    539 U.S. 113 ................................................................................................. 29, 30

*Vote.Org v. Callanen*,
    39 F.4th 297 (5th Cir. 2022) .............................................................................. 34

*Walters v. Nat'l Ass'n of Radiation Survivors*,
    473 U.S. 305 (1985) ............................................................................................ 41

*Warth v. Seldin*,
    422 U.S. 490 (1975) ............................................................................................ 33

*Wash. State Grange v. Wash. State Republican Party*,
    552 U.S. 442 (2008) ............................................................................................ 29

*Watchguard Techs., Inc. v. Valentine*,
    433 F. Supp. 2d 792 (N.D. Tex. 2006) .............................................................. 45

*West Virginia v. EPA*,
    597 U.S. 697 (2022) ............................................................................................ 26

*White v. Carlucci*,
    862 F.2d 1209 (5th Cir. 1989) ............................................................................ 45

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ........................................................................................... 6, 45

*Wittmer v. Phillips 66 Co.*,
    915 F.3d 328 (5th Cir. 2019) ................................................................................ 8

## FEDERAL STATUTES

20 U.S.C. § 1681 ........................................................................................ *passim*

20 U.S.C. §§ 1681–1682 .................................................................................. 17

20 U.S.C. § 1682 ................................................................................. 1, 4, 46, 47

20 U.S.C. § 1683 ........................................................................................... 46

20 U.S.C. § 1686 .................................................................................... 4, 16, 17

20 U.S.C. § 1688 ................................................................................. 21, 22, 23

42 U.S.C. § 2000e-2 ................................................................................ 5, 7, 8

## STATE STATUTES

Tex. Educ. Code § 51.251 ................................................................................ 30

Tex. Educ. Code § 51.281 ................................................................................ 30

## RULES AND REGULATIONS

34 C.F.R. § 106.21 ........................................................................................ 22

34 C.F.R. § 106.31 ........................................................................................ 15

34 C.F.R. § 106.33 .................................................................................... 16, 17

34 C.F.R. § 106.40 ........................................................................................ 22

34 C.F.R. § 106.41 ........................................................................................ 18

34 C.F.R. § 106.57 ........................................................................................ 22

45 C.F.R. § 86.21 (1975) ................................................................................. 21

45 C.F.R. § 86.40 (1975) ................................................................................. 22

45 C.F.R. § 86.57 (1975) ................................................................................. 22

40 Fed. Reg. 24,128 ...................................................................................... 21

1997 Sexual Harassment Guidance,
    62 Fed. Reg. 12,034 (Mar. 13, 1997) ........................................................... 28

Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving
    Federal Financial Assistance,
    85 Fed. Reg. 30,026 (May 19, 2020) ....................................................................... 5, 28, 29, 38

Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving
    Federal Financial Assistance,
    87 Fed. Reg. 41,390 (proposed July 12, 2022) .................................................... 5, 15

Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving
    Federal Financial Assistance: Sex-Related Eligibility Criteria for Male and Female
    Athletic Teams,
    88 Fed. Reg. 22,860 (proposed Apr. 13, 2023) ......................................................... 18

Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving
    Federal Financial Assistance,
    89 Fed. Reg. 33,474 (Apr. 29, 2024) ............................................................... *passim*

## OTHER AUTHORITIES

Administrative Procedure Act, S. Doc. No. 248, 79th Cong., 2d Sess. (1946) ........................... 28

Guaranteeing an Educational Environment Free From Discrimination on the Basis of Sex,
    Including Sexual Orientation or Gender Identity, Exec. Order No. 14,021,
    86 Fed. Reg. 13,803 (Mar. 8, 2021) ........................................................................... 5

## INTRODUCTION

Title IX prohibits recipients of federal funds from discriminating on the basis of sex in their education programs or activities. 20 U.S.C. § 1681(a). The Department of Education is charged with issuing rules to effectuate this prohibition. 20 U.S.C. § 1682. On April 29, 2024, the Department of Education issued a rule titled Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 89 Fed. Reg. 33,474 (Apr. 29, 2024) (the "Final Rule" or "Rule"). Among other things, the Final Rule interprets Title IX's prohibition on discrimination "on the basis of sex" to include "discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity." 89 Fed. Reg. at 33,886. And the Rule defines sex-based hostile environment harassment to include "[u]nwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity." 89 Fed. Reg. at 33,884. The Rule also makes several changes to the Department's regulations regarding recipients' grievance procedures for complaints of discrimination under Title IX, while offering schools flexibility to select the approach that best fits their specific circumstances. For example, the Rule gives schools the option to provide live questioning either through a live hearing or live individual meetings; to use either the preponderance of the evidence standard or the clear and convincing evidence standard; and to use a single-investigator model or not.

Plaintiffs' challenges to the Rule fail on every proffered ground. The Department's interpretation of Title IX's prohibition of discrimination "on the basis of sex," to be codified at § 106.10, straightforwardly applies the Supreme Court's reasoning in *Bostock v. Clayton County*, 590 U.S. 644 (2020). *Bostock* concluded that Title VII's prohibition on sex discrimination

encompasses discrimination based on gender identity and sexual orientation "because it is impossible" to discriminate against a person for being transgender or homosexual "without discriminating against that individual based on sex," even assuming sex is binary. *Id.* at 660. That same reasoning applies to the materially similar prohibition on sex discrimination in Title IX.

       Plaintiffs' other complaints about the Rule are also unlikely to succeed on the merits. Plaintiffs fail to demonstrate that the Final Rule is arbitrary or capricious based on the distinctions it recognizes between contexts in which Congress has specified exceptions to Title IX's prohibition on sex discrimination, and other contexts—such as restrooms—in which it has not. Nor do Plaintiffs demonstrate that the Final Rule is arbitrary or capricious in applying the principle that separate or different treatment based on sex does not constitute unlawful discrimination under Title IX if it does not cause harm. In this respect, the Final Rule aligns with recent Supreme Court precedent defining discrimination as differential treatment that causes some harm or injury. *See Muldrow v. City of St. Louis*, 601 U.S. ---, 144 S. Ct. 967, 974 (2024) (under Title VII, "words 'discriminate against,' refer to 'differences in treatment that injure' employees'" (quoting *Bostock*, 590 U.S. at 681)). The Department's articulation of this harm standard and its implementation of Title IX's narrow exceptions to the general prohibition on sex discrimination, in the provision to be codified at 34 C.F.R. § 106.31(a)(2), do not somehow render the Rule unreasonable. On the contrary, the Rule's adherence to the lines drawn by Congress—which specified only a handful of contexts where separation or different treatment based on sex is permitted even when it may subject a person to harm—was proper and lawful.

       Plaintiffs also do not show that the Rule's specification that Title IX's prohibition on sex discrimination on the basis of "pregnancy or related conditions" includes discrimination on the basis of "termination of pregnancy" is improper—in fact, that has been the consistent interpretation

of the Department since 1975. Contrary to Plaintiffs' assertion, the Rule does not purport to override Texas's abortion prohibitions. Nor does the Rule require healthcare plans offered by educational institutions to cover abortions.

Plaintiffs also mischaracterize the Final Rule as creating an unworkable harassment standard. The Department used a similar standard in its enforcement of Title IX for decades prior to regulatory changes made in 2020. And courts and the Equal Employment Opportunity Commission ("EEOC") likewise have used a similar standard to identify harassment under Title VII's analogous provisions for decades. Plaintiffs fail to show that the hostile environment harassment standard defined in the Rule conflicts with any governing legal precedent or that it is otherwise arbitrary or capricious. Nor do Plaintiffs demonstrate that the challenged harassment standard threatens First Amendment rights, or that it exceeds the Department's statutory authority.

Plaintiffs' argument that the Department violated the Administrative Procedure Act ("APA") in promulgating certain provisions regarding recipients' grievance procedures also lacks merit. Plaintiffs do not even demonstrate standing to challenge these portions of the Rule—which provide recipients with options for how to structure grievance procedures—and they fail to show that the Department's promulgation of these provisions was in any way unreasonable.

Finally, Plaintiffs fail to show that the Final Rule requires an interpretation of Title IX that would violate the Spending Power, or that the Rule implicates the major questions doctrine. Nor do they demonstrate that any provision of the Rule is arbitrary and capricious on the basis that the Department purportedly failed to adequately address reliance interests or to conduct a reasonable cost-benefit analysis.

Because Plaintiffs fail to show that the Department's promulgation of the Final Rule was in any respect arbitrary and capricious, beyond the Department's statutory authority, or otherwise

unlawful, they have not demonstrated a likelihood of success on the merits and their motions for preliminary relief should be denied.

Plaintiffs also have not satisfied the other requirements for a stay or preliminary injunction. Plaintiffs' alleged harms are largely speculative and cannot establish irreparable injury justifying preliminary relief. Moreover, the public interest and balance of equities weigh against granting Plaintiffs' motions, as enjoining the Rule would substantially harm the United States' interests in preventing discrimination in federally funded education programs and activities.

Accordingly, the Court should deny the motion for a § 705 stay and preliminary injunction.

## BACKGROUND

### I.    Title IX, Implementing Regulations, and Guidance

Title IX's anti-discrimination provision states, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). There are only a small number of "specific, narrow exceptions to that broad prohibition." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005); *see* 20 U.S.C. § 1681(a)(1)–(9) (listing educational institutions, organizations, or programs that are exempt or partly exempt from Title IX's prohibition on sex discrimination); *id.* § 1686 (permitting maintenance of sex-separate living facilities).

Title IX authorizes and directs the Department to "issu[e] rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken." *Id.* § 1682. Title IX also sets forth an administrative enforcement scheme, which allows the Department to obtain voluntary compliance from or, failing that, terminate the federal funds of a recipient that fails to comply with the statute or the Department's implementing regulations. *Id.*

4

Over the years, the Department has promulgated regulations effectuating Title IX, including in 2020, when it specified how recipients of federal funds must respond to allegations of sexual harassment in their education programs or activities. *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30,026 (May 19, 2020) [hereinafter 2020 Amendments].

One month after publication of the 2020 Amendments, the Supreme Court held that the prohibition on discrimination "because of . . . sex" in Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e-2(a)(1), necessarily encompasses discrimination because of sexual orientation and gender identity. *See Bostock*, 590 U.S. at 660. Following *Bostock*, President Biden directed the Department of Education to review the 2020 Amendments and existing agency guidance "for consistency with governing law." Guaranteeing an Educational Environment Free From Discrimination on the Basis of Sex, Including Sexual Orientation or Gender Identity, Exec. Order No. 14,021, § 2, 86 Fed. Reg. 13,803 (Mar. 8, 2021).

During engagements seeking input on Title IX issues in 2021 and 2022, *see* 89 Fed. Reg. at 33,480, stakeholders described the harms students suffer when they are restricted from participating in school consistent with their gender identity or are not provided equal educational access based on pregnancy or related conditions, *see* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 87 Fed. Reg. 41,390, 41,396 (proposed July 12, 2022). Stakeholders also characterized the 2020 Amendments as in tension with Title IX's nondiscrimination mandate, an impediment to schools' ability to effectively manage their educational environment, a deterrent to reporting, and unnecessarily adversarial. *Id.* at 41,395–97. In July 2022, the Department issued a Notice of Proposed Rulemaking (NPRM), *see* 87 Fed. Reg. 41,390, and, following extensive review of the more than 240,000 public comments,

5

published the Final Rule, which goes into effect on August 1, 2024. *See* 89 Fed. Reg. at 33,476.

As relevant to this case, the Final Rule: (1) describes the scope of prohibited sex discrimination under Title IX, *id.* at 33,476; (2) explains the limits of permissible different or separate treatment on the basis of sex under Title IX, *id.* at 33,477; (3) clarifies the definition of sex-based harassment under Title IX, *id.* at 33,476; (4) defines the terms "pregnancy or related conditions" and clarifies a recipient's obligations to students and employees who are experiencing these conditions, *id.* at 33,887; and (5) makes changes to the Department's regulations regarding recipients' grievance procedures, *id.* at 33,477.

