IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

STATE OF TEXAS, et. al.,

        *Plaintiffs,*

    v.

THE UNITED STATES OF AMERICA,
et. al.,

        *Defendants.*

Case No. 2:24-cv-86-Z

**BRIEF OF AMICUS CURIAE CITIZENS DEFENDING FREEDOM IN
SUPPORT OF PLAINTIFFS' MOTION FOR STAY OF AGENCY ACTION AND
<u>PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................. i

TABLE OF AUTHORITIES ........................................................................... ii

STATEMENT OF AMICUS CURIAE'S INTEREST ....................................... 1

INTRODUCTION .......................................................................................... 1

ARGUMENT ................................................................................................. 2

I.   The Final Rule exceeds authority delegated by Congress by legislating on a
     major question. ................................................................................... 3

     A.   The changes to Title IX in the Final Rule are politically and economically
          significant because the changes radically redefine the scope of Title IX.
          ..................................................................................................... 6
     B.   There has not been an express delegation from Congress to the
          Executive Branch. ....................................................................... 16

II.  The Final Rule is arbitrary and capricious because it violates the procedural
     rights of both complainants and accused students. ............................ 17

     A.   The Final Rule limits the right to access evidence. .................... 18
     B.   The Final Rule eliminates the right to a live hearing and cross
          examination. ............................................................................... 20

III. This Court should issue a nationwide injunction. ............................. 23

CONCLUSION ............................................................................................ 25

CERTIFICATE OF SERVICE ...................................................................... 1

i

# TABLE OF AUTHORITIES

### Cases

*Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*,

    57 F.4th 791, 809 (11th Cir. 2022)................................................................9

*Biden v. Nebraska*,

    143 S. Ct. 2355, 2374-75 (2023) .............................................3, 4, 5, 10, 17

*Career Colleges & Sch. of Texas v. U.S. Dep't of Educ.*,

    98 F.4th 220, 235 (5th Cir. 2024)................................................................14

*Cavalier v. Cath. Univ. of Am.*,

    306 F. Supp. 3d 9, 27 (D.D.C. 2018) ........................................................20

*City of Chicago v. Barr*,

    961 F.3d 882, 916-17 (7th Cir. 2020) ..................................................3, 24

*Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*,

    526 U.S. 629, 642 (1999) .....................................................................12, 15

*Doe v. Baum,*

    903 F.3d 575, 581 (6th Cir. 2018) ......................................................20, 22

*Doe v. Miami Univ.*,

    882 F.3d 579, 603 (6th Cir. 2018) ........................................................19

*Doe v. Princeton Univ.*,

    30 F.4th 335, 348 (3d Cir. 2022) .........................................................21

*Doe v. Purdue Univ.*,

    464 F. Supp. 3d 989, 1003 (N.D. Ind. 2020) ............................................................19

*Doe v. Purdue Univ.*,

    928 F.3d 652, 663 (7th Cir. 2019) (Barrett, J.) ...................................................19, 22

*Doe v. Regents of Univ. of California*,

    28 Cal. App. 5th 44, 238 Cal. Rptr. 3d 843 (2018) ....................................................22

*Doe v. U. of Scis.*,

    961 F.3d 203 (3d Cir. 2020) ...............................................................................21, 22

*ExxonMobil Pipeline Co. v. DOT*,

    867 F.3d 564, 571 (5th Cir. 2017) .............................................................................18

*FDA v. Brown & Williamson Tobacco Corp.*,

    529 U.S. 120, 133 (2000) .......................................................................................4, 5

*Fed. Commc'ns Comm'n v. Prometheus Radio Project*,

    592 U.S. 414, 423 (2021) ....................................................................................20, 23

*Gebser v. Lago Vista Indep. Sch. Dist.*,

    524 U.S. 274, 290 (1998) ..........................................................................................12

*Haidak v. U. of Massachusetts-Amherst*,

    933 F.3d 56 (1st Cir. 2019)........................................................................................22

*Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*,

    448 U.S. 607, 645 (1980) .............................................................................................4

*King v. Burwell*,

    576 U.S. 473, 485 (2015) .........................................................................3, 4, 6, 17

*Louisiana v. U.S. Dep't of Energy,*

    90 F.4th 461, 469 (5th Cir. 2024).................................................................18

*Louisiana, et al. v. U.S. Dep't of Education, et al.,*

    No._ 3:24-cv-00563-TAD-KDM, ECF No. 53 (W.D. La. June 13, 2024) ...................6

*MCI Telecommunications Corp. v. Am. Tel. & Tel. Co.,*

    512 U.S. 218 (1994) ..................................................................................4

*Oliver v. Univ. of Texas Sw. Med. Sch.,*

    No. 3:18-CV-1549-B, 2019 WL 536376 (N.D. Tex. Feb. 11, 2019) ..........................19

*Roho Inc. v. Marquis,*

    902 F.2d 356, 358 (5th Cir. 1990) .................................................................3

*State of Fla. v. Dep't of Health & Hum. Servs.,*

    19 F.4th 1271, 1281-82 (11th Cir. 2021) ..................................................3, 23, 24

*Tennessee et al. v. Cardona,*

    No. 2:24-cv-00072-DCR, 2024 WL 3019146 (E.D. Ky. June 17, 2024) ...............6, 24

*Texas v. Cardona,*

    No. 4:23-CV-00604-O, 2024 WL 2947022 (N.D. Tex. June 11, 2024) ...........9, 16, 17

