# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | CIVIL ACTION NO. 2:24-CV-86-Z |
| v. | § | |
| | § | |
| THE UNITED STATES OF AMERICA, | § | |
| *et al.*, | § | |
| | § | |
| *Defendants*. | § | |

---

# PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR STAY OF AGENCY ACTION AND PRELIMINARY INJUNCTION

---

# TABLE OF CONTENTS

Table of Contents ...................................................................................................................ii

Argument ...............................................................................................................................1

   I.   Plaintiffs are likely to succeed on the merits. ...............................................................1

      A.   The Final Rule unlawfully redefines "sex" in Title IX. .........................................1

      B.   The Final Rule unlawfully expands the concept of "sex-based harassment."....................6

      C.   The Final Rule unlawfully changes Title IX's grievance procedures...................8

      D.   The Final Rule wrongly protects abortion..............................................................10

      E.   The Final Rule is arbitrary and capricious. .........................................................13

   II.   Plaintiffs will suffer irreparable harm and the public interest and balance of the equities are in their favor.......................................................................................................................18

   III.  The scope of requested relief is proper........................................................................19

Conclusion ...........................................................................................................................20

Certificate of Service...........................................................................................................22

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ascendium Educ. Sols. v. Cardona,*
  78 F.4th 470 (D.C. Cir. 2023)..............................................................................8

*Baldwin v. United States,*
  140 S. Ct. 690 (2020) (Thomas, J., dissenting from the denial of certiorari)......................7

*Baltimore v. Azar,*
  439 F. Supp. 3d 591 (D. Md.), *aff'd*, 973 F.3d 258 (4th Cir. 2020)......................20

*Career Colleges & School of Texas v. United States Dep't of Education,*
  98 F.4th 220 (5th Cir. 2024) ..............................................................................19

*Data Mktg. Partn., LP v. U.S. Dept. of Lab.,*
  45 F.4th 846 (5th Cir. 2022) ........................................................................ 19, 20

*Davis v. Monroe County Board of Education,*
  526 U.S. 629 (1999).................................................................................. 6, 7, 8

*Doe 2 v. Shanahan,*
  917 F.3d 694 (D.C. Cir. 2019) (Williams, J., concurring in the result) .................................4

*Doe v. Univ. of Scis.,*
  961 F.3d 203 (3d Cir. 2020) ..............................................................................9

*Domain Prot., LLC v. Sea Wasp,*
  LLC, 2019 WL 3219939 (E.D. Tex. July 17, 2019)...............................................9, 10

*EEOC v. Abercrombie & Fitch Stores, Inc.,*
  575 U.S. 768 (2015).........................................................................................5

*Griffin v. HM Florida-ORL, LLC,*
  144 S. Ct. 1 (2023) (Kavanaugh, J., concurring in denial of stay) ....................................19

*Harris v. Forklift Sys., Inc.,*
  510 U.S. 17 (1993)...........................................................................................7

*Jackson v. Birmingham Bd. of Educ.,*
  544 U.S. 167 (2005).........................................................................................2

*B.P.J. ex rel. Jackson v. W.V. State Bd. of Educ.,*
  98 F.4th 542 (4th Cir. 2024) (Agee, J., concurring in part and dissenting in part) ..........................2

*Adams ex. rel. Kasper v. Sch. Bd. of St. Johns Cnty.*,
57 F.4th 791 (11th Cir. 2022) (en banc)............................................................2, 3

*Kentucky v. Yellen*,
54 F.4th 325 (6th Cir. 2022) ............................................................................8

*Kiakombua v. Wolf*,
498 F. Supp. 3d 1 (D.D.C. 2020) (K.B. Jackson, J.)...............................................19

*League of Women Voters of the U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ............................................................................19

*Loper Bright Enter. v. Raimondo*,
No. 22-451 (2024) .........................................................................................1

*Louisiana v. U.S. Dep't of Energy*,
90 F.4th 461 (5th Cir. 2024) .......................................................................13, 14

*Louisiana v. U.S. Dept. of Educ*,
No. 3:24-cv-563, 2024 WL 2978786 (W.D. La. June 13, 2024) ..........................1, 5, 6, 20

*Massachusetts v. EPA*,
549 U.S. 497 (2007).......................................................................................9

*Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*,
60 F.4th 956 (5th Cir. 2023) ............................................................................8

*Michigan v. EPA*,
576 U.S. 743 (2015)......................................................................................17

*Moyle v. United States*,
No. 23-726 (Jackson, J., concurring in part and dissenting in part), slip op...................13

*Mozilla Corp. v. FCC*,
940 F.3d 1 (D.C. Cir. 2019) ..............................................................................8

*Murthy v. Missouri*,
No. 23-411, 2024 WL 3165801 (U.S. June 26, 2024)........................................19

*Nasdaq Stock Mkt. LLC v. SEC*,
38 F.4th 1126 (D.C. Cir. 2022).........................................................................19

*Nat'l Federation of Indep. Bus. v. Sebelius*,
567 U.S. 519 (2012).......................................................................................6

*Nat'l Pork Producers Council v. Ross*,
598 U.S. 356 .................................................................................................3

*Nat'l Wildlife Federation v. EPA*,
    286 F.3d 554 (D.C. Cir. 2002) ..................................................................................12

*Neese v. Becerra*,
    640 F. Supp. 3d 668 (N.D. Tex. 2022) ...................................................... 1, 3, 16

*North Carolina v. EPA*,
    531 F.3d 896 (D.C. Cir. 2008) ..................................................................................20

*NB ex rel. Peacock v. D.C.*,
    682 F.3d 77 (D.C. Cir. 2012) ......................................................................................9

*Raytheon Co. v. Hernandez*,
    540 U.S. 44 (2003) ........................................................................................................4

*Sea-Land Serv., Inc. v. Dep't of Transp.*,
    137 F.3d 640 (D.C. Cir. 1998) ..................................................................................16

*Speech First, Inc. v. Fenves*,
    979 F.3d 319 (5th Cir. 2020) ..................................................................7, 8, 13, 18

*Starbucks Corp. v. McKinney*,
    144 S. Ct. 1570 (2024) ..............................................................................................18

*Tennessee v. Cardona*,
    No. 2:24-72, 2024 WL 3019146 (E.D. Ky. June 17, 2024) .................................. 1, 5, 6, 20

*Tennessee v. Dep't of Educ.*,
    --- F.4th ---, 2024 WL 2984295 (6th Cir. June 14, 2024) ......................................9

*Texas v. Biden*,
    20 F.4th 928 (5th Cir. 2021) ..........................................................................9, 16, 17

*Texas v. Cardona*,
    --- F. Supp. 3d ---, No. 4:23-cv-00604, 2024 WL 2947022 (N.D. Tex. June 11, 2024) ..................................................................................................*passim*

*Texas v. EEOC*,
    933 F.3d 443 (5th Cir. 2019) ..................................................................................8, 9