## II.   Procedural History

On April 29, 2024, the State of Texas filed its original Complaint. ECF No. 1. On May 13, 2024, Plaintiffs filed their Amended Complaint. ECF No. 12. On May 14, 2024, Plaintiffs filed their Motion for Stay of Agency Action and Preliminary Injunction, ECF No. 16 ("Pls.' Mot.").

## LEGAL STANDARD

"A preliminary injunction is an extraordinary and drastic remedy" that should "never be awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (citation omitted); *see Cherokee Pump & Equip., Inc. v. Aurora Pump*, 38 F.3d 246, 249 (5th Cir. 1994). A plaintiff may obtain this "extraordinary remedy" only "upon a clear showing" that it is "entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). The party seeking a preliminary injunction bears the burden to show "a substantial likelihood of success on the merits," "a substantial threat of irreparable injury," "that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted," and "that the grant of an injunction will not disserve the public interest." *Jordan v. Fisher*, 823 F.3d 805, 809 (5th Cir. 2016) (citation omitted).

## ARGUMENT

**I.    Plaintiffs Are Unlikely To Succeed on the Merits.**

    **A.    The Rule's Interpretation of Title IX To Prohibit Discrimination on the Basis of Gender Identity or Sexual Orientation Is Compelled by the Statutory Text.**

Title IX prohibits discrimination "on the basis of sex" in education programs or activities receiving federal financial assistance. 20 U.S.C. § 1681(a). The Final Rule interprets that provision to provide that "[d]iscrimination on the basis of sex includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity." 89 Fed. Reg. at 33,886 (to be codified at 34 C.F.R. § 106.10). As the Department explained, "discrimination on each of those bases is sex discrimination because each necessarily involves consideration of a person's sex, even if that term is understood to mean only physiological or 'biological distinctions between male and female.'" *Id.* at 33,802 (quoting *Bostock*, 590 U.S. at 655).

    Plaintiffs argue that the Department's interpretation of Title IX is inconsistent with the statutory text, Pls.' Mot. 17–21, and that it is arbitrary and capricious, *id.* 26–27. To the contrary, the Department faithfully interpreted the statutory text in light of *Bostock*, which interpreted Title VII's provision making it unlawful, in relevant part, "for an employer . . . to discriminate against any individual . . . because of such individual's . . . sex," 590 U.S. at 655 (quoting 42 U.S.C. § 2000e-2(a)(1)). The Supreme Court explained that Title VII's "because of" language "incorporates the 'simple' and 'traditional' standard of but-for causation." *Id.* at 656–57 (citation omitted). "[S]ex is necessarily a but-for cause" of discrimination on the basis of transgender status "because it is impossible" to discriminate against a person for being transgender "without discriminating against that individual based on sex." *Id.* at 660, 661 (emphasis omitted). If, for example, an employer "fires a transgender person who was identified as a male at birth but who

7

now identifies as a female," but "retains an otherwise identical employee who was identified as female at birth, the employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth." *Id.* at 660. "[T]he individual employee's sex plays an unmistakable and impermissible role in the discharge decision." *Id.* Critically, that is so even assuming "sex" in Title VII "refer[s] only to biological distinctions between male and female." *Id.* at 655.

*Bostock*'s reasoning applies with equal force to Title IX's prohibition on discrimination "on the basis of sex," 20 U.S.C. 1681(a), which employs a causation standard no more stringent than Title VII's "because of . . . sex" language, 42 U.S.C. § 2000e-2(a)(1). The Supreme Court has long used the phrase "on the basis of" interchangeably with Title VII's "because of" language when discussing Title VII's causation standard, including in *Bostock* itself. *See, e.g.*, 590 U.S. at 650 ("[I]n Title VII, Congress outlawed discrimination in the workplace on the basis of . . . sex."); *see also Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009) (explaining that the statutory phrase "based on" has the same meaning as the phrase "because of" (citing *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 63–64 & n.14 (2007))). Courts—including the Fifth Circuit—consistently rely on interpretations of Title VII's prohibition against discrimination "because of . . . sex" to interpret Title IX's textually similar provision. *See, e.g.*, *Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 75 (1992) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57 (1986)); *Lowrey v. Texas A&M Univ. Sys.*, 117 F.3d 242, 248 (5th Cir. 1997); *Lakoski v. James*, 66 F.3d 751, 756 (5th Cir. 1995). Indeed, the Fifth Circuit has emphasized "Title IX's similarity to Title VII," explaining that, "the prohibitions of discrimination on the basis of sex [in] Title IX and Title VII are the same." *Lakoski*, 66 F.3d at 756 & n.3; *see also Wittmer v. Phillips 66 Co.*, 915 F.3d 328, 337 (5th Cir. 2019) (Ho, J., concurring) ("[F]ederal statutes governing educational institutions employ

8

language indistinguishable from Title VII[.]"). Title IX no more permits a school to bar a student from band practice because the student is transgender than Title VII permits an employer to fire an employee because the employee is transgender.

Plaintiffs argue that the Rule is unlawful based on their view that Title IX defines sex as binary and biological. Pls.' Mot. 17. But Plaintiffs fail to acknowledge that *Bostock* "proceed[ed] on the assumption that 'sex' . . . referr[ed] only to biological distinctions between male and female." 590 U.S. at 655. Thus, per *Bostock*, regardless of how one defines "sex," "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Id.* at 660. The Rule faithfully follows *Bostock*'s reasoning. *See* 89 Fed. Reg. at 33,802, 33,804–05, 33,807. As *Bostock* underscores, discriminating against someone based on their gender identity or sexual orientation necessarily constitutes discrimination "on the basis of" the sex that they were assigned at birth. *See Bostock*, 590 U.S. at 660–61 (explaining "transgender status [is] inextricably bound up with sex"); *id.* at 669 ("[D]iscrimination based on homosexuality or transgender status necessarily entails discrimination based on sex; the first cannot happen without the second."). Contrary to Plaintiffs' assertion, Pls.' Mot. 13, the Rule does not "redefin[e] . . . sex to include sexual orientation and gender identity," nor does the Rule's interpretation of the scope of sex discrimination prohibited by Title IX depend on such a definition. *See* 89 Fed. Reg. at 33,802.[1]

---

[1] A court in this district recently declared unlawful the Department's interpretation in certain guidance documents predating the Final Rule, and "any future agency guidance documents," that Title IX prohibits discrimination based on sexual orientation and gender identity. *See* Mem. Op. & Order at 102, *Texas v. Cardona*, No. 4:23-cv-00604-O (N.D. Tex. June 11, 2024), ECF No. 37. In reaching that decision, the court endorsed much of the faulty reasoning and misunderstanding of *Bostock* underpinning Plaintiffs' claims here. *See generally id.* at 78–85. Regardless, the declaratory relief granted in the guidance documents case does not purport to extend to the Final Rule, and the court made clear that its parallel injunctive relief likewise does not apply to the Final Rule. *See id.* at 102, 108.

Plaintiffs also contend that "[t]he Final Rule . . . conflicts with the reasoning of *Bostock* because that case did not find that all sex-based distinctions were prohibited." Pls.' Mot. 20. But neither does the Final Rule's interpretation of the scope of sex discrimination equate to a prohibition on "all sex-based distinctions." As Plaintiffs elsewhere acknowledge, Title IX and the Department's regulations have long allowed for sex-based separation or differentiation in certain specified contexts, *id.* 4 & n.2, and these provisions are unaffected by the scope of sex discrimination provision to be codified at § 106.10. Whether any different or separate treatment on the basis of sex may be permissible in certain circumstances is instead addressed by other portions of the Final Rule and Title IX regulations, *see* Part I.B *infra*—not § 106.10, which merely sets forth the general scope of Title IX's prohibition on sex discrimination. Plaintiffs' challenge appears to stem in large part from § 106.31(a)(2), the separate provision governing the manner in which recipients may permissibly implement measures separating or differentiating students based on sex. *See* 89 Fed. Reg. at 33,887; *see generally* Pls.' Mot. 20, 23–25, 27–28. Plaintiffs conflate § 106.10 with § 106.31(a)(2), but these are separate provisions with separate justifications. *Compare* 89 Fed. Reg. at 33,801–13, *with id.* at 33,814–25. *Bostock*'s reasoning is fully consistent with § 106.10's general description of the scope of Title IX's prohibition on sex discrimination, with or without § 106.31(a)(2)'s clarification regarding sex-based separation or differentiation.

In arguing that *Bostock*'s reasoning does not apply to Title IX, Plaintiffs cite several lower court opinions. Pls.' Mot. 17–18. But none of these cases identifies a persuasive ground to conclude that *Bostock*'s analysis of Title VII's prohibition of discrimination "because of" sex is inapplicable to Title IX's materially similar text, particularly in light of binding Fifth Circuit precedent suggesting precisely the opposite.  *See Lakoski*, 66 F.3d at 756 & n.3.

*L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460 (6th Cir. 2023), an out-of-circuit equal

protection case, did not interpret Title IX, nor did it address what it means to discriminate on the "basis of sex."[2] In reversing the preliminary injunction of a state law prohibiting healthcare providers from performing gender-affirming surgeries and administering hormones or puberty blockers to transgender minors, the court considered whether the law would receive heightened review under the Equal Protection Clause. *Id.* at 479–86. The court observed that *Bostock* "does not alter" its conclusion about whether the law should receive increased scrutiny, and suggested in dicta that *Bostock*'s reasoning applied only to Title VII, *id.* at 484–85 (emphasis omitted). But this dicta—divorced from any analysis of Title IX's materially indistinguishable text—cannot overcome the textual analysis in *Bostock* itself. *See Bostock*, 590 U.S. at 654–55, 664–65.

*Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318 (6th Cir. 2021), an Age Discrimination in Employment Act (ADEA) case, is similarly inapposite, and did not even touch on the question of whether Title VII's prohibition on discrimination "because of" sex is materially distinguishable from Title IX's prohibition on discrimination "on the basis of" sex. The *Pelcha* court merely declined to rely on *Bostock*'s analysis of but-for causation under Title VII in light of binding Supreme Court precedent interpreting the ADEA's causality requirement. *See* 988 F.3d at 323–24 (citing *Gross*, 557 U.S. 167).

Similarly, *Adams v. School Board of St. John's County* did not interpret the scope of discrimination "on the basis of sex" addressed in § 106.10, but rather whether a particular school district policy preventing a transgender boy from using the boys' restroom violated Title IX. 57 F.4th 791, 799 (11th Cir. 2022). The court rejected an argument that *Bostock* compelled a decision

---

[2] Plaintiffs cite the motions panel decision in *L.W.* (i.e., on whether to stay the injunction), *see* 73 F.4th 408 (6th Cir. 2023), rather than the merits panel decision (on the injunction itself). It makes no difference; in both decisions, the court analyzed whether *Bostock* informed its analysis of an equal protection claim, not how it applied to Title IX's antidiscrimination provision.

that the restroom policy violated Title IX, noting among other things, that the Supreme Court "expressly declined to address the issue of sex-separated bathrooms and locker rooms." *Id.* at 808. But as explained above, the Rule's provision setting forth the scope of sex discrimination also does not address bathrooms or locker rooms. *See* 89 Fed. Reg. at 33,886. *Adams* does not disturb § 106.10's top-line determination, consistent with *Bostock*, that one cannot discriminate based on gender identity without discriminating based on sex.