*Texas v. United States,*

    809 F.3d 134, 188 (5th Cir. 2015), *as revised* (Nov. 25, 2015) ................................23

*Util. Air Regul. Grp. v. E.P.A.,*

    573 U.S. 302, 324 (2014) ...........................................................................5

*Valley v. Rapides Parish School Bd.,*

    118 F.3d 1047, 1051 (5th Cir. 1997) ..............................................................3

*VanDerStok v. Garland*,

    86 F.4th 179 (5th Cir. 2023)......................................................................3

*W. Virginia v. Env't Prot. Agency*,

    597 U.S. 697, 700 (2022) .............................................................3, 5, 7, 17

*Walsh v. Hodge*,

    975 F.3d 475, 485 (5th Cir. 2020) ............................................................22

### U.S. Constitution

U.S. Const. amend. XIV ...............................................................................17

### Statutes

20 U.S.C. § 1681 .......................................................................................6, 16

20 U.S.C. § 1681(a)(5) ....................................................................................8

20 U.S.C. § 1681(a)(6) ....................................................................................8

20 U.S.C. § 1681(a)(8) ....................................................................................8

20 U.S.C. § 1689(a)(6) ....................................................................................9

5 U.S.C. §§ 551-559 .......................................................................................18

### Other Authorities

Breyer, *Judicial Review of Questions of Law and Policy*, 38 Admin. L. Rev. 363, 370

    (1986)...........................................................................................................5

H.R. 5, 117th Cong. (2021-2022)..................................................................16

KC Johnson, *Title IX Public Hearing Comments*, Department of Education, Office

    for         Civil         Rights        (June        10,        2021),

https://ocrcas.ed.gov/sites/default/files/storage/correspondence/202106-titleix-
publichearing-comments/kcjohnson.pdf .................................................................14

Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving
Federal Financial Assistance, 89 Fed. Reg. 33474 (Aug. 1, 2024) (to be codified at
34 C.F.R. pt. 106) ........................................7, 11, 12, 13, 14, 15, 16, 18, 19, 20, 21, 23

Samantha Harris & KC Johnson, *Campus Courts in Court: The Rise in Judicial
Involvement in Campus Sexual Misconduct Adjudications,* 22 N.Y.U. J. LEGIS. &
PUB. POL'Y 49 (2020) .................................................................................................14

Samuel Buckberry Joyce, *Testing the Major Questions Doctrine*, STANFORD LAW
SCHOOL       (Feb.    26,    2024),    https://law.stanford.edu/wp-
content/uploads/2024/02/FINAL-Joyce-Article.pdf ......................................................4

### Regulations

34 C.F.R. § 106.30 .........................................................................................................10

34 C.F.R. § 106.45(b)(1)(iii) ...........................................................................................13

34 C.F.R. § 106.45(b)(5)(vi) ............................................................................................19

34 C.F.R. § 106.45(b)(6)(i) .........................................................................................21, 22

34 C.F.R. pt. 86 (1975) .....................................................................................................8

## STATEMENT OF AMICUS CURIAE'S INTEREST

Citizens Defending Freedom is a nonprofit, utilizing its resources to ensure every American citizen is equipped and empowered to stand for and preserve their constitutional rights and freedoms for themselves and future generations. Citizens Defending Freedom is committed to helping ensure federal agencies do not promulgate final rules that are unconstitutional or impose additional compliance costs on its members, the public, parents, or students. Its purpose includes educating the American public on issues that must be considered in a Title IX ruling on these critical issues. The outcome of this case will have a direct effect on Citizens Defending Freedom, including decisions on allocating its resources.

The Final Rule at issue suffers from many defects, including infringing upon the separation of powers and due process protections enshrined in the United States Constitution. While the individual parties may not be able or have standing to address these concerns, Citizens Defending Freedom is well-positioned to brief these issues in detail and does so below.

## INTRODUCTION

After failing to achieve progressive policy through legislation, the current Administration seeks to impose that policy through unlawful federal regulation in its Final Rule. In so doing, the Administration, through its Department of Education, will alter how all elementary schools, secondary schools, and postsecondary institutions implement the provisions of Title IX, having widespread social, political, and economic impacts throughout the entire United States educational system.

1

The Final Rule redefines Title IX's prohibition on sex discrimination, applies its dictates regardless of whether the activity occurs within the school or even within the United States, preempts state and local laws conflicting with its terms, and affects every schools' ability to effectively regulate participation in educational programs and activities. In addition, the Final Rule strips students of well-defined due process rights in the Title IX process, resulting in increased compliance costs and litigation. The Administration seeks to implement these changes without any clear indication of support from Congress in the statutory text in clear violation of doctrinal American values.

Ben Franklin was once asked what form of government the United States had; famously, he responded: "A republic, if you can keep it." Cases such as this, which define the boundaries of the separation of powers between the branches of government and limit unelected bureaucrats' ability to regulate the lives of Americans, are central to retaining our republican form of government. For these reasons, Citizens Defending Freedom respectfully submits this amicus brief in support of the Court granting Plaintiffs' Motion to Stay Enforcement of the Final Rule filed by the State of Texas.

## ARGUMENT

To prevail on the motion for preliminary injunction relating to the Final Rule, Plaintiffs must demonstrate (1) a likelihood of success on the merits; (2) that it is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in its favor; and (4) that an injunction is in the public interest.

2

*Valley v. Rapides Parish School Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997) (citing *Roho Inc. v. Marquis*, 902 F.2d 356, 358 (5th Cir. 1990)). This brief focuses exclusively on the likelihood of success element, arguing Plaintiffs will succeed on the merits because the Final Rule 1) exceeds the authority delegated to the Department of Education by Congress on a major question; and 2) is arbitrary and capricious by infringing upon students' constitutional due process rights without engaging in a careful comparison of these changes. Accordingly, this Court should issue a nationwide preliminary injunction "to avoid the chaos and confusion of a patchwork of injunctions. *State of Fla. v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1281-82 (11th Cir. 2021) (citing *City of Chicago v. Barr*, 961 F.3d 882, 916-17 (7th Cir. 2020)).