*Texas v. EPA*,
    829 F.3d 405 (5th Cir. 2016) ....................................................................................20

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) ......................................................................................9

*Texas v. United States (DACA)*,
    50 F.4th 498 (5th Cir. 2022) ......................................................................................9

*Texas v. United States (DACA)*,
 691 F. Supp. 3d 763 (S.D. Tex. 2023) (Hanen, J.)..................................................20

*Texas v. Yellen*,
 --- F.4th ---, No. 22-10560, 2024 WL 3159081 (5th Cir. June 25, 2024) ...........5

*United States v. Reagan*,
 596 F.3d 251 (5th Cir. 2010).....................................................................................9

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
 570 U.S. 338 (2013) ....................................................................................................5

*Wages & White Lion Invs., LLC v. FDA*,
 16 F.4th 1130 (5th Cir. 2021) ................................................................................18

*West Virginia v. EPA*,
 597 U.S. 697 (2022) ....................................................................................................6

**Statutes**

5 U.S.C. § 551(13) .........................................................................................................19

18 U.S.C. §§ 1461–1462 ...............................................................................................11

20 U.S.C. § 1681 ..................................................................................................... 10, 11

20 U.S.C. § 1681(a) ........................................................................................................2

20 U.S.C. § 1686...........................................................................................................2, 3

20 U.S.C. § 1688..................................................................................................... 11, 12

20 U.S.C. § 1688's first .................................................................................................11

42 U.S.C. § 2000e(j) .......................................................................................................4

42 U.S.C. § 12211(a), (b)(1) .........................................................................................5

**Other Authorities**

34 C.F.R. § 106.2 ..................................................................................................... 10, 12

34 C.F.R. § 106.10...........................................................................................................10

34 C.F.R. § 106.33...........................................................................................................3

34 C.F.R. § 106.40(b)(4)...............................................................................................12

Caroline Downey, *Biden Budget Proposal Replaces 'Mother' with 'Birthing Person,'* .........................................13

Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 VA. L. REV. 933, 950 (2018)................................19

Letter of Findings to Harvard Law School 7, Dec. 10, 2014,

Title IX's text reflects that it simply was not "meant to apply to anyone other than biological men and/or women." *Louisiana v. U.S. Dept. of Educ*, No. 3:24-cv-563, 2024 WL 2978786, at *4 (W.D. La. June 13, 2024). Defendants defend the Final Rule's fundamental rewrite of this protection by arguing that they "faithfully interpreted the statutory text *in light of Bostock*." Dkt. 41 at 17 (emphasis added). But given the Supreme Court's recent decisions, this Court should not be so forgiving to Defendants' interpretation. *See, e.g.*, *Loper Bright Enter. v. Raimondo*, No. 22-451 (2024) (slip op.) After all, "*Bostock* does not apply to … Title IX." *Neese v. Becerra*, 640 F. Supp. 3d 668, 676 (N.D. Tex. 2022). The Final Rule is unlawful for this and multiple other reasons—some of which have already led the Final Rule's enforcement to be enjoined in many States. *Louisiana*, 2024 WL 2978786, at *4; *Tennessee v. Cardona*, No. 2:24-72, 2024 WL 3019146, at *14 (E.D. Ky. June 17, 2024). Because Plaintiffs are likewise suffering substantial and irreparable injuries from Defendants' efforts to rewrite Title IX in the image of *Bostock,* this Court should grant Plaintiffs' Motion.

**ARGUMENT**

**I.      Plaintiffs are likely to succeed on the merits.**

Plaintiffs meet their burden to show a likelihood of success on the merits on at least three separate aspects of the Final Rule: its effort to redefine the term "sex" well beyond that which was understood at the time of Title IX, its efforts to change Title IX grievance procedures, and the way that it wrongfully equates treatment of people who kill unborn children with "sex" discrimination.

**A.  The Final Rule unlawfully redefines "sex" in Title IX.**

When it comes to the definition of sex-discrimination, Defendants never meaningfully engage with the text of Title IX and instead hinge their entire response on importing *Bostock*'s holding into a different statutory scheme. *See, e.g.*, Dkt. 41 at 7.[1] Defendants contend that the definition of "sex" is irrelevant in this context because, in Defendants' view, even though *Bostock* "proceed[ed] on the assumption that 'sex' … refer[ed] only to biological distinctions between male and female," the *Bostock* Court still found that "it is possible to discriminate against a person for being homosexual or

---

[1] References to page numbers for documents filed on this Court's electronic docket are to the pagination stamped by the ECF system in the header of those documents.

transgender without discriminating against that individual based on sex." Dkt. 41 at 19 (quoting *Bostock*, 590 U.S. at 660, 665). Defendants also accuse Plaintiffs of failing to engage with Defendants' analysis and [mis]interpretation of *Bostock*. Wrong on all counts.

To start, contrary to Defendants' insistence, concepts of biological sex are pervasive in Title IX. The statute recognizes in multiple ways that males and females have different body parts that affect how they use the bathroom and other private facilities like showers. *Adams ex. rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 811–17 (11th Cir. 2022) (en banc). And Title IX allows that separation to continue *not* as an exception from the general non-discrimination mandate like BFOQs, *see* 20 U.S.C. § 1681(a), but as a central feature of Title IX and an instruction about how to interpret Title IX, *id.* § 1686.

For example, section 1686 instructs that Title IX shall not "be construed" as prohibiting recipients "from maintaining separate living facilities for the different sexes." *Id.* § 1686.[2] Title IX accordingly does not prohibit the exclusion of one "sex" from the bathrooms of the other "sex"; it *endorses* that practice. *See id.* Section 1686 thus highlights that sex separation in contexts where biological differences matter—*e.g.*, dorms, bathrooms, locker rooms, athletics—is not discrimination under Title IX. And it comports with the meaning of discrimination. *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005) ("'less favorable' treatment"); *Bostock*, 590 U.S. at 657 ("worse than others who are similarly situated"). The sexes are not similarly situated in terms of biology, so separating them in contexts where physical differences matter does not treat either sex less favorably but equally. And this does not change even if there has been a surgical transition, *cf., e.g., B.P.J. ex rel. Jackson v. W.V. State Bd. of Educ.*, 98 F.4th 542, 567–68, 572–73 (4th Cir. 2024) (Agee, J., concurring in part and dissenting in part).

Nevertheless, in a flagrant contradiction of the statute, Defendants insist that sex separation, even in contexts like bathrooms that are clearly excepted by Title IX and its enacting regulations, can be discrimination. For example, according to their Final Rule, whether sex separation is discriminatory

---

[2] The "living facilities" referred to include "toilet, locker room, and shower facilities," which are permitted to be sex-separated by rule. Dkt. 16 at 27 (citing 34 C.F.R. § 106.33); *see also, e.g., Adams*, 57 F.4th at 811–12, 814.