Finally, *Neese v. Becerra* arose in a different context from this case—that is, a challenge by two physicians to a notice that the Department of Health and Human Services would interpret a prohibition of sex discrimination in Section 1557 of the Affordable Care Act to include discrimination on the basis of sexual orientation and gender identity. 640 F. Supp. 3d 668, 673 (N.D. Tex. 2022), *appeal filed*, No. 23-10078 (5th Cir. Jan. 25, 2023). The *Neese* physicians expressly conceded that *Bostock*'s reasoning applies to Title IX and Section 1557. *See* Resp. to Defs.' Mot. for Summ. J. & Reply in Supp. of Pls.' Mot. for Summ. J. at 7, *Neese v. Becerra*, No. 2:21-cv-00163-Z (N.D. Tex. Sept. 16, 2022), ECF No. 62. The Court disregarded plaintiffs' concession and, without the benefit of the Final Rule's analysis, concluded that *Bostock*'s reasoning does not extend to Title IX because "Title IX presumes sexual dimorphism" and because Title IX refers to discrimination "on the basis of" sex rather than "because of" sex. *See Neese*, 640 F. Supp. 3d at 676–84. But, as noted above, the Rule, like *Bostock*, explains that discrimination based on gender identity falls within the scope of discrimination on the basis of sex even if sex is assumed to be binary—that is, even if "sexual dimorphism" is presumed. *See* 89 Fed. Reg. at 33,802, 33,804–05, 33,807. And in focusing on Title IX's use of the phrase "on the basis" of sex, the Court in *Neese* failed to acknowledge that not only *Bostock* itself but also binding Fifth Circuit precedent uses "on the basis" and "because of" interchangeably. *See Braidwood Mgmt., Inc. v.*

*EEOC*, 70 F.4th 914, 918 (5th Cir. 2023) (explaining *Bostock*'s holding that Title VII bars discrimination based on sexual orientation because it is "discrimination . . . 'on the basis of sex'" (citation omitted)); *see also supra* at 8.[3]

In sum, none of the cases Plaintiffs rely upon casts doubt on *Bostock*'s application to Title IX's prohibition on discrimination "on the basis of sex," even if "sex" is defined as "biological."[4] Whatever the differences between Title VII and Title IX, for the reasons explained in *Bostock*, Title IX's prohibition on discrimination "on the basis of sex" by its plain terms prohibits discrimination based on gender identity and sexual orientation, *see Bostock*, 590 U.S. at 662, and Plaintiffs' arguments otherwise are unlikely to succeed.

Plaintiffs' attempt to avoid *Bostock*'s application ultimately relies on a misconstruction of the Supreme Court's holding. Insisting that Title VII in some instances allows an employer to fire an employee because the employee is transgender or homosexual, Pls.' Mot. 18–20, Plaintiffs assert that *Bostock* permits discrimination against homosexual or transgender employees when the

---

[3] In support of the conclusion that "on the basis of" in Title IX has a distinct meaning from "because of" in Title VII, *Neese* cited *Doe v. Manor College,* 587 F. Supp. 3d 249, 254 (E.D. Pa. 2022). But *Manor College*'s interpretation of "on the basis of sex" only strengthens the Department's determination, based on *Bostock*, that sex discrimination under Title IX encompasses discrimination based on gender identity. In *Manor College*, the court held that "a college retaliates 'on the basis of sex' when the protected activity under Title IX is a motivating factor for the adverse action," rather than a "but-for" cause. *Id.* at 255. *Bostock*, in contrast, held that Title VII's prohibition on discrimination "because of" sex encompassed discrimination based on sexual orientation and transgender status even if that standard required sex to be *more* than a "motivating factor" in the discrimination. *See Bostock*, 590 U.S. at 657 ("Under this more forgiving ['motivating factor'] standard, liability can sometimes follow even if sex *wasn't* a but-for cause of the employer's challenged decision. Still, because nothing in our analysis depends on the motivating factor test, we focus on the more traditional but-for causation standard . . . .").

[4] Although Plaintiffs purport to challenge the Rule's determination that prohibited sex discrimination includes discrimination on the basis of sexual orientation, Pls.' Mot. 2, 16, Plaintiffs nowhere suggest that they intend to engage in discrimination based on sexual orientation or explain how they are otherwise harmed by that provision. The failure further reinforces that any objection that Plaintiffs have to the Rule does not arise from § 106.10's straightforward application of *Bostock*'s reasoning to the indistinguishable language of Title IX.

discrimination is "appl[ied] equally to both biological sexes," *Id.* 20. In fact, *Bostock* directly rejected this argument, holding that it is no "defense for an employer to say it discriminates against both men and women because of sex." 590 U.S. at 659. As the Court explained, "an employer who fires a woman, Hannah, because she is insufficiently feminine and also fires a man, Bob, for being insufficiently masculine may treat men and women as groups more or less equally. But in both cases the employer fires an individual in part because of sex. Instead of avoiding Title VII exposure, this employer doubles it." *Id.*

The Final Rule explains the application of *Bostock*'s reasoning in detail, *see, e.g.*, 89 Fed. Reg. at 33,801–11, and Plaintiffs fail to identify any way in which the Department's interpretation of the scope of Title IX's prohibition on sex discrimination "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem," or is otherwise arbitrary or capricious. Pls.' Mot. 26 (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)). Plaintiffs' argument that the Department "neglected to offer a reasoned explanation for the Final Rule's departure from the historic understanding . . . of Title IX's prohibition on 'sex' discrimination," *id.*, is simply a reprise of Plaintiffs' contention that the Department was wrong to apply *Bostock*'s reasoning to Title IX.

Plaintiffs thus are unlikely to succeed on the merits of their claims that the interpretation of sex discrimination to be codified at 34 C.F.R. § 106.10 is inconsistent with Title IX or otherwise arbitrary and capricious.

B.     **The Final Rule's Limitations on Sex Separation Are Lawful and Properly Account for Congressional Direction.**

Contrary to Plaintiffs' suggestion, the Final Rule's clarification of the extent to which Title IX permits separate or different treatment on the basis of sex also follows naturally from Title IX's operative text, and is not arbitrary or capricious. Plaintiffs take issue with the Rule's provision

14

that, with limited exceptions, a recipient may not carry out sex-based different or separate treatment in a manner that prevents a person from participating in an education program or activity consistent with the person's gender identity. Pls.' Mot. 23–25, 27. Plaintiffs also claim that this provision of the Rule ignores safety, privacy, and compliance concerns. *Id.* 27. These arguments fail.

As explained in the Final Rule, the Department's regulations have long specified that separate or different treatment on the basis of sex is generally prohibited under Title IX because such treatment is presumptively discriminatory. 89 Fed. Reg. at 33,814 (citing NPRM, 87 Fed. Reg. at 41,534; 34 C.F.R. § 106.31(b)(4), (7)). The regulations, however, also have long-recognized limited contexts in which sex separation or differentiation is allowed. *Id.* The provision to be codified at § 106.31(a)(2) explains how recipients may carry out such separate or different treatment without running afoul of the statute's nondiscrimination mandate. As the Supreme Court recently explained in *Muldrow v. City of St. Louis*, a Title VII case, a plaintiff claiming discrimination must demonstrate some harm, but need not establish a "significant" injury or meet "an elevated threshold of harm." 144 S. Ct. at 974. Consistent with this principle, the Rule provides that, save for limited instances allowed by statute, Title IX prohibits "distinctions or differences in treatment [on the basis of sex] that injure protected individuals." 89 Fed. Reg. at 33,814 (brackets in original) (quoting *Bostock*, 590 U.S. at 681).

In accordance with that natural reading of Title IX's prohibition of sex-based "discrimination," 20 U.S.C. § 1681(a), the Department explained that, except in certain contexts set forth below, a recipient must not provide sex-separate facilities or activities in a manner that subjects any person to legally cognizable injury, *i.e.*, more than de minimis harm. 89 Fed. Reg. at 33,814. The Department has long recognized that sex "separation in certain circumstances,

15

including in the context of bathrooms or locker rooms, is not presumptively unlawful sex discrimination" because such sex-separate facilities generally impose no more than de minimis harm on students. *Id.* at 33,818. But consistent with federal court decisions and guidelines published by respected medical organizations, the Department explained that sex separation that prevents a person from participating in a program or activity consistent with the person's gender identity *does* cause more than de minimis harm—a conclusion that Plaintiffs do not dispute. *Id.* at 33,816 (citing court decisions); *id.* at 33,819 n.90 (citing guidelines published by medical organizations). Because preventing a person from using sex-separate restrooms consistent with the person's gender identity causes more than de minimis sex-based harm, *id.* at 33,814, it is prohibited by Title IX.

At the same time, the Department recognized that Congress specified a few limited contexts in which different or separate treatment based on sex is permitted, without regard to the degree of harm such sex separation might cause. *Id.* at 33,819; *see, e.g.*, 20 U.S.C. § 1681(a)(6) (membership practices of certain social fraternities or sororities); *id.* § 1681(a)(4) (institutions focused on military training); *id.* § 1686 (educational institution's maintenance of "separate living facilities for the different sexes"). The Final Rule "clearly effectuates this basic congressional decision." *Califano v. Aznavorian*, 439 U.S. 170, 178 (1978). Plaintiffs are incorrect that the Final Rule's attention to the distinction between regulations informed by express congressional direction, listed in § 106.31(a)(2), and regulations permitting sex separation in other contexts is "contradictory," Pls.' Mot. 27. As explained by the Department, this distinction follows directly from the statute itself and basic tenets of administrative law. 89 Fed. Reg. at 33,814, 33,819. Although Congress did not except "toilet, locker room, and shower facilities" from the general prohibition on sex discrimination, Pls.' Mot. 27 (quoting 34 C.F.R. § 106.33), the Department

reasonably determined that sex separation in such contexts can be consistent with Title IX, but only to the extent that any sex-based harm imposed is de minimis—*i.e.*, not discriminatory. 89 Fed. Reg. at 33,816; *see id.* at 33,821 (explaining that the statutory living facilities "carve-out" in 20 U.S.C. § 1686 is inapplicable to "other aspects of a recipient's education program or activity for which Title IX permits different treatment or separation on the basis of sex, such as bathrooms, locker rooms, or shower facilities," and noting that the latter are "regulations that the Department adopted under different statutory authority [at 20 U.S.C. §§ 1681–1682], and which have long been addressed separately from 'living facilities'").

Plaintiffs' suggestion that the Final Rule "violates *Bostock*" because it does not create "exemptions" to "sex-specific policies" for cisgender students, Pls.' Mot. 25, is meritless. Indeed, this argument turns the Rule on its head and ignores a key element of unlawful discrimination on the basis of sex—that it causes harm. *See* 89 Fed. Reg. at 33,814; *Muldrow*, 144 S. Ct. at 974 (quoting *Bostock*, 590 U.S. at 681). As explained by the Department, the provision to be codified at § 106.31(a)(2) "is not limited to transgender students" but rather "protects all students from harm when a recipient separates or treats students differently based on sex." 89 Fed. Reg. at 33,820. Sex-separate bathrooms differentiate on the basis of sex, and the Title IX regulations have long permitted this separation, 34 C.F.R. § 106.33. But, as Plaintiffs do not dispute, the Department had no basis to conclude that such separation causes cognizable harm to cisgender students and employees, 89 Fed. Reg. at 33,820, and it therefore determined that such separation does not as a general matter subject them to unlawful discrimination. In contrast, as explained in the Final Rule, sex separation that prevents a person from participating in a program or activity consistent with the person's gender identity *does* cause such harm. *Id.* at 33,816. Because the provision to be codified at § 106.31(a)(2) merely applies the well-established principle that different treatment

17

based on sex is unlawful only if it causes cognizable harm, it does not violate Title IX's prohibition on sex discrimination.