## I.    The Final Rule exceeds authority delegated by Congress by legislating on a major question.

"[A]n administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." *VanDerStok v. Garland*, 86 F.4th 179 (5th Cir. 2023). Accordingly, an agency's exercise of authority must always derive from authority delegated to it by Congress. *Id.* One way an agency exceeds its statutory authority is by legislating on a "major question" that Congress did not clearly delegate to the agency. *W. Virginia v. Env't Prot. Agency*, 597 U.S. 697, 716 (2022); *Biden v. Nebraska*, 143 S. Ct. 2355, 2374-75 (2023) (citing *King v. Burwell*, 576 U.S. 473, 485 (2015)); *see Nebraska*, 143 S. Ct. at 2378 (Barrett, J., concurring)

(citing *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)).[1] Limiting an agency to decisions that are within its authority, prevents the unconstitutional shift of Article I legislative power to Article II Executive Agencies, such as the Department of Education (the "Department").[2]

Contrary to some speculation in the commentariat,[3] the major questions doctrine dates back decades. In 1986, then-First Circuit Judge Stephen Breyer wrote in a law review article, "Congress is more likely to have focused upon, and answered, major questions, while leaving interstitial matters [for agencies] to answer themselves in the course of a statute's daily administration." *Nebraska*, 143 S. Ct. at 2380 (citing S. Breyer, *Judicial Review of Questions of Law and Policy*, 38 ADMIN. L.

---

[1] In *Nebraska,* the Supreme Court reaffirmed courts should not assume Congress has assigned questions of "deep 'economic and political significance'" to an agency unless such assignment is made in a "clear statement to that effect." *Nebraska*, 143 S. Ct. at 2375 (citing *King v. Burwell*, 576 U.S. 473, 485 (2015)). Accordingly, the Supreme Court rebuffed the Department of Education's attempt to implement a student debt relief plan that would have cost the federal government billions of dollars because "[t]he basic and consequential tradeoffs" inherent in a mass debt cancellation program "are ones that Congress would likely have intended for itself." *Id.*

[2] *See e.g., Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 645 (1980) ("In the absence of a clear mandate in the Act, it is unreasonable to assume that Congress intended to give the Secretary the unprecedented power over American industry that would result from the Government's view of §§ 3(8) and 6(b)(5), coupled with OSHA's cancer policy."); *MCI Telecommunications Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218 (1994) ("It is highly unlikely that Congress would leave the determination of whether an industry will be entirely, or even substantially, rate-regulated to agency discretion—and even more unlikely that it would achieve that through such a subtle device as permission to "modify" rate-filing requirements.").

[3] Samuel Buckberry Joyce, *Testing the Major Questions Doctrine*, STANFORD LAW SCHOOL (Feb. 26, 2024), https://law.stanford.edu/wp-content/uploads/2024/02/FINAL-Joyce-Article.pdf.

REV. 363, 370 (1986)). This formulation bears a striking resemblance to the core of the major questions doctrine as it would come to be well-defined over the decades.[4]

Through the major questions doctrine, the Supreme Court places a renewed emphasis on the separation of powers, ensuring that Executive Branch agencies do not overstep into legislative territory without a clear expression of authority from Congress. *W. Virginia*, 597 U.S. at 700 (internal citations omitted) (expressing that the major questions doctrine is animated by separation of powers principles and a practical understanding of legislative intent). Given these recent decisions, it is important courts thoroughly review agency action to ensure compliance with Supreme Court precedent and the foundational separation of powers underpinning the United States Constitution.

When considering whether an agency action is a major question, a reviewing court must consider (1) whether the Final Rule is a significant political or economic question that Congress would likely reserve to itself, and (2) if so, whether there was a clear statutory authorization. *Nebraska*, 143 S. Ct. at 2375. The changes to Title IX in the Final Rule are not consistent with the text or history of Title IX and are of vast

---

[4] *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000) ("Given this history and the breadth of the authority that the FDA has asserted, we are obliged to defer not to the agency's expansive construction of the statute, but to Congress' consistent judgment"); *see also Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 324 (2014) ("We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance.") (citations omitted); *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021) (*per curiam*) ("We expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance") (citations omitted).

political and economic significance. As such, the Final Rule is a major question and these changes should be reserved to Congress, the branch of government that controls the passage of laws, absent a clear delegation of authority. *Nebraska*, 143 S. Ct. at 2375 (citing *Burwell*, 576 U.S. at 485). Here, there has been no express delegation. Therefore, the Final Rule violates the major questions doctrine and should be preliminarily enjoined.[5]

### A. The changes to Title IX in the Final Rule are politically and economically significant because the changes radically redefine the scope of Title IX.

Title IX was passed in 1972 and provides "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681. It is a simple statute that, essentially, prevents sex discrimination in schools receiving federal funding. The language of Title IX presents a binary view of sex and makes no mention of concepts like "gender identity" or "sexual orientation" when defining the treatment of sex. *See* 20 U.S.C. § 1681 (referring repeatedly to "one sex" and "the other sex"). Despite the text and

---

[5] Indeed, the Western District of Louisiana recently stayed the Final Rule because, among other things, it violates the major questions doctrine. *Louisiana, et al. v. U.S. Dep't of Education, et al.*, No. 3:24-cv-00563-TAD-KDM, ECF No. 53, at 23-27 (W.D. La. June 13, 2024). That court specifically determined there were "vast" political and economic impacts from the Final Rule and that there was no such appropriate delegation. *Id.* The Eastern District of Kentucky also found that the major question doctrine supports enjoining the regulations. *Tennessee, et al. v. Cardona, et al.*, No. 2:24-cv-00072-DCR, ECF No. 100, at 28-30 (E.D. Ky. June 17, 2024). This Court should follow suit, staying the Final Rule.

history of Title IX, the Final Rule redefines the prohibition on sex discrimination to include "discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity." Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 89 Fed. Reg. 33474, 33,476 (Aug. 1, 2024) (to be codified at 34 C.F.R. pt. 106). The Final Rule also allows schools to maintain sex-segregated programs, activities, and facilities, but it prohibits schools from enforcing these distinctions in a manner that causes "more than de minimis harm," which it has defined to include prohibiting a person from participating in education programs or activities consistent with their gender identity. *See id.* at 33816, 33819–20. Because these changes apply to all schools accepting federal funding (*i.e.* all public schools and nearly all colleges and universities), the changes are significant.