2

turns on whether it causes "more than de minimis harm." Dkt. 41 at 15. And barring a man who claims to be a woman from a women's bathroom is *per se* more than de minimis harm. 89 Fed. Reg. at 33,818. This incoherent "attempt" to interpret Title IX disregards the plain text of the statute—*see* 20 U.S.C. § 1686—the reality of biological differences, and it erodes the justification that permits sex separation in a variety of typical contexts such as dorms, locker rooms, and athletics. *See Adams*, 57 F.4th at 813–15; *see also* 34 C.F.R. § 106.33.

Defendants rely exclusively on *Bostock* to support their gender-identity aspects of the Final Rule. Dkt. 41 at 18–24. Examining guidance documents by the Department of Education that also tried to *Bostock*-ize Title IX, Judge O'Connor recently explained at length why *Bostock* does not apply to Title IX. *See Texas v. Cardona*, --- F. Supp. 3d ---, No. 4:23-cv-00604, 2024 WL 2947022, at \*35–36 (N.D. Tex. June 11, 2024). The Final Rule's gender-identity provisions "directly conflict with—and in some cases, undermine certain provisions in—Title IX by condemning precisely what Title IX allows." *Id.* at \*43.

Defendants fall back on casual judicial use of "on the basis of sex" (the language used in Title IX) as interchangeable with the "because of … sex" language in *Bostock*'s Title VII as proof Title IX must have the same standard relating to sexual orientation and gender identity. Dkt. 41 at 18–19, 22–23. But Judge O'Connor has already rejected this argument. *See Texas v. Cardona*, 2024 WL 2947022, at \*37–39. After all, "[t]he language of an opinion is not always to be parsed as though we were dealing with language of a statute." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 373–74 (citation omitted); *see also Neese*, 640 F.Supp.3d at 678 ("[J]ust because a *judicial opinion* employs two phrases interchangeably in one context does not mean *Congress* employed those same terms interchangeably in a different context.").

Defendants also criticize this Court's decision in *Neese* as obsolete by "the benefit of the Final Rule's analysis," *see* Dkt. 41 at 22, but Plaintiffs think the Court had the better of that exchange. So did Judge O'Connor, who followed *Neese* even with that "benefit" available. *See Texas v. Cardona*, 2024 WL 2947022, at \*30, 31, 34, 35, 37.

3

Defendants also criticize Plaintiffs' arguments that the logic of *Bostock* would not apply anyway to discrimination against bisexual or transgender employees where it is applied equally to both sexes. Dkt. 41 at 23–24. But that circumstance is directly addressed in *Bostock* itself—because the trait that is not "tolerated" in that situation is identical for both sexes, Title IX has "nothing to say" about it, *Bostock*, 590 U.S. at 660, even if *Bostock* applied to it.

Similarly, Defendants dispute (at Dkt. 41 at 27–28) Plaintiffs' point that if *Bostock* applies to Title IX, then the Final Rule violates it because the Final Rule's provisions actually *require* discrimination based on gender identity. Dkt. 13-2 at 32–33. But requiring that male students to use the men's bathroom while allowing male students who identify as women to use the women's bathroom treats the otherwise identically situated people differently based on one characteristic: gender identity. Judge O'Connor found this would "privilege[] transgender persons with the ability to abide by their biological sex or not." *Texas v. Cardona*, 2024 WL 2947022, at *38.  Assigning bathroom, or dress codes, or pronoun usage based on sex does not discriminate based on gender identity because the concept of gender identity is disregarded—and disregard of a trait is the non-discrimination norm. *See Raytheon Co. v. Hernandez*, 540 U.S. 44, 54 n.7, 55 (2003). By allowing sex-separated facilities or programs but creating exceptions based on gender identity, the Final Rule creates an accommodation mandate akin to disability or religion, *cf. Doe 2 v. Shanahan*, 917 F.3d 694, 708 (D.C. Cir. 2019) (Williams, J., concurring in the result) ("describing the requirement that all servicemembers serve in their biological sex as "declining to make … accommodations for gender transition," rather than "a transgender ban")—but the prohibition on sex discrimination has no accommodation mandate and thus only incorporated the standard non-discrimination norm of disregarding a trait.

Compare the Final Rule with Title VII's well-known accommodation requirement for religion. Title VII defines "religion" broadly to include "all aspects of religious *observance and practice*, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate an employee's or prospective employee's religious observance or practice." 42 U.S.C. § 2000e(j) (emphasis added).

And Title VII's accommodation requirement, unlike the norm of neutrality for most anti-discrimination provisions, requires preferential treatment for employees based on religious practices:

> Title VII does not demand mere neutrality with regard to religious practices—that they be treated no worse than other practices. Rather, it gives them favored treatment, affirmatively obligating employers not "to fail or refuse to hire or discharge any individual. . . because of such individual's" "religious observance and practice." An employer is surely entitled to have, for example, a no-headwear policy as an ordinary matter. But when an applicant requires an accommodation as an "aspec[t] of religious. . . practice," it is no response that the subsequent "fail[ure] . . . to hire" was due to an otherwise-neutral policy. Title VII requires otherwise-neutral policies to give way to the need for an accommodation.

*EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 775 (2015).     *Bostock*, on the other hand, forbids "favored treatment" based on sexual orientation and gender identity, and thus precludes any requirement of accommodation. Other than disability,[3] none of the other protected characteristics require accommodation of employees' voluntary "observance[s] or practice[s]," including dress, bathroom usage, or customized language demands. The religious accommodation requirement "reinforce[es] the conclusion that Congress acted deliberately when it omitted" any accommodation requirement from the sex discrimination provision in Title IX. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 354 (2013).

Further, a more limited construction of Title IX's anti-discrimination provision than *Bostock* applied to Title VII is justified by the clear-statement rule applicable to spending-clause legislation and by the major questions doctrine. As Judge O'Connor explained, Title IX being a statute enacted pursuant to the Spending Clause makes all the difference because it requires that any ambiguities be interpreted in favor of the States. *See Texas v. Cardona*, 2024 WL 2947022, at *40–42 & n. 135; *see also Tennessee v. Cardona*, 2024 WL 3019146, at *14–15; *Louisiana*, 2024 WL 2978786, at *16. The express allowance of sex-separated living facilities and sports teams in Title IX and its longstanding regulations show that States did not have clear notice that they were signing up to allow opposite-sex students (and others) into these facilities and programs. *Id.* at *42; *see also Texas v. Yellen*, --- F.4th ---, No. 22-10560, 2024 WL 3159081, at *9 (5th Cir. June 25, 2024) ("Congress lacks the constitutional power …

---

[3] Congress has explicitly precluded gender dysphoria or transgender status (or homosexuality) as a basis for an accommodation under the Americans with Disabilities Act. *See* 42 U.S.C. § 12211(a), (b)(1).

to *impose mandatory conditions* through the enactment of vague spending laws.") (emphasis added). Moreover, the "spending power … does not include surprising States with post-acceptance … conditions." *Nat'l Federation of Indep. Bus. v. Sebelius*, 567 U.S. 519, 584 (2012).