Nor does the Department's decision to address athletics through a separate rulemaking,[5] and to specify that the de minimis harm provision in § 106.31(a)(2) does not apply to male and female athletic teams that a recipient offers under § 106.41(b), *see id.*, render the Rule arbitrary and capricious. *See generally* Pls.' Mot. 28. Congress recognized by statute that athletics is a special context, *id.*; *see* Education Amendments of 1974, section 844, and the Department's athletics regulations have always tracked this determination that the unique circumstances of athletics merit a different approach, "governed by an overarching nondiscrimination mandate and obligation to provide equal athletic opportunities for students regardless of sex." 89 Fed. Reg. at 33,816 (citing 34 C.F.R. § 106.41(a), (c)). This approach allows that individual students may be excluded from a particular male or female team based on their sex, even when doing so may impose more than de minimis harm. *Id.* at 33,817. Plaintiffs fault the Department for not addressing in this rulemaking positions the United States has taken in briefs in private litigation regarding Title IX's application to athletics. Pls.' Mot. 14. But as the Final Rule explains, "[t]he Department is continuing to evaluate comments on that proposed regulation, and will issue its final rule on this standard for criteria for a student's eligibility to participate on sex-separate athletic teams in the future." 89 Fed. Reg. at 33,817. The Final Rule states: "Until that [athletics] rule is finalized and issued, the current regulations on athletics continue to apply." *Id.* Thus, as the Rule makes explicit and contrary to Plaintiffs' assertion, Pls.' Mot. 28, the Rule in no way alters the status quo

---

[5] In April 2023, the Department issued a separate notice of proposed rulemaking regarding the athletics regulations, which will be finalized in a separate rulemaking. *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance: Sex-Related Eligibility Criteria for Male and Female Athletic Teams, 88 Fed. Reg. 22,860 (proposed Apr. 13, 2023).

regarding sex-separate athletic teams, nor does it "undercut" the Department's separate rulemaking regarding athletics.

Further, Plaintiffs have not shown that, in promulgating § 106.31(a)(2), the Department failed to "address . . . the risk that the Department's policy would pose to student safety and privacy." *Id.* 27. The Department thoroughly considered and addressed commenters' concerns, including reported concerns regarding safety, privacy, and compliance. *See generally* 89 Fed. Reg. at 33,817–20. The Department "strongly agrees that recipients have a legitimate interest in protecting all students' safety and privacy," and explained that, under § 106.31(a)(2), "a recipient can make and enforce rules that protect all students' safety and privacy without also excluding transgender students from accessing sex-separate facilities and activities consistent with their gender identity." 89 Fed. Reg. at 33,820; *see also id.* ("nothing in Title IX or the final regulations prevents a recipient from offering single-occupancy facilities, among other accommodations, to any students who seek additional privacy for any reason"). The Department concluded, however, that there is no "evidence that transgender students pose a safety risk to cisgender students, or that the mere presence of a transgender person in a single-sex space compromises anyone's legitimate privacy interest." *Id.* The Final Rule notes, for example, that federal courts have rejected "unsubstantiated and generalized concerns that transgender persons' access to sex-separate spaces infringes on other students' privacy or safety." *Id.* (citing cases).

The Department also addressed concerns regarding compliance, including "questions about how a recipient should determine a person's gender identity for purposes of § 106.31(a)(2)." *Id.* at 33,819. Contrary to Plaintiffs' characterization, the Rule does not "prohibit[] schools from even seeking confirmation of a student's gender identity," Pls.' Mot. 14; the Rule acknowledges that "many recipients rely on . . . written confirmation" by the student or an appropriate adult authority

19

figure. 89 Fed. Reg. at 33,819. But the Rule explains that recipients may not "requir[e] a student to submit to invasive medical inquiries or burdensome documentation requirements" because doing so "imposes more than de minimis harm." *Id.* Plaintiffs do not meaningfully dispute that conclusion, and the Rule's recognition that some compliance mechanisms are unduly burdensome does not render the Rule arbitrary and capricious.

With respect to Plaintiffs' concern regarding how § 106.31(a)(2) applies to "'nonbinary' . . . or 'questioning individuals,'"[6] Pls.' Mot. 27, the Department explained that "a recipient may, for example, coordinate with the student, and the student's parent or guardian as appropriate, to determine how to best provide the student with safe and nondiscriminatory access to facilities, as required by Title IX." 89 Fed. Reg. at 33,818. Plaintiffs identify no way in which this explanation is unreasonable, and Plaintiffs' assertion that the Rule leaves recipients unable to apply § 106.31(a)(2) to individuals who identify as nonbinary or are uncertain of their gender identity, Pls.' Mot. 27, is incorrect.

In sum, the Final Rule's application of the de minimis harm standard in § 106.31(a)(2) is supported and logical, and, in promulgating this provision, the Department neither entirely failed to consider an important aspect of the problem nor ignored relevant evidence. *See FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021) (noting that judicial review under arbitrary-and-capricious standard is "deferential" and "simply ensures that the agency has acted within a zone of reasonableness").

---

[6] Plaintiffs also assert that the Rule is unclear about how "its gender-identity mandate" applies to "bisexual" students and employees, Pls.' Mot. 27, but sexual orientation is a distinct concept from gender identity, and § 106.31(a)(2) does not mention sexual orientation.

C.      **The Final Rule Does Not "Wrongfully Protect Abortion."**

Plaintiffs argue that the Rule "wrongfully protects abortion" by including "termination of pregnancy" within the definition of "pregnancy or related conditions" that are protected from discrimination under Title IX. Pls.' Mot. 28–29. Plaintiffs do not dispute that the Rule's interpretation of "pregnancy or related conditions" is consistent with the text of Title IX. *Id.* Nor do Plaintiffs dispute that since 1975, Title IX regulations have protected students against discrimination based on termination of pregnancy. Instead, Plaintiffs argue that the Rule is unlawful because it "purports to override Texas's abortion prohibitions," *id.* 28, requires coverage for abortion in healthcare plans, *id.* 29, and requires schools and professors to protect illegal actions, *id*. The Final Rule does none of these things. Because Plaintiffs claim is wholly predicated on a misapprehension of the Rule, it is unlikely to succeed on the merits.

First, the Final Rule has no effect on Texas's laws prohibiting abortion. Title IX, and by extension the Rule, do not regulate the provision of abortion services or affect whether and under what circumstances an abortion should be permitted. *See* 20 U.S.C. § 1688 ("Nothing in this chapter shall be construed to require or prohibit any person, or public or private entity, to provide or pay for any benefit or service, including the use of facilities, related to an abortion."). Rather, the Rule merely protects students, applicants, and employees who are experiencing pregnancy or related conditions, including abortion, from discrimination in education programs or activities. 89 Fed. Reg. at 33,887 (to be codified at 34 C.F.R. §§ 106.40(b)) ("A recipient must not discriminate in its education program or activity against any student based on the student's current, potential, or past pregnancy or related conditions."); *see also id.* (to be codified at 34 C.F.R. § 106.21(c)(2)(ii)); *id.* at 33,896 (to be codified at 34 C.F.R. § 106.57(b)). This is not a novel distinction. The Title IX regulations have prohibited discrimination on the basis of "termination of pregnancy" since 1975. *Compare* 40 Fed. Reg. 24,128 (codified at 45 C.F.R. §§ 86.21(c)(2)

21

(prohibiting discrimination in admissions based on "termination of pregnancy or recovery therefrom"), 86.40(b)(1) (providing that a "recipient shall not discriminate against any student, or exclude any student from its education program or activity" based on "termination of pregnancy or recovery therefrom"), 86.57(b) ( "A recipient shall not discriminate against or exclude from employment any employee or applicant for employment on the basis of . . . termination of pregnancy, or recovery therefrom.") (1975)); *with* 34 C.F.R. §§ 106.21(c) (prohibiting discrimination in admissions based on "termination of pregnancy, or recovery therefrom"), 106.40(b)(1) (prohibiting a recipient from discriminating "against any student, or exclud[ing] any student from its education program or activity" based on "termination of pregnancy, or recovery therefrom"), 106.57(b) (recipients may not discriminate against or exclude a person from employment based on "termination of pregnancy, or recovery therefrom") (current)). In other words, the Rule does not add abortion to the scope of Title IX's protections against discrimination because it has already been covered for decades without issue. At most, the Rule merely confirms these longstanding protections and adds clarity by revising the definition of prohibited sex discrimination to state that discrimination on the basis of "pregnancy or related conditions" includes discrimination on the basis of "termination of pregnancy."

Second, contrary to Plaintiffs' allegations, the Rule unequivocally does not "require[] all healthcare plans offered by every educational institution to cover abortion on the same terms as 'any other temporary medical condition.'" Pls.' Mot. 29 (quoting 89 Fed. Reg. at 33,887–88 (to be codified at 34 C.F.R. § 106.40(b)(4))). As the Department made explicit: "nothing in Title IX or these final regulations requires recipients to pay for abortions either directly or through health insurance." 89 Fed. Reg. at 33,760–61. The Department further explained that this is because 20 U.S.C. § 1688 "limits the Department's enforcement of section 1681's general nondiscrimination

mandate in specific ways . . . [including, by] provid[ing] that nothing in Title IX 'shall be construed to require or prohibit any person, or public or private entity, to provide or pay for any benefit or service, including the use of facilities, related to an abortion.'" 89 Fed. Reg. at 33,757 (quoting 20 U.S.C. § 1688). And the Department stated that "[c]onsistent with this limitation, these final regulations prevent recipients from being required to provide or pay for benefits or services related to, or use facilities for, abortions[.]" *Id.*

Third, to the extent Plaintiffs claim that the Rule is invalid because it does not allow recipients to discriminate against a student who obtained a legal but "purely elective abortion," Pls.' Mot. 29–30, they are wrong. Title IX itself prohibits discriminating based on sex, 20 U.S.C. 1681, and provides that Section 1688 does not permit penalizing a student because the student "is seeking or has received any benefit or service related to a legal abortion." *Id.* § 1688. Thus, any prohibition against discrimination on this basis is a function of the statute and not the challenged Rule, and so Plaintiffs' claimed injury is neither traceable to the Rule nor redressable through this lawsuit. Moreover, because determining whether a recipient's action constitutes a penalty related to a legal abortion is inherently fact-specific, it would reasonably need to be addressed on a case-by-case basis. 89 Fed. Reg. at 33,758.

Finally, to the extent Plaintiffs claim that the Rule would require recipients to accommodate an illegal abortion, Pls.' Mot. 29–30, they lack standing. Plaintiffs' claimed injury appears to rest on a theory that the Rule would require them to accommodate a student who had an illegal abortion in a way that would conflict with Texas law. But Plaintiffs have failed to provide any supportive affidavits or other evidence to support their theory that a student desiring an abortion will choose to seek out an illegal abortion, succeed in finding a provider willing to commit that illegal act, disclose to the recipient the student's involvement in the illegal act, and then seek

23

a reasonable modification accommodation or leave from a recipient for her illegal abortion. An alleged injury is insufficient for standing if, like Plaintiffs' theory here, it "relies on a highly attenuated chain of possibilities." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013). That is particularly true when the theory requires assuming that individuals will engage in illegal conduct. *See O'Shea v. Littleton*, 414 U.S. 488, 497 (1974) (Article III is not "satisfied by general assertions" that "respondents will be prosecuted for violating valid criminal laws" because "[w]e assume that respondents will conduct their activities within the law"). At the very least, the record fails to prove that any such injury to Plaintiffs is "certainly impending." *Clapper*, 568 U.S. at 410.

### D.   The Final Rule Does Not Raise a Spending Clause Issue or Violate the Major Questions Doctrine.

Plaintiffs' Spending Clause and "major question" arguments fail because the Rule neither purports to interpret ambiguous statutory text, nor constitutes an extraordinary action taken without clear congressional authorization.