### a.    *The changes are politically significant.*

The Final Rule's inclusion of "sexual orientation" and "gender identity" within the definition of "sex" in Title IX changes the entire scope of the statute and eliminates important due process protections (discussed *supra,* II). This change in the scope of Title IX is a vastly significant political question that is best suited for the halls of Congress. *W. Virginia*, 597 U.S. at 721 (citing *Brown & Williamson Tobacco Corp.*, 529 U.S. at 159–160). The Supreme Court recently rejected an agency's attempt to legislate on a politically significant issue, determining an agency could not under a general authority "adopt measures necessary to prevent the … spread of disease, institute a nationwide eviction moratorium in response to the COVID-19

pandemic." *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2487 (2021) (*per curiam*). Similarly, the Final Rule will be implemented under a re-interpretation of the general grant of authority to prohibit sex discrimination in educational programs and activities. Such a re-interpretation is a quintessential political action, particularly where the text and history are not in alignment with such an interpretation.

As noted by Plaintiffs, prior regulations from the Department "treated sex as binary, referring multiple times to "one sex," especially versus "the other sex," using the phrase "both sexes," and referencing "boys and girls" and "male and female teams." Exhibit 2, Mtn. Leave to File 11, May 14, 2024, ECF No. 13-2 (citing 34 C.F.R. §§ 106.33, 106.34(a)(3), 106.36(c), 106.37(a)(3), 106.41(c), 106.51(a)(4), 106.58(a), 106.60(b), 106.61; *see also* 34 C.F.R. pt. 86 (1975)). In addition to these examples, Title IX contains an exemption for public undergraduate institutions with a historic "policy of admitting only students of one sex." 20 U.S.C. § 1681(a)(5). It also discusses organizations whose memberships have "traditionally been limited to persons of one sex," *see* 20 U.S.C. § 1681(a)(6), and "Father-son or mother-daughter activities," so long as similar opportunities provided for "one sex" are offered to "the other sex," *see* 20 U.S.C. § 1681(a)(8). States and schools have operated according to this interpretation of the law for decades, and only now does the Department purport to turn all of that on its head, redefining "sex" to include "sexual orientation" and "gender identity."

This new view from the Department has already been rejected by courts, including this Court. *Texas v. Cardona*, No. 4:23-CV-00604-O, 2024 WL 2947022 (N.D. Tex. June 11, 2024). *Cardona* determined the references to "sexual orientation and gender identity" are references only to "statuses" and "do not otherwise alter how the Title IX statute contemplates '"sex."'" *Id.* at *31 (citing 20 U.S.C. § 1689(a)(6) (directing the formation of a sexual-violence task force to, in part, "develop recommendations on . . . inclusive approaches to supporting survivors, which include consideration of . . . lesbian, gay, bisexual, or transgender (commonly referred to as 'LGBTQI+') status")). Therefore, *Cardona* aptly found "these statuses do[] nothing more than authorize information gathering, presumably for potential statutory changes in the future. Until Congress enacts such a change, § 1689(a)(6) cannot be construed as broadening the definition of sex." *Id.* at *31. *Cardona* determined that "the obligation not to discriminate on the basis of sexual orientation or gender identity is nowhere within the text of Title IX." *Id.* at *44.

*Cardona*'s conclusion is consistent with a recent Eleventh Circuit case, which found a prohibition on sex discrimination did not include a prohibition on gender identity discrimination, because, among other things, any separation of students based on sex (*e.g.*, a bathroom policy) would result in transgender students in both categories, thereby not excluding them on the basis of gender identity. *Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 809 (11th Cir. 2022). Therefore, the Executive Branch's inclusion of gender identity and sexual orientation in the Final Rule is significant by ushering in a conception of the statute that

radically redefines "sex" in way that has been repeatedly rejected. In *Nebraska,* the Department of Education (under the same presidential Administration) was rebuffed because "[t]he Secretary's new modifications of these provisions were not moderate or minor" but "[i]nstead, they created a novel and fundamentally different loan forgiveness program. 143 S. Ct. at 2369. By creating a "novel and fundamentally different" system under Title IX, the Executive Branch's rule is politically significant and therefore is a major question that should be left to Congress.

### b.    *The Final Rule is economically significant.*

Unsurprisingly, the complete overhaul of Title IX in the Final Rule imposes an enormous economic impact by expanding the scope of Title IX. Expanding the scope of Title IX thereby increases costs in terms of resources, liability, and necessitating training for all employees of schools that receive federal funding.

The Final Rule's use of the term "sex-based harassment" to describe the kind of conduct warranting a school's response, in contrast to the 2020 Regulations use of the term "sexual harassment," greatly expands the scope of Title IX. *Compare* 89 Fed. Reg. at 33884 (to be codified at 34 C.F.R. § 106.2) (defining "sex-based harassment"), *with* 34 C.F.R. § 106.30 (defining "sexual harassment"). This seemingly subtle change is anything but subtle in practice.

The 2020 Regulations limit the scope of "sexual harassment" to only conduct that constituted hostile environment sexual harassment, quid pro quo sexual harassment, and specific offenses defined by federal statute. *See* 34 C.F.R. § 106.30. Each term of the 2020 rule had distinct elements that must be met for there to be a

10

finding of responsibility in the formal grievance process. *Id.* This provided specificity to the 2020 Rule creating firm rules and clear guidance.