Similarly, the major questions doctrine requires applying "common sense as to the manner in which Congress would have been likely to delegate such power to the agency at issue." *West Virginia v. EPA*, 597 U.S. 697, 722–23 (2022) (cleaned up). *Bostock* did not involve an agency interpreting a grant of delegated authority, so this question did not need to be answered in that case. But the Final Rule purports to exercise such authority granted by Congress. As Judge O'Connor explained, the major questions doctrine precludes allowing the agency to assert a long-unheralded power of such public importance. *See Texas v. Cardona*, 2024 WL 2947022, at *35–37; *see also Tennessee v. Cardona*, 2024 WL 3019146, at *14 (holding that the Department of Education's redefinition of "sex" to include "gender identity" involves a major question); *Louisiana*, 2024 WL 2978786, at *13–15 (finding that the Department of Education's interpretation of "sexual discrimination in Title IX" to include "gender identity, sexual orientation, sex stereotypes, and sex characteristics" involves a matter of vast economic and political significance, requiring the agency demonstrate "clear statutory authorization").

### B.  The Final Rule unlawfully expands the concept of "sex-based harassment."

When it comes to sex-based harassment, the Supreme Court has held—based on the statute—that harassment must meet a specific threshold to be considered "discrimination" that arises "under" the recipient's program or activity. *See, e.g.*, *Davis v. Monroe County Board of Education*, 526 U.S. 629, 644 (1999) ("The statute's plain language confines the scope of prohibited conduct based on the recipient's degree of control over the harasser and the environment in which the harassment occurs."). "Moreover, the provision that the discrimination occur 'under any education program or activity' suggests that the behavior be serious enough to have the systemic effect of denying the victim equal access to an educational program or activity." *Id.* at 652. The Final Rule ignores these textual limitations of Title IX, requiring recipients to monitor conduct *outside* their programs to assess whether it contributes to the allegedly hostile environment within their programs. *See* Dkt. 16 at 31, 39, 45.

Defendants respond that (1) Plaintiffs' reliance on *Davis* is misplaced and (2) Plaintiffs do not show that the Final Rule's sex-based harassment standard violates the First Amendment. Dkt. 41 at 26–32. Defendants' attempts fail to meaningfully address—let alone rebut—Plaintiffs' claims against the Final Rule's unlawful rewriting of the sex-based harassment standard.

*First*, Defendants insist that *Davis* is irrelevant because it was a private damages action and did not limit the Department's enforcement authority. Dkt. 41 at 27–29. But that is no reason to reject *Davis*'s conclusions regarding what Title IX's terms mean. Indeed, Title IX is an implied private right of action against a federally funded educational institution. It would make no sense for the scope of Title IX's protections to change based on the enforcement mechanism. There is no reason the same words mean one thing in a private lawsuit and another for agency enforcement.

*Second*, Defendants argue that concerns about the First Amendment are exaggerated and cite the Final Rule's disclaimers asserting it does not violate First Amendment rights. Dkt. 41 at 29–30. But the Rule's self-serving assertions do not make it compliant with constitutional rights, especially when it concludes that what it calls "harassment" is not protected speech. *See Baldwin v. United States*, 140 S. Ct. 690, 692 (2020) (Thomas, J., dissenting from the denial of certiorari) ("[C]ourts never defer to agencies in reading the Constitution.") (citation omitted); *see also* 89 Fed. Reg. at 33,504. More fundamentally, Defendants do not contest that the Final Rule requires teachers to report—and recipients to respond to—what *may* be harassment. Dkt. 16 at 46. This will significantly chill speech given the Final Rule's illegal expansion of "sex discrimination" to include harassment on other grounds. *Id.* at 30–33.

Defendants are also wrong to suggest that similarities between the Final Rule's harassment standard and other anti-harassment provisions demonstrate the standard is constitutional. But the case Defendants cite, Dkt. 41 at 26, does not even mention the First Amendment. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993). That is clearly insufficient to show the Final Rule does not compel recipients to violate First Amendment rights, especially when the Supreme Court has not decided whether it is

constitutional to allow "purely verbal harassment claims," which "seems self-evidently dubious." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 337 n.16 (5th Cir. 2020).

Even if Title IX could be construed as authorizing the Final Rule's redefinition of sex-based harassment, this Court must reject an agency interpretation that causes "grave constitutional concerns." *Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 966 (5th Cir. 2023). The *Davis* Court developed its standard to align with First Amendment protections. *See* 526 U.S. at 649. The Final Rule will suppress protected speech. For example, the Final Rule praised the punishment of a student for wearing a t-shirt stating, "THERE ARE ONLY TWO GENDERS," as that speech "invades the rights of others." 89 Fed. Reg. at 33,504. The Final Rule implies that nearly any statement about gender identity could subject a student or employee to a harassment claim, which violates the First Amendment.

### C.  The Final Rule unlawfully changes Title IX's grievance procedures.

Defendants all but concede that Plaintiffs have standing to challenge the Final Rule's other provisions, *but see* Dkt. 41 at 33–34, though contend otherwise with respect to the Department's new grievance procedures because they allegedly give schools the option of adopting these policies, so any harm, Defendants argue, is caused by "recipients' independent choices."[4] Dkt. 41 at 42.

Defendants never deny that the regulations injure Plaintiffs. Increased "compliance costs" and "regulatory burden" are injuries. *Kentucky v. Yellen*, 54 F.4th 325, 342 (6th Cir. 2022); *Texas v. EEOC*, 933 F.3d 443, 446 (5th Cir. 2019). And all agree that the Final Rule imposes those costs via policy reviews and revisions; training; litigation; and more complaints, investigations, and enforcement. Dkt. 13-3 at App.005 (Bailey Decl. ¶ 8); 89 Fed. Reg. at 33,851–52, 33,876, 33,483, 33,868–69. Because Plaintiffs are injured by the Rule's "promulgation," they have "standing to challenge essential components of that rule," even if those components "are not directly linked to [their] injuries." *Mozilla Corp. v. FCC*, 940 F.3d 1, 46–47 (D.C. Cir. 2019); *see also Ascendium Educ. Sols. v. Cardona*, 78 F.4th 470, 478 (D.C. Cir. 2023).

---

[4] This argument goes to causation, not redressability, since vacating the Final Rule would obviously stop the harmful procedures by forcing all schools to comply with the standard set forth in the 2020 Rule.

Moreover, Texas, as a provider of education, is a direct object of the Final Rule. Accordingly, causation and redressability should be of "little question." *Texas v. EEOC*, 933 F.3d at 446. And the Final Rule strongarms recipients into adopting these policies by means of a litigation trap. *See Doe v. Univ. of Scis.*, 961 F.3d 203, 213 & n.6 (3d Cir. 2020). Far from being speculative, the Department has gone after schools for refusing to reduce their due process procedures.[5] *See, e.g.*, U.S. Dep't. of Education, Office for Civil Rights, Letter of Findings to Harvard Law School 7, Dec. 10, 2014, https://bit.ly/45Fru4B. In addition, multiple changes introduced by the Final Rule are not optional. *See, e.g.*, 89 Fed. Reg. 33,882 (requiring schools to accept oral complaints). So Texas has standing to challenge these coerced procedures.