As to the Spending Clause, Plaintiffs contend that even if Title IX's prohibition on discrimination "on the basis of sex" is ambiguous, the Spending Clause requires that ambiguity to be resolved in Plaintiffs' favor. Pls.' Mot. 22. But Title IX is not ambiguous: rather, the plain text of the statute prohibits any discrimination on the basis of sex in education programs. *See* Part I.A *supra*. And as already explained, that prohibition encompasses discrimination based on gender identity. *Id.* "Congress may attach appropriate conditions to federal taxing and spending programs to preserve its control over the use of federal funds," *NFIB v. Sebelius*, 567 U.S. 519, 579 (2012), so long as it does so "unambiguously," *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). The requirement of unambiguity demands that Congress "make the existence of the condition itself" "explicitly obvious," not that Congress list all ways in which a recipient could fail to comply. *Benning v. Georgia*, 391 F.3d 1299, 1307 (11th Cir. 2004) (citation omitted). Indeed,

"so long as a spending condition has a clear and actionable prohibition of discrimination, it does not matter that the manner of that discrimination can vary widely." *Id.* at 1306.

Here, this standard is met because Title IX unambiguously prohibits sex-based discrimination. *See* 20 U.S.C. § 1681(a) ("No person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."). "Because it is impossible" to discriminate against a person for being transgender "without discriminating against that individual based on sex," *Bostock*, 590 U.S. at 660, Title IX's prohibition on sex-based discrimination necessarily includes discrimination because of gender identity. Plaintiffs in essence argue that certain obligations imposed by the Rule are not ones they expected. *See* Pls.' Mot. 22. But Plaintiffs were on notice that they were barred from engaging in any form of discrimination based on sex, and "the fact that a statute has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity; instead, it simply demonstrates the breadth of a legislative command." *Bostock*, 590 U.S. at 674 (cleaned up).

Indeed, in 2005, the Supreme Court rejected an analogous argument that Title IX did not cover retaliation because it was not specifically mentioned in the statute, concluding that specific forms of discrimination not expressly mentioned in the statute—such as retaliation—nonetheless constitute unlawful sex discrimination. *Jackson*, 544 U.S. at 175; *see also id.* ("Because Congress did not list any specific discriminatory practices when it wrote Title IX, its failure to mention one such practice does not tell us anything about whether it intended that practice to be covered."). Title IX places recipients of federal funds clearly on notice that they must comply with the statute's prohibition on sex-based discrimination in all of its forms.

This case does not implicate the major questions doctrine either, *see* Pls.' Mot. 22–23.  That

doctrine is reserved for "extraordinary" cases, "in which the history and breadth of the authority that the agency has asserted, and the economic and political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (citation omitted). Here, Plaintiffs' only argument for invoking the major questions doctrine is that the Final Rule—that is, the provision to be codified at § 106.31(a)(2)—affects the practice of "separating bathrooms by biological sex, common in States' governance of schools." Pls.' Mot. 23. As explained above, however, § 106.31(a)(2) effectuates Congress's decision in Title IX to generally prohibit sex-based discrimination where it subjects a person to more than de minimis harm. *See* Part I.B *supra.* The relevant portions of the rule thus reflect "policy decisions" made by "Congress . . . itself" in the text of the statute. *West Virginia*, 597 U.S. at 723.

> **E.    The Final Rule's Definition of Hostile Environment Sex-Based Harassment is a Lawful Exercise of the Department's Statutory Authority and Consistent with the Requirements of the First Amendment.**

The Final Rule defines hostile environment sex-based harassment, in relevant part, as "[u]nwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity." 89 Fed. Reg. at 33,884. This definition is consistent with "relevant judicial precedent, and . . . with congressional intent and the Department's longstanding interpretation of Title IX and resulting enforcement practice prior to the 2020 amendments." *Id*. at 33,490. In addition, the definition "closely tracks longstanding case law defining sexual harassment," *id.* at 33,494 (citing *Harris v. Forklift Sys., Inc*., 510 U.S. 17 (1993)), and aligns with the similar definition used by the EEOC. *Id.* at 33,516.

Plaintiffs nevertheless argue that the Rule's definition of hostile environment harassment to be codified at § 106.2 is unlawful for three reasons: (1) the definition is inconsistent with the

26

standard for private damages actions articulated in *Davis ex rel. LaShonda D. v. Monroe County Board of Education*, 526 U.S. 629 (1999), Pls.' Mot. 30–33; (2) the definition "imposes viewpoint-based and content-based restrictions on students and employees" in violation of the First Amendment, *id.* 30, and the Department failed to consider and respond to significant comments regarding First Amendment concerns, *id*. 31–32; and (3) the definition is "internally inconsistent," *id.* 32. Plaintiffs also argue that the "application" provision in § 106.11 unlawfully "expands the scope of recipients' liability beyond the scope of the statute," Pls.' Mot. 39, because it specifies that a hostile environment under a recipient's education program or activity may arise in part from conduct that occurs "outside the recipient's education program or activity or outside the United States," 89 Fed. Reg. at 33,886. These arguments fail.

*First*, Plaintiff's reliance on *Davis* is misplaced. Plaintiffs fault the Rule for "discard[ing] the definition of sexual harassment articulated by the Supreme Court in *Davis* and adopted by the Department in its 2020 rulemaking." Pls.' Mot. 30. But *Davis* addressed the standard a plaintiff must meet to bring a private action for damages under Title IX's implied cause of action, 526 U.S. at 650; it did not limit the Department's enforcement authority. The Supreme Court's prior articulation of the scope of the private cause of action in Title IX in *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1998), focused on the fact that this cause of action is "judicially implied," rather than an express creation of Congress. *Id.* at 284. Explaining that "[t]he requirement that recipients receive adequate notice of Title IX's proscriptions . . . bears on the proper definition of 'discrimination' in the context of a private damages action," *Davis*, 526 U.S. at 649, *Davis* thus held that "funding recipients are properly held liable in damages only where they are deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access

to the educational opportunities or benefits provided by the school." *Id.* at 650. As the Rule explains, "although the Court in *Davis* used the phrase 'severe, pervasive, and objectively offensive,' the opinion as a whole makes clear that the Court was describing only the standards applicable to the 'particular context' of a private action for damages—not the standard applicable to administrative enforcement." 89 Fed. Reg. at 33,498.

Plaintiffs identify no basis to conclude that the *Davis* standard must apply in the distinct administrative enforcement context, and *Davis*'s analysis of when to allow recovery of damages on theories of *respondeat superior* and constructive notice is thus not controlling. *See id.* at 33,499 & n.9 (addressing *Davis* and *Gebser*). Indeed, after observing that Congress ''entrust[ed]'' Federal agencies to ''promulgate rules, regulations, and orders to enforce the objectives'' of Title IX, 526 U.S. at 638, the *Davis* court twice approvingly cited the Department's then-recently published guidance regarding sexual harassment, *see id.* at 647–48, 651 (citing 1997 Sexual Harassment Guidance, 62 Fed. Reg. 12,034 (Mar. 13, 1997)). That guidance specifically stated that schools could be found to violate Title IX if the relevant harassment "was sufficiently severe, persistent, or pervasive to create a hostile environment." 62 Fed. Reg. at 12,040.

To the extent Plaintiffs take issue with the Rule's specification that a hostile environment is one that "limits or denies" a person's educational access, Pls.' Mot. 30 (citing 89 Fed. Reg. at 33,884), the Department explained why that phrase does not "expand[] Title IX," Pls.' Mot. 30, or conflict with *Davis* or any prior standard applied by the Department. 89 Fed. Reg. at 33,511. As the Department noted in 2020 with respect to its prior definition, the "effectively denies a person access" element of the definition of hostile environment harassment ''does not act as a more stringent element than the 'interferes with or limits a student's ability to participate in or benefit from the school's programs' language found in Department guidance.'' *Id.* (quoting 85 Fed. Reg.

28

at 30,152). Given this longstanding interpretation and application, the Department determined that "the phrase 'limits or denies' more accurately captures the full scope of Title IX's nondiscrimination mandate." 89 Fed. Reg. at 33,511. As explained above and in the Rule, *Davis* does not restrict the Department's Title IX enforcement authority, *see id.*, and its holding is not in tension with the harassment definition set forth in § 106.2.

*Second*, Plaintiffs fail to show that the Final Rule's definition of sex-based harassment runs afoul of the First Amendment. *See* Pls.' Mot. 31–32. Plaintiffs assert a pre-enforcement facial challenge to the Rule, but do not even try to show that the Rule is "unconstitutional in all of its applications." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008). Plaintiffs instead appear to suggest that the rule is overbroad. *See* Pls.' Mot. 30–31. Although in the First Amendment context "a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep," *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021), courts "have insisted that a law's application to protected speech be 'substantial,' not only in an absolute sense, but also relative to the scope of the law's plainly legitimate applications, before applying the 'strong medicine' of overbreadth invalidation," *Virginia v. Hicks*, 539 U.S. 113, 119-20 (internal citations omitted). Plaintiffs cannot satisfy this standard.

Nothing in the Rule raises overbreadth concerns. The hostile environment harassment definition "covers only sex-based conduct that is unwelcome, both subjectively and objectively offensive, and so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity." 89 Fed. Reg. at 33,503. The Supreme Court has upheld Title VII's anti-harassment provisions that apply a similar standard "without acknowledging any First Amendment concern." *Id.* at 33,505 (citing *Harris*, 510 U.S. at 23).

Indeed, Plaintiffs cite no case in which a court has held unconstitutional a definition of harassment analogous to the hostile environment sex-based harassment definition to be codified at § 106.2. Nor do Plaintiffs show that the challenged definition "encompasses wide swaths of constitutionally protected activity," Pls.' Mot. 30. Further narrowing the Rule's scope, the harassment definition "only prohibit[s] conduct that meets all the elements" set forth in the definition and is evaluated based on the "the totality of the circumstances …. to ensure that no element or relevant factual consideration is ignored." 89 Fed. Reg. at 33,506. When evaluated against the "plainly legitimate sweep" of preventing sex-based harassment, the Rule in no way reaches such a substantial proportion of protected speech to justify "'the strong medicine' of overbreadth invalidation," *Virginia*, 539 U.S. at 119–20.[7]

Plaintiffs are also wrong that the Department failed to adequately address commenters' First Amendment concerns. The argument is plainly belied by the record. *See* 89 Fed. Reg. at 33,492–97, 33,500–11, 33,514–16, 33,542, 33,559, 33,570-71, 33,616, 33,810, 33,828, 33,838. As explained, the Department carefully considered the hostile environment harassment definition's potential interaction with the First Amendment and responded to comments raising these arguments, including comments about "misgendering," Pls.' Mot. 32. *See* 89 Fed. Reg. at 33,501–08, 33,516. The Rule also directly addresses Plaintiffs' concern that the definition covers isolated incidents that do not actually create a hostile environment, Pls.' Mot. 31, explaining that "a stray remark, such as a misuse of language, would not constitute harassment under [the applicable]

---

[7] Notably, the Texas Education Code provides a definition of "sexual harassment" that is similar to the definition of sex-based hostile environment harassment to be codified at 34 C.F.R. § 106.2. Texas law specifies that, in the higher education context, "'[s]exual harassment' means unwelcome, sex-based verbal or physical conduct that . . . is sufficiently severe, persistent, or pervasive that the conduct interferes with a student's ability to participate in or benefit from educational programs or activities at a postsecondary educational institution." Tex. Educ. Code §§ 51.251(5) & 51.281(4).

standard," and emphasizing that "nothing in the regulations requires or authorizes a recipient to violate anyone's First Amendment rights." 89 Fed. Reg. at 33,516.

*Third*, Plaintiffs do not show that the Rule is "internally inconsistent." Pls.' Mot. 32. Plaintiffs argue that the Rule's incorporation of a "totality of the circumstances" approach to determining whether a hostile environment exists is "in tension" with its baseline definition of sex-based harassment because it "reads out 'severe or pervasive' from its definition." *Id*. This argument misunderstands the function of the "totality of the circumstances" inquiry. As the Department explained, the definition in § 106.2 "requires a contextual consideration of the totality of the circumstances to determine whether harassment impacted a complainant's . . . educational benefits, and only accounts for conduct that is so serious that it implicates a person's access to the recipient's education program or activity." 89 Fed. Reg. at 33,498; *see also id.* at 33,508. It is precisely this approach that protects speech and avoids inappropriate responses to "a single or isolated incident," Pls.' Mot. 31, that does not actually create a hostile environment.