The Final Rule, in contrast, defines "hostile environment harassment" (which is part of the umbrella term "sex-based harassment," which it itself a subset of an even larger umbrella term, "sex discrimination" (89 Fed. Reg. at 33491)) as:

> Unwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity (i.e., creates a hostile environment). *Whether a hostile environment has been created is a fact-specific inquiry that includes consideration of the following: (i) The degree to which the conduct affected the complainant's ability to access the recipient's education program or activity; (ii) The type, frequency, and duration of the conduct; (iii) The parties' ages, roles within the recipient's education program or activity, previous interactions, and other factors about each party that may be relevant to evaluating the effects of the conduct; (iv) The location of the conduct and the context in which the conduct occurred; and (v) Other sex-based harassment in the recipient's education program or activity.*

89 Fed. Reg. at 33884. This is a confusing and unworkable multi-factor analysis, designed to expand the scope of Title IX, and on which the Final Rule has provided limited guidance. *See* 89 Fed. Reg. at 33563, 33884.

In addition, the multi-factor analysis required by the Final Rule will substantially increase costs both in terms of potential litigation as well as in training all employees. Schools will expend considerable resources analyzing each Title IX complaint not only on its own merits, but the generalized culture of "[o]ther sex-based harassment in the recipient's education program or activity," among at least four other factors. 89 Fed. Reg. at 33884. This will necessarily entail a more cost-intensive inquiry into not only the facts of the individual Title IX case, but also the generalized

history of "sex-based harassment" at the school over an undetermined period of time. The Title IX staff at every school will need to take this wide-ranging review for each Title IX complaint that alleges hostile environment harassment, necessarily entailing substantial costs unaccounted for by the Department.

The Final Rule also increases Title IX liability by expanding the "actual knowledge" requirement[6] to what is effectively constructive knowledge. 89 Fed. Reg. at 33563. Indeed, it *imputes* knowledge onto the recipient institution so long as a single employee at the institution has knowledge. 89 Fed. Reg. at 33563. The Final Rule's formulation is contrary to the statute of Title IX and the Supreme Court's longstanding interpretation of that statute, providing "no such [administrative enforcement] action shall be taken until the department or agency concerned has advised the *appropriate person or persons* of the failure to comply with the requirement." 20 U.S.C. § 1682.

The Supreme Court interprets this "appropriate person" language to require an institution have "actual knowledge" of sexual harassment before liability is imposed. *See, e.g., Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998) ("Because the express remedial scheme under Title IX is predicated upon notice to an 'appropriate person' … we hold that a damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged

---

[6] The Supreme Court requires schools to have "actual knowledge" of harassment before they can be liable for failing to respond. *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 642 (1999).

discrimination … has actual knowledge of discrimination in the recipient's programs and fails adequately to respond"); *Davis*, 526 U.S. at 642 (same). The Final Rule bucks this language and instead imputes knowledge to an institution where any employee— not only an "appropriate person" at the institution—has knowledge of any potential sex-based harassment, thereby drastically expanding the scope of Title IX.

Remarkably, the Department does not acknowledge any additional training burden that would necessarily result from the additional requirement to train almost every employee that he or she must report any conduct potentially constituting sex-based harassment lest the institution be imputed with knowledge of the harassment. *See generally*, 89 Fed. Reg. at 33852. The Department states that "[t]raining employees is accounted for in the [Regulatory Impact Analysis] model and does not meaningfully change recipients' annual burden to provide training as compared to the 2020 amendments." *Id.*

In contrast, the 2020 Rule only required training for "Title IX Coordinators, investigators, decision-makers, and any person who facilitates an informal resolution process." 34 C.F.R. § 106.45(b)(1)(iii). It did not *de facto* require the training of every single employee on their mandatory reporting obligations, as the Final Rule does. 89 Fed. Reg. at 33888 (to be codified at 34 C.F.R. § 106.44(c)) (subjecting all school employees who do not qualify as "confidential employees" to be mandatory Title IX reporters, meaning they must report alleged conduct to the Title IX Coordinator).

The due process issues, which will be discussed *infra*, are also relevant to the costs analysis. The Final Rule forces recipients to incur the litigation risks that were

present prior to the 2020 Regulations. *See generally* Samantha Harris & KC Johnson, *Campus Courts in Court: The Rise in Judicial Involvement in Campus Sexual Misconduct Adjudications*, 22 N.Y.U. J. LEGIS. & PUB. POL'Y 49 (2020) (noting that several hundred accused-student lawsuits were filed post 2011, alleging both violations of constitutional due process rights and the right to be free from discriminatory discipline under Title IX; further noting that this development resulted in the erosion of the historical deference given to universities in such cases). After the 2020 Regulations took effect, accused-student litigation dropped to a "trickle."[7] In backtracking to the landscape before 2020, the Final Rule speaks the language of "fairness" (89 Fed. Reg. at 33636) and "equity" (89 Fed. Reg. at 33849) but ushers in the same procedural due process issues present in the 2011 Dear Colleague Letter. No doubt, the return of that regime will increase costs.

The Final Rule amounts to an all-encompassing and incredibly expensive overhaul of Title IX as it has been understood and applied over the last fifty years. As a result, it is economically significant.[8] Each of the changes noted above made by the Final Rule will increase compliance costs for institutions. The cost of

---

[7] KC Johnson, *Title IX Public Hearing Comments*, DEPARTMENT OF EDUCATION, OFFICE FOR CIVIL RIGHTS (June 10, 2021), https://ocrcas.ed.gov/sites/default/files/storage/correspondence/202106-titleix-publichearing-comments/kcjohnson.pdf.