And that is before considering the "special solicitude" that States receive in the standing analysis. *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007). Special solicitude applies here because Texas "challeng[es] an agency action as invalid," *Texas v. Biden* (MPP), 20 F.4th 928, 969 (5th Cir. 2021); and the Rule "regulate[s] matters [the States] believe they control." *Texas v. United States* (DAPA), 809 F.3d 134, 153 (5th Cir. 2015); *Tennessee v. Dep't of Educ.*, --- F.4th ---, 2024 WL 2984295, at * 7–11 (6th Cir. June 14, 2024); *Texas v. Cardona,* 2024 WL 2947022, at *11–13. Texas therefore need not "mee[t] all the normal standards" for redressability, causation, or immediacy. *Texas v. United States* (*DACA*), 50 F.4th 498, 514, 519 (5th Cir. 2022).

As Plaintiffs have explained, the Final Rule's changes to Title IX grievance procedures, when considered as a whole and in context, induce regulated parties to deny students and employees due-process rights and are therefore contrary to constitutional right. Dkt 16 at 41–43. Defendants did not address this argument, Dkt. 41 at 41, so it is waived—and enough to show likelihood of success on this claim. *United States v. Reagan*, 596 F.3d 251, 254 (5th Cir. 2010); *Domain Prot., LLC v. Sea Wasp, LLC*, 2019 WL 3219939, at *8 (E.D. Tex. July 17, 2019).

---

[5] The Department's past enforcement actions against schools that refused to lower procedural safeguards poses a real threat as they rework their policies to comply with the Final Rule, *NB ex rel. Peacock v. D.C.*, 682 F.3d 77, 84 (D.C. Cir. 2012), and it has not "disavow[ed]" enforcement against schools that elect to keep the 2020 procedures.

**D. The Final Rule wrongly protects abortion.**

The Final Rule also claims that discriminating against women who kill their unborn children through abortion somehow qualifies as discrimination "on the basis of sex." *See* 89 Fed. Reg. at 33,883 (proposed 34 C.F.R. § 106.2) (defining "pregnancy or related conditions" to include "termination of pregnancy"); *id.* at 33,886 (proposed 34 C.F.R. § 106.10) ("Discrimination on the basis of sex includes discrimination on the basis of . . . pregnancy or related conditions."). That is preposterous—women who encounter discrimination because they killed their unborn children through abortion are not being discriminated against "on the basis of sex." They are facing discrimination on the basis of their *conduct* and *behavior*. It is no different from a policy that discriminates against prostitutes. That is not discrimination "on the basis of sex." It is discrimination on the basis of a person's choice to engage in vile and immoral conduct.

The Final Rule does not even limit its protections to women, and it does not limit its protections to individuals who "terminate" their *own* "pregnancy." It also does not limit its protections to *lawful* "termination of pregnancy." A male abortionist who "terminates" pregnancies in violation of Texas's abortion laws can claim protections from discrimination under this Rule, as a school that refuses to hire an illegal abortionist is discriminating "on the basis of . . . termination of pregnancy"— termination of another person's pregnancy, to be sure, but "termination of pregnancy" nonetheless. This has nothing to do with "sex" discrimination. It is about forcing educational institutions to implement the Department of Education's abortion-on-demand ideology and forcing them to accommodate individuals who engage in depraved acts of violence against the most vulnerable and helpless members of the human family.

Defendants do not defend the idea that abortion discrimination qualifies as discrimination "on the basis of sex" within the meaning of 20 U.S.C. § 1681. Instead, they claim that the plaintiffs "do not dispute that the Rule's interpretation of 'pregnancy or related conditions' is consistent with the text of Title IX." *See* Dkt. 41 at 21. That is false; Plaintiffs deny that Title IX authorizes *any* type of abortion-discrimination prohibition. *See* Dkt. 16 ("The Final Rule wrongfully protects abortion"). Plaintiffs are not raising an "as-applied" challenge to the Final Rule's attempt to equate abortion

10

discrimination with "sex" discrimination. They are challenging *any* attempt to convert Title IX into a rule that bans discrimination against people who kill unborn children. Defendants observe that the Department of Education has adopted this lawless and atextual interpretation of "sex" discrimination since 1975. *See* Dkt. 41 at 21–22. That is not an argument for the correctness of the Final Rule; it is merely an observation that the Department has been misusing Title IX for decades by equating abortion discrimination with "sex" discrimination.

Defendants also claim that the Final Rule's abortion-discrimination prohibition is authorized by another provision of Title IX, which says:

> Nothing in this chapter shall be construed to require or prohibit any person, or public or private entity, to provide or pay for any benefit or service, including the use of facilities, related to an abortion. Nothing *in this section* shall be construed to permit a penalty to be imposed on any person or individual because such person or individual is seeking or has received any benefit or service related to a *legal* abortion.

20 U.S.C. § 1688 (emphasis added). But Defendants' abortion-discrimination prohibition is not limited to "legal" abortions; it extends to *any* "termination of pregnancy," which includes illegal abortions as well. More importantly, section 1688's rule of construction prevents only section 1688 from being construed as permitting penalties on those who seek or receive benefits or services related to a legal abortion; it does not authorize the Department of Education to interpret other provisions of Title IX (such as 20 U.S.C. § 1681) as imposing a ban on abortion discrimination. No one is relying on 20 U.S.C. § 1688's first sentence to authorize discrimination against people who perform or obtain abortions. The prerogative to discriminate in this manner comes from the fact that abortion discrimination is *not* discrimination "on the basis of sex," and therefore falls outside the scope of Title IX's anti-discrimination rule. Finally, nearly every abortion provider in the United States is violating 18 U.S.C. §§ 1461–1462, which outlaws and criminalizes the shipment or receipt of abortion-related paraphernalia through the mail or via any express company, common carrier, or interactive computer service. So even in states where abortion remains legal, the abortion provider is committing federal criminal acts as a necessary incident to the abortion procedure. These cannot be regarded as "legal" abortions under 20 U.S.C. § 1688 because they are inherently accompanied by federal criminal acts.

11

Defendants deny that the Final Rule requires student healthcare plans to cover abortion on the same terms as other temporary medical conditions—but that is simply false. The provision to be codified at 34 C.F.R. § 106.40(b)(4) says:

> [A] recipient must treat *pregnancy or related conditions* in the same manner and under the same policies as any other temporary medical conditions with respect to any medical or hospital benefit, service, plan, or policy the recipient administers, operates, offers, or participates in with respect to students admitted to the recipient's education program or activity.