*Finally*, Plaintiffs are incorrect that the Department exceeded the scope of its statutory authority by clarifying that a recipient's obligations to address sex-based harassment apply even when some conduct contributing to a hostile environment in the recipient's program or activity occurred outside of a recipient's program or activity or outside the United States. *Id.* 31, 39; *see* 89 Fed. Reg. at 33,886. As the Rule states clearly: Title IX applies to every recipient and to all sex discrimination occurring under a recipient's education program or activity in the United States. *Id.* at 33,576 (citing § 106.11). Conduct occurring abroad or outside the recipient's program or activity is only implicated insofar as it "contributes to a hostile environment in the United States," *id.*, and in the recipient's program or activity, *id.* at 33,528. If such conduct occurs, for instance, in a study-abroad program, that conduct may be relevant and considered by the recipient in addressing any

31

sex-based hostile environment "occurring within its program in the United States." *Id.* at 33,576. The Rule directly refutes Plaintiffs' argument that this standard is in conflict with *Davis*, Pls.' Mot. 39, confirming that "under § 106.11, a recipient is not responsible for the actions of parties over which it lacks significant control." 89 Fed. Reg. at 33,529. Rather, under the Rule, a recipient's obligations depend on whether it has "disciplinary authority over the respondent's conduct in the context in which it occurred." *Id.* (citing *Davis*, 526 U.S. at 641).

Accordingly, Plaintiffs are unlikely to succeed on the merits of their challenge to the sex-based harassment definition in § 106.2 or the "application" provision in § 106.11.

**F.     Plaintiffs Fail To Establish Standing To Challenge the Provisions Regarding Grievance Procedures and Fail To Show These Provisions Violate the APA.**

Plaintiffs also have not demonstrated a likelihood of success on their challenge to certain of the Final Rule's provisions regarding grievance procedures—specifically, provisions concerning use of a single-investigator model (§ 106.45(b)(2)); initiation of a complaint by the Title IX Coordinator (§ 106.44(f)(1)(v)); the manner in which a recipient may allow parties to a complaint to access the relevant evidence (106.45(f)(4)(i)); live hearing procedures for postsecondary institutions (§ 106.46(g)); and the recipient's options for the standard of proof to be applied in proceedings (§ 106.45(h)(1)). *See* Pls.' Mot. 33–39.

As an initial matter, Plaintiffs are not injured by the challenged provisions, which generally provide recipients with multiple options, meaning that recipients are free to continue to structure their grievance procedures in accordance with Plaintiffs' preferences if they so choose. To the extent any injury to Plaintiffs' interests arises at all, it would be caused by recipients' independent choices, not by the Rule. Plaintiffs thus lack standing to challenge these provisions.

Plaintiffs' claims also cannot succeed on the merits. Plaintiffs do not dispute that the grievance procedures are consistent with the Department's authority and the text of Title IX.

Rather, their only claim is that the agency's reasoning regarding the grievance procedures was arbitrary and capricious. *Id.* 33, 35. Under the APA, the court's "narrow" role is to assess whether the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. The Department has done so with respect to each challenged aspect of the grievance procedures, including thorough consideration of the issues raised now by Plaintiffs.

### 1. Plaintiffs Lack Standing To Challenge the Grievance Procedures.

To establish standing, a plaintiff must show that it has suffered or will imminently suffer an "injury in fact" "caused" by the challenged government action that a favorable decision would likely "redress." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–62 (1992). To satisfy the injury-in-fact requirement, a plaintiff must allege an invasion of a "legally protected interest" that is "concrete" and "particularized" and "actual or imminent"—not "conjectural" or "hypothetical." *Id.* at 560 (citation omitted). A plaintiff generally "cannot rest his claim to relief on the legal rights or interests of third parties." *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)). Further, "standing is not dispensed in gross." *Davis v. Federal Election Comm'n*, 554 U.S. 724, 734 (2008) (quoting *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996)). "Rather, a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Id.* (cleaned up).

Plaintiffs lack standing because they are not suffering any actual or imminent, concrete and particularized injury due to the grievance procedures. Plaintiffs are a state government and two professors. No Plaintiff is a student potentially subject to grievance procedures, and Plaintiffs identify no basis on which they would have standing to raise, for example, due process concerns

33

on behalf of students.[8] Accordingly, in order to establish standing, Plaintiffs here must show that the State of Texas or the individual Plaintiff professors will be injured by the changes to the grievance procedures.

Plaintiffs have not established that they are injured by the challenged grievance procedures, nor could they. As an initial matter, the professor-Plaintiffs do not allege that they expect to be harmed by being subjected to grievance procedures as employees, let alone that such a hypothetical is certainly impending. Moreover, the provisions they challenge provide recipients with multiple options—including the option to continue using the procedures *currently in effect* (presumably Plaintiffs' preferred procedures). And while the Rule adjusts some requirements for the standard of proof, recipients can still use either the preponderance of the evidence standard or the clear and convincing evidence standard (in the latter case, as long as they use the clear and convincing evidence standard in all comparable proceedings). Notably, Plaintiffs nowhere allege—including in their declarations—that any specific school would be prevented by the Rule from using its preferred policies on the challenged issues (regarding the availability of evidence, live hearings, the use of a single-investigator model, notice to parties, or the applicable evidentiary standard). As to Texas in its capacity as a recipient of federal funds from the Department, the Rule leaves it up to the State and its agents to decide what procedures to employ (or what related laws to enact), consistent with Title IX and its implementing regulations.

---

[8] Indeed, Plaintiffs make no attempt to explain why they should be allowed to circumvent the prudential third-party standing bar—they do not allege, for example, any "hindrance" preventing the third party from raising his own claim. *Vote.Org v. Callanen*, 39 F.4th 297, 304 (5th Cir. 2022) (quoting *Kowalski*, 543 U.S. at 130).

For similar reasons, Plaintiffs' argument that the Final Rule places schools in a "litigation trap" also lacks merit.[9] Pls.' Mot. 33–35 (arguing that "[i]f recipients comply with the Department's new regulations, they risk civil rights lawsuits and litigation expenses."). Because the challenged provisions provide options to schools, whichever option schools ultimately choose is not attributable to the Final Rule. *See Little v. KPMG LLP*, 575 F.3d 533, 540 (5th Cir. 2009) ("A claim of injury generally is too conjectural or hypothetical to confer standing when the injury's existence depends on the decisions of third parties not before the court."). Furthermore, speculation about potential future lawsuits is insufficient to establish standing. *See, e.g.*, *Sullo & Bobbitt P.L.L.C. v. Abbott*, 536 F. App'x 473, 477 (5th Cir. 2013) (unpublished) (plaintiff is "subject to potential lawsuits with minimal chances of success," which is an alleged "injury [that] is not certainly impending"). Nor does it make sense to suggest that schools would "invite federal or private enforcement actions," Pls.' Mot. 33, by taking an action permitted by the Rule—if the action is permitted by the Rule, there is no basis to conclude it would provide the basis for an enforcement action by the Department or in a private Title IX lawsuit.

### 2. The Grievance Procedures Are Not Arbitrary or Capricious.

Review under the arbitrary and capricious standard is "deferential," *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019), and merely examines whether the agency's decision "was the product of reasoned decisionmaking," *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 52. When an agency changes its position, it must "display awareness that it *is* changing position." *FCC v. Fox Tele. Stations, Inc.*, 556 U.S. 502, 515 (2009). This "conscious change of course" will itself indicate that

---

[9] Plaintiffs' motion makes apparent that Texas has policy preferences about how its schools should shape their grievance procedures. *E.g.*, Pls.' Mot. 38 (referring to "the many benefits of a live hearing with adversarial cross-examination"). But under the Rule, Texas remains free to, for example, require that *its own* schools provide live hearings. Texas has no basis to demand that the Department impose Texas's preferences on *all* schools.

the agency "believes [the new policy] to be better," which is all that is required. *Id.* This is not an especially searching analysis—the agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one." *Id.*

Here, the Department acknowledged and explained its changes to the regulations concerning grievance procedures, and Plaintiffs do not demonstrate that that these provisions are arbitrary or capricious. Instead, Plaintiffs incorrectly argue that the Department erred by only considering the operation and impact of the changes individually, rather than in the context of the larger Rule. Pls.' Mot. 33–35. This argument fails on its face because the Department explicitly considered the cumulative effect that would result from all the grievance procedures set forth in the Rule. *See, e.g.*, 89 Fed. Reg. at 33,633–48 (spending at least fifteen pages discussing the overall "framework" the Final Rule sets forth for grievance procedures and discussing high-level issues across multiple provisions). Consideration of such cumulative effects also included specific consideration of the due process implications. *Id.* at 33,364–66, 33,736–37.

Plaintiffs also fail to demonstrate that the Department acted unreasonably in promulgating any of the individual challenged grievance procedures:

### *Single-Investigator Model*

The Department carefully considered its decision to give schools the option of using a single-investigator model, contrary to Plaintiffs' argument, Pls.' Mot. 36. *See* 89 Fed. Reg. at 33660–64. And contrary to Plaintiffs' implication, the Department demonstrated an awareness that it was changing position, and explained why it views its new position increasing a school's choice as preferable, and considered any relevant reliance interests, which is all that is required. *Fox Tele. Stations*, 556 U.S. at 515. For example, the Department "learned that requiring separate staff members to handle investigation and adjudication is burdensome for some recipients in a way that

36

undermines their ability to ensure their education programs or activities are free from sex discrimination under Title IX," 89 Fed. Reg. at 33,662. In response to these comments, and in recognition of the variety of types of recipients and their relative capacities, the Department explained that "permitting, but not requiring, the single-investigator model . . . in conjunction with the other measures designed to ensure equitable treatment of the parties . . . offer[s] recipients reasonable options to structure their grievance procedures in compliance with Title IX, while accommodating each [recipient's] administrative structure, educational community, and applicable Federal and State case law and State or local legal requirements." *Id.* In addition, the Department specifically considered Plaintiffs' concern that "the single-investigator model will lead to an increase in private lawsuits against recipients and OCR complaints," concluding that this concern was "speculative" and identifying several unsupported assumptions underlying that concern. *Id.* at 33,664. Finally, the Department acknowledged commenters' concerns about potential bias related to the single-investigator model, but explained that the "final regulations, like the proposed regulations, contain other obligations to ensure overall fairness and accuracy in grievance procedures" and "appropriately balance flexibility for recipients with protections against bias by investigators and decisionmakers." *Id*. at 33,662.

### *Initiation of Complaint*

Plaintiffs take issue with the Rule insofar as it allows for proceedings to be initiated without a "formal written complaint." Pls.' Mot. 37. But Plaintiffs confuse notice to respondents with the initiation of a complaint by the Title IX coordinator. *Id.* Plaintiffs allege that "[t]he accused need only receive an 'oral' statement . . .," *id.*, but the provisions Plaintiffs cite (§ 106.2 and § 106.44(f)(1)(v)) are about what constitutes a *complaint* and when a Title IX coordinator may initiate one, not the required notice to respondents. Notice to respondents in the postsecondary

harassment context involving a student party—which must be in writing—is governed by § 106.46(c). *See* 89 Fed. Reg. at 33,893. Plaintiffs do not even cite or discuss that provision, and thus cannot meaningfully object to it.