[8] For this reason, Plaintiffs also show irreparable injury; "increased costs of compliance, necessary alterations in operating procedures, and immediate threats of costly and unlawful adjudications of liability all inflicted by the Rule's new provisions." *Career Colleges & Sch. of Texas v. U.S. Dep't of Educ.*, 98 F.4th 220, 235 (5th Cir. 2024).

implementing the Final Rule's ban on discrimination on the basis of gender identity, and along with that ban, its classification of any treatment of an individual inconsistent with his or her gender identity as sex-based harassment will result in more Title IX actions and require additional training for staff. 89 Fed. Reg. at 33516, 33816 (including any treatment of a person inconsistent with his or her gender identity subjects him or her to "more than de minimis harm," violating Title IX). The expanded scope of "actual knowledge" will only compound the required increase in training costs as any janitor, lower-level staff member, or any faculty member may unknowingly subject the institution to liability, if they heard a student discuss conduct that may constitute sex-based harassment under the nebulous multi-factor balancing test. *See* 89 Fed. Reg. at 33563, 33884.

In promulgating the procedural provisions, the Department failed to adequately consider the cost burden on States and recipients, as articulated above. In terms of computing these costs, these changes impact all United States educational institutions that accept federal funding. Therefore, it will apply to tens, if not hundreds of millions of people across the nation, necessitating astronomical costs in implementing the changes for compliance – even the Department estimates compliance costs to be over $98 million, and that excludes the costs for which it failed to account. 89 Fed. Reg. at 33861. The Department subjects recipients to a host of new, unforeseen and incredibly expensive requirements, something especially significant with respect to Spending Clause statutes of which Title IX is one. *See Davis*, 526 U.S. at 640 ("we have repeatedly treated Title IX as legislation enacted

pursuant to Congress' authority under the Spending Clause"). Because the Final Rule imposes astronomical new costs on recipients, it is economically significant and is a major question that should be left to Congress.

### B. There has not been an express delegation from Congress to the Executive Branch.

The thirty-seven-word Title IX statute does not provide an express delegation of authority to redefine the term "sex" or to impose these radical new costs on recipients. *See* 20 U.S.C. § 1681. Instead, the statute's repeated references to "one sex" or the "other sex" precludes any finding that there has been an express delegation of authority – if anything, there has been an implicit rejection of authority. Title IX does not include discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity (Congress chose not to add these categories as discussed) – this is imposed by this Final Rule alone. *See* 89 Fed. Reg. at 33476; *Cardona*, 2024 WL 2947022 at *45. Congress could not – and did not – delegate to the Department the power to completely redefine the scope of the statute.

Congress has repeatedly rejected invitations to alter Title IX's focus on binary sex categories. *See* H.R. 5, 117th Cong. (2021-2022). As recently as the last Congress, it rejected the invitation to adopt legislation that would have protected against discrimination based on sex, sexual orientation, and gender identity in areas including public accommodations. *See id.* This opportunity to act on this issue, and the decision not to, is the opposite of a clear expression of delegation to the Department of Education through Title IX. *See Nebraska*, 143 S. Ct. 2355, 2373

16

(2023) (chiding the attempt to claim administrative authority to take an action that Congress has chosen not to enact itself) (citing *West Virginia*, 142 S. Ct., at 2614). Indeed, "Title IX has never been amended to expand its anti-discrimination provisions to include sexual orientation and gender identity." *Cardona*, 2024 WL 2947022 at *45. That is why this Court struck down guidance documents from the Department of Education that purported to include "gender identity" in the term "sex" because such guidance exceeded the Department's authority. *Id.*

The Final Rule would create a fundamentally different Title IX with different protections for newly defined groups such as gender identity and sexual orientation. This redefinition of the scope of Title IX and the consequential tradeoffs associated with that decision on the institutions across the nation are considerations Congress would likely have intended for itself. *See Nebraska*, 143 S. Ct. at 2369. (citing *West Virginia*, 142 S. Ct. at 2613). Therefore, the text and history of Title IX weigh in favor of a finding that the Final Rule violates the major questions doctrine because the changes to the law are significant such that it should come from Congress, not the Executive Branch, and there is no express delegation of authority to make such a change. *Id.* at 2374-75 (citing *Burwell*, 576 U.S. at 485).

## II.    The Final Rule is arbitrary and capricious because it violates the procedural rights of both complainants and accused students.

Due Process protects the citizenry from a government that would take away life, liberty, or property, without adequate justification. U.S. CONST. amend. XIV. The Final Rule removes these important foundational due process protections for students, including removing the right to review evidence and the right to a live

17

hearing with cross examination. 89 Fed. Reg. at 33696, 33747. The removal of these protections limits any ability of a student to advocate for his or her rights. As Plaintiffs point out, the Final Rule holistically fails to account for these changes as it is required to do under the Administrative Procedure Act ("APA") (5 U.S.C. §§ 551-559). ECF No. 16, at 32-35. This is also true with the procedural issues highlighted in this brief.

When considering if agency action is arbitrary and capricious, courts ask whether "an agency articulated a rational connection between the facts found and the decision made." *Louisiana v. U.S. Dep't of Energy,* 90 F.4th 461, 469 (5th Cir. 2024) (citing *ExxonMobil Pipeline Co. v. DOT,* 867 F.3d 564, 571 (5th Cir. 2017)). Then the court must ask if the agency's reasoning "fails to account for relevant factors or evinces a clear error of judgment." When an agency changes position, such changes require a careful comparison of the agency's statements to ensure that the agency has recognized the change, reasoned through it without factual or legal error, and balanced all relevant interests affected by the change. *Id.* Here, the Final Rule makes changes that are not rationally connected to the facts and refused to provide adequate explanation for its drastic changes. Therefore, these changes are arbitrary and capricious in addition to violating the major questions doctrine.