89 Fed. Reg. at 33,888 (emphasis added). "Pregnancy or related conditions," in turn, is defined to include "termination of pregnancy." *See id.* at 33,883 (to be codified at 34 C.F.R. § 106.02). That means that abortion must be treated "in the same manner and under the same policies as any other temporary medical conditions" with respect to any student healthcare plan that the educational institution operates, offers, or participates in. Defendants try to get out of this by observing that the *preamble* claims to reaffirm 20 U.S.C. § 1688, which prohibits the Department of Education from forcing recipient institutions to pay for abortions. *See* Dkt. 41 at 22. But the preamble does not limit the scope of the codified rule. *See Nat'l Wildlife Federation v. EPA*, 286 F.3d 554, 569–70 (D.C. Cir. 2002) ("The preamble to a rule is not more binding than a preamble to a statute.").

Plaintiffs also do not need to independently demonstrate standing to challenge the Final Rule's ban on abortion discrimination as applied to illegal abortions. *See* Dkt. 41 at 23–24. Plaintiffs are challenging a single agency "action"—the Final Rule—and they are seeking to have this agency action stayed (and eventually "set aside") under section 705 and 706 of the APA. To establish standing, the Plaintiffs need only to identify a single "injury in fact" that is fairly traceable to the agency "action" being challenged, which will be redressed by an order vacating the Final Rule. Plaintiffs have indisputably made that showing. They do not need to prove an additional injury that is traceable to every single unlawful provision and every single unlawful application of the Final Rule. This is not an as-applied challenge; Plaintiffs are seeking vacatur of the entire Final Rule, and standing depends only on whether Final Rule injures them in some way.

Finally, Defendants cannot even begin to defend their attempts to equate abortion discrimination (or pregnancy discrimination) with "sex" discrimination unless they are willing to acknowledge that only women can become pregnant. It is now à la mode to describe pregnant women with gender-neutral terminology to accommodate those who believe that women pretending to men should be regarded as actual men in the eyes of the law. *See* Caroline Downey, *Biden Budget Proposal Replaces 'Mother' with 'Birthing Person,'* June 7, 2021, available at http://yhoo.it/3xBHPKS; OMB, Budget of the U.S. Government Fiscal Year 2022, p. 18, available at http:// bit.ly/4eFwxpE; *Moyle v. United States*, No. 23-726 (Jackson, J., concurring in part and dissenting in part), slip op. at 8 (repeatedly referring to abortion patients as "pregnant patients" and "pregnant people"). So Defendants will need to decide whether they want to continue equating abortion and pregnancy discrimination with "sex" discrimination, or whether they persist in the delusional belief that "men" can become pregnant. They cannot have both.

### E.  The Final Rule is arbitrary and capricious.

Plaintiffs are also likely to succeed on the merits because the Final Rule is internally inconsistent, fails to define key terms, disregards evidence submitted, makes decisions that are counter to the evidence before the Department, fails to properly balance all the relevant interests that would be affected by the Department's changed position, and routinely offers "conclusory statements" rather than real responses to valid and serious concerns submitted by commenters. *See Louisiana v. U.S. Dep't of Energy*, 90 F.4th 461, 473 (5th Cir. 2024).

*First*, Defendants fail to refute that the Final Rule is contradictory and thereby capricious when they argue that the Final Rule merely recognizes that sex-based classifications are not harmful in "certain contexts," but are harmful "in other contexts." Dkt. 41 at 15–16. As discussed above, that is not the Final Rule's position; instead, the Final Rule takes contrary positions regarding whether sex separation is harmful in the *same* contexts, such as in bathrooms.

Relatedly, Defendants failed to meaningfully address Plaintiffs' arguments that the Final Rule's new gender-identity discrimination standard is inconsistent with other related rulemakings, and in

particular, it "undercuts" its separate rulemaking on athletics. Defendants merely contend that the subject of athletics is "a special context," but they entirely fail to explain why athletics pose such "unique circumstances" that would "merit a different approach" when the Final Rule already imposes its new gender-identity mandate on programs or activities that pose similar safety and privacy concerns. Indeed, outside of citing the Final Rule itself in support of their arguments, Defendants fail to cite one case supporting their position.

*Second*, Defendants sidestep, rather than rebut, Plaintiffs' arguments related to the Final Rule's fails to address key concepts and in particular how to treat people claiming a nonbinary gender identity. Defendants insist the Final Rule adequately addresses how to treat students asserting a nonbinary identity because recipients of federal funds may "coordinate with the student, and the student's parent[,] … to determine how to best provide the student with safe and nondiscriminatory access to facilities." Dkt. 41 at 20. But saying *regulated parties* will figure it out is no answer, the Final Rule applies to entities and institutions, and how they manage their facilities. The Final Rule is silent on what entities and persons subject to the rule should do when students demand a bathroom that is designated for their precise non-binary gender identity. Which bathroom are the Plaintiffs supposed to allow the xer/xims to use?

*Third*, Defendants failed to show how they meaningfully considered key issues highlighted by Congress. For example, defendants dispute Plaintiffs' assertion that the Final Rule fails to properly consider safety and privacy concerns, Dkt. 41 at 19, but Defendants cite only "conclusory statements" rejecting Plaintiffs' concerns, which "do not constitute adequate agency consideration of an important aspect of a problem." *Louisiana v. U.S. Dep't of Energy*, 90 F.4th 461, 473 (5th Cir. 2024). Indeed, Defendants concluded that there is no "evidence that transgender students pose a safety risk" or "that the mere presence of a transgender person in a single-sex space compromises anyone's legitimate privacy interest." Dkt. 41 at 19. But they make these claims with no explanation and no evidence to rebut Plaintiffs' contrary assertions. *See* 89 Fed. Reg. at 33,820. Defendants also do not dispute that recipients cannot require "documentary evidence confirming a student's gender dysphoria diagnoses

14

prior to permitting their participation in sex-segregated activities or facilities of the opposite sex." Dkt. 16 at 14. At most, Defendants suggest the Final Rule will not be exploited because Plaintiffs can impose nonburdensome requirements, such as "written confirmation" from "the student or student's parent." Dkt. 41 at 19–20. But "written confirmation" from students looking to exploit the Final Rule is no safeguard, nor does it prevent abuse by non-students.

Defendants similarly failed to consider the significant costs of changing policies that have developed over many years (or decades) in reliance on existing Title IX rules. While Defendants insist that the Final Rule "expressly disclaims any … construction requirement," Dkt. 41 at 44–45, Defendants neglect to mention that disclaimer was premised only on the assumption that "many schools … have long maintained policies and practices that generally permit students to participate in school consistent with their gender identity." 89 Fed. Reg. at 33,876 (emphasis added). But precisely because Title IX has long encouraged—or at least allowed—single-sex facilities to ensure equal opportunity to biological women, many schools in reliance have *not* maintained such practices. *See Texas v. Cardona*, 2024 WL 2947022, at *42.