Nor is there anything unreasonable about the fact that a school may initiate a complaint based on an oral complaint or, under extraordinary circumstances, no complaint at all. The Rule lists eight non-exhaustive factors for a recipient's Title IX Coordinator to consider in determining whether specific facts require warrant an investigation in the absence of a complaint. *Id.* at 33,889 (to be codified at 34 C.F.R. § 106.44(f)(1)(v)(A)(1)–(8)). The Rule also makes clear that even after considering these eight factors, Title IX Coordinators are permitted "to initiate complaints only in the circumstances of an imminent and serious threat to the health or safety of the complainant or other person or conduct that would prevent a recipient from ensuring equal access to its education program or activity on the basis of sex." *Id.* at 33,596; *see also id.* at 33,889 (to be codified at 34 C.F.R. § 106.44(f)(1)(v)(B)). Thus, these circumstances are limited and likely to be rare. Nor is a school's obligation to act in certain circumstances in the absence of a written complaint new in the Rule—under the 2020 regulations, schools were already required to respond to sexual harassment based on actual knowledge that could be the result of oral reporting or even personal observation. 85 Fed. Reg. at 30,574 (promulgating 34 C.F.R. § 106.44(a)). In fact, the Rule and its eight non-exhaustive factors provide *more* clarity than the 2020 Amendments about the circumstances in which a Title IX Coordinator should initiate the grievance process, which is one reason the Department decided to make this change. 89 Fed. Reg. at 33,594.

### *Access to Evidence*

The Rule does not "remove the right" of students to access the evidence against them, Pls.' Mot. 37—to the contrary, the Rule requires schools to provide parties with access to evidence on

request and to provide parties notice of this right. "A recipient must provide an equal opportunity to access either the relevant and not otherwise impermissible evidence, or an accurate description of this evidence." 89 Fed. Reg. at 33,892 (to be codified at 34 C.F.R. § 106.45(f)(4)(i)). In the latter case, a school "must further provide the parties with an equal opportunity to access the relevant and not otherwise impermissible evidence upon the request of any party," *id.*; *see also id.* at 33,682 (to be codified at 34 C.F.R. § 106.45(c)(1)(iv)) (notice of the right). Notably, after reviewing and considering comments on the NPRM, the Department added the two options for providing each party with access to the evidence. *Id.* at 33,695. Contrary to Plaintiffs' assertions, Pls.' Mot. 37, the Department *did* address due process concerns, 89 Fed. Reg. at 33,695, and the Department *did* explain why the flexible approach of the Rule is superior to alternatives—"the description option may be more appropriate for complaints involving younger students and individuals facing less severe consequences, allowing the recipient to streamline the investigation process while ensuring that the parties have a meaningful opportunity to be heard," *id.* at 33,695. This flexible approach is in keeping with the Supreme Court's common understanding that "due process is flexible and calls for such procedural protections as the particular situation demands." *Serrano v. CBP*, 975 F.3d 488, 496 (5th Cir. 2020) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). As courts in this circuit have recognized, the flexible nature of due process means that "an explanation of the evidence" may suffice in student discipline cases. *E.g.*, *Riggan v. Midland Indep. Sch. Dist.*, 86 F. Supp. 2d 647, 656 (W.D. Tex. 2000) (citing *Goss v. Lopez*, 419 U.S. 565, 580 (1975)). And again, the Rule in any case does not require Texas or any recipient to choose the "accurate description of the evidence" option. *See generally* 89 Fed. Reg. at 33,892.

### *Live Hearings and Live Questioning*

Plaintiffs' challenge involves the procedures required at postsecondary institutions

involving allegations of sex-based harassment. In deciding to allow postsecondary institutions "the option to determine whether to use live hearings with questioning by an advisor or some other form of live questioning," 89 Fed. Reg. at 33,732, the Department carefully considered feedback from stakeholders and the public. *See id.* at 33,732–33; 87 Fed. Reg. at 41,503 (cited in 89 Fed. Reg. at 33,733); *see also* 89 Fed. Reg. at 33,894–95 (to be codified at 34 C.F.R. § 106.46(f)). This change will allow schools to decide whether to provide live questioning through a live hearing or through separate meetings with the parties. The Rule in no way *prevents* schools from using adversarial live questioning (also referred to as cross-examination) as Plaintiffs seem to prefer. Pls.' Mot. 38. "[N]othing in § 106.46(f)(1) or elsewhere in the final regulations precludes a postsecondary institution from choosing to use a live hearing with questioning by an advisor, either because it is required under applicable Federal or State case law or for any other reason." 89 Fed. Reg. at 33,737. The Department carefully considered its decision, including specifically the "costs" and "burdens" of the live questioning requirement, *id.* at 33,732–33, contrary to Plaintiffs' suggestion, Pls.' Mot. 38. While Plaintiffs express concern that having separate meetings may actually be more burdensome for schools, *id.*, the Department explained that schools are best positioned to understand their unique needs. That is why a school can choose live hearings if it prefers, 89 Fed. Reg. at 33,735, or can use live hearings for some types of complaints and another form of live questioning for others, *id.* at 33,891–92 (to be codified at 34 C.F.R. § 106.45(b)(8)).

Plaintiffs assert that the Department "failed to provide a 'detailed justification' for adopting 'findings that contradict' the ones underlying the 2020 Rule," Pls.' Mot. 38 (quoting *Fox Tele. Stations*, 556 U.S. at 515), but Plaintiffs overstate what is required when an agency changes position. Here the Department clearly recognized that it was making a change, explained why it made the change and the reasons that it viewed that change as preferable, and considered any

40

relevant reliance interests, which more than satisfies the applicable requirements under *Fox*. *Compare Fox Tele. Stations*, 556 U.S. at 515, *with* 89 Fed. Reg. at 33,737 (recognizing "that these final regulations depart from the 2020 amendments with respect to the requirement of live hearings"), *and id.* at 33,734 (noting the Department's consideration of factors including "impact on respondents" and "on reporting," "the goal of ensuring that Title IX grievance procedures are prompt and equitable and provide the parties, including the respondent, with a meaningful opportunity to be heard," "reliable outcomes," and "potential financial and administrative burden[s]" on postsecondary institutions). As the Department recognized, it is appropriate to weigh any "marginal gains" to due process from a particular procedural safeguard against the "societal cost" of the safeguard, such as administrative efficiency or the potential to deter complainants. *Id.* at 33,637 (quoting *Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 321 (1985), and *Dixon v. Love*, 431 U.S. 105, 114 (1977)); *see also id.* 33,732 (considering the impact of live hearings on reporting). And the Department properly did so here. *See id.*

### *Standard of Proof*

Plaintiffs also take issue with the portions of the Rule addressing the standard of proof in grievance proceedings.[10] Pls.' Mot. 38–39. The Final Rule continues to permit recipients to use either the preponderance of the evidence standard or the clear and convincing evidence standard, and the Department thoroughly considered its changes to the Rule's specific conditions. Given that the clear and convincing standard remains an option if "the recipient uses [that] standard of proof in all other comparable proceedings, including proceedings relating to other discrimination

---

[10] Plaintiffs refer to the evidentiary standard used in grievance proceedings as the "burden of proof," but that is not how the term is used in the Rule. *See* 89 Fed. Reg. at 33,520.

complaints," 89 Fed. Reg. at 33,893 (to be codified at 34 C.F.R. § 106.45(h)(1)), the Rule is certainly not a "de facto ban," *contra* Pls.' Mot. 39.

Presumably Plaintiffs prefer the clear and convincing evidence standard, although they nowhere explain why. In contrast, the Department explained its reasoning at length, 89 Fed. Reg. at 33,700–06, including citing the conclusions of several courts that preponderance of the evidence satisfies the requirements of due process when a school evaluates allegations of sexual harassment, *id.* at 33,701. That Plaintiffs may not agree does not make the Department's approach unreasonable. And while Plaintiffs assert that the Department "nowhere explains" the meaning of "comparable proceedin[g]," Pls.' Mot. 39, in fact that is also extensively discussed in the Rule. *See, e.g.*, 89 Fed. Reg. at 33,704 (explaining the Department's understanding that comparable proceedings "include, for example, allegations of similar types of person-to-person (as distinct from recipient-to-person) offenses that are physical in nature and not based on sex"); *id.* at 33,705 ("A recipient must consider the standard it uses for other civil rights allegations in deciding what standard is appropriate to use for Title IX allegations . . . .").

Underscoring Plaintiffs' lack of standing to challenge these changes, Plaintiffs do not identify a single school that wishes to use a clear and convincing evidence standard—rather than preponderance of the evidence—but would be thwarted by the Rule. *See* Part I.F.1 *supra*. For example, the University of Texas at Austin, where the two individual Plaintiffs teach, already uses a preponderance of the evidence standard for sexual harassment and sex discrimination proceedings. *See* UT Austin, Handbook of Operating Procedures 3-3031, Prohibition of Sexual Assault, Interpersonal Violence, Stalking, Sexual Harassment, and Sex Discrimination, Part IX (effective Aug. 25, 2022), https://perma.cc/FRF7-452M ("Preponderance of the evidence is the standard for determining allegations of conduct that violates this Policy.").

42

G.      **Plaintiffs Do Not Demonstrate that the Department Failed To Adequately Assess Reliance Interests or Conduct a Reasonable Cost-Benefit Analysis.**

Plaintiffs also do not demonstrate that any provision of the Final Rule is arbitrary and capricious based on a failure to adequately address reliance interests or cost-benefit issues.

Plaintiffs repeatedly assert that the Department failed to adequately consider Texas's "reliance interests." Pls.' Mot. 28; *see also id.* 27, 42, 43. But beyond an assertion that Texas educational institutions have relied "on 50 years of Title IX practice and legal precedent interpreting 'on the basis of sex' to mean biological sex," *id.* 42, Plaintiffs do not explain in what concrete way Texas has relied on the Department's prior regulations or how the Final Rule interferes with such purported reliance interests, let alone demonstrate that the Department failed to address such concerns. *Cf. DHS v. Regents of the Univ. of Calif.*, 591 U.S. 1, 31 (2020) (faulting agency for failing to address reliance interests where individuals had "enrolled in degree programs, embarked on careers, started businesses, purchased homes, and even married and had children, all in reliance" on rescinded program and the "consequences of the rescission . . . would 'radiate outward'" to affect hundreds of thousands of individuals). Regardless, to the extent Plaintiffs' reliance argument is based on the Department's interpretation of the scope of sex discrimination in § 106.10, that interpretation is compelled by the statutory text, for the reasons explained in *Bostock*, *see* Part I.A *supra*, and is fully consistent with Texas's understanding of "sex" as "biological sex." And to the extent Plaintiffs' argument rests on general concerns about potential conflicts with unspecified and inherently variable state laws, Pls.' Mot. 28, such vague concerns are insufficient to establish any deficiency in the Rule. As Plaintiffs concede, the Department expressly considered how the Rule might interact with state laws, and reasonably explained that this would need to be addressed on a case-by-case basis. *Id.* 28 (citing 89 Fed. Reg. at 33,822); *see also id.* (explaining that the Department could not opine on how § 106.31(a)(2) interacts with any

43

specific State laws because such an opinion "would require a fact-specific analysis"). Plaintiffs identify no way in which this response is arbitrary or capricious.

Nor do Plaintiffs demonstrate that any provision of the Rule is arbitrary and capricious because of a failure to conduct a reasonable cost-benefit analysis. Indeed, any claim relating to the Department's cost-benefit analysis is not subject to review. The Department did not undertake a cost-benefit analysis to comply with Title IX, but rather only to comply with Executive Orders 12866 and 13563. 89 Fed. Reg. at 33,843, 33,859. Alleged violations of these "Executive Orders cannot give rise to a cause of action" under the APA. *Fla. Bankers Ass'n v. U.S. Dep't of Treas.*, 19 F. Supp. 3d 111, 118 n.1 (D.D.C. 2014), *vacated on other grounds*, 799 F.3d 1065 (D.C. Cir. 2015); *see Air Transp. Ass'n v. FAA*, 169 F.3d 1, 8–9 (D.C. Cir. 1999). Nor is this a case where the Department "decide[d] to rely on a cost-benefit analysis as part of its rulemaking," thus creating the possibility that "a serious flaw undermining that analysis can render the rule unreasonable." *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012).