### A. The Final Rule limits the right to access evidence.

The right to access evidence has repeatedly been upheld by courts as a due process issue in schools because to deny students' access to evidence, deprives them of the availability to prove their innocence (in the case of respondents) or prove guilt

18

(in the case of complainants). *See, e.g., Doe v. Purdue Univ.*, 928 F.3d 652, 663 (7th Cir. 2019) (Barrett, J.) ("And withholding the evidence on which it relied in adjudicating his guilt was itself sufficient to render the process fundamentally unfair."). Whereas the 2020 Rule requires a school disclose to the parties all "directly related evidence" (34 C.F.R. § 106.45(b)(5)(vi)), the Final Rule permits a school to only disclose a "description" of the relevant evidence. 89 Fed. Reg. at 33696. Even more alarming, the Final Rule permits schools to provide only an *oral* description of the evidence to the student-parties. 89 Fed. Reg. at 33696 ("Under § 106.45(f)(4), a recipient may provide a description of the evidence orally or in writing"). Only when the student knows enough about the law and federal regulations to specifically request the evidence against him, does the school need to provide him that evidence. 89 Fed. Reg. at 33682.

As the Department is—or should be—aware, there is a long history in Title IX caselaw of universities losing cases (either on a constitutional due process theory or a Title IX theory) because they failed to give the parties access to the evidence. *See, e.g., Doe v. Purdue Univ.*, 464 F. Supp. 3d 989, 1003 (N.D. Ind. 2020) ("Because the Defendants withheld evidence they used to find the Plaintiff guilty of violating university policy, the disciplinary process was fundamentally unfair"); *Oliver v. Univ. of Texas Sw. Med. Sch.*, No. 3:18-CV-1549-B, 2019 WL 536376, at *13 (N.D. Tex. Feb. 11, 2019) (denying motion to dismiss due process and Title IX claims where accused was never provided access to the evidence against him); *Doe v. Miami Univ.*, 882 F.3d 579, 603 (6th Cir. 2018) (denying motion to dismiss due process claim where

19

university did not give accused a copy of the disciplinary file); *see also Cavalier v. Cath. Univ. of Am.*, 306 F. Supp. 3d 9, 27 (D.D.C. 2018) (denying motion to dismiss Title IX deliberate indifference claim where university failed to "preserve and seek out important evidence"). These cases are from both complainant-side Title IX cases (deliberate indifference) and respondent-side Title IX cases, revealing that access to evidence is a procedural protection that benefits both complainants and respondents and underscoring the importance of access to evidence for due process.

Not only does the Department fail to acknowledge or discuss these holdings and why the Final Rule alters the procedure, it also sets forth requirements that simultaneously hurt students and schools, permitting schools to only provide an oral "description" of the evidence (89 Fed. Reg. at 33696), but still requiring schools to collect and compile all the evidence, to be provided to students upon request. 89 Fed. Reg. at 33682. In other words, a school must still incur the costs associated with investigating and adjudicating each Title IX case, but the students are still deprived of access to that evidence. In short, it is worst case scenario for both students and schools – students are denied the right to be automatically presented with the evidence, but schools still have to expend the resources to collect that evidence.

### B.    The Final Rule eliminates the right to a live hearing and cross examination.

A live hearing with cross examination is likewise paramount to due process. Indeed, "due process requires cross-examination in circumstances like these because it is the greatest legal engine ever invented for uncovering the truth." *Doe v. Baum,* 903 F.3d 575, 581 (6th Cir. 2018). Over the last four years, universities have proven

themselves more than capable of facilitating cross examination in these hearings (34 C.F.R. §106.45(b)(6)(i)), but now the Department rolls back that protection without justification.

The Final Rule eliminates the right to any live hearing, including any with cross examination. 89 Fed. Reg. at 33747. Whereas the 2020 Rule requires that all postsecondary schools provide a live hearing with cross examination to adjudicate all formal complaints of sexual harassment (34 C.F.R. § 106.45(b)(6)(i)), the Final Rule permits a postsecondary school to adjudicate a Title IX matter without a live hearing at all, and through a model titled the "single investigator model." 89 Fed. Reg. at 33746-33747. A school uses a "single investigator model" when it uses the same official serves as both investigator and decisionmaker, and potentially also as Title IX Coordinator, thereby combining all prosecutorial, investigative, and adjudicative functions into one person. 85 Fed. Reg. 30367. Courts have found this to be an inherently unfair procedure.[9] The Department, however, disagrees, and explains that it "has good reason to believe that many recipients will appreciate the flexibility these final regulations will afford them, including the option to use a single-investigator model, to better fulfill their obligation not to discriminate based on sex…" 89 Fed. Reg. 33662. But this "flexibility" to invade students' constitutional right to due process and basic fairness is no flexibility at all.

---

[9] *See, e.g., Doe v. Univ. of Scis.*, 961 F.3d 203, 206 (3d Cir. 2020) (finding that the "single investigator model" violates principles of basic fairness in a university Title IX proceeding); *Doe v. Princeton Univ.*, 30 F.4th 335, 348 (3d Cir. 2022) (same).

Several federal courts of appeal have recognized a student's constitutional right to a live hearing with some form of cross examination (even if only through a hearing panel) in the Title IX context.[10] Courts also consistently hold a public university student's "circumstances entitle[] him to relatively formal procedures." *See Purdue*, 928 F.3d at 663. The 2020 Rule integrated these holdings and mitigated concerns of the hearing degenerating into a "shouting match," *Walsh v. Hodge*, 975 F.3d 475, 485 (5th Cir. 2020), through its requirement that all cross examination be conducted by the advisor and never through a party directly. 34 C.F.R. § 106.45(b)(6)(i). The Final Rule, however, permits a school to drop far below even the low standard expressed in *Haidak,* where the First Circuit held that cross examination through a hearing panel was constitutionally sufficient. *Haidak,* 933 F.3d at 70-71. Under the Final Rule, schools will be able to deny the student parties any right to a hearing, which necessarily impairs the ability of schools to make the credibility determinations they need to make. *See Baum*, 903 F.3d at 580.