For similar reasons, the Court should discount Defendants' contention that Plaintiffs "do not explain in what concrete way Texas has relied on the Department's prior regulations," "how the Final Rule interferes with such purported reliance interests," or how the Department failed to address such concerns. Dkt. 41 at 43–44. Plaintiffs did show the "concrete way[s]" Texas relied on the historic understanding of Title IX explaining that Texas relied on 50 years of Title IX practice in "adopt[ing] laws, policies, and procedures, and significantly invest[ing] in an entire infrastructure to implement its education systems." Dkt. 12 at ¶¶ 131, 134. Plaintiffs also explained how the Final Rule interfered with those reliance interests by asserting that Texas relied on 50 years of Title IX practice and legal precedent interpreting "on the basis of sex" to mean biological sex, *not* "sexual orientation" and "gender identity," but "[t]he Final Rule upends these important reliance interests and usurps Texas's sovereignty by adding 'gender identity' and 'sexual orientation.'" Dkt. 12 at ¶¶ 131, 134. And finally, Texas explained how the Department failed to address these concerns when it stated that "[t]he

Department[] … refused to dutifully consider the reliance interest Texas and other recipients had with respect to the Department's historic understanding of Title IX," Dkt. 16 at 27, and Defendants expressly "decline[d] to opine on how [the Final Rule] interacts or conflicts with any specific State laws because it would require a fact-specific analysis" and instead "refer[red] the public to § 106.6(b), which affirms that a [school's] obligation to comply with Title IX and the regulations is not obviated or alleviated by any State or local law," Dkt. 16 at 28 (citing 89 Fed. Reg. at 33,822). Regardless, the "consideration [of any reliance interests] must be undertaken by the agency in the first instance," *MPP*, 20 F.4th at 990 (quoting *Regents of the Univ. of Cal. v. DHS*, 140 S. Ct. 1891, 1913 (2020))—"agencies 'must assess the strength of reliance interest (even *weak* interests, it seems) 'in the first instance.'" *Id.* (quoting *Regents*, 140 S. Ct. at 1913). Defendants "post hoc rationalizations" in their response cannot be considered in the arbitrary-and-capricious inquiry—only the reasoning articulated by the agency when it acted is relevant. *MPP*, 20 F.4th at 989 (citations omitted).

Defendants' primary response to Plaintiffs' arbitrary-and-capricious argument is to call it "a reprise" of Plaintiffs' assertion that *Bostock* is inapplicable. Dkt. 41 at 14; *but see Sea-Land Serv., Inc. v. Dep't of Transp.*, 137 F.3d 640, 646 (D.C. Cir. 1998) ("An agency action, however permissible as an exercise of discretion, cannot be sustained where it is based not on the agency's own judgment but on an erroneous view of the law."). If that is true, it is only because Defendants themselves just keep relying on *Bostock* to "prove" their case while ignoring *Bostock*'s express disclaimer that its holding did not apply to other laws, and while ignoring the several decisions that have recognized that "*Bostock* … was limited only to Title VII itself" and "does not stretch to [other statutes]" like Title IX. *Pelcha*, 988 F.3d at 324; *Neese*, 640 F. Supp. 3d at 675–84; *compare* 89 Fed. Reg. at 33,806.

Defendants have similarly failed to rebut that internal inconsistencies in the Final Rule's grievance procedures render it arbitrary. Specifically, Defendants do not dispute that the Department had to consider the cumulative effect its procedural changes but instead argue that the Department "explicitly" did. Dkt. 41 at 46. Yet, in the "fifteen pages" Defendants cite, there are not even fifteen words—and certainly not a reasonable explanation—addressing cumulative effect. *Id.* (citing 89 Fed.

Reg. at 33,633–48). In that page range, the Department failed to explain how the combination of a single-investigator model and no cross-examination does not exacerbate the due-process concerns. Nor did it explain how the changes to the burden of proof, notice, and access to evidence together affect the reliability of proceedings, especially after adding the single-investigator model. Furthermore, while the Department stated that it disagreed that the procedures set forth in final §§ 106.45 and 106.46 pressure a recipient to adopt unfair procedures, it never tackled how its redefinition of key concepts, such as "sex discrimination" and "sex-based harassment," and recipients' expanded liability warped the incentives to diminish safeguards as a way of avoiding liability. The Department's omissions render its procedural changes unreasonable. *See Michigan v. EPA*, 576 U.S. 743, 750 (2015).

Even when examining individual procedures, Defendants provided an inadequate explanation of departures from prior policies. In particular, the Department found in earlier rulemakings that the revised procedures either undermined the grievance process's reliability or raised grave due process concerns. *See, e.g.*, 85 Fed Reg. 30330–31, 30359–61, 30367–68. Instead of denying these previous findings, Defendants argue in their Response that the Department "demonstrated an awareness" of the change and adequately explained the relevant factors. *See, e.g.*, Dkt. 41 at 46. However, "[s]tating that a factor was considered is not a substitute for considering it." *MPP*, 20 F.4th at 993 (cleaned up). The Department had an obligation to confront the substance and underpinnings of its previous conclusions and justify the reversal. It did not.

Defendants' insistence that the Final Rule does not preclude schools from maintaining certain due-process safeguards is also insincere. Defendants' amici—who apparently prompted this part of the Final Rule—call adversarial cross examination, along with permitting parties their "advisory of choice," "irreconcilable" with Title IX. Dkt. 39 at 29–30. The Department did not address or disavow this position when discussing the Final Rule. Nor did it explain why these protections should be optional given its key findings in 2020 that these procedures are concomitant with a reliable, impartial, and just grievance process. The Department's silence is particularly jarring given that numerous courts found the 2011 Dear Colleague Letter problematic because the grievance procedures it endorsed

infringed on due process right. The Final Rule adopts many of these procedures but leaves these judicial concerns largely unaddressed.

## II.   Plaintiffs will suffer irreparable harm and the public interest and balance of the equities are in their favor.

In addition to showing likely success on the merits, Texas has also shown the other three traditional factors for an injunction. *See Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1576 (2024). *First*, Texas will suffer irreparable harm absent preliminary relief. Defendants do not dispute that Texas law conflicts with the terms of the Final Rule. *See* Dkt. 41 at 46. Instead, Defendants dismiss Texas's sovereign injuries with three sentences, contending that "it is the federal government, not Texas, that faces significant irreparable harm" because the Supremacy Clause prohibits Texas from regulating "activities of the Federal Government." *Id.* at 46–47. But the same can be said *anytime* a State alleges a sovereign injury based on a federal law conflicting with a state law.