Even if the Department's cost-benefit analysis were reviewable, it would readily withstand scrutiny. Plaintiffs argue that it will take a Title IX Coordinator and lawyers more than the Department's estimated average of 4 hours to read the Final Rule in its entirety, Pls.' Mot. 27, but they do not explain how this calculus renders deficient the Department's cost-benefit analysis with respect to any portion of the Rule. Indeed, the Rule demonstrates the Department's reasoned consideration on this issue. *See* 89 Fed. Reg. at 33,866 (describing development of average assumptions for review of the rule based on variations across recipients). Nor do Plaintiffs explain why compliance with the Rule would require them to incur construction costs for modification of "bathrooms and locker rooms," Pls.' Mot. 27, as the Rule expressly disclaims any such construction requirement. *See* 89 Fed. Reg. at 33,876 ("Compliance with final § 106.31(a)(2) may

44

require updating of policies or training materials, but will not require significant expenditures, such as construction of new facilities or creation of new programs."). To the extent courts "review an agency's cost-benefit analysis," they do so "deferentially," *Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 254 (D.C. Cir. 2013), and Plaintiffs demonstrate no serious flaw in the Department's analysis, which was based on reasoned consideration of the issues Plaintiffs reference. *See, e.g.*, 89 Fed. Reg. at 33,851–52, 33,866–68.

## II.    Plaintiffs Have Not Established Irreparable Harm.

Plaintiffs also fail to establish the imminent irreparable harm needed to justify a preliminary injunction. Plaintiffs bear a "heavy burden of clearly establishing to the Court irreparable harm." *Watchguard Techs., Inc. v. Valentine*, 433 F. Supp. 2d 792, 794 (N.D. Tex. 2006). "A plaintiff seeking a preliminary injunction must 'demonstrate that irreparable injury is likely in the absence of an injunction.'" *Anibowei v. Morgan*, 70 F.4th 898, 902 (5th Cir. 2023) (quoting *Winter*, 555 U.S. at 22). "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. Moreover, "the irreparable harm element must be satisfied by independent proof, or no injunction may issue." *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989).

*First*, Plaintiffs claim that they will suffer irreparable harm in the form of unrecoverable compliance costs in the lead up to the Final Rule's August 1, 2024 effective date. In order for compliance costs to qualify as irreparable harm, they "must be based on more than 'speculat[ion]' or 'unfounded fears.'" *Rest. L. Ctr. v. United States Dep't of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023) (quoting *Louisiana v. Biden*, 55 F.4th 1017, 1034 (5th Cir. 2022)). Here, Plaintiffs' evidence of their alleged compliance costs fails to meet that standard. Despite claiming that compliance will

be "significant and costly," Pls.' Mot. 40, Plaintiffs' declarants provide only a handful of vague and speculative assertions regarding their alleged costs in advance of the Rule's effective date. *See, e.g.*, Bailey Decl. ¶ 8, App. 005 ("Because recipients must comply with these new regulations before the next school year begins, [Texas School for the Deaf]'s training and other compliance costs will be incurred this summer before the effective date."); Olshak Decl. ¶ 5, App. 008 ("[T]he implementation of these regulations will increase the workload of the Texas A&M System Title IX Office and the Title IX Offices of the component universities and agencies of the Texas A&M System."). At most, these generic assertions state the obvious: a new regulation will likely require regulated parties to undertake *some* activities to assure compliance. Such statements do not justify the extraordinary relief in the form of a preliminary injunction. *Cf. Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016) (compliance with regulation would lead to permanent closure of power plants).

*Second*, Plaintiffs allege that the Final Rule threatens to strip recipients in Texas of federal funding. Pls.' Mot. 44.[11] But Plaintiffs fail to identify how any such injury is realistic, let alone "imminent." *ADT, LLC v. Cap. Connect, Inc.*, 145 F. Supp. 3d 671, 697 (N.D. Tex. 2015). Indeed, even if an administrative enforcement action were to occur once the Rule goes into effect, recipients could at that time raise challenges to any administrative enforcement proceedings, which would necessarily precede any termination of funds. 20 U.S.C. § 1682. And any adverse administrative determination would be subject to judicial review. *Id.* § 1683.

*Third*, Plaintiffs claim the Rule infringes on Texas's sovereign interest in enforcing its state laws and policies, which Texas alleges conflict with the Rule. But regardless of whether Texas's state laws and policies conflict with the Final Rule, a "corollary [of the Supremacy Clause] is that

---

[11] Plaintiffs conflate their arguments regarding compliance costs and stripping of funds. *See* Pls.' Mot. 41–44. Regardless, as explained above, neither alleged injury amounts to irreparable harm.

the activities of the Federal Government are free from regulation by any state." *Mayo v. United States*, 319 U.S. 441, 445 (1943). Accordingly, it is the federal government, not Texas, that faces significant irreparable harm, if it is prevented from administering the Rule.

### III.   The Equities and Public Interest Weigh Against Preliminary Relief.

The balance of equities and the public interest "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, these combined factors counsel against issuing the requested preliminary relief. The Rule implements the Department's authority to enforce the statutory objectives of Title IX. *See* 20 U.S.C. § 1682. "There is inherent harm to an agency in preventing it from enforcing regulations that Congress found it in the public interest to direct that agency to develop." *Cornish v. Dudas*, 540 F. Supp. 2d 61, 65 (D.D.C. 2008). The public interest favors allowing the Department to fulfill these responsibilities. Moreover, a stay or preliminary injunction would significantly harm the Government's interests in preventing discrimination in education programs and activities. The Final Rule effectuates Title IX's important goals of "avoid[ing] the use of federal resources to support discriminatory practices [and] provid[ing] individual citizens effective protection against those practices." *Cannon v. Univ. of Chi.*, 441 U.S. 677, 704 (1979). Needless to say, preventing sex discrimination is in the public interest. *See EEOC v. Bass Pro Outdoor World, L.L.C.*, 826 F.3d 791, 798 (5th Cir. 2016).

Conversely, Plaintiffs have failed to show they face imminent and irreparable harm supporting relief. *See* Part II *supra*. At best, Plaintiffs have pointed to an unspecified amount of compliance costs. *See id.* But compelling non-monetary government interests measure up against even serious economic harm. *See, e.g.*, *Big Tyme Invs., L.L.C. v. Edwards*, 985 F.3d 456, 470 (5th Cir. 2021) (allowing the state government's restrictions with respect to the operations of bars in response COVID-19 despite financial harms to the bars).

47

In sum, the balance of the equities and the public interest both weigh in favor of denying

Plaintiffs' motion, and the Court may deny their motion on this basis alone. *See Def. Distributed*

*v. U.S. Dep't of State*, 838 F.3d 451, 460 (5th Cir. 2016).

## IV. Any Relief Afforded by the Court Should Be Limited in Accordance with the APA and Equitable Principles.

While Defendants dispute that preliminary relief is necessary at all, any relief afforded

must be appropriately limited to the parties and consistent with the APA and equitable principles.

The Court should not issue preliminary relief that extends beyond Plaintiffs or beyond

portions of the Rule as to which the Court has found that Plaintiffs have established a likelihood

of success. But in any event, relief—including any "set aside"—should be limited by traditional

equitable principles, including that "injunctive relief should be no more burdensome to the

defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442

U.S. 682, 702 (1979); *see also, e.g.*, *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en

banc) (plurality opinion) (concluding without contradiction from any other member of the Court

that the district court could consider on remand "a more limited remedy" than universal vacatur,

and instructing the district court to "determine what remedy . . . is appropriate to effectuate" the

judgment), *cert. granted*, 144 S. Ct. 374 (2023); *Central & S.W. Servs., Inc. v. EPA*, 220 F.3d 683,

692 (5th Cir. 2000) (declining to enter vacatur in favor of remand). "At a minimum, a district court

should think twice—and perhaps twice again—before granting universal anti-enforcement

injunctions against the federal government." *Arizona v. Biden*, 40 F.4th 375, 395–96 (6th Cir.

2022) (Sutton, C.J., concurring).

And while Plaintiffs appear to refer to a § 705 stay as an interim measure, Proposed Order,

ECF No. 16-2, a sweeping, permanent § 705 stay would raise all the same problems as nationwide

injunctions. *See DHS v. New York*, 140 S. Ct. 599, 599–601 (2020) (Gorsuch, J., concurring in the

grant of stay). Moreover, Section 705 (like other APA provisions) "was primarily intended to reflect existing law," not "to fashion new rules of intervention for District Courts." *Sampson v. Murray*, 415 U.S. 61, 68 n.15 (1974). Plaintiffs do not identify, and Defendants have not found, any pre-APA practice of district courts granting universal stays of agency regulations. Consistent with that backdrop, Congress contemplated that any relief under Section 705 "would normally, if not always, be limited to the parties," Administrative Procedure Act, S. Doc. No. 248, 79th Cong., 2d Sess. at 277 (1946). And even if Section 705 did authorize universal preliminary relief, such an "extraordinary remedy" would at minimum "demand truly extraordinary circumstances to justify it." *United States v. Texas*, 599 U.S. 670, 702 (2023) (Gorsuch, J., concurring in the judgment). Especially where, as here, parallel challenges are pending in courts around the country, universal relief threatens to "stymie the orderly review of important questions," "render meaningless rules about joinder and class actions," and "sweep up nonparties who may not wish to receive the benefit of the court's decision." *Id.* at 703. There is no sound basis for imposing those costs where, as here, party-specific relief could fully remedy any cognizable injury Plaintiffs may face.

Finally, the Final Rule is severable. *See* 89 Fed. Reg. at 33,848 ("[R]emov[ing] any 'doubt that it would have adopted the remaining provisions of the Final Rule' without any of the other provisions, should any of them be deemed unlawful."). The Rule promulgates numerous regulatory provisions running approximately 14 single-spaced pages. *See id.* at 33,882–96. Plaintiffs have challenged only a small fraction of these provisions, and for some, only certain applications. If the Court grants preliminary relief as to any portion of the Rule, the remainder of the Rule should still be permitted to go into effect, as intended, on August 1, 2024.[12] As the Supreme Court explained,

---

[12] On June 13, 2024, the U.S. District Court for the Western District of Louisiana issued a decision in which it preliminarily enjoined the Department from enforcing the Rule in the plaintiff States

courts should "enjoin only the unconstitutional applications of a statute while leaving other applications in force, . . . or . . . sever its problematic portions while leaving the remainder intact." *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328–29 (2006) (citation omitted).

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for stay of agency action and preliminary injunction.

Dated: June 14, 2024                               Respectfully submitted,

                                                   BRIAN M. BOYNTON
                                                   Principal Deputy Assistant Attorney General

                                                   EMILY B. NESTLER
                                                   Assistant Branch Director

                                                   /s/ *Elizabeth Tulis*
                                                   ELIZABETH TULIS
                                                   REBECCA KOPPLIN
                                                   BENJAMIN TAKEMOTO
                                                   HANNAH SOLOMON-STRAUSS
                                                   PARDIS GHEIBI
                                                   Trial Attorneys
                                                   United States Department of Justice
                                                   Civil Division, Federal Programs Branch
                                                   1100 L Street NW
                                                   Washington, DC 20005
                                                   Phone: (202) 514-9237
                                                   Fax: (202) 616-8470
                                                   E-mail: elizabeth.tulis@usdoj.gov

                                                   *Attorneys for Defendants*

---

(Louisiana, Idaho, Mississippi, and Montana). *See* Mem. Ruling at 39–40, *Louisiana v. U.S. Dep't of Educ.*, No. 3:24-cv-00563 (W.D. La. June 13, 2024), ECF No. 53. The *Louisiana* court's reasoning was faulty in numerous respects, and one such error was the court's failure to even address the issue of severability.

**CERTIFICATE OF SERVICE**

I hereby certify that on June 14, 2024, I electronically filed this document with the Court

by using the CM/ECF system, and that this document was distributed via the Court's CM/ECF

system.


*/s/ Elizabeth Tulis*