The Department's Final Rule deprives both student parties of the benefit of strenuously testing their opponent's story through cross examination, instead permitting schools to make decisions on these sensitive cases behind closed doors,

---

[10] *See generally, Doe v. Baum,* 903 F.3d 575 (6th Cir. 2018) (holding that when credibility is at issue, student is entitled to true cross-examination); *Haidak v. U. of Massachusetts-Amherst*, 933 F.3d 56, 70 (1st Cir. 2019) (holding "some form" of cross-examination is required, if only through a hearing panel, provided the hearing panel "conduct[s] reasonably adequate questioning"); *Doe v. Regents of Univ. of California,* 28 Cal. App. 5th 44 (2018) (holding selective questioning by a hearing panel can violate student's due process rights); *see also Doe v. U. of Scis.*, 961 F.3d 203 (3d Cir. 2020) ("basic fairness" requires cross-examination).

without ever allowing either party the right to be heard in a live hearing. 89 Fed. Reg. at 33895 (to be codified at 34 C.F.R. § 106.46(g)). A school not operating in good faith can now more easily sweep legitimate assaults under the rug, or railroad accused students, whatever it believes will less likely lead to liability.

In sum, the procedural requirements of the Final Rule will (1) require schools to use a confusing multifactor test to determine whether conduct constitutes sex-based harassment (the same conduct may constitute sex-based harassment between some students but not others); (2) impose liability even if only one employee at the school is aware of the allegation; (3) remove the right of students to see the evidence in the case; and (4) remove the right to any form of a live hearing. Taken together, these provisions threaten schools into violating the rights of their students. Such a result cannot possibly effectuate the text or purpose of Title IX – especially considering the Department found that such procedures were impermissible just four years ago. For these reasons, it cannot be said that the Department has "reasonably considered the relevant issues and reasonably explained the decision" to make these changes sufficient to survive arbitrary and capricious review. *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

### III.    This Court should issue a nationwide injunction.

"[A] federal district court may issue a nationwide … injunction in appropriate circumstances." *State of Fla. v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1281–82 (11th Cir. 2021) (citing *Texas v. United States*, 809 F.3d 134, 188 (5th Cir. 2015), *as revised* (Nov. 25, 2015)) (internal quotations omitted). While these circumstances

are rare, they are generally warranted where it is necessary to "protect similarly situated nonparties[] or to avoid the chaos and confusion of a patchwork of injunctions." *Id.* (citing *City of Chicago v. Barr*, 961 F.3d 882, 916-17 (7th Cir. 2020)). While *amicus* urges that nationwide injunctions should be reserved for the exceptional cases, this is an exceptional case.

The Western District of Louisiana and Eastern District of Kentucky have already issued orders staying the application of the Final Rule within those Districts' states. *Louisiana, et al. v. U.S. Dep't of Education, et al.*, No. 3:24-cv-00563-TAD-KDM, ECF No. 53, at 23-27 (W.D. La. June 13, 2024); *Tennessee et al. v. Cardona*, No. 2:24-cv-00072-DCR, 2024 WL 3019146 (E.D. Ky. June 17, 2024). The necessary result of these partial injunctions is the very "patchwork of injunctions" resulting in "chaos and confusion" for recipients of federal funds nationwide that should be avoided. *State of Fla.*, 19 F.4th at 1281–82. Schools and students who may not be able to afford to litigate these issues in federal court should not be deprived of their rights simply because they could not afford to be a plaintiff. Moreover, there is no utility in the Department applying the 2020 Regulations in some states and the Final Rule in others, depending on a patchwork of varying and evolving federal district court orders. If the Court finds that Plaintiffs are likely to succeed on the merits, this Court should issue a nationwide injunction to equally protect all students and schools in our nation, and to prevent any further confusion until the cases are resolved.

## CONCLUSION

As evidenced above and in Plaintiff's briefing, the Final Rule suffers from many fatal issues counseling in favor of this Court granting the requested stay. This Court should grant Plaintiffs' motion for stay of agency action and preliminary injunction.

Dated: June 26, 2024                    Respectfully submitted,

                                         */s/    Molly McCann*
                                         Molly McCann, VA Bar 94222
                                         Lindsay R. McKasson
                                         Benjamin North
                                         Shawn Flynn
                                         BINNALL LAW GROUP, PLLC
                                         717 King Street, Suite 200
                                         Alexandria, Virginia 22314
                                         Phone: (703) 888-1943
                                         Fax: (703) 888-1930
                                         molly@binnall.com
                                         lindsay@binnall.com
                                         ben@binnall.com
                                         shawn@binnall.com


                                         JONATHAN K. HULLIHAN
                                         Remnant Law
                                         5900 Balcones Drive # 20675
                                         Austin, TX 78731
                                         Phone: (512) 720-6218
                                         Fax: (512) 200-4616
                                         JHullihan@Remnantlawgroup.com


                                         James H. K. Bruner, Esq.
                                         Citizens Defending Freedom
                                         P.O. Box 156
                                         Mulberry, Florida 33860
                                         Phone: 850 -228- 4227

                                         *Attorneys for Citizens Defending Freedom*

25

## CERTIFICATE OF SERVICE

I certify that on June 26, 2024, a copy of the foregoing was filed with the Clerk of the Court using the Court's CM/ECF system, which will send a copy to all counsel of record.

/s/    *Molly McCann*
Molly McCann, VA Bar 94222

*Attorney for Citizens Defending Freedom*

1