In any event, Texas is not regulating "activities of the Federal Government" by prohibiting boys from using girls' locker rooms in schools. States have traditionally been sovereign in the field of education. *Texas v. Cardona*, 2024 WL 2947022, at *37 (quoting *United States v. Lopez*, 514 U.S. 549, 564 (1995)). The Final Rule's intrusion into a field traditionally occupied by the states emphasizes Texas's sovereign injury. And, doubling down on the Final Rule's massive financial threat, Defendants remind Texas that its failure to voluntarily comply with the terms of the Rule will result in "terminat[ing]" its federal funds. Dkt. 41 at 4. Even if Texas's sovereign injuries and massive financial loss were not enough, Defendants do not dispute that Texas will incur nonrecoverable compliance costs in advance of the Final Rule's August 1, 2024 effective date. Nor could they. The Final Rule itself contemplates "increased costs." *See* 89 Fed. Reg. 33,858.

*Second*, the balance of the equities favors a preliminary injunction, which will also protect against the myriad harms that will result from Defendants' abuse of their authority. It will preserve Texas's sovereignty in enforcing its laws and preserve the "public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1143 (5th Cir. 2021) (quotation omitted). There is "no public interest in the

perpetuation of unlawful agency action." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).

## III.   The scope of requested relief is proper.

This Court should postpone the effective date of the Final Rule pending a decision on the merits. Plaintiffs seek a stay of the Final Rule under § 705, which provides that a "reviewing court" may "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings."[6] "[T]he scope of preliminary relief under Section 705 aligns with the scope of ultimate relief under Section 706, which is not party-restricted and allows a court to 'set aside' an unlawful agency action." *Career Colleges & School of Texas v. United States Dep't of Education*, 98 F.4th 220, 255 (5th Cir. 2024). Indeed, "[t]he default rule is that vacatur is the appropriate remedy." *Data Mktg. Partn., LP v. U.S. Dept. of Lab.*, 45 F.4th 846, 859 (5th Cir. 2022). Thus, "[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.'" *Career Colleges*, 98 F.4th at 255.[7]

Defendants resort to salvage some of the Final Rule with severability, merely citing a severability clause. Dkt. 38 at 35–36. "But 'the ultimate determination of severability will rarely turn on the presence or absence' of a severability clause." *Nasdaq Stock Mkt. LLC v. SEC*, 38 F.4th 1126, 1145 (D.C. Cir. 2022). At this preliminary stage, the Court is not obligated to examine hundreds of pages to winnow the field, all before August 1. After all, "[j]udges are not like pigs, hunting for truffles buried [in the record]." *Murthy v. Missouri*, No. 23-411, 2024 WL 3165801, at *12 n.7 (U.S. June 26, 2024) (citation omitted, alterations in original). The Court should instead stay the rule "in its entirety"

---

[6] Agency action" is defined to include "the *whole* … of an agency rule." 5 U.S.C. § 551(13) (emphasis added).
[7] This reading accurately reflects the difference between the APA context—where vacatur of a rule "for everyone" is the normal remedy, *Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 52 (D.D.C. 2020) (K.B. Jackson, J.) (citation omitted); *see Career Colleges*, 98 F.4th at 255—and non-APA cases involving requests for equitable relief that flow to particular parties, *cf. Griffin v. HM Florida-ORL, LLC*, 144 S. Ct. 1, 1, n.1 (2023) (Kavanaugh, J., concurring in denial of stay) (explaining difference); *see also* Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 VA. L. REV. 933, 950 (2018) ("[T]he [APA] establishes a unique form of judicial review that differs from judicial review of statutes.").

because the Department didn't "brie[f] how [the court] might craft a limited stay," even though that was its burden. *Texas v. EPA*, 829 F.3d 405, 435 (5th Cir. 2016).

Regardless, the Final Rule fails the test for severability, which turns on whether the agency would have adopted the rule without the vacated provisions, and whether it would "function sensibly." *Texas v. United States (DACA)*, 691 F. Supp. 3d 763, 792–93 (S.D. Tex. 2023) (Hanen, J.). The Department loses on both because it "ma[de] no developed argument." *Data Mktg., P'ship*, 45 F.4th at 859–60. There is "'substantial doubt'" that the agency would've adopted an emasculated form of the Final Rule. *Baltimore v. Azar*, 439 F. Supp. 3d 591, 615 (D. Md.), *aff'd*, 973 F.3d 258 (4th Cir. 2020). It lists as "Major Provisions" the ones that Plaintiffs challenge, and that are prominent in the description of its core purposes. 89 Fed. Reg. at 33,476–77. Erasing major provisions fatally undermines the rationale for the rule. *See Baltimore*, 439 F. Supp. 3d at 615.

And the Department "ha[s] not explained how the provisions should be severed" or how the new rule would sensibly function. *Id.* "[I]t is not the judiciary's duty or role to write or rewrite regulations or rules." *DACA*, 691 F. Supp. 3d at 793; *see also Tennessee v. Cardona*, 2024 WL 3019146, at *42–43. If "gender identity," the definition of sexual harassment, and the grievance procedures fall, then the Final Rule won't "survive … in anything approaching recognizable form." *North Carolina v. EPA*, 531 F.3d 896, 929 (D.C. Cir. 2008) (cleaned up).

That's true even if Plaintiffs are right *only* about gender identity. *See Tennessee*, 2024 WL 3019146 at *43 (holding that the "severability clause had little impact … because the impermissible definition of 'discrimination on the basis of sex' … permeates the remaining regulations"). Preliminary relief against the entire rule gives the Court time to consider issues like severability when the administrative record is available. *See id.*; *Louisiana*, 2024 WL.2978786, at *21.

## CONCLUSION

Before August 1, 2024, the Court should grant Plaintiffs' motion and postpone the effective date of the Final Rule, as well as issue preliminary injunctive relief.

Dated: June 28, 2024.

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy Attorney General for Legal Strategy

*/s/Ryan D. Walters*
**RYAN D. WALTERS**
Chief, Special Litigation Division
Ryan.Walters@oag.texas.gov

**AMY SNOW HILTON**
Special Counsel
Amy.Hilton@oag.texas.gov

**KATHLEEN T. HUNKER**
Special Counsel
Kathleen.Hunker@oag.texas.gov

**ETHAN SZUMANSKI**
Special Counsel
Ethan.Szumanski@oag.texas.gov

**GARRETT GREENE**
Special Counsel
Garrett.Greene@oag.texas.gov

Office of the Attorney General of Texas
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: 512-463-2100
Fax: 512-457-4410

**COUNSEL FOR THE STATE OF TEXAS**

**GENE P. HAMILTON**
America First Legal Foundation
611 Pennslvania Ave. SE #231
Washington, DC 20003
(202) 964-3721
Gene.Hamilton@aflegal.org

**COUNSEL FOR STATE OF TEXAS,
DANIEL A. BONEVAC & JOHN
HATFIELD**

**JONATHAN F. MITCHELL**
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
Jonathan@mitchell.law

**COUNSEL FOR DANIEL A. BONEVAC &
JOHN HATFIELD**

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on June 28, 2024, which automatically serves all counsel of record who are registered to receive notices in this case.

*/s/Ryan D. Walters*
RYAN D. WALTERS